**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE**

| |
|---|
| POSCO, |
|         Plaintiff, |
|     and |
| GOVERNMENT OF THE REPUBLIC OF KOREA, |
|         Plaintiff-Intervenor, |
|     v. |
| UNITED STATES, |
|         Defendant, |
|     and |
| NUCOR CORPORATION, |
|         Defendant-Intervenor. |

**NON-CONFIDENTIAL**
Proprietary Information
Removed from Brief Pages 13
to 16, 19, 31, and 32
Court No. 24-00006

## <u>PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff POSCO ("POSCO" or "Plaintiff") hereby moves for judgment on the agency record in this action. Plaintiff challenges the *Final Results* issued by the U.S. Department of Commerce ("Commerce") in *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Admin. Review; 2021*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) ("*Final Results*"), Appx15500–15502, in the following respects: (i) Commerce's determination that the Government of Korea's ("GOK") provision of electricity for less than adequate remuneration ("LTAR") to POSCO was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) is unsupported by substantial evidence and is otherwise not in accordance with law; (ii) Commerce's determination that the GOK's allocation of carbon emissions permits to POSCO constitutes a countervailable subsidy is unsupported by substantial evidence and is otherwise not in accordance with law. The legal and factual grounds for Plaintiff's motion are set forth in the brief accompanying this motion. A proposed order is attached.

WHEREFORE, Plaintiff respectfully requests that this Court (1) grant this motion; (2) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (3) remand the case to Commerce with instructions to correct the errors identified by the Court; and (4) for such other and further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff POSCO*

Dated:  June 17, 2024

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE**

| |
|---|
| POSCO, |
|           Plaintiff, |
|    and |
| GOVERNMENT OF THE REPUBLIC OF KOREA, |
|           Plaintiff-Intervenor, |
|    v. |
| UNITED STATES, |
|           Defendant, |
|    and |
| NUCOR CORPORATION, |
|           Defendant-Intervenor. |

Court No. 24-00006

## <u>ORDER</u>

Upon consideration of Plaintiff POSCO's Rule 56.2 Motion for Judgment on the Agency Record, and all other pertinent papers and proceedings, it is hereby

**ORDERED** Plaintiff's motion is granted; and it is further

**ORDERED** that the *Final Results* that the U.S. Department of Commerce ("Commerce") issued in *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Admin. Review; 2021*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) ("*Final Results*"), Appx15500–15502, are not supported by substantial evidence and otherwise not in accordance with law; and it is further

**ORDERED** that the *Final Results* are hereby remanded to Commerce for reconsideration in accordance with the Court's opinion.

**SO ORDERED.**

Dated: _____, 2024
       New York, NY                           _____
                                         Honorable Stephen A. Vaden, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE**

POSCO,

           Plaintiff,

    and

GOVERNMENT OF THE REPUBLIC OF KOREA,

           Plaintiff-Intervenor,

    v.

UNITED STATES,

           Defendant,

    and

NUCOR CORPORATION,

           Defendant-Intervenor.

**NON-CONFIDENTIAL**
Proprietary Information
Removed from Pages 13 to 16, 19,
31, and 32
Court No. 24-00006

**PLAINTIFF POSCO'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

June 17, 2024

**Morris, Manning & Martin, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff POSCO*

## <u>TABLE OF CONTENTS</u>

I.     STATEMENT PURSUANT TO RULE 56.2 ................................................................ 1

II.    ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE
      ADMINISTRATIVE DETERMINATION ................................................................ 2

III.   STATEMENT OF FACTS ....................................................................................... 2

IV.   SUMMARY OF ARGUMENT ................................................................................. 8

V.     STANDARD OF REVIEW ...................................................................................... 10

VI.   ARGUMENT ......................................................................................................... 11

      A.    Commerce's Determination that the GOK's Provision of Electricity for LTAR
            was *De Facto* Specific is Unsupported by Substantial Evidence and is Otherwise
            Contrary to Law. ............................................................................................ 11

      B.    Commerce's Determination that the GOK's Provision of Carbon Emission
            Permits to POSCO Constitutes a Countervailable Subsidy is Unsupported by
            Substantial Evidence and is Otherwise Contrary to Law ..................................... 19

            1.    The K-ETS Does Not Provide a Financial Contribution Because There is
                    No Revenue Foregone that is "Otherwise Due" ...................................... 20

                  a.   Commerce Misinterprets the Plain Language of the Statute ............. 21

                  b.   Commerce's Interpretation Of "Otherwise Due" Is Unreasonable..... 28

                  c.   Commerce's Determination that Revenue was Foregone is
                       Unsupported by Substantial Evidence. ................................................. 29

            2.    Commerce Failed To Adequately Explain the Statutory or Regulatory
                    Basis For Its Determination That The K-ETS Program Provided a
                    Countervailable Benefit to POSCO .......................................................... 32

            3.    The K-ETS Program is Not Specific. ....................................................... 36

                  a.   The K-ETS Program is Not Specific Pursuant to Section
                       1677(5A)(D)(i). ....................................................................................... 36

                  b.   The K-ETS Program Meets the Safe Harbor of Section
                          1677(5A)(D)(ii). ..................................................................................... 41

VII.   CONCLUSION AND RELIEF REQUESTED ........................................................ 45

*Certificate Of Compliance* ............................................................................................. 46

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
    523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ....................................................21, 22, 37, 38, 39

*Bethlehem Steel Corp. v. United States*,
    140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ....................................................................15, 16

*Carlisle Rubber & Tire Co. v. United States*,
    564 F. Supp. 834 (Ct. Int'l Trade 1983) ..................................................................................12

*Changzhou Trina Solar Energy Co. v. United States*,
    352 F.Supp.3d 1316 (Ct. Int'l Trade 2018) .......................................................................17, 18

*Chevron, U.S.A., Inv. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837, 104 S. Ct. 2778 (1984)........................................................................21, 28, 29

*Fine Furniture (Shanghai) Ltd. v. United States*,
    748 F.3d 1365 (Fed. Cir. 2014).................................................................................................8

*Histeel Co., Ltd. v. United States*,
    547 F. Supp. 3d 1233 (Ct. Int'l Trade 2021) ..........................................................................28

*Hyundai Steel Co. v. United States*,
    659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) ................................................................. *passim*

*Hyundai Steel Co. v. United States*,
    No. 22-00032, 2023 WL 8715732
    (Ct. Int'l Trade Dec. 18, 2023) .......................................................................25, 36, 39, 40

*Hyundai Steel v. United States*,
    2024 WL 1929018 (Ct. Int'l Trade May 2, 2024) ...................................................................44

*La. Pub. Service Comm'n v. F.C.C.*,
    476 U.S. 355, 106 S. Ct. 1890 (1986).....................................................................................24

*Linyi Chengen Import and Export Co. v. United States*,
    391 F.Supp.3d 1283 (Ct. Int'l Trade 2019) ............................................................................17

*MCI Telecomms. Corp. v. AT&T Co.*,
    512 U.S. 218, 114 S. Ct. 2223 (1994).................................................................................21, 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 103 S. Ct. 2856 (1983) .......................................................................................17

*Samsung Electronics Co., Ltd. v. United States*,
   973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) .......................................................15

*Samsung Electronics Co., Ltd. v. United States*,
   37 F. Supp. 3d 1320 (Ct. Int'l Trade 2014) .......................................................16

*Timex V.I., Inc. v. United States*,
   157 F.3d 879 (Fed. Cir. 1998) .......................................................21

*Williams v. Taylor*,
   529 U.S. 362, 120 S. Ct. 1495 (2000).......................................................24

*United States v. Menasche*, 348 U.S. 528,
   75 S. Ct. 513 (1955) .......................................................24

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i).......................................................10

19 U.S.C. § 1677(5)(A).......................................................8

19 U.S.C. § 1677(5)(B).......................................................8, 35, 36

19 U.S.C. § 1677(5)(D)....................................................... *passim*

19 U.S.C. § 1677(5)(E).......................................................34, 35, 36

19 U.S.C. § 1677(5A)(D)....................................................... *passim*

**Regulations**

19 C.F.R. § 351.502(b) .......................................................8, 17

19 C.F.R. § 351.503(b)(2)....................................................... *passim*

19 C.F.R. § 351.511(a)(2).......................................................3, 34

**Other Authorities**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:*
   *Final Results of Countervailing Duty Admin. Review; 2021*, 88 Fed. Reg.
   86,318 (Dep't Commerce Dec. 13, 2023)....................................................... *passim*

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:*
   *Final Results of Countervailing Duty Administrative Review; 2020*, 87 Fed.
   Reg. 74, 597 (Dep't Commerce Dec. 6, 2022) .......................................................3

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 37,019 (Dep't Commerce June 6, 2023) .................................................................................................5, 35

*Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of Vietnam:  Final Negative Countervailing Duty Determination*, 77 Fed. Reg. 64,471 (Dep't Commerce Oct. 22, 2012) ................................................29

*Final Negative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 67 Fed. Reg. 62,106 (Dep't Commerce Oct. 3, 2002) .................................................................................................29

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 42,144 (Dep't Commerce July 14, 2022) .................................2

*Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (Dep't Commerce Mar. 8, 2018)..............................40, 41

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, (1994).................................................................12, 18, 42

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE

POSCO,

        Plaintiff,

   and

GOVERNMENT OF THE REPUBLIC OF KOREA,

        Plaintiff-Intervenor,

   v.

UNITED STATES,

        Defendant,

   and

NUCOR CORPORATION,

        Defendant-Intervenor.

**NON-CONFIDENTIAL**
Proprietary Information
Removed from Pages 13 to 16, 19,
31, and 32
Court No. 24-00006

**PLAINTIFF POSCO'S BRIEF IN SUPPORT OF
ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with U.S. Court of International Trade ("USCIT") Rule 56.2, and the April

17, 2024 scheduling order, Plaintiff POSCO ("POSCO" or "Plaintiff") files this brief in support

of its Rule 56.2 motion for judgment upon the agency record.  Order, ECF No. 26.  As discussed

below, the U.S. Department of Commerce's ("Commerce") *Final Results* are unsupported by

substantial evidence and otherwise not in accordance with law.

## I.    STATEMENT PURSUANT TO RULE 56.2

The administrative determination under review is Commerce's *Final Results* in the

countervailing duty ("CVD") administrative review of certain cut-to-length carbon-quality steel

plate ("CTL plate") from the Republic of Korea ("Korea"), which covered entries of subject

merchandise into the United States between January 1, 2021, and December 31, 2021.  *See*

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results*

*of Countervailing Duty Admin. Review; 2021*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13,

2023) ("*Final Results*"), Appx15500–15502, and accompanying Issues and Decision Mem.

("I&D Mem."), Appx15419–15478.

