**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN**

| | | |
|---|---|---|
| POSCO, | ) | |
| Plaintiff, | ) | |
| and | ) | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | **Court No. 24-00006** |
| UNITED STATES, | ) | **NONCONFIDENTIAL** |
| Defendant, | ) | Business Proprietary Information Removed from Pages 4, 7, 8, and 9. |
| and | ) | |
| NUCOR CORPORATION, | ) | |
| Defendant-Intervenor. | ) | |

**<u>PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S MEMORANDUM IN SUPPORT OF POSCO'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: July 12, 2024

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ......................................................................................... i

**TABLE OF AUTHORITIES** ................................................................................ ii

**INTRODUCTION** ................................................................................................. 1

**ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED** .......... 1

**STATEMENT OF ISSUES** .................................................................................... 2

**STATEMENT OF FACTS** ..................................................................................... 2

**STANDARD OF REVIEW** .................................................................................... 2

**SUMMARY ARGUMENT** .................................................................................... 2

**ARGUMENT** ........................................................................................................ 4

I.     Commerce's Finding of *De Facto* Specificity for the GOK's Provision of Electricity Is Not Supported by Substantial Evidence on the Record or Otherwise in Accordance with Law ............................................................... 4

     A.    Commerce Did Not Conduct the Requisite Analysis for a *De Facto* Specificity Finding ..................................................................................... 4

          1.    Commerce Failed to Consider the Inherent Characteristics of the Korean Steel Industry ........................................................ 5

          2.    Commerce Must Consider the Industry Makeup of the Country at Issue as a Whole .......................................................... 6

     B.    POSCO Did Not Consume a Disproportionately Large Amount of Electricity ............................................................................................... 8

          1.    Electricity in Korea Is Broadly Available and Widely Used by Virtually Everyone ......................................................... 8

          2.    The GOK Provided Electricity Under a Standard Pricing Mechanism Without Any Exercise of Discretion or Favorable Treatment to the Steel Industry ................................................ 10

II.    Commerce's Decision to Countervail the GOK's K-ETS Program Is Not Supported by Substantial Evidence on the Record or Otherwise in Accordance with Law ............................................................................... 11

     A.    Commerce Erred in Finding that the Allocation Amounted to Revenue Foregone that Was "Otherwise Due" to the GOK .............................. 11

     B.    Commerce Erred in Finding that the Additional KAUs Conferred a Benefit to POSCO ...................................................................................... 14

     C.    Commerce Erred in Finding that the Allocation of Additional KAUs Was *De Jure* Specific ...................................................................... 16

**CONCLUSION** ................................................................................................. 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

***Cases***

*Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ..................
............................................................................................................. 5, 7, 9, 10, 12

*Bethlehem Steel Corp. v. United States,* 223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) ............... 12

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018)
............................................................................................................................... 6, 7

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) .................................... 15

*Gov't of Sri Lanka v. United States*, 308 F. Supp. 1373 (Ct. Int'l Trade 2018) .......................... 15

*Hyundai Steel Co. v. United States,* 659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) ................ 12, 17

*Hyundai Steel Co. v. United States*, No. 22-00032, 2023 WL 8715732 (Ct. Int'l Trade Dec. 18,
2023) ................................................................................................................................ 17

*Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ......................... 8

***Statutes***

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................................................... 2

19 U.S.C. § 1677(5)(B) ............................................................................................................ 14

19 U.S.C. § 1677(5)(D)(ii) ....................................................................................................... 11

19 U.S.C. § 1677(5A)(D)(i) ..................................................................................................... 16

19 U.S.C. § 1677(5A)(D)(ii) .................................................................................................... 16

19 U.S.C. § 1677(5A)(D)(iii)(III) ..................................................................................... 4, 6, 10

28 U.S.C. § 1581(c) .................................................................................................................... 2

***Regulations***

19 C.F.R. § 351.503(b)(1) ......................................................................................................... 15

19 C.F.R. § 351.503(b)(2) ......................................................................................................... 14

*Administrative Decisions*

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2021*, 88 Fed. Reg. 86,318 (Dec. 13, 2023).... 1

*Common Alloy Aluminum Sheet from Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333 (Mar. 9, 2021) ................................................................ 12

*Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015)................................................................................. 10

## INTRODUCTION

This brief is submitted on behalf of Plaintiff-Intervenor the Government of the Republic of Korea ("GOK") in support of Plaintiff POSCO's Rule 56.2 Motion for Judgment on the Agency Record challenging the U.S. Department of Commerce's ("Commerce") final results in the 2021 administrative review of the countervailing duty ("CVD") order on Certain Carbon and Alloy Steel Cut-to-Length Plate ("CTL Plate") From the Republic of Korea. *See* Pl. POSCO's Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 28 ("Pl. Br."). For the reasons explained by POSCO and those set forth in this brief, Commerce's determinations as to two programs are unsupported by substantial evidence and not in accordance with law. First, in determining that the GOK's provision of electricity was *de facto* specific, Commerce erroneously relied on unsupported assumptions and faulty logic, overlooked undisputed evidence of widespread use of the program across enterprises and industries, and unreasonably departed from its practice. Second, in countervailing the additional carbon emission permits allocated to POSCO, Commerce misapplied the law to find that the allocation of those permits amounts to revenue foregone that is otherwise due to the GOK, ignored costs incurred by POSCO to find a benefit, and disregarded objective criteria to conclude that the program is *de jure* specific. The Court should hold that Commerce's determinations as to these two programs lack legal and factual support and remand to Commerce.

## ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

The GOK challenges certain aspects of Commerce's final results in the 2021 administrative review of the CVD order on CTL Plate, published as *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 86,318 (Dec. 13, 2023) (P.R.178) ("*Final Results*"), and the accompanying Issues and Decision Memorandum ("*Final Results IDM*") (P.R.174).

## STATEMENT OF ISSUES

1.    Whether Commerce's determination that the GOK's provision of electricity for less than adequate remuneration ("LTAR") was *de facto* specific is supported by substantial evidence on the record and is otherwise in accordance with law.

2.    Whether Commerce's determination that the additional carbon emission permits – Korea Allowance Units ("KAUs") – allocated to POSCO under the Korean Emissions Trading System ("K-ETS") constitutes a countervailable subsidy is supported by substantial evidence on the record and is otherwise in accordance with law.

## STATEMENT OF FACTS

The GOK adopts POSCO's statement of facts.  To the extent that additional facts not mentioned by POSCO are relevant to the GOK's arguments, they are discussed within the context of the arguments set forth in this brief.

## STANDARD OF REVIEW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).  The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## SUMMARY ARGUMENT

In proceedings related to several CVD orders (including the CVD order on CTL plate), Commerce has repeatedly declined to countervail the GOK's provision of electricity.  Commerce should have reached the same conclusion in this review, but instead erroneously concluded that the program is *de facto* specific.

Commerce's *de facto* specificity determination is unsupported by substantial evidence and otherwise not in accordance with law.  In reaching its *de facto* specificity determination,

Commerce improperly equated disparate electricity consumption with disproportionate electricity consumption. Commerce ignored that electricity is broadly available and widely used in Korea. Commerce further neglected to consider that electricity prices in Korea are determined by a standard pricing mechanism and that industrial customers are not treated differently from other customers. Rather, record evidence demonstrates that neither POSCO nor the steel industry consumed disproportionately large amounts of electricity.

Similarly, Commerce's determination countervailing the GOK's allocation of additional KAUs to POSCO under the K-ETS is unsupported by substantial evidence and otherwise not in accordance with law. Commerce's basis for finding financial contribution, benefit, and *de jure* specificity with regard to the additional KAUs is flawed. In its financial contribution determination, Commerce erroneously relied on a mere *possibility* of obtaining revenue for finding foregone revenue that is "otherwise due." Commerce ignored that POSCO would not have been required to purchase the KAUs from the GOK in the absence of the allocation. With respect to its benefit determination, Commerce also failed to consider the full cost of compliance and the overall purpose of the K-ETS program. The additional KAUs did not relieve POSCO from the financial burden of compliance, but rather imposed an overall burden on the company to comply with the emission requirements under the K-ETS program. Finally, as to its *de jure* specificity finding, Commerce misconstrued the statute by ignoring the fact that the legislation establishing the K-ETS program provided neutral eligibility criteria that do not favor any particular industry or enterprise. For these reasons, the GOK's allocation of the KAUs does not constitute revenue foregone that is otherwise due to the GOK, does not confer a benefit to POSCO, and is not *de jure* specific.