## II.     ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

1.     Whether Commerce's determination that the Government of Korea's ("GOK")

provision of electricity for less than adequate remuneration ("LTAR") to POSCO was *de facto*

specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) is unsupported by substantial evidence and

is otherwise not in accordance with law.

2.     Whether Commerce's determination that the GOK's allocation of carbon

emissions permits to POSCO constitutes a countervailable subsidy is unsupported by substantial

evidence and is otherwise not in accordance with law.

## III.     STATEMENT OF FACTS

On July 14, 2022, Commerce initiated an administrative review of the CVD order on

CTL plate from Korea for the 2021 period of review ("POR").  *See Initiation of Antidumping*

*and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 42,144, 42,151-52 (Dep't

Commerce July 14, 2022), Appx01000, Appx01018–01019.  Commerce selected POSCO as the

sole mandatory respondent in this administrative review and, on August 3, 2022, issued initial

questionnaires to the GOK and POSCO.  *See* Mem. from Faris Montgomery, International Trade

Compliance Analyst, Office VIII Antidumping and Countervailing Duty Operations to Irene

Darzenta Tzafolias, Director, Office VIII Antidumping and Countervailing Duty Operations,

"Countervailing Duty Administrative Review of Certain Carbon and Alloy Steel Cut-to-Length

Plate from the Republic of Korea, 2021: Respondent Selection" (Aug. 1, 2022), Appx01035–

01039; Letter from Katie Marksberry, Program Manager, AD/CVD Operations, Office VIII, to

Jinman Ro, Embassy of the Republic of Korea, "Administrative Review of Certain Carbon and

Alloy Steel Cut-to-Length Plate from the Republic of Korea, 2021: Countervailing Duty Questionnaire" (Aug. 3, 2022) ("Initial Questionnaire"), Appx01040.  On October 7, 2022, POSCO submitted its initial questionnaire response.  Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Initial Questionnaire Resp." (Oct. 7, 2022) ("POSCO IQR"), Appx82278.  The GOK submitted its initial questionnaire on October 11, 2022.  Letter from Lee & Ko LLC and Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: GOK's Initial Questionnaire Resp." (Oct. 11, 2022) ("GOK IQR"), Appx86962.

Of relevance in this appeal, two of the programs being reviewed by Commerce were (1) the provision of electricity for LTAR, *see* Initial Questionnaire at Appx01703–01079, and (2) the provision of Korea Emissions Trading System ("K-ETS") permits, which was established via the Act on the Allocation and Trading of Greenhouse-Gas Emission Permits ("AAGEP"), *id*. at Appx01069–01072.  With respect to the provision of electricity for LTAR program, Commerce had reviewed the program in previous reviews and established a methodology for analyzing whether the provision of electricity provided a countervailable benefit.  *See, e.g., Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 74, 597 (Dep't Commerce Dec. 6, 2022), and accompanying Issues and Decision Mem. ("CTL Plate 2020 I&D Mem.") at 21-27.  Under this benefit methodology pursuant to 19 C.F.R. § 351.511(a)(2)(iii), Commerce requires information on whether the government price is consistent with market principles, including the government's price-setting philosophy, whether the price charged is sufficient to recover costs

with a rate of return sufficient to ensure future operations, or whether there is discrimination among various types of users. *See, e.g.,* CTL Plate 2020 I&D Mem. at 21.

In order to evaluate whether the electricity for LTAR program was specific, Commerce requested that the GOK provide information and data regarding the industries that consumed electricity, including industrial electricity, in Korea. Appx01077. This information is relevant to the analysis of whether any industry or enterprise received a "disproportionate" amount of the benefit from the electricity for LTAR program such that the program could be considered *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III). In its response to the Initial Questionnaire, the GOK provided the requested data for Commerce's *de facto* specificity analysis. Appx87021–87022. In particular, the GOK reported the amount of electricity provided to the steel industry and to the largest 10 industries consuming electricity during the POR. *Id.* This data was treated as confidential.

With respect to the K-ETS program, in its response to the Initial Questionnaire, POSCO explained that companies that emit a certain volume of carbon dioxide or equivalents are subject to the K-ETS and allocated certain carbon emissions permits, or Korean Allowance Units ("KAUs") that represent an emissions limit the GOK imposes on each company. *See* POSCO IQR at Appx83692. Pursuant to Article 12 of the AAGEP, the GOK determines the amount of emissions permits applicable to each entity, and allocates a portion of each entity's permits to the entity. Appx88704 (Article 12(3)). Entities that meet certain production cost and international trade exposure, or "intensity," criteria are freely allocated 100 percent of the applicable permits. Appx88704 (Article 12(4)). For entities that do not meet the production cost or trade intensity criteria, the GOK applies a ratio to the entity's applicable permit amount and thereby reduces the amount of permits allocated to them. Appx88704 (Article 12(3)). During the POR, the ratio

freely allocated to entities that do not meet the production cost or trade intensity criteria is 90 percent of the entity's applicable emissions allocation.  Appx83693.  Entities who exceed the allocated annual emissions cap have several ways to meet their obligations, including purchasing additional emissions permits from private parties or the GOK auction, borrowing permits from future years or carrying forward unused permits from prior years, or by paying fines to the GOK.  *See* Appx86978–86980.  POSCO explained that it met the production cost and trade intensity criteria and thus was allocated 100 percent of its applicable emissions permits, whereas other industries had their allocation amounts reduced to the 90 percent ratio applicable during the POR.  Appx83692.  POSCO also explained its actual emissions exceeded its allocated permits and it was required to purchase additional permits from private parties at significant expense.  Appx82319, Appx83778–83779.

On June 6, 2023, Commerce issued its *Preliminary Results*.  *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 37,019 (Dep't Commerce June 6, 2023) ("*Preliminary Results*"), and accompanying Decision Mem. ("PDM").  With respect to the K-ETS program, Commerce determined that the GOK was providing POSCO with a financial contribution in the form of revenue foregone by allocating to POSCO 100 percent of its applicable K-ETS permits instead of 90 percent allocated to companies not meeting the production cost or trade intensity criteria.  Appx14992.  Commerce found that the program provided a benefit under 19 C.F.R. § 351.503(b)(2) as POSCO was "relieved of the obligation to purchase additional allowances" that the GOK required of other entities subject to the K-ETS.  Appx14992.  Commerce also determined that the program was *de jure* specific because companies that meet the trade intensity or production cost criteria automatically qualify for an

additional 10 percent allocation of K-ETS permits.  Appx14992.  With respect to the provision of electricity for LTAR program, Commerce did not make a preliminary determination, explaining that it required more information.  Appx14999–15000.[1]

On August 9, 2023, Commerce issued a post-preliminary analysis memorandum, addressing the GOK's provision of electricity for LTAR program.  *See* Mem. from James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations to Lisa W. Wang, Assistant Secretary for Enforcement and Compliance, "Post-Preliminary Analysis of the Countervailing Duty Administrative Review of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea; 2021 (Aug. 9, 2023), Appx15099–15113.  In this memorandum, Commerce preliminarily determined that the GOK was providing a countervailable benefit to POSCO in the form of the provision of electricity for LTAR. Appx15109.  Commerce determined that the GOK was providing a benefit to POSCO because, during the POR, certain of its industrial tariff rates did not recover costs (inclusive of a rate of return).  Appx15109.  Commerce also determined that the provision of electricity was *de facto* specific under 19 U.S.C. §1677(5A)(D)(iii)(III) because the steel industry and three other industries combined consumed a disproportionately large amount of electricity in Korea. Appx15109.

POSCO submitted a case brief to Commerce on October 16, 2023.  *See* Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO Case Brief" (Oct. 16, 2023).  Appx 97338.  POSCO argued that the K-ETS Program is not countervailable because it does not provide a benefit to POSCO, does not provide a financial contribution because there is

---

[1] The additional information required did not relate to the issue of *de facto* specificity for the electricity for LTAR program and thus is not relevant or discussed further here.

no revenue foregone, and is not specific.  Appx97350–97363.  POSCO also argued that the electricity for LTAR program was not countervailable because it is not *de facto* specific. Appx97364–97367.

In the *Final Results*, Commerce continued to determine that the GOK provided countervailable subsidies to POSCO through the provision of electricity for LTAR and the provision of additional free K-ETS permits.  Addressing POSCO's argument regarding specificity, Commerce found that the GOK's provision of electricity for LTAR was *de facto* specific in accordance with 19 U.S.C. § 1677(5A)(D)(iii)(III) because the steel industry receives a disproportionate amount of the subsidy.  Appx15442–15444.  To support its *de facto* specificity determination, Commerce relied on usage data provided by the GOK for the steel industry and the top ten largest electricity consuming industries that reflected their consumption as a proportion of the total amount of electricity consumed in Korea and within the industrial classification.  Appx15443–15444.  The GOK data were proprietary, but Commerce found that they demonstrated that the steel industry and two other industries combined, consumed a disproportionately large amount of electricity in Korea.[2]  Appx15443–15444; Appx97564. Commerce found this sufficient to support a disproportionality specificity determination under 19 U.S.C. § 1677(5A)(D)(iii)(III).  *See* Appx15444.

With respect to the K-ETS program, Commerce found that the GOK's allocation of additional permits provided a financial contribution in the form of revenue foregone, pursuant to 19 U.S.C. § 1677(5)(D)(ii) because the GOK allocated to POSCO 100 percent of its carbon

---

[2] In the Post-Preliminary Analysis, Commerce had found that the steel industry and *three* other industries combined consumed a disproportionately large amount of electricity in Korea. Appx.15109.  In the *Final Results*, this was revised to the steel industry and *two* other industries based on revised *de facto* specificity data that was collected at verification of the GOK.  *See* Appx15443–15444.

emission permits but allocated only 90-percent to entities who did not meet the production cost or trade intensity criteria. Appx15452. Commerce also found that the provision of carbon emission permits to be *de jure* specific on the grounds that criteria under the K-ETS program establish that some industries may receive the additional credits while others do not, rejecting POSCO's argument that the program does not expressly limit access to the 100 percent allocation of permits to particular industries or enterprises. *See* Appx15463–15465. Commerce continued to find that the K-ETS program provided a benefit under 19 C.F.R. § 351.502(b) "by relieving POSCO of the obligation to purchase ten percent of the allocated amount of its KAUs." Appx15460.

Thus, in the *Final Results*, Commerce calculated an *ad valorem* subsidy rate of 0.61 percent for the K-ETS program and 0.07 percent for the provision of electricity for LTAR program. Appx15428. In total, Commerce calculated an *ad valorem* subsidy rate of 0.87 percent for POSCO. *Final Results,* 88 Fed. Reg. at 86,319, Appx15501. This appeal followed.