## ARGUMENT

I.  **COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY FOR THE GOK'S PROVISION OF ELECTRICITY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW**

In its *Final Results*, Commerce determined that the GOK's provision of electricity was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III).  *Final Results IDM* at 24-26 (P.R.174).  Commerce reasoned that the usage data "demonstrate that the steel industry and *two* other industries combined consume a majority of the industrial class electricity in Korea."  *Id.* at 26.  Commerce identified the **[                                        ]** industries as the two other industries at issue.  Memorandum from Faris Montgomery to The File, "Final Results Calculations for POSCO" (Dec. 1, 2023) ("*Final Calc Memo*") at 4 (C.R.269/P.R.175).  Commerce's finding of *de facto* specificity is unsupported by substantial evidence and otherwise not in accordance with law.

> **A.  Commerce Did Not Conduct the Requisite Analysis for a *De Facto* Specificity Finding**

"Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist: . . . (III) An enterprise or industry receives a disproportionately large amount of the subsidy."  19 U.S.C. § 1677(5A)(D)(iii)(III).  Under this provision, Commerce cannot determine that the GOK's provision of electricity to certain industrial users is *de facto* specific simply because some users consume higher levels of electricity.  As explained below, Commerce's *de facto* specificity finding is unlawful because Commerce completely failed to account for the differences in characteristics and size across industries that explain the disparity in electricity consumption.

### 1.    Commerce Failed to Consider the Inherent Characteristics of the Korean Steel Industry

*Bethlehem Steel Corp. v. United States* confirmed that "disproportionate" is not synonymous with "disparity."  140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001).  Instead, *Bethlehem Steel* held that imposing "countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws."  *Id.* at 1369.  For that reason, the Court held that the "mere fact that the {Korean} steel industry received a greater monetary benefit from the program than did other participants is not determinative of whether that industry was 'dominant' or receiving 'disproportionate' benefits."  *Id.*  On this basis, the Court sustained Commerce's decision that the Korean steel industry received neither "dominant" nor "disproportionate" amount of subsidies under an electricity discount program, given that the "inherent characteristics" of the Korean steel industry was the "large consumption of electricity":

> Although the steel industry received over 51% of the financial benefits afforded by the VCA program during the period of investigation, there is nothing in the record to indicate this percentage was disproportionately higher than would be expected.  Commerce, consistent with its prior practice, examined the Korean steel industry and concluded that one of its inherent characteristics was the large consumption of electricity.  Thus, when Commerce examined the Korean steel industry's electricity usage, and the attendant benefits derived from the VCA program, it found them to be neither "dominant" nor "disproportionate."

*Id.*

As POSCO explained, the plain meaning of "disparity" and "disproportionately" support the holding in *Bethlehem Steel* and confirm that Commerce erred in its *de facto* specificity analysis.  Pl. Br. 14.  "Disparity" may occur even if a subsidy is not industry-specific due to the fundamental differences across different groups.  On the other hand, an analysis of "disproportionality" requires some sort of comparison and consideration of context, and

Commerce must consider whether certain enterprises or industries (or groups thereof) receive an outsized benefit from the program that is out of proportion.

Commerce undertook no such comparison in its specificity analysis regarding the GOK's alleged provision of electricity for LTAR. *Final Results IDM* at 24-26 (P.R.174). Its determination consisted entirely of a bald and unreasoned finding that a certain set of industries together consumed a "majority of the industrial class electricity" during the POR. *Id.* at 26. Commerce provided no explanation as to how the amount of electricity consumed by certain industries, by itself, showed that those industries "receive{d} a disproportionately large amount of the subsidy" as required under 19 U.S.C. § 1677(5A)(D)(iii)(III). Rather, Commerce's finding only demonstrates that there was a disparity in electricity consumption between three industries (including the steel industry), on the one hand, and all other industries on the other.