## IV.    SUMMARY OF ARGUMENT

Under the CVD law, a foreign producer like POSCO receives a countervailable subsidy if Commerce finds that "(1) a foreign government provide{d} a *financial contribution* (2) to a *specific* industry and (3) a recipient within the industry receive{d} a *benefit* as a result of that contribution." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677(5)(B) (emphasis added); *see also* 19 U.S.C. § 1677(5)(A). This appeal addresses two subsidy programs. The first is the electricity for LTAR program, in which POSCO challenges Commerce's determination only with respect to the specificity element. The second is the K-ETS program, and for this program POSCO challenges all three elements of Commerce's subsidy determination – financial contribution, specificity, and benefit.

Commerce's specificity determination with respect to the GOK's provision of electricity for LTAR is unsupported by substantial evidence and is otherwise not in accordance with law. Pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III), in order to find that a subsidy is *de facto* specific, the record must show that "an enterprise or industry receives a disproportionately large amount of the subsidy." This can include a group of enterprises or industries. In the *Final Results*, Commerce found that the *steel industry* received a disproportionately large amount of this alleged subsidy because the steel industry *and* two other unrelated industries consumed a majority of industrial electricity. But showing that this random grouping of unrelated industries consumed a majority of electricity does not demonstrate that the *steel industry* was a disproportionate user of this program. Instead, it just shows that three randomly chosen industries together consumed a majority of electricity. Furthermore, Commerce does not explain how it determined that the steel industry, or the random grouping of industries' usage of electricity was out of proportion (*i.e.,* disproportionate) given that the steel industry as well as the other two industries are energy intensive and thus would be expected to consume more industrial electricity than other industrial users. This *de facto* specificity determination is thus unsupported by substantial evidence and is otherwise not in accordance with law.

Commerce's determination that the GOK's provision of K-ETS permits to POSCO constituted a countervailable subsidy is also unsupported by substantial evidence and is otherwise not in accordance with law. Commerce found that the provision of additional emissions permits to POSCO provided a financial contribution in the form of revenue foregone by the GOK. However, Commerce failed to demonstrate that any foregone revenue was "otherwise due" to the GOK as required by the plain language of the statute. POSCO had many options for obtaining emissions permits had it needed them, and the mere *possibility* that POSCO

9

might have purchased permits from the GOK does not mean that the GOK has foregone revenue that is otherwise due.  Commerce's benefit determination under 19 C.F.R. § 351.503(b)(2) is also unlawful because that regulation requires Commerce to provide an explanation of how the program has common or similar elements to the statutory examples, which Commerce has not done.  To the extent the Court concludes that Commerce has given the required explanation by analogizing the benefit to an LTAR program, that explanation is unlawful.  The allocation of 100 percent of the emissions permits is for free and not for any "remuneration."  More fundamentally, these permits are not "goods" or "services" and thus are not similar to an LTAR benefit that is statutorily limited to goods or services only.  Finally, Commerce erred in finding that the K-ETS program was *de jure* specific under 19 U.S.C. § 1677(5A)(D)(i).  The plain language of 19 U.S.C. § 1677(5A)(D)(i) requires that a statute providing for an alleged subsidy *expressly limit* access to an enterprise or industry in order to be specific as a matter of law.  The K-ETS program does not expressly limit access to the provision of additional permits to a specific enterprise or industry; access is instead dependent on objective criteria laid out in the statute and eligibility is automatic upon meeting those criteria.  Any industry or enterprise can qualify if they meet the eligibility criteria.

## V.    <u>STANDARD OF REVIEW</u>

In reviewing a challenge to Commerce's determination in a CVD administrative review, the Court "shall hold unlawful any determination, finding or conclusion found… to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## VI.   ARGUMENT

### A.   Commerce's Determination that the GOK's Provision of Electricity for LTAR was *De Facto* Specific is Unsupported by Substantial Evidence and is Otherwise Contrary to Law.

In the *Final Results*, Commerce found that the GOK's provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) "because the steel industry receives a disproportionate amount of the subsidy." Appx15442. As support, Commerce relied on confidential GOK data that showed the amount of industrial class electricity consumed by the top ten industries, including the steel industry. Appx15433. Commerce concluded from this data that "the steel industry and two other industries combined consumed a disproportionately large amount of the industrial class electricity in Korea." Appx15434. This decision is unsupported by substantial evidence and is otherwise not in accordance with law.

In determining whether a domestic subsidy is "specific" the statute provides that Commerce can find specificity on a *de jure* or *de facto* basis. *See* 19 U.S.C. §§ 1677(5A)(D)(i) (*de jure*) & (5A)(D)((iii)(I)-(IV)(*de facto*). This case involves a *de facto* specificity determination. The statute provides that a domestic subsidy is *de facto* specific if:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
> (II) An enterprise or industry is a predominant user of the subsidy.
> *(III) An enterprise or industry receives a disproportionately large amount of the subsidy.*
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV) (emphasis added). The statute also provides that "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D)(iv). In evaluating

whether a subsidy is *de facto* specific Commerce must also consider the extent of diversification of economic activities in the country providing the subsidy. *See* 19 U.S.C. § 1677(5A)(D)(iii).

"The specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy. Conversely, the specificity test was not intended to function as a loophole through which narrowly focused subsidies provided to or used by discreet segments of an economy could escape the purview of the CVD law." *See* Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242. Although the line between what is specific and not specific is not clearly defined, Judge Maletz in *Carlisle Tire & Rubber* "explained that all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results." *Carlisle Rubber & Tire Co. v. United States*, 564 F. Supp. 834, 838 (Ct. Int'l Trade 1983) ("*Carlisle Rubber & Tire*").

The GOK's provision of electricity is exactly the type of widely used public program that is *not* intended to be countervailed. *See* SAA, 1994 U.S.C.C.A.N. at 4242 (citing to *Carlisle Rubber & Tire*, 564 F. Supp. at 838 (stating that countervailing generally available government benefits such as "public highways and bridges, as well as tax credits for expenditures on capital investment even if available to all industries and sectors… simply defies reason.")). In citing favorably to *Carlisle Rubber & Tire*, the SAA recognizes that finding widely used programs such as these to be "specific" would produce absurd results. SAA, 1994 U.S.C.C.A.N. at 4242. This is particularly true where, as here, electricity is broadly available and widely used *and* the electricity rates for industrial users such as the steel industry are set based on a standard pricing

mechanism and thus no enterprise or industry receives a more preferential rate for electricity than other companies or industrial users. Appx91721–91734. As demonstrated in the Electricity Tariff Table submitted by the GOK, the same industrial electricity tariff rate is applicable to all electricity users involved in mining, manufacturing, and other businesses. Appx91727–91728.

Furthermore, the industrial tariff rates are *higher* than the residential, general, agricultural and educational tariffs and thus it can hardly be said that the steel industry (or even the random grouping of 3 industries) is being singled out for electricity subsidies. *Compare* Appx91727–91728 (industrial tariff rates) *with* Appx91724–91726, Appx91729 (rates for residential, general, agricultural, and educational users). The Electricity Tariff Table demonstrates that not only do industrial users pay higher rates than other users, but that industrial users with high usage (contract demand of 300kW or more) pay the highest rates for electricity. *See* Appx91727–91728. POSCO thus submits that there is no basis to find that the electricity for LTAR program is specific.

However, even if a broadly available and widely used public program such as electricity, where the industrial rates apply uniformly, could be considered "specific," Commerce's *de facto* specificity decision is unlawful. In the *Final Results*, Commerce found that "the GOK's provision of electricity for LTAR is *de facto* specific because the steel industry receives a disproportionate amount of the subsidy." Appx15442. As support, Commerce did *not* rely on consumption data for the steel industry alone, as would be expected, but instead combined the industrial electricity consumption of three unrelated and disparate industries within the narrower industrial classification of electricity consumers in Korea. Appx97564 (combining **[**

                                  **]** industries together). Based on this random grouping, Commerce concluded that this data "demonstrate that the steel industry and *two* other industries

combined consumed a majority of the industrial class electricity in Korea." Appx15444. As a simple matter of logic, the fact that a random grouping of three industries consumed a majority of electricity does not demonstrate that the *steel industry* received a disproportionate amount of the alleged subsidy. The "group" is not the steel industry but is rather some undefined group of unrelated industries. In order to find that the *steel industry* consumed a disproportionate amount of industrial electricity, Commerce should have analyzed the consumption data for the steel industry. That data shows that the steel industry consumed [      ] percent of the total industrial electricity consumption in Korea, and only [      ] percent of the total electricity consumption in Korea. *See* Appx97564. These low percentages do not provide substantial evidence of disproportionate use by the steel industry.

Although the term "disproportionate" is not defined in the statute, the normal dictionary definition is "being out of proportion." "Disproportionate." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/disproportionate (last visited June 14, 2024) (attached as Exhibit A).[3] In order to determine if something is out of proportion there must be some logical basis of comparison, *i.e.,* out of proportion in comparison to what?[4] Commerce has failed to explain on what basis it found that the percentage of electricity consumed by the steel industry is out of proportion to what would otherwise be expected. This is an important omission because, as discussed in the *Bethlehem Steel* case below, steel production is an

_____

[3] Pursuant to the practice comment in Rule 81 of the Rules of the U.S. Court of International Trade, POSCO attaches hereto printouts of the cited internet-based definitions.

[4] Commerce noted that the next three industries in terms of consumption "made up a significantly smaller percentage of the total industrial class electricity consumed during the POR." Appx15444; Appx97564. This does not, however, support the conclusion that the largest three industries consumption was disproportionate. Rather, it is just comparing the largest consumers with the smaller consumers and reaching the unremarkable conclusion that the largest consumers' consumption was larger than the smaller consumers. This comparison does not account for differences in the size of industries or differences in the electricity intensity between industries, and thus does not demonstrate disproportionate use.

inherently energy intensive process and so the percentage of total industrial electricity consumption by the steel industry would be expected to be large. The steel industry's consumption of [      ] percent of the total industrial electricity consumption in Korea, and only [      ] percent of the total electricity consumption in Korea is not on its face out of proportion given the energy intensive nature of steel production. *See* Appx97564.

In *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ("*Bethlehem Steel*"), Commerce found that even a much greater percentage of countervailable benefits received by the Korean steel industry did not support a finding of *de facto* specificity under 19 U.S.C. § 1677(5A)(D)(iii). In that case, the court sustained Commerce's determination that an electricity program pursuant to which the steel industry had received over 51 percent of the benefits was not *de facto* specific. *Id*. at 1369. Commerce found that despite the majority of the benefits going to a single industry, the benefits received were not disproportionate because high electricity usage was an inherent characteristic of the steel industry, all recipients received an identical rate reduction based on a standard mechanism, and the subsidy was not designed to benefit any one industry. *Id*. at 1368–70. In sustaining this determination, the court reasoned:

> In virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits than another group. To impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws.