Further, in simply concluding that three industries "disproportionately" consumed electricity, Commerce completely failed to account for the differences in characteristics across industries that explain the disparity in electricity consumption. As POSCO points out, certain industries consume more electricity than others solely due to the nature of their business, and this disparity does not indicate that the GOK provided a disproportionately large amount of electricity to certain industries. Pl. Br. 14-15. For example, manufacturing industries, such as the steel industry, naturally tend to consume more electricity than other industries, such as retail, because they are required to operate large machines and equipment to manufacture their products.

### 2.    Commerce Must Consider the Industry Makeup of the Country at Issue as a Whole

*Changzhou Trina Solar Energy Co. v. United States* held that the Department is "under an obligation to compare the industries receiving the subsidy to the industry makeup of the country

at issue as a whole" when determining *de facto* specificity. *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1330 (Ct. Int'l Trade 2018). The Court held that the Department needs to "explain how subsidizing {} broad industries amounts to a specific rather than a generally available subsidy" when "a large swath of industries {} could be further broken down into numerous sub-industries." *Id.* at 1331. Commerce failed that test in this case.

The difference in the actual size of enterprises and industries plays a substantial role in creating a disparity in electricity consumption. Some enterprises and industries are much larger than others. It is to be expected that large industries like the **[                    ]**, and steel industries—the three industries identified by Commerce as supposedly consuming a disproportion amount of electricity—would consume more electricity than relatively smaller industries. *See* Letter from Lee & Ko LLC to Sec'y of Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: GOK's Initial Questionnaire Response" (Oct. 11, 2022) ("GOK IQR") at 54-55 (C.R.157/P.R.61). As large enterprises and industries have significantly larger scales of operations than those of other smaller enterprises and industries, their usage of electricity will naturally create a significant disparity in electricity consumption notwithstanding the fact that their consumption may in fact be proportionate to their size. But such disparity should not and cannot be equated to disproportionality. *See Bethlehem Steel*, 140 F. Supp. 2d at 1369.

Commerce is required to support its disproportionality determination with substantial evidence. However, Commerce has only shown disparity among industries that naturally have different levels of electricity consumption. Commerce failed to point to any evidence that would support its conclusion that the GOK provided a disproportionately large amount of the alleged subsidy to the three industries it identified, including the steel industry. Rather, Commerce based

its determination on the unreasonable and unsupported assumption that all industries and enterprises are of the same nature and size and thus consume the same amount of electricity. Thus, Commerce's finding that certain industries, including the steel industry, consume a disproportionate amount of electricity is unsupported by substantial evidence.

### B.    POSCO Did Not Consume a Disproportionately Large Amount of Electricity

In its *de facto* specificity determination, Commerce failed to consider that electricity in Korea is broadly available and widely used throughout the economy and that the GOK provides electricity under a standard pricing mechanism regardless of company and industry.

### 1.    Electricity in Korea Is Broadly Available and Widely Used by Virtually Everyone

Commerce must apply the specificity test to "winnow out" subsidies that are broadly available and widely used throughout an economy. Pl. Br. 12-13. In applying that test, the Court has warned Commerce that it must not make an "overreaching and indiscriminate type of specificity finding." *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1316 (Ct. Int'l Trade 2023).

Commerce's misapplication of the specificity test in the *Final Results* yielded precisely the sort of "overreaching and indiscriminate type of specificity finding" that *Mosaic* forecloses. 659 F. Supp. 3d at 1316. Contrary to Commerce's finding, record evidence demonstrates that electricity in Korea is available to any person upon request, such that it widely available and used. *See* GOK IQR at 36, 49, Appendix-27 at 16 (C.R.157/P.R.61), Exhibits E-4 at 63 (C.R.175/P.R.70) and E-10 (C.R.177/P.R.72). Further, the record does not support a finding that POSCO, the steel industry, or any group of industries were predominant users of this program or used a disproportionately large amount of electricity. The steel industry consumed only [      ] percent of the total amount of electricity consumed in Korea, whereas the top industry in terms

of electricity consumption (i.e., the **[                    ]**) consumed only **[        ]** percent.
*See* GOK IQR at 54-55 (C.R.157/P.R.61), Exhibit E-11 (C.R.177/P.R.72).  On this basis alone,
Commerce should not have found the program to be *de facto* specific.