*Id*. at 1369.[5]

---

[5] Likewise, in *Samsung Electronics Co., Ltd. v. United States*, 973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014), the court held that Commerce failed to adequately address how a tax credit program provided by the GOK to Samsung Electronics Company was disproportionately large. In that case, it was undisputed that respondent Samsung received a larger share of tax credits than the average beneficiary. *Id*. at 1326. However, the court admonished Commerce for failing to consider the aspects of the program relevant to disproportionality, namely, that the GOK conferred tax credits based on usage and pursuant to a standard pricing mechanism. *Id*.; *see also*

Similarly, while the record demonstrates that the steel industry (or the random group of three industries) may consume a large amount of electricity relative to other industries, the electricity for LTAR program is based on usage and electricity prices are set based on a standard pricing mechanism.  *See* Appx87017–87018, Appx91727–91728 (showing that electricity prices were based on standard pricing).  Differences in the proportion of electricity consumed by the steel industry (or the random group of three industries) compared to that of other industries is attributable in part to the fact that the production of steel requires a lot of electricity.  *See Bethlehem Steel*, 140 F. Supp. 3d at 1369.  The record here thus shows only that there is some disparity in the energy consumption between industries in Korea, and Commerce has provided no evidence that the benefit was specific to the steel industry.  "{I}mpos{ing} countervailing duties on an industry where disparity alone is demonstrated," but evidence that the benefit was specific is absent, "is anathema to the purpose of the countervailing duty laws."  *Bethlehem Steel*, 140 F. Supp. 2d at 1369.

Furthermore, Commerce's reliance on an arbitrary grouping of the top three consumers of industrial electricity to support its conclusion that the steel industry consumed a disproportionate amount of industrial electricity is arbitrary and capricious.  Nowhere does Commerce attempt to explain why it selected the top three industries—all of which are unrelated to each other—to determine that a "group" of industries received a disproportionately large amount of the subsidy.  Instead, Commerce just aggregated the steel industry's electricity consumption with the electricity consumption of the [                    ] industries – the first two largest and vastly different industries with no relation to each other.  *See* Appx97564.  It seems that

---

*Samsung Electronics Co., Ltd. v. United States*, 37 F. Supp. 3d 1320, 1324-26 (Ct. Int'l Trade 2014) (sustaining Commerce's revised disproportionate *de facto* specificity determination based on revised analysis).

Commerce simply tallied up the fewest number of industries necessary to reach a majority.  *See*

Appx97564.  Commerce's results-oriented aggregation of the electricity use by these unrelated

industries is the definition of arbitrary, capricious and an abuse of discretion.  *See Linyi Chengen*

*Import and Export Co. v. United States*, 391 F.Supp.3d 1283, 1292 (Ct. Int'l Trade 2019) (citing

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856,

2866-67 (1983)) ("The court will uphold Commerce's determinations unless they are 'arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law.' … An agency acted

in an arbitrary and capricious manner if it 'entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise.'").  Nowhere in the *Final Results* does Commerce attempt to explain its choice

to group these industries together, nor how this artificially assembled "group" shows that the

*steel industry* consumed a disproportionate amount of industrial electricity.

To be sure, Commerce was not required under its regulations to determine if the three

industries had shared characteristics.  *See* 19 C.F.R. § 351.502(b).  However, Commerce did

need to explain why it found that this broad and unrelated group of industrial consumers received

a disproportionate amount of the subsidy compared to other industrial users.  This is especially

true where all industrial consumers paid for electricity based on the same standard pricing and

thus the fact that the largest three of the industrial consumers used a majority of electricity does

not show that they received a disproportionate amount of the benefits.  Commerce needs to

explain why this group's consumption shows that the electricity for LTAR program is out of

proportion and cannot simply tally up the largest three industrial consumers and call it a day.

*Changzhou Trina Solar Energy Co. v. United States*, 352 F.Supp.3d 1316 (Ct. Int'l Trade 2018)

(finding that under "limited number" *de facto* analysis Commerce needed to explain how subsidizing broad industries amounts to a specific rather than a generally available subsidy. "It is nonsensical to simply count the number of proffered industries, regardless of their composition, in order to determine specificity.").

Nor is there any limiting principle to Commerce's arbitrary method of just going down the list of the largest industrial consumers until they constitute a majority. Under this method, Commerce could treat the largest 8 of 10 industrial users as a "group" and find that this group consumed a disproportionate amount of the subsidy even though the group accounts for virtually all industrial users. Commerce does not even conceal the fact that it is just tallying up the largest industrial users until it reaches a majority as its calculations include a column that sums up the various industries and the percentage of industrial electricity consumed (*e.g.,* sum of industries 1-2, 1-3 etc.). Appx97564. This lack of any limiting principle could lead to absurd results and further demonstrates that it is arbitrary and capricious. *See* SAA at 929.

To the extent that Commerce relies on Korea's economic diversification to determine that the provision of electricity for LTAR is disproportionately used by the steel industry, this reliance is misplaced. While Commerce must take into account the extent of economic diversification, this criterion should "serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors." *See* SAA, 1994 U.S.C.C.A.N. at 4243. Here, Commerce fails to link its finding that the economy of Korea is diverse with its finding that the steel industry, or even the group of industries in which Commerce lumped the steel industry together with, consumes a disproportionately large amount of electricity.[6] To the contrary, the

---

[6] While the Korean economy may span 19 different industry groupings, the data upon which Commerce relies also shows that the number of establishments in each of these industries is not

existence of a number of large industries in Korea is fully consistent with a finding of economic

diversification and not indicative of disproportionality.

Finally, when viewing the steel industry's total electricity consumption (or for that

matter, the electricity consumption of the three largest industrial users) in comparison to the total

electricity consumption in Korea by all users, it is abundantly clear that the steel industry does

not receive a disproportionate amount of the subsidy.  When viewed in relation to the overall

consumption, the steel industry consumes only **[        ]** percent of all electricity, and the three

industries Commerce has decided to arbitrarily lump together account for only **[        ]** percent

of all consumption.  *See* Appx97564.  These percentages indicate that neither the steel industry

nor the group of industries Commerce analyzed consume a disproportionately large percentage

of electricity in the Korean market.

Accordingly, this Court should find that Commerce's determination that the GOK's

provision of electricity for LTAR was *de facto* specific is not supported by substantial evidence

and is otherwise not in accordance with law.

**B.      Commerce's Determination that the GOK's Provision of Carbon Emission
         Permits to POSCO Constitutes a Countervailable Subsidy is Unsupported by
         Substantial Evidence and is Otherwise Contrary to Law.**

As discussed, certain high carbon emitting companies like POSCO are required to

participate in the K-ETS program whereby they are required to reduce carbon emissions or else

face fines.  Appx83692.  Under the K-ETS, the GOK sets a "cap" on a participants' carbon

emissions based on the company's actual historical emissions and issues a certain percentage of

free permits based on the carbon reduction levels applicable to the participant.  At the end of

each compliance year, the participant must surrender emissions permits to offset their actual

---

equal.  For example, the number of manufacturing establishments (413,849) far outnumbers the
number of establishments in 14 of these 19 industry groupings.  *See* Appx1153–1158.

annual emissions of greenhouse gases.  If the participant meets or reduces its carbon emissions below its set amount, then it has no additional obligations.  Appx88704.  However, if the participant exceeds its carbon emissions target it must obtain additional permits beyond the free allocation to cover its actual carbon emission levels.  These emissions permits can be purchased in the private market, via a GOK-auction, or through other means such as carrying forward unused permits from prior years or borrowing permits from future years.  If the number of emissions permits required are not surrendered then the participant is subject to fines.  Appx86978–86980.  For participants that meet the high trade intensity or high production cost criteria set out in Korean law, the GOK freely allocates 100 percent of the emission credits.  For participants that do not meet these criteria, the GOK allocates 90 percent of the emissions permits for free.  Appx88704.  POSCO qualified for the 100 percent allocation.  Appx83692.  In the *Final Results*, Commerce determined that the 100 percent allocation of POSCO's assigned permits, instead of 90 percent, constitutes a financial contribution from the GOK in the form of revenue foregone that was otherwise due, a benefit was conferred to POSCO based on the 10 percent differential, and the program is *de jure* specific.  As demonstrated below, Commerce's determination errs on all three counts.

### 1. The K-ETS Does Not Provide a Financial Contribution Because There is No Revenue Foregone that is "Otherwise Due"

Section 1677(5) defines a financial contribution to include, *inter alia*, "foregoing or not collecting revenue *that is otherwise due*, such as granting tax credits or deductions from taxable income."  19 U.S.C. § 1677(5)(D)(ii) (emphasis added).  In the *Final Results*, Commerce determined that the GOK's 100 percent allocation of emissions permits to POSCO, instead of 90 percent, constitutes a financial contribution under this provision.  *See* Appx15455.  Specifically, Commerce determined that "in providing additional free emissions allowances to entities within

certain sectors, the GOK has relieved POSCO of the financial burden of meeting its emissions compliance obligations and provided a financial contribution in for the form of revenue foregone, pursuant to section 771(5)(D)(ii) of the Act." *See* Appx15452. Commerce's error is that it failed to interpret this statutory language as requiring that the alleged revenue be "otherwise due" to the GOK from the additional 10 percent of emissions permits allocated to POSCO. This renders its financial contribution determination unsupported by substantial evidence and otherwise not in accordance with law.

### a. Commerce Misinterprets the Plain Language of the Statute

When evaluating an agency's interpretation of a statute, this Court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inv. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984) ("*Chevron*"). Here, "Congress has directly spoken to the precise question at issue" by limiting 19 U.S.C. § 1677(5)(D)(ii) to "revenue that is otherwise due." *See Hyundai Steel Co. v. United States*, 659 F. Supp. 3d 1327, 1334 (Ct. Int'l Trade 2023) ("*Hyundai Steel I*") ("The court readily concludes that the plain meaning of the phrase {otherwise due} does not encompass revenue that could, but not necessarily would, have otherwise been collected by the relevant authority."). POSCO submits that this statutory language is clear and that the Court must give effect to that plain language. *See Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393, 1403 (Ct. Int'l Trade 2021) ("*ASEMESA*") (citing *Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998)) ("*Chevron* requires that the court begin with the plain meaning of the statute.").

Courts traditionally look to dictionary definitions to determine the plain meaning of statutory terms. *See, e.g., MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 227-29, 114 S. Ct.