Commerce bluntly ignored that electricity was widely used by virtually everyone in the
country.  Instead, Commerce simply grouped the top three industries to reach the conclusion that
together they consumed an allegedly disproportionately large amount of electricity (i.e., over
**[        ]** percent of the total electricity consumed by customers within the industrial classification).
But Commerce never provided an explanation as to why it focused solely on the top three
industries, or why those industries in particular were the relevant industries for its *de facto*
specificity analysis.  Commerce's decision to group these industries appears to be arbitrary,
especially when considering that there are other industries which shared similar characteristics
and output as the steel industry and the other two industries aggregated by Commerce, such as
the **[                    ]** industry.  *See* GOK IQR at 54-55 (C.R.157/P.R.61).  Yet, Commerce
decided to group three industries that have nothing in common other than the fact that they were
among the largest electricity consuming industries.  *Final Results IDM* at 25-26 (P.R.174).  Nor
did Commerce explain why it was reasonable to compare their electricity usage to the total usage
by only industrial customers, rather than usage of electricity by all customer classes.

Besides, even if Commerce were allowed to arbitrarily group the top three industries, the
combined consumption of **[        ]** percent does not warrant a finding of *de facto* specificity.
Commerce has previously determined that a program pursuant to which the steel industry by
itself had received over 51 percent of the benefits was not *de facto* specific, Pl. Br. 15, a decision
that the court sustained in *Bethlehem Steel*, 140 F. Supp. 2d at 1369-70.

2.    **The GOK Provided Electricity Under a Standard Pricing Mechanism Without Any Exercise of Discretion or Favorable Treatment to the Steel Industry**

Commerce practice establishes that there is no *de facto* specificity when industrial users are "treated in a manner consistent or even less favorable than other consumers with respect to the electricity tariff schedule." *Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying Issues and Decision Memorandum at 13. The Court has sanctioned that practice, holding that a program is not *de facto* specific "if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than similarly situated consumers." *Bethlehem Steel*, 140 F. Supp. 2d at 1369; *id.* at 1369-70 (upholding Commerce's finding of no specificity under 19 U.S.C. § 1677(5A)(D)(iii)(III) because there is "no exercise of discretion and no favorable treatment afforded to any one industry"). Commerce failed to adhere to that practice in the *Final Results*.

The record demonstrates that the Korean Electric Power Corporation ("KEPCO") provided electricity to all enterprises and industries in Korea that use electricity and that electricity was provided under a standard pricing mechanism, i.e., KEPCO's electricity tariff schedule. *See* GOK IQR at 10-11, 36, 50 (C.R.157/P.R.61), Exhibit E-10 (C.R.177/P.R.72). Nothing in the record evidence demonstrates that the steel industry and POSCO were treated favorably. To the contrary, record evidence indicates that KEPCO enforced a standard pricing mechanism and provided electricity to customers in other classifications, such as residential, educational, and agricultural, at lower rates than industrial customers. GOK IQR at 36, 50 (C.R.157/P.R.61), Exhibit E-10 (C.R.177/P.R.72).

For all of these reasons, Commerce could not have concluded that POSCO, the steel industry, or even the top three electricity-consuming industries combined received a

"disproportionately" large amount of subsidy.  *See* GOK IQR at 54-55 (C.R.157/P.R.61).  The

Court should therefore hold that Commerce's finding of *de facto* specificity is not supported by

substantial evidence on the record or otherwise in accordance with law.

## II.    COMMERCE'S DECISION TO COUNTERVAIL THE GOK'S K-ETS PROGRAM IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW

In its *Final Results*, Commerce countervailed the GOK's allocation of an additional ten

percent of KAUs under the K-ETS program to entities (such as POSCO) within certain sectors.

*Final Results IDM* at 31-48 (P.R.174).  In doing so, Commerce found that the allocation meets

the definition of a financial contribution, is *de jure* specific, and confers a benefit.  *Id.*  Each of

these findings lack record and legal support.