2223, 2229-31 (1994); *ASEMESA,* 523 F. Supp. 3d at 1403.  Merriam-Webster defines "due" as "owed or owing as a debt," and "owed or owing as a natural or moral right." *Due*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/due (last visited on June 14, 2024) (attached as Exhibit B).  Black's Law Dictionary defines "due" as "owing or payable; constituting a debt." *Due*, Black's Law Dictionary (8th ed. 2004).  Merriam-Webster defines "otherwise" as "in different circumstances," and "to suggest an indefinite alternative." *Otherwise*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/otherwise (last visited June 14, 2024) (attached as Exhibit C).  The plain meaning of the statute thus requires that a financial contribution pursuant to Section 771(5)(D)(ii) exists only if the GOK had a "right" to collect revenue from POSCO and POSCO would have "owed" revenue to the GOK as a result of an "obligation or duty" absent the allocation of permits that it actually received.

The statutory examples of foregone revenue otherwise due, "tax credits" or "deductions from taxable income," confirm this interpretation.  19 U.S.C. § 1677(5)(D)(ii).  These statutory examples represent government actions that reduce or relieve a taxpayer of taxes that they are otherwise legally *required* to pay to the government.  That is, "but for" the provision of the tax credit or tax deduction, the government would be legally entitled to receive the additional tax revenue.  The taxpayer legally owes the government the taxes and, by reducing that tax burden, the government is foregoing revenue that is otherwise payable or owed.  There is nothing speculative or contingent about this legal obligation.

By contrast, under the K-ETS program, there is no expected revenue owed to the GOK by virtue of the emissions permit allocations.  Rather, at the time the emissions permits are issued, it is unknown whether the recipient will need all of the permits to cover their emission

reduction obligations, or whether they will need to purchase additional permits from private parties or through the GOK auction.  The purpose of issuing the emissions permits is to set a cap on the recipient's carbon emissions, thus providing an incentive for the reduction of emissions. The expectation, therefore, is that the recipient will reduce its carbon emissions below the amount of permits issued and thereby accomplish the goals of the K-ETS program.  In other words, the GOK would have no expectation that it would be foregoing revenue from any additional permits allocated.  Unlike taxes, which the government collects to generate revenue, the emissions permits are distributed as a cap on the emissions that a company can generate without being penalized.  In providing additional emissions permits to POSCO, the GOK is therefore not foregoing revenue that it expects or is legally entitled to receive, *i.e.*, that is otherwise "due."

POSCO did not "owe" revenue to the GOK before its emission allocation or after its allocation.  Rather, the GOK capped POSCO's carbon emission output with the permit allocation it deemed applicable through criteria unrelated to any revenue collectable from POSCO.  *See* Appx88703–88707; Appx88765–88776.  Through the emissions trading system, the GOK sets the amount of carbon emissions under which entities are capped by unconditionally allocating permits at different levels to entities that meet certain criteria.  Appx88703–88707; Appx88765–88776.  Unallocated "reserve" permits are used "to provide permits to new entrants and to participants that {have} constructed or expanded {their} facilities," and includes an additional 14,000,000 permits to stabilize the emission permit market and 20,000,000 permits for market creation and liquidity management.  Appx86979.  Additionally, an entity that exceeds its allocated cap can borrow unused permits carried forward from prior years, borrow permits from future years, or purchase additional permits from private parties in the market.  Appx86985–

86987.  It does not have to purchase the permits from the GOK, and thus no revenue "due" to the GOK results from the allocation of permits.  At most, the difference in the percentage of permits allocated demonstrates that the AAGEP sets different emissions limits and associated costs for different companies required to participate, but this difference does not represent "revenue otherwise due" to the GOK as required by statute.

Commerce's interpretation of the statute to permit an affirmative finding of financial contribution in such a situation is contrary to the unambiguous language in the statute and the express intent of Congress.  It is "a cardinal principle of statutory construction… {to} 'give effect, if possible, to every clause and word of a statute.'"  *Williams v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, 1519 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39, 75 S. Ct. 513, 520 (1955)).  Since the agency can only act in such a manner as its authorizing statute allows it, a statutory limitation confers a limitation on the agency's authority to act.  *See e.g.*, *La. Pub. Service Comm'n v. F.C.C.*, 476 U.S. 355, 374, 106 S. Ct. 1890, 1901 (1986) ("*La. Pub. Service Comm'n*") ("{A}n agency literally has no power to act… unless and until Congress confers power upon it.").  For an agency to act otherwise would be "to expand its power in the face of a congressional limitation on its jurisdiction" and to override Congress, which the agency cannot do.  *La. Pub. Service Comm'n*, 476 U.S. at 375, 106 S. Ct. at 1902.  Congress placed a limitation on Commerce's ability to act by adding the words "otherwise due" after "foregoing or not collecting revenue."  19 U.S.C. § 1677(5)(D)(ii).  No revenue was otherwise due to the GOK based on the permit allocation.

This court agreed with this argument in the *Hyundai Steel I* case, which dealt with the same K-ETS program.  In that case, the court examined the same dictionary definitions of the "otherwise due" statutory language and concluded that "{t}hese definitions indicate that the

24

statute requires the foregoing of revenue that the recipient of the financial contribution would –
not merely could – otherwise *owe* the authority." *Hyundai Steel I*, 659 F. Supp. 3d at 1334. The
court concluded that Commerce had not accounted for the "is otherwise due" constraint put in
the statute by Congress, and thus "the agency's financial contribution determination is not in
accordance with law." *Id.* The court also found that Commerce's financial contribution
determination was not supported by substantial evidence "to the extent that the full allocation
does not result in revenue foregone that is otherwise due." *Id.* at 1337.[7]

The various justifications provided by Commerce in support of its financial contribution
determination are unpersuasive. First, the very description used by Commerce to support the
existence of a financial contribution shows that the GOK was not foregoing any revenue that was
otherwise due. Specifically, Commerce states that by providing the additional free emissions
allowances "the GOK has relieved POSCO of the financial burden of meeting its emissions
compliance obligations…." Appx15452. But even if POSCO were somehow partially relieved
of the financial burden of meeting its emissions compliance obligations, this does not support the
conclusion that the GOK was foregoing revenue that is otherwise due to the GOK. As discussed,
the permit allocation did not result in any revenue being otherwise due to the GOK and any relief
in POSCO's financial burden from the additional permits does not mean that POSCO owed any
revenue to the GOK. To the contrary, it had numerous options for meeting its emissions

---

[7] POSCO acknowledges that in *Hyundai Steel II*, the court affirmed Commerce's financial
contribution determination for the same K-ETS program. *See Hyundai Steel Co. v. United
States*, No. 22-00032, 2023 WL 8715732, at *4 (Ct. Int'l Trade Dec. 18, 2023) ("*Hyundai Steel
II*") (affirming Commerce's financial contribution determination based on 19 U.S.C. §
1677(5)(D)(ii)). However, the court in *Hyundai Steel II* does not appear to have grappled with
the fact that the revenue that was allegedly "otherwise due" was not certain but was instead just
potential revenue that *may* have been paid to the GOK. *See id.* (discussing in same paragraph
that the provision of additional permits was initial revenue the GOK *could* have received, but
then concluding that the additional allocation meant that the GOK failed to collect revenue that it
otherwise *would* have received).

reductions requirements that included reducing its carbon emissions or purchasing additional permits from private parties.

Second, Commerce's attempt to analogize the provision of additional emissions permits to the statutory example of tax credits is unavailing. According to Commerce, like a tax credit that partially relieves an entity of its tax liability to the government the K-ETS program creates a compliance obligation that is partially relieved by the additional emissions permits. Appx15452. This comparison is inapt. As discussed, a tax credit represents government action that reduces or relieves a taxpayer of taxes that are otherwise *legally owed* to the government. That is, "but for" the provision of the tax credit, the government would be legally entitled to receive the additional tax revenue. The taxpayer legally owes the government the taxes and, by reducing that tax burden, the government is foregoing revenue that is otherwise payable or owed. By contrast, under the K-ETS program, there is no expected revenue otherwise due to the GOK from the permit allocation. As previously discussed, at the time the emissions permits are issued, it is unknown whether the recipient will need all of the permits to cover their emission reduction obligations, or whether they will even need to purchase additional permits from private parties or through the GOK auction. The GOK has no expectation that it would be foregoing revenue from any additional permits allocated. Unlike taxes, which the government collects in order to generate revenue, the emissions permits are distributed as a cap on the emissions that a company can generate without being penalized. In providing additional emissions permits to POSCO, the GOK is therefore not foregoing revenue that it expects or is legally entitled to receive.

Third, Commerce next tries to justify its treatment of the additional 10 percent allocation as revenue forgone that is otherwise due by explaining that the GOK controls the market for emissions permits and that because the GOK is the only entity that can control the amount of

permits in the market, "any KAU that is not freely allocated and is released into the market by the GOK generates revenue for the GOK." Appx15453. But even if true this does not demonstrate that the provision of additional permits to companies like POSCO results in the GOK foregoing revenue that was otherwise due. There is nothing in the AAGEP or its Enforcement Decree that supports the conclusion that the GOK would have received any revenue if the GOK had not provided POSCO with the 100 percent allocation of permits. No party is legally required to purchase permits from the GOK. Entities subject to the K-ETS may reduce emissions below the applicable allocated emissions cap, purchased permits on the private market, or borrow permits from future or prior periods. As this court has previously concluded, "revenue that could, but not necessarily would, have been collected" does satisfy the requirements of 19 U.S.C. § 1677(5)(D)(ii). *Hyundai Steel I*, 659 F. Supp. 3d at 1334.

Fourth, Commerce further explained that it was not the purchase of the additional permits from the GOK auction that caused revenue to be foregone, but rather the surrender of permits to the GOK at the end of each compliance year. Appx15454. This is incorrect. While companies subject to the K-ETS program must surrender the permits at the end of each compliance year, failure to do so results in a fine. Appx15453–15454. This fine, however, is unrelated to the provision of additional permits. As Commerce concedes, there are multiple ways in which subject entities can obtain the permits necessary to comply with the law – they can purchase it through a government-run auction, carry forward and borrow permits from previous and future compliance periods, or purchase additional permits through the private market. Appx15454. In short, there is no guarantee that the GOK would have earned additional revenue had it not provided POSCO with the additional permits. While POSCO *might* have purchased some additional permits from the GOK-run auction had it only been provided 90 percent of its allotted

permits, it might also have chosen to reduce GHG emissions, purchase all permits through the private market, or borrow permits from future compliance years.

In sum, the plain language of the statute requires that the allegedly foregone revenue otherwise be "due" to the government, *i.e.,* that the revenue was actually or certainly owed to the GOK. Commerce was thus required to give effect to this unambiguous statutory language but failed to do so in the *Final Results*. Instead, Commerce misapplied this plain statutory language and instead interpreted the "otherwise due" language to capture revenue that "might have" or was not certain to be due to the government. This was a legal error. 19 U.S.C. § 1677(5)(D) unambiguously requires that, in order for a financial contribution to be found, Commerce must find that, but for the varying levels of permits allocated, POSCO affirmatively owed revenue to the GOK and that the GOK had a right to collect thereon. Commerce erroneously interprets the statute to permit its finding of a financial contribution where there is no evidence that revenue was otherwise due to the GOK. The *Final Results* are thus not in accordance with law.