### A.    Commerce Erred in Finding that the Allocation Amounted to Revenue Foregone that Was "Otherwise Due" to the GOK

In the *Final Results*, Commerce found that the allocation of additional KAUs constitutes

foregone revenue otherwise due to the GOK pursuant to 19 U.S.C. § 1677(5)(D)(ii).  *Id.* at 34-37

(P.R.174).  It reasoned that "{b}y providing additional free" KAUs to such entities, the GOK

chose "not to collect costs (i.e., foregoing revenue) that are otherwise due under the overall

framework and purpose of" the K-ETS.  *Id.* at 35.  Commerce also found that the "GOK

generates revenue from any KAU that it does not freely allocate" because KAUs must be

surrendered to the GOK.  *Id.* at 36.  Commerce's findings are unsupported by substantial

evidence.

A financial contribution may include "foregoing or not collecting revenue that is

otherwise due."  19 U.S.C. § 1677(5)(D)(ii).  Under this provision, a financial contribution does

not arise simply because the government does not raise revenue which it could have raised –

rather, such revenue must be "otherwise due."  To determine whether revenue is "otherwise due,"

Commerce must employ a "but for" test. *Common Alloy Aluminum Sheet from Bahrain: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 13,333 (Mar. 9, 2021), and accompanying Issues & Decision Memorandum at 9. That is, the government must be legally entitled to collect the additional revenue "but for" its decision to forgo such revenue. *See id. Bethlehem Steel Corp. v. United States* confirmed this interpretation, holding that a government foregoes revenue that is otherwise due when it receives "a lower tariff payment … *than it would have received* if the program were not in effect." 223 F. Supp. 2d 1372, 1382 (Ct. Int'l Trade 2002) (emphasis added).

Further, *Hyundai Steel Co. v. United States* confirmed that the phrase "otherwise due" limits what Commerce may treat as a financial contribution under the statute. 659 F. Supp. 3d 1327, 1336 (Ct. Int'l Trade 2023). According to *Hyundai Steel*, the mere *possibility* of obtaining revenue is insufficient to conclude that the government forewent revenue that is "otherwise due." *Id.* at 1337. Indeed, *Hyundai Steel* found that Commerce failed to overcome this *very* constraint when it attempted to countervail the *same* K-ETS program in a prior administrative review. Pl. Br. 24-25. Here too, Commerce made the same misstep in its financial contribution analysis by ignoring the phrase "otherwise due."

The record confirms that the GOK did not forego revenue that is otherwise due "but for" its decision to allocate the additional KAUs. Companies have the option to purchase additional KAUs from private market transactions, decide to reduce their greenhouse gas ("GHG") emissions, or borrow emissions permit from the next compliance year, none of which would generate revenue for the GOK. GOK IQR at 18-20, 22 (C.R.157/P.R.61), Exhibit CEP-14 (C.R.168/P.R.66).

Commerce acknowledged that POSCO would not have been required to purchase the additional KAUs from the GOK in the absence of the disputed allocation. *Final Results IDM* at 35-36 (P.R.174). Nevertheless, Commerce explained that it makes no difference that POSCO could have obtained additional KAUs via non-government sources because "the fact that each ton of carbon has a price means that this 'cost' is in fact otherwise due by some company, at some point." *Id.* at 36. By focusing on whether POSCO would have incurred additional cost without the additional KAUs, Commerce distorted the financial contribution analysis. Whether POSCO would have incurred the additional cost is irrelevant. Rather, the material question is whether those costs *would have otherwise resulted in revenue to the GOK*. POSCO had access to private markets and other non-government options to obtain additional KAUs, or the option of reducing its emissions, none of which would have resulted in revenue to the GOK. Thus, as POSCO demonstrated, Commerce had no basis to conclude that any costs POSCO would have incurred absent the additional KAUs necessarily meant foregone revenue that was otherwise due to the GOK. Pl. Br. 31-32.

Commerce also erroneously found that *all* KAUs involve some revenue that would otherwise be due to the GOK, noting that all KAUs are ultimately surrendered to the GOK. *Final Results IDM* at 36. Commerce's reasoning misconstrues the statute and is not supported by record evidence.