### b. Commerce's Interpretation Of "Otherwise Due" Is Unreasonable.

As demonstrated, 19 U.S.C. § 1677(5)(D)(ii) unambiguously requires that Commerce may only find a financial contribution in the form of revenue foregone if revenue was in fact otherwise due. However, if the Court finds that the statute is ambiguous regarding the revenue otherwise due, the Court should nonetheless find that Commerce's interpretation is unreasonable. Pursuant to step two of *Chevron*, "if a statute does not 'directly speak' to the issue at hand, the court must determine whether the agency's interpretation of the statute was 'reasonable,' meaning that the interpretation is not 'arbitrary, capricious, or manifestly contrary to the statute.'" *Histeel Co., Ltd. v. United States*, 547 F. Supp. 3d 1233, 1244 (Ct. Int'l Trade 2021); *see also Chevron*, 467 U.S. at 843, 104 S. Ct. at 2782.

As discussed, the GOK regulates carbon emissions by setting levels of carbon emission caps through the varying allocations of permits depending on whether entities meet certain trade intensity or production cost criteria.  Appx86978–86979.  The GOK allocated 100 percent of the permits assigned to POSCO.  Appx96962.  However, no revenue is otherwise due based on the number of permits allocated.  Nor is there any expectation that the GOK would collect revenue because there is no guarantee that an entity's emissions will exceed its allocated cap so that purchase of permits is necessary, and parties who exceed their allocated amounts have the option to borrow or purchase from non-governmental third parties.  *See* Appx86985–86988.  An interpretation of the statute that permits the finding of a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(ii) where revenue is not otherwise obligatory is arbitrary, capricious, and manifestly contrary to the statute.  *See Chevron*, 467 U.S. at 845, 104 S. Ct. at 2783.

### c.  Commerce's Determination that Revenue was Foregone is Unsupported by Substantial Evidence.

In order to give meaning to the "otherwise due" language of the statute, Commerce must point to substantial evidence that shows that the alleged revenue foregone was actually "due" to the government.  *See* 19 U.S.C. § 1677(5)(D)(ii); *see also Final Negative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 67 Fed. Reg. 62,106 (Dep't Commerce Oct. 3, 2002) and accompanying Issues and Decision Mem. at Comment 5 (finding no financial contribution where "there is no evidence that the {Government of Argentina} failed to receive any revenue it would otherwise receive."); *Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of Vietnam: Final Negative Countervailing Duty Determination*, 77 Fed. Reg. 64,471 (Dep't Commerce Oct. 22, 2012) and accompanying Issues and Decision Mem. at Comment 3 ("Imports of raw materials, spare parts and accessories, and fixed assets by {the respondent} are not subject to duties in Vietnam and,

therefore, the {Government of Vietnam} has not foregone revenue.").  No such evidence exists on this record.

The *Final Results* err by assuming that any of the permits allocated to POSCO above 90 percent of its allowance constitutes revenue that would have been otherwise due to the GOK.[8] *See* Appx15452–15455.  However, this is not the case.  As the GOK explained, its "reserve" permits are "used for several purposes, including to provide permits to new entrants and to participants that {have} constructed or expanded {their} facilities."  Appx86979.  The "reserve" in Phase Three also includes an additional 14,000,000 permits to stabilize the emission permit market and 20,000,000 permits for market creation and liquidity management.  Appx86979.  Each permit allocated above 90 percent would have been part of this larger pool of permits used for multiple purposes, in addition to auctions, and thus would not have necessarily been auctioned by the GOK.  These permits therefore do *not* represent revenue "otherwise due" to the GOK as they could have been used in a variety of ways that would not have generated any revenue for the GOK.

In addition, as Commerce describes, there are six ways that companies can acquire additional permits to cover shortfalls between their allocated permits and their actual emissions levels without any involvement by the GOK, if they even exceed their allocated emission permits.  Appx14991.  For those only receiving 90 percent of their allowances, they *may* participate in government auctions, but they are not required to do so and instead may turn to the private market to cover their shortfall.  Appx86980.  As Commerce admits, parties are "not

---

[8] Even assuming that the time at which a company surrenders its permits under the K-ETS program is the moment at which revenue is "otherwise due" to the GOK, Commerce's *Final Results* still assume that all additional permits necessary to avoid being fined would need to be purchased from the GOK.  *See* Appx15454.  As detailed herein, this is not the case—there were multiple other avenues through which POSCO could have purchased additional permits. Appx14991.

obligated to purchase {additional permits} from the GOK-run auction." Appx15454. Furthermore, some of those companies may have sufficiently reduced their emissions such that they do not need additional permits beyond the 90 percent and may have spare permits that they can transfer to the next compliance year or sell to other entities in the market. Appx86979. If all entities receiving the 90 percent allocation were required to purchase the additional 10 percent via GOK auctions then it could reasonably be presumed that each additional KAU the GOK freely allocated beyond 90 percent was revenue "otherwise due" to the GOK (assuming they exceeded their emissions cap). However, data on the record suggests that the GOK largely would not have generated revenue from the additional KAUs allocated to POSCO.

The GOK is not a market actor in the K-ETS market, and its allocation of KAUs via auction during the POR demonstrate that it is not reacting to market forces (*i.e.,* the demand for additional KAUs). Data submitted by the GOK demonstrate that [

]. Below is a table detailing the sales of KAU's during the POR:

**Total KAU Sales During 2021**

|  | GOK Auctions | % of Total | Private Sales | % of Total | Total Quantity Sold |
|---|---|---|---|---|---|
| Jan. | [ |  |  |  |  |
| Feb. |  |  |  |  |  |
| Mar. |  |  |  |  |  |
| Apr. |  |  |  |  |  |
| May |  |  |  |  |  |
| June |  |  |  |  |  |
| July |  |  |  |  |  |
| Aug. |  |  |  |  |  |
| Sept. |  |  |  |  |  |
| Oct. |  |  |  |  |  |
| Nov. |  |  |  |  |  |
| Dec. |  |  |  |  |  |
| Total |  |  |  |  | ] |

*See* Appx86982–86989.

As can be seen, while [

]. Thus, statistically, it is

more likely that any additional KAUs freely allocated to POSCO would not have been sold

through the GOK's auctions and thus would not have generated any revenue for the GOK. As

mentioned, the record shows that companies were not required to purchase KAUs from GOK

auctions. Instead, [

], and any additional KAUs the GOK allocated to companies like POSCO were

not potential revenue for the GOK, as Commerce assumes. *See* Appx14992.

The *Final Results* thus fail to provide evidentiary support to the determination that the

GOK has in fact foregone revenue due from POSCO. The fact that POSCO would have had the

*option* to purchase permits from the GOK is not evidence that POSCO was obligated to purchase

them from the GOK and thereby owe the GOK revenue. Commerce's determination assumes,

without evidence, that had POSCO been allocated 90 percent of its assigned permits instead of

100 percent, POSCO *must* have purchased permits from the GOK. *See* Appx15454. The record

cannot support such a finding, and only shows that the revenue that the GOK *could* have

collected from POSCO had it not received the 100 percent allocation was *otherwise due.*

### 2. Commerce Failed To Adequately Explain the Statutory or Regulatory Basis For Its Determination That The K-ETS Program Provided a Countervailable Benefit to POSCO

In the *Preliminary Results*, Commerce found that the K-ETS program "provides a benefit

under 19 C.F.R. § 351.503(b)(2) to the extent that the recipient is relieved of the obligation to

purchase additional allowances." Appx14992. 19 C.F.R. § 351.503(b)(2) is the regulatory

"catch-all" provision, which provides that Commerce "*will* determine whether a benefit is

conferred by examining whether the alleged program or practice has common or similar elements to the four illustrative examples in sections 771(5)(E)(i) through (iv) of the Act." (emphasis added). In its case brief, POSCO argued that Commerce had failed to comply with its regulations by not explaining how the K-ETS program has common or similar elements to the four illustrative examples in section 771(5)(E) of the Act. Appx97355-97356. In the *Final Results*, Commerce agreed that it did not provide a discussion of how the K-ETS program had common or similar elements to the statutory examples. Appx15459. However, even after making such an admission Commerce never actually provided an explanation as to how the K-ETS program had common or similar elements to the statutory examples as required by 19 C.F.R. § 351.503(b)(2).

Instead, in the *Final Results* Commerce explains how it *calculates* the benefit from the K-ETS program that it says is "akin to measuring the benefit in a LTAR {less than adequate remuneration} program." Appx15459. However, Commerce's chosen method for how to calculate the benefit from the K-ETS program begs the question required by its regulation, which is to explain how the K-ETS program "has common or similar elements to the four illustrative examples in sections 771(5)(E)(i) through (iv) of the Act." 19 C.F.R. § 351.503(b)(2). Those statutory examples include equity infusions, loans, loan guarantees, or the provision of goods or services for LTAR or the purchase goods for more than adequate remuneration ("MTAR"). *See* 19 U.S.C. § 1677(5)(E). Commerce is thus required by its regulation to explain how the K-ETS program, by its nature, has common or similar elements to equity infusions, loans, loan guarantees, or the provision of goods or service for LTAR or the purchase of goods or services for MTAR. It is not sufficient to simply say that the manner in which it calculates the benefit from the K-ETS program is akin to how it measures the benefit from an LTAR program. The

failure to provide the required explanation renders Commerce's benefit determination unsupported by substantial evidence and otherwise not in accordance with law.

Even *assuming arguendo* that Commerce's explanation could be construed as saying the K-ETS program has common or similar elements to the LTAR benefit program, that comparison is inapt. Under an LTAR program, the government is providing a good or service to a respondent at a lower price than what the respondent could purchase the good or service from a private party in the market. *See, e.g.,* 19 C.F.R. § 351.511(a)(2) (defining adequate remuneration). This is plain from the language of the statute that requires that there be some "remuneration" provided by the respondent for the good or service, albeit remuneration that is less than what would be paid in a private market transaction. To the extent that the additional 10 percent of permits provided to companies like POSCO is the benefit then there is no remuneration being paid for the additional permits. They are provided for free. The additional permits are thus nothing like the provision of a good or service for less than adequate *remuneration*.