The fact that all KAUs are ultimately surrendered to the GOK is irrelevant to the question of whether all KAUs surrendered would have resulted in revenue to the GOK. It is not the act of surrendering KAUs to the GOK that implicates revenue otherwise due, but rather the act of purchasing additional KAUs from the GOK. As stated above, POSCO, as all other companies subject to the K-ETS program, had non-government options to obtain the requisite KAUs,

13

meaning that the GOK was not due any particular level of revenue related to such KAUs.  GOK IQR at 18-20, 22 (C.R.157/P.R.61), Exhibit CEP-14 (C.R.168/P.R.66).  POSCO demonstrated that the GOK-run auctions represented only a minor fraction of overall KAU sales.  Pl. Br. 31.

Further, Commerce's conclusion relied on the erroneous assumption that all companies emit GHGs beyond the amount of their KAUs during each compliance year.  However, some companies may end up never using the additional KAUs if they are able to reduce their carbon emissions well below their set amount.  The K-ETS program accounts for this possibility as it allows companies to carry over unused KAUs to the next compliance year.  GOK IQR at 12-13 (C.R.157/P.R.61).  In such cases, some KAUs may never be surrendered to the GOK.

Moreover, to the extent that the GOK may earn revenue from the K-ETS generally, the statute limits countervailing a subsidy to situations in which a government authority "provides a financial contribution . . to a person and a benefit is thereby conferred."  19 U.S.C. § 1677(5)(B).  Because the financial contribution must provide a benefit to the recipient, a countervailable financial contribution in the form of revenue foregone can be provided to and confer a benefit upon POSCO only if the revenue was otherwise due *from POSCO*.  As explained, that demonstrably was not the case.

Thus, Commerce's finding that the additional KAUs constitute revenue foregone that was otherwise due to the GOK is unsupported by substantial evidence and is not in accordance with law.

### B.    Commerce Erred in Finding that the Additional KAUs Conferred a Benefit to POSCO

In the *Final Results*, Commerce determined that the additional KAUs allocated to POSCO conferred a benefit pursuant to 19 C.F.R. § 351.503(b)(2), reasoning that POSCO was "relieved of the requirement to acquire additional allowances of KAUs" under the K-ETS

program. *Final Results IDM* at 40-42 (P.R.174). Similar to its findings on financial contribution, Commerce's benefit determination suffers from legal and factual errors.

A benefit is conferred "where a firm pays less for its inputs . . . than it otherwise would pay in the absence of the government program." 19 C.F.R. § 351.503(b)(1). In determining whether a benefit exists, Commerce must consider a program in its entirety and cannot evaluate certain aspects of the program "in isolation." *Gov't of Sri Lanka v. United States*, 308 F. Supp. 1373, 1380 (Ct. Int'l Trade 2018). In undertaking this analysis, Commerce must consider all evidence that "fairly detracts" from its determination. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).

Commerce failed to account for the full cost of compliance, as well as the overall purpose of the K-ETS program, in finding that POSCO was "relieved of the requirement to acquire additional allowances of KAUs" under the K-ETS program. *Final Results IDM* at 40-42 (P.R.174). The GOK enacted the K-ETS program through the Act on the Allocation and Trading of Greenhouse-Gas Emission Permits ("AAGEP") to implement its commitment to reduce greenhouse gas emissions, an obligation it undertook in the 2009 Copenhagen Accord (and later the Paris Agreement). GOK IQR at Appendix-16 (C.R.157/P.R.61). The K-ETS program compels enterprises and industries to either pay for their emissions (through KAUs) or face financial penalties if they fail to comply. *Id.* at 12-13. To prevent carbon leakage in light of the tremendous burden on enterprises and industries, the GOK provides KAUs to further the overall objective of reducing global emissions. *Id.* at 1-3. Thus, KAUs are more akin to permits that allow companies to emit certain amounts of GHG during a compliance year without sustaining additional costs. They are not financial contributions that confer benefits to companies.

Even with the additional KAUs, however, most companies suffered a significant financial burden in complying with the K-ETS program. *See* Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Initial Questionnaire Response," (Oct. 7, 2022) at Exhibit E-3 (C.R.46/P.R.53); GOK IQR at Exhibit CEP-15 (C.R.168/P.R.66). As a result, the additional KAUs did not relieve POSCO or any other companies or industries subject to the K-ETS program from the financial burden of compliance, but rather creates an overall burden on them to invest in technology that reduces their emissions and obtain KAUs sufficient to cover their remaining emissions. Commerce's finding that the additional KAUs confer a benefit is thus unsupported by substantial evidence or otherwise in accordance with law.