More fundamentally, emissions permits are not "goods" or "services" as required for an LTAR program. *See* 19 U.S.C. § 1677(5)(E)(iv) ("in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration…"). Instead, the emissions permits are simply instruments that set a cap on POSCO's carbon emissions. Thus, even if Commerce's explanation is charitably interpreted as saying the K-ETS program has common or similar elements to an LTAR statutory benefit that explanation is unlawful because the provision of emissions permits does not constitute a good or service that is required for an LTAR benefit. Commerce has not even attempted to explain how the provision of emissions permits is a good or a service.

34

Furthermore, unlike the four illustrative examples in § 1677(5)(E), Commerce has not complied with statutory and regulatory text that requires that the benefit be a result of the financial contribution at issue. 19 U.S.C. § 1677(5)(B) defines a countervailable subsidy as "in the case in which an authority--(i) provides a financial contribution… to a person and a benefit is *thereby* conferred." 19 U.S.C. § 1677(5)(B) (emphasis added). 19 C.F.R. § 351.503(b)(2) similarly states that "paragraph (b)(1) of this section is not intended to limit the ability of the Secretary to impose countervailing duties when the facts of a particular case establish that a *financial contribution has conferred* a benefit." 19 C.F.R. § 351.503(b)(2) (emphasis added). The benefit thus must be the result of the particular financial contribution at issue. This interpretation is supported by the four illustrative examples in § 1677(5)(E)(i) through (iv) that describe a benefit that follows as a logical consequent from the financial contribution described therein. *See, e.g.,* 19 U.S.C. § 1677(5)(E)(ii) (there is a benefit to the recipient "in the case of *a loan*, if there is a difference between the amount the recipient of the loans pays *on the loan* and the amount the recipient would pay on a comparable commercial loan").

In the *Final Results*, Commerce explains that it "applied an adequate remuneration standard" allegedly "because the GOK is charging certain entities no cost for something that has an established market value." Appx15459. Yet, Commerce's benefit determination, which it described as "akin to measuring the benefit in an LTAR program," does not follow as a consequence from the alleged financial contribution, here, revenue foregone that is otherwise due. Whether POSCO allegedly benefits from additional permits that the GOK provides "at no cost" is irrelevant to whether POSCO benefits from the GOK foregoing or not collecting revenue that it was otherwise due. In short, Commerce determined, without support, that the GOK provided a financial contribution in the form of revenue foregone that was otherwise due but has

failed to explain how a benefit was *thereby* conferred like any of the illustrative examples from 19 U.S.C. § 1677(5)(E) and required pursuant to 19 U.S.C. § 1677(5)(B) and 19 C.F.R. § 351.503(b)(2). See *Hyundai Steel I*, 659 F. Supp. 3d at 1338 (remanding benefit determination so that it can be reconsidered in light of any change in its financial contribution determination).

Accordingly, Commerce has failed to explain in the *Final Results* whether the K-ETS "has common or similar elements to the four illustrative examples in § 1677(5)(E)(i) through (iv)" as required by 19 C.F.R. § 351.503(b)(2). Commerce's benefit determination is unsupported by substantial evidence and contrary to law.[9]

### 3. The K-ETS Program is Not Specific.

#### a. The K-ETS Program is Not Specific Pursuant to Section 1677(5A)(D)(i).

In the *Final Results*, Commerce found the differential in the relative allocation of emissions permits under the K-ETS program to be specific as a matter of law pursuant to 19 U.S.C. § 1677(5A)(D)(i), Appx15463–15464, which provides that "where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of

---

[9] POSCO acknowledges that this court has twice found that Commerce's benefit determination for this K-ETS program was supported by substantial evidence and otherwise in accordance with law. *Hyundai Steel I*, 659 F. Supp. 3d at 1337-1340; *Hyundai Steel II.*, 2023 WL 8715732, at *4-5. Although POSCO strongly disagrees with the benefit determinations in those cases, the narrow benefit argument made in this appeal was not decided by the court in either of those cases. The only reference to the argument regarding Commerce's failure to comply with the requirements of 19 C.F.R. § 351.503(b)(2) is the *Hyundai Steel I* court's reference to the fact that "Hyundai Steel did not challenge Commerce's reliance on subsection (b)(2) but instead focused solely on Commerce's failure to consider the burdens imposed by the K-ETS." *Hyundai Steel I*, 659 F. Supp. 3d at 1338. This is not the case here, as POSCO plainly raised the argument that Commerce failed to comply with the regulatory language of 19 C.F.R. § 351.503(b)(2) in its case brief. Appx97355-97356. Thus, to the extent this Court finds the reasoning in *Hyundai I* or *Hyundai II* persuasive, these cases do not address the benefit argument made by POSCO in this appeal.

law." 19 U.S.C. §1677(5A)(D)(i).  As support, Commerce stated that the two criteria for

receiving 100 percent allocation of emission permits, "international trade intensity" and

"production cost incurrence rate," "result in an express statutory limitation on which industries or

enterprises qualify for the additional allocation by setting thresholds that industries must meet in

order to qualify."  Appx15464.  The criteria in Article 12(4) of the AAGEP and the Enforcement

Decree do not, however, "explicitly limit" such treatment "to a specific enterprise or industry" as

required to be *de jure* specific.  Commerce's explanation is, by definition, not a finding of *de

jure* specificity, as the statute requires *express* limits on access to a subsidy for the program to be

specific, which the AAGEP and the Enforcement Decree do not provide.

      In *ASEMESA*, the court held that the plain meaning of 19 U.S.C. §1677(5A)(D)(i) "is that

a subsidy is *de jure* specific when the authority providing the subsidy, or its operating legislation,

directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a

given enterprise or industry." *ASEMESA*, 523 F. Supp. 3d at 1403.  In applying this

unambiguous reading, the court rejected Commerce's interpretation that the statute permitted a

*de jure* specificity finding when, by law, "there {was} no uniform treatment across the

{relevant} sector in the provision of benefits." *ASEMESA*, 523 F. Supp. 3d at 1403.  The lack of

uniform treatment of the agricultural sector, which was the relevant sector in that case, was "not

equivalent to its explicit restriction of those benefits to a specific enterprise or industry."

*ASEMESA*, 523 F. Supp. 3d at 1403.  Accordingly, the plain meaning of 19 U.S.C.

§1677(5A)(D)(i) requires that, to be *de jure* specific, "the authority providing the current

subsidy, or its operating legislation, directly and explicitly prescribes limitations on the

distribution of subsidies *to an enterprise or industry*." *ASEMESA*, 523 F. Supp. 3d at 1404

(emphasis added).

Here, the trade intensity and production cost criteria do not "explicitly limit" the 100 percent allocation "to a specific enterprise or industry" as required to be *de jure* specific pursuant to statute.  The AAGEP and the Enforcement Decree do not "express" that a certain enterprise or industry is ineligible for the 100 percent allocation.  Appx86976–86977; *see* Appx88703–88704. The criteria set standards that required collection and analysis of data regarding each subsector's imports, exports, sales, production, and emissions.  *See* Appx86976–86977.  Any subsector may meet the trade intensity of production cost thresholds regardless of enterprise or industry.  As more entities become subject to the K-ETS over time, more subsectors will either qualify or not qualify based on the criteria in the AAGEP.  *See* Appx86977 (explaining that the subsectors receiving full allocation of KAUs have changed).  Commerce itself admits that the program "does not explicitly designate certain industries or enterprises" that receive the 100 percent allocation of permits.  Appx15464.  Notably, the GOK set the criteria with the Enforcement Decree, and then later determined which subsectors received the 100 percent allocation using the criteria.  Appx89000-89003; Appx88993-88999.  The GOK could not have "expressly limited" the K-ETS allocations to an enterprise or industry because it did not yet know which subsectors met the criteria.  The K-ETS does not expressly limit the 100 percent allocation to an enterprise or industry pursuant to 19 U.S.C. § 1677(5A)(D)(i).

Commerce similarly claimed that the trade intensity and production cost criteria result in express statutory limitations because some industries qualify while others do not before this court in other cases, and these arguments were rejected.  *Hyundai Steel I,* 659 F. Supp. 3d at 1341; *Hyundai Steel Co. v. United States*, No. 22-00032, 2023 WL 8715732, at *16 (Ct. Int'l Trade Dec. 18, 2023) ("*Hyundai Steel II*").  As the court explained, "Commerce's observation that 'some industries may benefit from the additional assistance in the form of the additional

KAUs, while others do not,' merely reflects the truism that not all industries will 'qualify under the criteria.'" *Hyundai Steel I*, 659 F. Supp. 3d at 1342.  Indeed, "non-uniform treatment across the economy," without more "is not enough; instead, the authority or its implementing legislation must 'explicitly restrict' the 'benefits to a specific enterprise or industry.'" *Id.* (citing *ASEMESA*, 523 F. Supp. 3d 1393).  The court noted the "inherent disconnect" between the "types of businesses" resulting from application the trade intensity and production cost criteria and a "specific enterprise or industry" required by 19 U.S.C. § 1677(5A)(D)(i).  *Hyundai Steel II*, 2023 WL 8715732 at *18-19.  Commerce's explanation that "some industries may benefit… while others do not" lacks "any indication of how the criteria or the limitation and the thresholds, operate to 'restrict the bounds of {the} particular subsidy to a given enterprise or industry,' 'a specific enterprise or industry' or even a 'specific' small universe of enterprises or industries." *Hyundai Steel II*, 2023 WL 8715732 at *19.

Commerce attempts to distinguish the *Hyundai Steel* decisions by insinuating, without citing evidence, that the K-ETS allegedly changed the criteria from Phase 2 to Phase 3 of the program.  Appx15465.  Commerce explains that, in Phase 2, entities qualified if either the trade intensity or production cost factors were 30 percent or higher or, if the trade intensity and production cost factors were at least 10 percent and 5 percent respectively, but the explanation is an irrelevant red herring as the record shows that the trade intensity and production cost criteria did not change from Phase 2 to Phase 3.  *Compare* Appx89002 *with* Appx88970.  The only difference is that entities qualify if the trade intensity and production cost factors equal 0.2 percent once multiplied together rather than pursuant to the 30-, 10-, and 5-percent thresholds from Phase 2.  *Compare* Appx88993-99 *with* Appx88951-75; *see also* Appx88766.  Commerce admits that "the calculation methodology of the production cost and trade intensity factors did

not change between phases of the K-ETS."  Appx15465.  Commerce's claim that the trade

intensity and production cost criteria "are different" fails to distinguish the *Hyundai Steel* cases

as the trade intensity and production criteria examined by the court in those cases have not

changed.  *See Hyundai Steel I*, 659 F. Supp. 3d at 1331 n.10 (explaining the trade intensity and

production cost calculations); *Hyundai Steel II*, 2023 WL 8715732 at *19 (referencing the

formulas to calculate factors pursuant to the trade intensity and production cost criteria).