### C.    Commerce Erred in Finding that the Allocation of Additional KAUs Was *De Jure* Specific

In addition to its problematic financial contribution and benefit determinations, Commerce also erroneously found that the allocation of additional KAUs was *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i). *Final Results IDM* at 45-48 (P.R.174). Despite its acknowledgement that the K-ETS program does not explicitly limit eligibility for the additional KAUs to specific industries or enterprises, Commerce reasoned that "the AAGEP and its implementing rules do establish criteria," which "result in an express statutory limitation on which industries or enterprises qualify." *Id.* at 46. Commerce's finding contradicts the record.

Where the authority or legislation "establishes objective criteria or conditions" for eligibility, a subsidy is not *de jure* specific if (1) "eligibility is automatic," (2) "the criteria or conditions for eligibility are strictly followed," and (3) "the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification." 19 U.S.C. § 1677(5A)(D)(ii). The term "objective criteria or conditions" means

"criteria or conditions that are neutral and that do not favor one enterprise or industry over another." *Hyundai Steel Co.*, 659 F. Supp. 3d at 1340.

Commerce concluded that "the AAGEP and its implementing rules do establish criteria, and those criteria result in an express statutory limitation on which industries or enterprises qualify for the additional allocation by setting thresholds that industries must meet in order to qualify." *Final Results IDM* at 46 (P.R.174). The Court has entertained and rejected this same reasoning in other appeals concerning the K-ETS program. For example, the Court found that the relevant laws in South Korea do not "expressly restrict access to a particular (specific, as it were) and limited number of enterprises or industries. There is also nothing to demonstrate why any particular enterprise or industry would not qualify as long as it met the statutory numbers." *Hyundai Steel Co. v. United States*, No. 22-00032, 2023 WL 8715732, at *21 (Ct. Int'l Trade Dec. 18, 2023). The Court reached a similar conclusion as to the K-ETS program in another appeal, holding that Commerce's *de jure* specificity determination "relied on the existence of the criteria *per se* to establish specificity" and did not "offer a convincing explanation for why the 'international trade intensity' or 'production cost' criteria . . . *inherently* favor a given enterprise or industry." *Hyundai Steel Co.*, 659 F. Supp. 3d at 1342. Commerce's *de jure* specificity finding in the *Final Results* suffers from the same flaw.

The record confirms that the relevant South Korean laws contain objective criteria that require a finding that the K-ETS program is not *de jure* specific. Article 19(1) of the AAGEP Enforcement Decree specifies that the GOK will provide all KAUs to businesses for which the "production cost incurrence rate and the international trade intensity . . . is at least 2/1000." GOK IQR at 9-10, Appendix-16 at 2-3 (C.R.157/P.R.61), Exhibit CEP-1 (C.R.167/P.R.66). Rather than providing a list of eligible enterprises and industries, these criteria are neutral and

17

there is no indication that a single enterprise or industry will receive preferential treatment over others.  Moreover, once an enterprise or industry meets the threshold, it automatically receives the KAUs, and nothing in the provision authorizes the GOK to exercise its discretion to modify or reverse eligibility.  Lastly, the criteria are clearly spelled out in Article 12(4) of the AAGEP and Article 19(1) of the Enforcement Decree, making them verifiable.  GOK IQR at Exhibit CEP-1 (C.R.167/P.R.66).  Commerce's finding that the allocation of additional KAUs is *de jure* specific is thus unsupported by substantial evidence or otherwise in accordance with law.

**<u>CONCLUSION</u>**

For the reasons discussed above, Commerce's *Final Results* are not supported by substantial evidence or otherwise in accordance with law.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: July 12, 2024    *Counsel for the Government of the Republic of Korea*

## **CERTIFICATE OF COMPLIANCE**

Undersigned counsel hereby certifies that the foregoing Memorandum in Support of POSCO's Rule 56.2 Motion for Judgment on the Agency Record complies with the word-count limitation set forth in the Court's April 17, 2024 Scheduling Order. The Memorandum contains 5,208 words according to the word-count function of the word-processing software used to prepare this submission.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: July 12, 2024                    *Counsel for the Government of the Republic of Korea*