Commerce also cites *Silicon Metal from Australia* as support for its argument that the

trade intensity and production cost criteria favor certain industries over others that do not meet

the criteria because, in *Silicon Metal from Australia*, Commerce determined that a program with

"emission intensive" and "trade exposed" criteria allegedly limited eligibility of the program to

certain enterprises or industries.  Appx15465 (citing *Silicon Metal from Australia: Final

Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (Dep't Commerce Mar. 8,

2018) and accompanying Mem. at Comment 3).  *Silicon Metal from Australia* has limited

relevance as Commerce's determination in that case was not appealed and is thus neither binding

on the court nor authoritative regarding statutory interpretation.  To the extent it may involve

similar facts, POSCO disagrees with the decision and submits that it too is not in accordance

with law because the program in that case did not limit eligibility to enterprises or industries

pursuant to 19 U.S.C. § 1677(5A)(D)(i).

In sum, the requirements of 19 U.S.C. § 1677(5A)(D)(i) have not been met and

Commerce's *de jure* specificity determination is thus contrary to law and unsupported by

substantial evidence.

### b. The K-ETS Program Meets the Safe Harbor of Section 1677(5A)(D)(ii).

In the *Final Results*, Commerce also found that the criteria for qualifying for 100 percent allocation of permits under the AAGEP and the implementing rules "are not objective within the meaning of {19 U.S.C. § 1677(5A)(D)(ii)}." Appx15464. Section 1677(5A)(D)(ii), which provides a safe harbor for *de jure* specificity, provides that:

> (ii) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, *the subsidy is not specific as a matter of law*, if—
>
> (I)     Eligibility is automatic,
> (II)    The criteria or conditions for eligibility are strictly followed, and
> (III)   The criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.
>
> For purposes of this clause, the term "objective criteria or conditions" means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.

19 U.S.C. § 1677(5A)(D)(ii) (emphasis added). According to the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, "neutral in this context means economic in nature and horizontal in application, such as the number of employees or the size of the enterprise." SAA, 1994 U.S.C.C.A.N. at 4243. Commerce fails to adequately explain how subsection (D)(ii) is not met in the *Final Results* and a review of its criteria shows that the AAGEP and its Enforcement Decree meet the elements of the safe harbor.

First, eligibility is automatic. The program allocates 100 percent of an entity's assigned permits if the value of its production cost incurrence rate multiplied by its international trade intensity "is at least 2/1000."[10] Appx88766. Once this criterion is met, any entity regardless of

---

[10] The trade intensity for each subsector is calculated as follows: Annual average of (exports + imports) / annual average of (sales + imports) during the base period. The cost incurrence rate

enterprise or industry is automatically eligible for the 100 percent allocation. *See id;* Appx88704. Second, the criteria for eligibility are strictly followed. The permits are "allocated strictly" pursuant to the AAGEP and the Enforcement Decree. Appx87203. As the GOK reported, it "does not have any discretion that goes beyond the criteria laid out." Appx87203. Third, the criteria and conditions are capable of verification because the GOK requires that companies submit a report for each compliance year. *See* Appx87200; Appx88782–88783. Companies must prepare reports on the amount of GHG emitted during a compliance year and submit it to the GOK, who verifies and certifies the data in the report. Appx87200. Finally, as POSCO has detailed herein, the trade intensity and production cost criteria do not "favor one enterprise or industry over another." *Any* subsector may meet the trade intensity or production cost thresholds regardless of enterprise or industry, as the AAGEP and Enforcement Decree do not limit any enterprises or industries from qualification. *See* Appx88695–88722; Appx88752–88799. Accordingly, each requirement pursuant to Section 771(5A)(D)(ii) has been met and the program is thus not *de jure* specific.

In the *Final Results*, Commerce claims that the trade intensity and production cost criteria are "not objective criteria or conditions" because each of these criteria, "while economic in nature, are not horizontal in application and thus are not neutral" because allegedly, the criteria favor certain industries who "by their nature" have more emission intensive production processes or are more dependent on international markets for sales and sourcing than other industries. Appx15464. Commerce points to the fact that the majority of industries qualifying for the full allocation of permits are "manufacturing industries," and that claims that the trade intensity and production cost criteria "favor industries such as primary steel, with defined higher levels of

---

for each subsector is calculated as follows: Annual average of (GHG emitted amount x market price of the permits) / amount of value-added during the base period. Appx86976–86977.

international trade intensity and production costs" over other industries.  Appx15465.

Commerce also asserts that the production cost and trade intensity criteria "contrast" against

criteria that would be based on total greenhouse gas emissions and total sales, which would be

horizontal objective criteria according to Commerce.  Appx15464.

 Commerce's explanation fails to demonstrate how the application of the trade intensity

and production criteria are not horizontal.  As explained, the criteria set standards that are

applied evenly across the economy.  *See* Appx86976–86977.  Any subsector may meet the trade

intensity of production cost thresholds regardless of enterprise or industry.  The number of

entities that qualify pursuant to the criteria changes over time, depending on the relevant factors:

imports, exports, sales, production costs, emissions and the market price of permits.  *See*

Appx86977.  Whether a majority of companies that qualified were "manufacturing industries" is

irrelevant to whether the criteria are horizontal in application.  Moreover, Commerce fails to

point to any materially distinguishing factor in the "total GHG emissions" and "total sales"

counterexamples that it highlights.  The total amount of emissions and sales are objective and

horizontal, just like the sales and emissions factors that the K-ETS accounts for and just like the

number of employees and size of the enterprise examples from SAA.  Again, as the Court noted

in *Hyundai Steel*, "Commerce's observation that 'some industries may benefit from the

additional assistance in the form of the additional KAUs, while others do not,' merely reflects

the truism that not all industries will 'qualify under the criteria.'"  *Hyundai Steel I*, 659 F. Supp.

3d at 1342.  The *Final Results* disregard that the trade intensity and production cost criteria are

applied horizontally to *all* subsectors and that any sector could qualify if they meet the criteria

like the "number of employees" or "size of an enterprise" examples from the SAA.

The court has already rejected Commerce's faulty rationale in *Hyundai Steel v. United States*, 2024 WL 1929018 (Ct. Int'l Trade May 2, 2024) ("*Hyundai Steel III*"). In *Hyundai Steel III*, Commerce on remand also determined that the AAGEP and Enforcement Decree were *de jure* specific because they favored industries that were GHG intensive or more dependent on international markets for sales and sourcing. *Hyundai Steel III*, WL 1929018, at *9–11. The court rejected this explanation, finding that the agency's rational "merely repackages the language of the criteria into a statement that certain subsectors are favored" and that "converting the language of the criteria into subsector descriptors is insufficient to demonstrate that a subsidy may not exist throughout the economy." *Hyundai Steel III*, WL 1929018, at *11. The court also found that Commerce's reliance on a list of industries that qualified for the full allocation of K-ETS permits was not relevant to a *de jure* specificity analysis and that the agency had provided no interpretation of the *de jure* specificity statute to support its consideration of the actual users of the subsidy in order to determine whether the subsidy was *de jure* specific. *Hyundai Steel III*, WL 1929018, at *11.

Commerce's determination that the trade intensity and production cost criteria are not do not meet the safe harbor of 19 U.S.C. § 1677(5A)(D)(ii) is contrary to law and unsupported by substantial evidence.

## VII.    CONCLUSION AND RELIEF REQUESTED

Based on the foregoing, POSCO respectfully requests that this Court (i) hold that

Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in

accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors

identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff POSCO*

*Certificate Of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 13,068 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  June 17, 2024

**Exhibit A**



merriam-webster.com/dictionary/disproportionate

**Dictionary** | **Thesaurus** | disproportionate | Games & Quizzes | Word of the Day

# Dictionary

**Definition**

Example Sentences

Word History

Entries Near

Show More ⌄

**Save Word**

# disproportionate *adjective*

dis·pro·por·tion·ate ⟨ ˌdis-prə-ˈpȯr-sh(ə-)nət ◀⧏ ⟩

Synonyms of *disproportionate* ›

**:** being out of proportion

> a *disproportionate* share

**disproportionately** adverb

**Exhibit B**

merriam-webster.com/dictionary/due



Dictionary | Thesaurus

due

## Dictionary

**Definition**

**adjective**

noun

adverb

Synonyms

Example Sentences

Word History

Phrases Containing

Related Articles

Entries Near

Show More ⌄

Save Word

# due  1 of 3  adjective

ˈdü  ˈdyü

Synonyms of *due* >

**1** : owed or owing as a debt

is *due* a full week's pay

**2**  **a** : owed or owing as a natural or moral right

finally got the recognition she was *due*

give credit where credit is *due*

everyone's right to dissent ... is *due* the full protection of the Constitution
— Nat Hentoff

**b** : according to accepted notions or procedures : **APPROPRIATE**

with all *due* respect

**3**  **a** : satisfying or capable of satisfying a need, obligation, or duty : **ADEQUATE**

giving the matter *due* attention

**b** : **REGULAR, LAWFUL**

*due* proof of loss

**4** : capable of being attributed : **ASCRIBABLE** → used with *to*

this advance is partly *due* to a few men of genius
— A. N. Whitehead

**5** : having reached the date at which payment is required : **PAYABLE**

the rent is *due*

**6** : required or expected in the prescribed, normal, or logical course of events : **SCHEDULED**

The train is *due* at noon.
When is the baby *due*?

*also* : expected to give birth

has a friend who is *due* in April

**Exhibit C**



**Dictionary** | **Thesaurus** | otherwise | 🔍 | **Games & Quizzes** | **Word of the Day** | Gram

## Dictionary

**Definition**

pronoun

**adverb**

adjective

Synonyms

Example Sentences

Word History

Phrases Containing

Related Articles

Entries Near

Show More ⌄

Save Word 🔖

was ordered to testify and could not do *otherwise*

# otherwise  2 of 3  adverb

1    : in a different way or manner

glossed over or *otherwise* handled
– *Playboy*
All shows begin at 8:00 unless *otherwise* noted.

2    : in different circumstances

might *otherwise* have left
The test helps identify problems that might have *otherwise* gone unnoticed.

3    : in other respects

an *otherwise* flimsy farce
– *Current Biography*
I didn't like the ending, but *otherwise* it was a very good book.
The patient had a foot problem, but she was *otherwise* healthy.

4    : if not

do what I tell you, *otherwise* you'll be sorry
Tickets can be bought in advance at a discount; *otherwise* they can be purchased at
the door for full price.

5    : **NOT** → paired with an adjective, adverb, noun, or verb to indicate its contrary or to
suggest an indefinite alternative

people whose deeds, admirable or *otherwise*
– John Fischer
almost thirty thousand women, Irish and *otherwise*
– J. M. Burns
his opinion as to the success or *otherwise* of it
– *Australian Dictionary of Biography*