## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:    THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| POSCO, | ) |
| Plaintiff, | ) |
| and | ) |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) Ct. No. 24-0006 |
| Plaintiff-Intervenor, | ) |
| v. | ) PUBLIC VERSION |
| UNITED STATES, | ) Business Proprietary Material Omitted from Pages 17, 23, 38, 39 |
| Defendant, | ) |
| and | ) |
| NUCOR CORPORATION, | ) |
| Defendant-Intervenor. | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Of Counsel:

FEE PAUWELS
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

EMMA E. BOND
Trial Attorney | Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
202-305-2034 | emma.e.bond@usdoj.gov

September 13, 2024

*Attorneys for Defendant*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iv

RULE 56.2 STATEMENT ............................................................................................ 2

I.    The Administrative Determination Under Review ................................. 2

II.   Issues Presented For Review ................................................................. 3

STATEMENT OF FACTS ............................................................................................ 3

I.    Commerce Initiates An Administrative Review Of The Countervailing Duty
      Order Covering Cut-To-Length Carbon-Quality Steel Plate From Korea ............. 3

II.   Commerce Preliminarily Finds That The Provision Of Permits In The Emissions
      Trading System Confers A Countervailable Subsidy ........................................... 4

      A.    The Korea Emissions Trading System Provides Additional Emission
            Permits To Select Entities .......................................................... 5

      B.    Commerce Preliminarily Finds That The Additional Allocation Of Free
            Emission Permits Confers A Countervailable Subsidy ............................ 7

      C.    Commerce Determines Additional Information Is Required Regarding
            The Provision Of Electricity For LTAR Program .................................... 8

III.  In A Post-Preliminary Analysis, Commerce Preliminarily Determines That The
      Electricity For LTAR Program Confers A Countervailable Subsidy ................... 9

      A.    Overview Of The Provision Of Electricity For LTAR Program ................ 9

      B.    Commerce Preliminarily Determines To Countervail The Electricity For
            LTAR Program ........................................................................... 9

IV.   Commerce Issues The Final Results, Determining That The Provision Of
      Electricity For LTAR And The Provision Of Korean Emissions Trading System
      Permits Conferred Countervailable Subsidies To POSCO ................................ 11

SUMMARY OF ARGUMENT ................................................................................... 12

ARGUMENT ............................................................................................................ 13

I.    Standard Of Review ...................................................................................13

II.    Commerce Reasonably Determined That The Electricity For LTAR Subsidy Was *De Facto* Specific .............................................................................14

    A.    A Subsidy Is De Facto Specific If A Group Of Industries Receives A Disproportionately Large Amount Of The Subsidy .................................15

    B.    Commerce's Determination That A Group Of Industries Received A Disproportionately Large Amount Of The Subsidy Is Lawful And Supported By Substantial Evidence .......................................................16

    C.    Plaintiffs' Remaining Challenges Are Unpersuasive ..............................20

        1.    Commerce Reasonably Considered A Group Of Industries In Assessing Specificity .................................................................20

        2.    The Large Number Of Users Is A Predicate For Considering Disproportionality, Not A Disqualifying Factor..........................21

        3.    Commerce Reasonably Compared The Group's Electricity Consumption To Other Industrial Consumers Of Electricity........22

        4.    *Bethlehem Steel* Is Distinguishable Based On The Nature Of The Program ......................................................................................24

III.    Commerce's Determination To Countervail The Provision Of Additional Emission Permits In The Korea Emissions Trading System Is Lawful And Supported By Substantial Evidence...................................................................27

    A.    Commerce's Financial Contribution Determination Is Lawful And Supported By Substantial Evidence .......................................................27

        1.    Commerce Determined That But For The Additional Allocation, Revenue Would Be Due To The Government Of Korea—And Nothing More Is Required By The Statute...................................32

        2.    Commerce Reasonably Explained That The Provision Of Free Permits In The Korea Emissions Trading System Is Analogous To The Example Of Tax Credits In The Statute ...............................36

        3.    Substantial Evidence Supports Commerce's Finding That Freely Allocating Additional Emission Permits To Certain Entities Results In Foregone Revenue That Otherwise Would Be Due To The Government Of Korea.......................................................37

B.    Substantial Evidence Supports Commerce's Finding That The Additional Allocation Of Free Emission Permits Conferred A Benefit ....................40

1.    Commerce Reasonably Measured The Benefit From The Additional Allocation Of Free Permits ........................................40

2.    Plaintiffs' Challenges To Commerce's Reasoning Are Unpersuasive ...............................................................42

C.    Commerce's Specificity Determination Is Lawful And Supported By Substantial Evidence ...............................................................43

1.    Commerce Reasonably Determined That The Program Expressly Limits Qualifying Enterprises Or Industries Eligible For The Additional Allocation Of Free Permits ........................................44

2.    The Law Does Not Provide Objective Criteria Because The Conditions Favor Certain Industries .............................................46

CONCLUSION....................................................................................48

# TABLE OF AUTHORITIES

## CASES

*AK Steel Corp. v. United States*,
  192 F.3d 1367 (Fed. Cir. 1999)........................................................................17, 19

*Asociacion de Exportadores e Industtiales de Aceitunas de Mesa v. United States*,
  102 F.4th 1252 (Fed. Cir. 2024) ............................................................. 18, 28, 35

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
  *(ASEMESA), 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021)* ....................................45

*Beijing Tianhai Indus. Co. v. United States*,
  52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) .............................................................34

*Bethlehem Steel Corp. v. United States*,
  140 F. Supp. 2d 1354 (2001) ................................................................... 24, 25, 26

*BGH Edelstahl Siegen GmbH v. United States*,
  600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022) .................................................29, 42

*Carlisle Tire and Rubber Co. v. United States*,
  564 F. Supp. 834 (Ct. Int'l Trade 1983)...................................................................15

*Changzhou Trina Solar Energy Co. v. United States*,
  352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .................................................20, 23

*Chevron, U.S.A., Inv. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837, 104 S. Ct. 2778 (1984) ....................................................................35

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007)...............................................................................14

*Consol. Edison Co. of N.Y. v. NLRB*,
  305 U.S. 197 (1938) ..........................................................................................14, 38

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ................................................................................................14

*Delverde, SrL v. United States*,
  202 F.3d 1360 (Fed. Cir. 2000)...............................................................................34

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996) .........................................................................13, 31

*Gov't of Quebec v. United States*,
105 F.4th 1359 (Fed. Cir. 2024) .................................................................4

*Hyundai Steel Co. v. United States* (*Hyundai Steel I*),
659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) ....................................passim

*Hyundai Steel Co. v. United States*,
701 F. Supp. 3d 1398 (Ct. Int'l Trade 2024) ...................................passim

*Hyundai Steel Co. v. United States*,
No. 22-00032, 2023 WL 8715732 (Ct. Int'l Trade Dec. 18, 2023) ........................................30

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) ............................................................................35

*Micron Tech., Inc. v. United States*,
243 F.3d 1301 (Fed. Cir. 2001).......................................................15, 35

*Mosaic Co. v. United States*,
589 F. Supp. 3d 1298 (Ct. Intl. Trade 2022).................................25, 26

*Mosaic Co. v. United States*,
659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) .........................................21

*Ningbo Dafa Chem. Fiber Co. v. United States*,
580 F.3d 1247 (Fed. Cir. 2009).......................................................14, 38

*PPG Industries, Inc.*,
928 F.2d 1568 (Fed. Cir. 1991).................................................................8

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012)E ..............................................................31

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) ................................................................................14

## STATUTES

1 U.S.C § 1 ......................................................................................................34

19 U.S.C. § 1516a(b)(1)(B).............................................................................13

19 U.S.C. § 1671(a)(1).....................................................................................34

19 U.S.C. § 1677(5) ..........................................................................................4

19 U.S.C. § 1677(5)(A)......................................................................................4

19 U.S.C. § 1677(5)(B) ..............................................................................................9

19 U.S.C. § 1677(5)(C) ............................................................................................42

19 U.S.C. § 1677(5)(D) ............................................................................................28

19 U.S.C. § 1677(5)(D) ............................................................................................32

19 U.S.C. § 1677(5)(D)(ii) ................................................................................passim

19 U.S.C. § 1677(5)(D)(iii) ........................................................................................9

19 U.S.C. § 1677(5)(E) .......................................................................................40, 41

19 U.S.C. § 1677(5)(E)(i)-(iv) .................................................................................41

19 U.S.C. § 1677(5)(E)(iv) ....................................................................... 10, 41, 43

19 U.S.C. § 1677(5A)(D) ............................................................................ 16, 20, 22

19 U.S.C. § 1677(5A)(D)(i) ..............................................................................passim

19 U.S.C. § 1677(5A)(D)(ii) ...................................................................... 46, 47, 48

19 U.S.C. § 1677(5A)(D)(i)-(iii) ...............................................................................8

19 U.S.C. § 1677(5A)(D)(iii) ...........................................................................passim

19 U.S.C. § 1677(5A)(D)(iii)(I) ..............................................................................23

19 U.S.C. § 1677(5A)(D)(iii)(II) .............................................................................26

19 U.S.C. § 1677(5A)(D)(iii)(III) ............................................................................16

19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV) .......................................................................11

19 U.S.C. § 3512(d) ..........................................................................................15, 35

**REGULATIONS**

19 C.F.R. § 351.502(a) .............................................................................................21

19 C.F.R. § 351.502(b) ................................................................................ 16, 20, 41

19 C.F.R. § 351.503(a) .............................................................................................41

19 C.F.R. § 351.503(b)(2) ............................................................................. 8, 40, 43

19 C.F.R. § 351.509 .......................................................................................................40

19 C.F.R. § 351.509(a)(1) ...........................................................................................40

19 C.F.R. § 351.511(a)(1) ......................................................................................10, 27

19 C.F.R. § 351.511(a)(2)(iii) ......................................................................................24

## RULES

Rule 56.2....................................................................................................................1, 2

## FEDERAL REGISTER NOTICES

*Pure Magnesium and Alloy Magnesium from Canada,*
    57 Fed. Reg. 30,946 (Dep't of Commerce, July 14, 1992) ....................................25

*Countervailing* Duties,
    63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998).............................15, 18, 21, 22, 42

*Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination,*
    80 Fed. Reg. 68,849 (Nov. 6, 2015) ........................................................................24

*Certain Carbon and Alloy Steel Cut-to-Length Plate from thr Republic of Korea: Countervailing Duty Order,*
    82 Fed. Reg. 24,103 (May 25, 2017) .........................................................................3

*Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination,*
    83 Fed. Reg. 9,834 (March 8, 2018) ........................................................................47

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    87 Fed. Reg. 42,144 (Dep't of Commerce, July 14, 2022), ........................................3

*Large Diameter Welded Pipe from Korea,*
    88 Fed. Reg. 85,236 (Dep't of Commerce Dec. 7, 2023) .................................19, 26

*Brass Rod from the Republic of Korea: Final Affirmative Countervailing Duty Determination,*
    89 Fed. Reg. 29,290 (Dep't of Commerce, Apr. 22, 2024)..............................19, 26

*Certain Carbon and Alloy Steel Cut-to-Length Plate From Korea: Final Results and Partial Recission of Countervailing Duty Administrative Review;*
    *2019, 2017 Fed. Reg. 6,842 (*Dep't of Commerce , Feb. 7, 2022) .............................4

## LEGISLATIVE HISTORY

H.R. Rep. No. 103-316, vol. 1, at 925 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040..................4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:    THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | | |
|---|---|---|
| POSCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) | Ct. No. 24-0006 |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | PUBLIC VERSION |
| | ) | Business Proprietary Material |
| UNITED STATES, | ) | Omitted from Pages 17, 23, 38, 39 |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NUCOR CORPORATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully responds to the motions for judgment on the administrative record filed by plaintiff, POSCO, and plaintiff-intervenor, the government of the Republic of Korea (Korea) (collectively, plaintiffs). *See* POSCO Br., ECF Nos. 28, 29; Government of Korea (GOK) Br., ECF Nos. 32, 33. Plaintiffs challenge certain aspects of the 2021 administrative review of the countervailing duty order covering certain carbon and alloy steel cut-to-length plate (cut-to-length plate) from Korea.

In the final results, the Department of Commerce determined that the government of Korea's provision of electricity for less than adequate remuneration conferred a countervailable

subsidy.  Plaintiffs no longer contest that this program satisfied the first two elements of the analysis—namely, that it provided a financial contribution and conferred a benefit.  Although plaintiffs dispute the third element—specificity—Commerce reasonably determined the program was *de facto* specific because the steel industry, among a small group of other industries, received a disproportionately large amount of the subsidy.

Further, Commerce reasonably determined to countervail the provision of additional emission permits as part of the Korean Emissions Trading System.  As Commerce explained, the emission permits (referred to as Korean Allowance Units or KAUs) are fungible financial instruments, and the free allocation of additional permits to select entities: (1) provided a financial contribution akin to a tax credit in the form of foregone revenue otherwise due to the government of Korea, (2) conferred a benefit by improving the financial status of the entities receiving the additional permits, and (3) was *de jure* specific because the program's implementing rules limited eligibility based on criteria including the necessary volume of international trade.  Plaintiffs' arguments to the contrary are unpersuasive.  Because Commerce's final results are lawful and supported by substantial evidence, we respectfully request that the Court deny plaintiffs' motions and sustain the final results.

## RULE 56.2 STATEMENT

I.      The Administrative Determination Under Review

The administrative determination under review is *Certain Carbon and Alloy Steel Cut-to-Length Plate From Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 86,318 (Dec. 13, 2023) (final results), Appx15500–15502, and the accompanying

Issues and Decision Memorandum, Appx15419–15478.[1]  The period of review covered by the

final results is January 1, 2021, to December 31, 2021.  *Id.*

II.    Issues Presented For Review

      1.    Whether Commerce's determination that the provision of electricity for less than

adequate remuneration (LTAR) program is *de facto* specific is lawful and supported by

substantial evidence.

      2.    Whether Commerce's determination to countervail the free allocation of

additional emission permits as part of the Korean Emissions Trading System is lawful and

supported by substantial evidence.

## STATEMENT OF FACTS

I.    Commerce Initiates An Administrative Review Of The Countervailing Duty Order
     Covering Cut-To-Length Carbon-Quality Steel Plate From Korea

      In 2017, Commerce issued a countervailing duty order covering certain carbon and alloy

steel cut-to-length plate from Korea.  *Certain Carbon and Alloy Steel Cut-to-Length Plate from

the Republic of Korea: Countervailing Duty Order*, 82 Fed. Reg. 24,103 (May 25, 2017).

Pursuant to timely requests, Commerce initiated an administrative review of the order for the

2021 period of review.  *Initiation of Antidumping and Countervailing Duty Administrative

Reviews*, 87 Fed. Reg. 42,144 (Dep't of Commerce, July 14, 2022), Appx1011-1023.  Commerce

selected POSCO—the only producer of subject cut-to-length plate from Korea imported to the

United States during the period of review—as the sole mandatory respondent.  Appx1035-1037

(respondent selection memorandum); *see also* Appx14969.

---

    [1]  Appx__ refers to the Bates-numbered pages of the combined joint appendix to this
case.

On August 3, 2022, Commerce issued an initial questionnaire to the government of Korea.  Appx1040.  As explained in the questionnaire, Commerce inquired "into each subsidy program previously examined in the investigation or prior review, except for programs already determined to be terminated or not countervailable."  Appx1040.  As relevant here, Commerce requested information about the provision of emission permits (KAUs) as part of the Korea Emissions Trading System, a program that Commerce found to be "countervailable in a prior segment of this proceeding."[2]  Appx1069-1072.  Commerce also requested information regarding the provision of electricity for less than adequate remuneration (LTAR).[3]  Appx1073-1079.

II.    Commerce Preliminarily Finds That the Provision Of Permits In The Emissions Trading System Confers a Countervailable Subsidy

On June 6, 2023, Commerce published the preliminary results, preliminarily assigning POSCO a net countervailable subsidy rate of 0.79.  Appx15043-15045.  A countervailable subsidy exists when (1) a foreign governmental authority "provides a 'financial contribution;' (2) a 'benefit' is thereby conferred upon a recipient in connection with the manufacture or export of the subject merchandise; and (3) the subsidy is 'specific' to a foreign enterprise or industry, or a group of such enterprises or industries."  *Gov't of Quebec v. United States*, 105 F.4th 1359, 1362 (Fed. Cir. 2024) (citing 19 U.S.C. §§ 1677(5), (5A)).  Thus, in determining whether a

---

[2]  In prior reviews covering 2019 and 2020, Commerce determined that the provision of Korean Emission Trading System permits conferred a countervailable subsidy.  *See Certain Carbon and Alloy Steel Cut-to Length Plate From Korea:  Final Results of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 74,597 (Dep't of Commerce, Dec. 6, 2022) (AR 2020 Final), and accompanying IDM (AR 2020 IDM); *Certain Carbon and Alloy Steel Cut-to Length Plate From Korea:  Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 6,842 (Dep't of Commerce, Feb. 7, 2022) (AR 2019 Final), and accompanying IDM (AR 2019 IDM).

[3]  In the 2020 review, Commerce determined that the provision of electricity for LTAR program did not confer a benefit.  *See* AR 2020 IDM.

subsidy is countervailable, Commerce looks to three specific elements:  financial contribution, specificity, and whether a benefit was conferred.  19 U.S.C. § 1677(5); Uruguay Round Agreements Act, Statement of Administrative Action, H. R. Rep. No. 103-316, vol. 1, at 925 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4241 (SAA).

Applying these elements, Commerce preliminarily found nine programs to be countervailable, and that additional information was necessary to assess the provision of electricity for LTAR program.  Appx14981-14993, Appx14999-15000.  Commerce preliminarily found that the provision of additional free emission permits in the Korea Emissions Trading System conferred a countervailable subsidy.  Appx14990-14993.

A.    The Korea Emissions Trading System Provides Additional Emission Permits To Select Entities

The Korea Emissions Trading System requires subject entities to surrender emission permits to "offset annual emissions of various greenhouse gases."  Appx14990-14991 (citations omitted).

The Korea Emissions Trading System is governed by the Act on the Allocation and Trading of Greenhouse-Gas Emission Permits (AAGEP), and an enforcement decree implementing the AAGEP.  Appx14990; *see also* Appx88676, Appx88695 (AAGEP), Appx88752 (enforcement decree).  An entity is subject to the emissions trading system if, over the past three years, it (1) emitted at least 125,000 tons of carbon dioxide (or equivalent emissions) per year, or (2) had a single place of operation—*e.g.*, a specific plant—that emitted at least 25,000 tons of carbon dioxide (or equivalent emissions).  Appx14990; *see also* Appx87197; Appx88700 (Article 8(1) of AAGEP).

To operate the emissions trading system, the government of Korea establishes an allocation plan to reduce national greenhouse gas emissions, Appx88697 (Article 5(1) of

AAGEP); and allocates emission permits to subject business entities, Appx88703-88704 (Article 12 of AAGEP); Appx14990; Appx86984-86985.  "The term 'emission permit' means an amount of greenhouse gas emissions permitted and allocated to an individual business entity producing greenhouse gases within the scope of total allowances for greenhouse gas emissions" to achieve "targets for reducing greenhouse gases."  Appx88695 (Article 2(3) of AAGEP citing Article 5(1) and 42(1)).

The government of Korea issues a certain percentage of the allocated permits for free, with "the ratio of emission permits allocated gratuitously" established by presidential decree. Appx88704 (Article 12(3) of AAGEP explaining that permits are allocated either "onerously" or "gratuitously").  The government of Korea provides fewer free allocations in later phases to place a greater burden on emitting greenhouse gases over time.  Appx14990; *see also* Appx87190-87191.  The period of review fell within "Phase 3," in which the government of Korea freely allocated a baseline of 90 percent of the total allocated permits for the one-year compliance period.  Appx14991 (citing Appx86978).

Despite the baseline 90 percent allocation, the government of Korea freely allocated additional permits—totaling *100 percent* of the allocated permits—to entities meeting specific requirement thresholds.  Appx14991 (citing Appx88766 (Article 19(1) of enforcement decree); Appx88703-88704 (Article 12 of the AAGEP).  The additional allocation of free permits was provided to businesses with high international trade intensity and/or production costs. Appx14991 (citing, *e.g.*, Appx88704, Appx88766).  POSCO and various cross-owned entities were subject to the emissions trading system during the period of review, Appx14991, and received the 100 percent free allocation of permits, Appx14992; *see also* 19 C.F.R. § 351.525(b)(6)(i)-(v).

After the compliance period, each subject entity must report its emissions to the government of Korea, Appx88710-88711, and the government of Korea then certifies "the actual amount of greenhouse gas emissions produced."  Appx88712-88713 (Article 25 of the AAGEP). Each subject entity must then surrender emission permits to the government of Korea "equivalent to the amount of greenhouse gas emissions" previously certified.  Appx88713 (Article 27(1) of the AAGEP); *see also* Appx14990.  If the freely allocated emission permits are not sufficient to cover the certified amount of emissions, an entity may obtain additional permits by (among other things):

(1) purchasing additional emission permits from an auction run by the government of Korea,

(2) purchasing additional emission permits from a private entity—either on a centralized trading exchange or directly from other entities,

(3) relying on banked emission permits carried over from an earlier compliance year (with certain limitations), or

(4) applying earned credits for certain activities (*e.g.*, an external carbon offset program).

Appx14991 (citing, *e.g.*, Appx86985-86990; Appx92233-92235); *see also* Appx87191.  Any shortfall in surrendering the required number of emission permits results in a penalty paid to the government of Korea, with the "maximum penalty of KRW 100,000 per ton of carbon dioxide." Appx14991; *see also* Appx88715 (Article 33(1) of the AAGEP); Appx87192.

B.     Commerce Preliminarily Finds That The Additional Allocation Of Free Emission Permits Confers A Countervailable Subsidy

Commerce preliminarily found that the additional allocation of free emission permits conferred a countervailable subsidy at a subsidy rate of 0.61 percent *ad valorem*.  Appx14990-14993.  First, by providing "POSCO, POSCO Chemical, and POSCO SPS with an additional ten percent" free allocation of permits, the government of Korea "provided POSCO something of value on which it could otherwise collect revenue."  Appx14992.  Accordingly, "in providing

7

additional free emissions allocation to entities within certain sectors," Commerce preliminarily

determined that the government of Korea "is providing a financial contribution in the form of

revenue foregone," pursuant to 19 U.S.C. § 1677(5)(D)(ii).  Appx14992 (citation omitted).

Commerce also preliminarily found that the program conferred a benefit "to the extent

that the recipient is relieved of the obligation to purchase additional allowances."  Appx14992

(citing 19 C.F.R. § 351.503(b)(2)).  Commerce calculated a benchmark for the average unit value

of each emissions permit and multiplied it by the "quantity of preferential free allowances

provided to POSCO or its cross-owned input suppliers"—*i.e.*, the additional 10 percent.

Appx14992-14993.

Last, Commerce preliminarily found the program was specific.  Domestic subsidies can

be specific as a matter of law (*de jure*) or fact (*de facto*).  *See* 19 U.S.C. § 1677(5A)(D)(i)-(iii).

If Commerce determines a subsidy is *de jure* specific, it is not required to undertake a *de facto*

specificity analysis.  *See PPG Industries, Inc.*, 928 F.2d 1568, 1576 (Fed. Cir. 1991).  In this

case, Commerce determined that the additional free allowance of KAUs was "*de jure* specific,"

Appx14992, because "the authority providing the subsidy, or the legislation pursuant to which

the authority operates, expressly limit{ed} access to the subsidy to an enterprise or industry," 19

U.S.C. § 1677(5A)(D)(i).  As Commerce explained, "the additional allocations are expressly

limited to certain industries as a matter of law."  Appx14992.

C.    Commerce Determines Additional Information Is Required Regarding The
      Provision Of Electricity For LTAR Program

The government of Korea introduced "a new electricity tariff system on January 1,

2021," and the "full information" regarding 2021 costs became available only shortly before the

deadline for the preliminary results.  Appx15000.  Thus, Commerce required additional

information to analyze the provision of electricity for LTAR program.  Appx14999-15000.

III.    In A Post-Preliminary Analysis, Commerce Preliminarily Determines That The
        Electricity For LTAR Program Confers A Countervailable Subsidy

After analyzing the 2021 data, Commerce issued a post-preliminary memorandum

preliminarily determining that the provision of electricity for LTAR program conferred a

countervailable subsidy, at a "subsidy rate of 0.07 percent *ad valorem*."  Appx15110.

    A.    Overview Of The Provision Of Electricity For LTAR Program

The Korean electricity market is divided into three areas: "(1) electricity generation;

(2) the electricity wholesale market; and (3) the transmission/distribution/selling of electricity to

end users."  Appx15100.  With respect to the final area—selling of electricity—the Korea

Electric Power Corporation (KEPCO) "is the exclusive supplier of electricity in Korea," (with

certain exceptions for community energy services not applicable here).  Appx15101.

KEPCO generally purchases electricity from the Korea Power Exchange (KPX), which is

"responsible for setting the price of electricity, overseeing the electricity trading, and collecting

relevant data for the electricity market in Korea."  Appx15101.  KEPCO holds "majority

ownership" of KPX.  Appx15101.  The final area—electricity generation—is provided by six

"government-operated electricity generators" wholly owned by KEPCO—in addition to

"independent power generation companies, and community energy systems."  Appx15101.

    B.    Commerce Preliminarily Determines To Countervail The Electricity For LTAR
          Program

Commerce preliminarily determined to countervail the provision of electricity for LTAR

program.  Appx15104-15110.  First, Commerce found that KEPCO was an "authority" that

provided "a financial contribution in the form of the provision of a good or service."  Appx15104

(citations omitted); *see also* 19 U.S.C. § 1677(5)(B), (5)(D)(iii).

Further, a benefit was conferred because KEPCO provided electricity for less than adequate remuneration. *See* Appx15109. When an authority provides goods or services, "a benefit exists to the extent that such goods or services are provided for less than adequate remuneration," (LTAR). 19 C.F.R. § 351.511(a)(1); 19 U.S.C. § 1677(5)(E)(iv). To assess whether goods or services are provided for LTAR, Commerce considers, in order of preference: (1) a comparison between the government price and a market-determined price for actual transactions within the country" (a Tier 1 benchmark), (2) a comparison between the government price to a world market price (a Tier 2 benchmark), or (3) if no world market price is available, an assessment whether the government price is consistent with market principles (a Tier 3 benchmark). Appx15104-15105.

In this case, Commerce lacked information to calculate a Tier 1 or 2 benchmark, and thus preliminarily determined whether the government price for electricity for industrial customers was "consistent with market principles"—and concluded it was not. Appx15105-15110. On the one hand, KEPCO had a "pricing mechanism" based on laws, regulations, and processes to fully recover costs and a rate of return," during the period of review. Appx15109. However, "KEPCO's cost data demonstrate certain industrial tariff rates did not recover costs (inclusive of a rate of return)." Appx15109. Thus, a benefit was conferred.

Finally, regarding specificity, Commerce preliminary found that—although the record did not support a finding of *de jure* specificity—the provision of electricity for LTAR program was *de facto* specific. Appx15109-15110. A subsidy is *de facto* specific if one or more of the following four factors exist: (1) "{t}he actual recipients of the subsidy . . . are limited in number," (2) "{a}n enterprise or industry is a predominant user of the subsidy," (3) {a}n enterprise or industry *receives a disproportionately large amount of the subsidy*," or (4) the

10

discretion exercised by the authority in granting the subsidy "indicates that an enterprise or industry is favored over others."  19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV) (emphasis added).  In evaluating the *de facto* factors, Commerce "shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy{.}"  19 U.S.C. § 1677(5A)(D)(iii).

Commerce preliminarily determined the electricity for LTAR program was *de facto* specific because the steel industry received a "disproportionately large amount of the subsidy." Appx15109.  Commerce found a "wide diversification of economic activities" in Korea, and preliminarily determined that—out of 19 industry groupings—the steel industry and three other industries consumed "a disproportionately large amount of electricity in Korea."  Appx15109 (citing Appx97126-97130, Appx97176).

IV.    Commerce Issues The Final Results, Determining That The Provision Of Electricity For LTAR And The Provision Of Korean Emissions Trading System Permits Conferred Countervailable Subsidies To POSCO

From August 28, 2023, through September 1, 2023, Commerce met with representatives of the government of Korea to conduct verification of the GOK's questionnaire responses regarding the electricity for LTAR program.  *See* Appx97276-97277 (verification report). During verification, Commerce "observed differences between the reported electricity consumption amounts" reported by the government of Korea and the sales record of consumption.  Appx97277.  The corrected data showed that the steel industry and only "*two* other industries combined consume a majority of the industrial class electricity in Korea."  *See* Appx15444.

In administrative case briefs, POSCO and the government of Korea challenged (among other issues) Commerce's finding of *de facto* specificity for the electricity for LTAR program.

Appx97320 (government of Korea case brief); Appx97364 (POSCO case brief). Both parties also disputed Commerce's determination with respect to the Korean Emissions Trading System program, including financial contribution, benefit, and specificity. Appx97328 (GOK case brief); Appx97350 (POSCO case brief). Nucor submitted rebuttal briefs arguing that Commerce should "continue to countervail" the electricity for LTAR program and the provision of permits in the Korea Emissions Trading System (among other programs). *See, e.g.*, Appx97390.

On December 13, 2023, Commerce issued the final results, imposing a subsidy rate of 0.87 percent *ad valorem*. Appx15500-15502. Commerce continued to find both the electricity for LTAR program and the provision of Korea Emissions Trading System permits to be countervailable. Appx15428, Appx15442-15444 (electricity for LTAR program), Appx15452-15455, Appx15458-15460, Appx15463-15466 (provision of emission permits).

## SUMMARY OF ARGUMENT

Commerce's final results should be sustained in their entirety. First, with regard to the electricity for LTAR program, Commerce reasonably determined that the subsidy was *de facto* specific because the steel industry and two other industries—operating in the context of a well-diversified economy—consumed a disproportionately large amount of the subsidy.

Commerce's determination with regard to the Korean Emissions Trading System—specifically, the additional allocation of free permits to entities in trade-intensive sectors—should also be sustained. Substantial evidence supports Commerce's finding that the program provided a financial contribution. As Commerce explained, the permits are fungible financial instruments that subject entities must surrender to the government of Korea to account for their emissions. The government of Korea's free allocation of additional permits—over and above the baseline

allocation of 90 percent—reflected a financial contribution in the form of foregone revenue otherwise due to the government of Korea.

Although plaintiffs do not dispute that the emission permits are fungible financial instruments, they contend that the provision of additional permits *for free* did not confer a benefit on POSCO. Plaintiffs are incorrect. Commerce reasonably determined that the additional allocation conferred a benefit because POSCO was relieved of the requirement to acquire additional permits to comply with the emissions trading system. As Commerce explained, relieving POSCO of this requirement was akin to tax exemption programs that improve the financial status of an entity.

Finally, Commerce reasonably determined that the additional allocation in the emissions trading system is *de jure* specific. Plaintiffs are incorrect in claiming the additional allocation is based on objective criteria that are neutral and do not favor one enterprise or industry over another. Instead, substantial evidence supports Commerce's finding that the criteria favor certain industries because the allocation is limited to industries with high trade intensity or high production costs.

## **ARGUMENT**

### I.    Standard Of Review

In reviewing Commerce's countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

Commerce's factual findings "are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009). Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). An agency decision may not be overturned "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

II.    **Commerce Reasonably Determined That The Electricity For LTAR Subsidy Was *De Facto* Specific**

Commerce reasonably determined that the provision of electricity for LTAR program was *de facto* specific because the steelmaking industry and two other industries combined consumed a disproportionately large amount of the subsidy. Appx15442-15444. Plaintiffs' arguments to the contrary are unpersuasive.

A.    **A Subsidy Is De Facto Specific If A Group Of Industries Receives A Disproportionately Large Amount Of The Subsidy**

A domestic subsidy is *de facto* specific if (in relevant part): (1) the actual recipients "are limited in number," (2) "{a}n enterprise or industry is a predominant user of the subsidy," or (3) "{a}n enterprise or industry receives a disproportionately large amount of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii). Commerce examines these factors "in sequence," and "may find a domestic subsidy to be specific based on the presence of a single *de facto* specificity factor."

14

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,355 (Dep't of Commerce, Nov. 25, 1998) (citations omitted).

"{T}he weight accorded to particular {*de facto*} factors will vary from case to case." SAA at 931.[4]  "For example, where the number of enterprises or industries using a subsidy is not large, the first factor alone would justify a finding of specificity{.}"  *Id.*  "On the other hand, where the number of users of a subsidy is very large, the predominant use and disproportionality factors would have to be assessed."  *Id.*  The specificity requirement serves as "an initial screening mechanism to winnow out *only* those foreign subsidies which truly are broadly available and widely used throughout an economy," such as "'public highways and bridges.'"  SAA at 929 (quoting *Carlisle Tire and Rubber Co. v. United States*, 564 F. Supp. 834, 838 (Ct. Int'l Trade 1983)) (emphasis added).

In evaluating the *de facto* factors, moreover, Commerce "shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy{.}"  19 U.S.C. § 1677(5A)(D)(iii).  "{A}ny reference to an enterprise or industry"— including whether an enterprise or industry receives a disproportionately large amount of the subsidy—"includes a group of such enterprises or industries."  *Id.* § 1677(5A)(D).  "In determining whether a subsidy is being provided to a 'group' of enterprises or industries," Commerce "is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy."  19 C.F.R. § 351.502(b).

---

[4]  The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1309 (Fed. Cir. 2001) (quoting 19 U.S.C. § 3512(d)).

B.    Commerce's Determination That A Group Of Industries Received A
Disproportionately Large Amount Of The Subsidy Is Lawful And Supported By
Substantial Evidence

Commerce reasonably determined that the provision of electricity for LTAR program

was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III).  Appx15442-15444.

Commerce found that the Korean economy was widely diversified—with 19 industry

groupings—and that the steel industry and two other industries received a disproportionately

large amount of the subsidy provided by the electricity for LTAR subsidy program.  Appx15443-

15444.  This determination was lawful and supported by substantial evidence.

As an initial matter, the statute does not mandate any specific methodology in conducting

a *de facto* specificity analysis, and Commerce has discretion to apply a reasonable methodology.

*See* SAA at 931 (stating the "factors will vary from case to case").  As the Federal Circuit has

explained, "{d}eterminations of disproportionality and dominant use are not subject to rigid

rules, but rather must be determined on a case-by-case basis taking into account all facts and

circumstances of a particular case."  *AK Steel Corp. v. United States*, 192 F.3d 1367, 1384 (Fed.

Cir. 1999) (citation omitted).

In this case, substantial evidence supports Commerce's finding that a group of

industries—namely, the steel industry and two other industries— consumed a disproportionate

amount of the subsidy provided by the electricity for LTAR subsidy program.  Appx15443-

15444.  This finding was based on electricity usage data from the government of Korea during

the period of review, including the ten largest electricity-consuming industries in Korea and the

total electricity consumed by industrial users.  Appx87021-87022; Appx97441, Appx97564

(final results calculation memorandum), Appx97290-97291 (verification report).  Based on the

corrected data provided during verification, the steel industry and two other industries combined

consume a majority of the industrial class electricity in Korea.  Appx15444.  According to the corrected data, the steel industry consumed [ █████ ] percent of the electricity consumed by industrial consumers in Korea during the period of review.  Appx97564.  When combined, the steel industry and the [ ███████████████████ ] industries accounted for [ █████ ] percent of the total amount of electricity consumed by industrial class entities.  Appx97441, Appx97654.  The remaining industries each consumed less than [ ███ ] percent of the total electricity consumed by industrial consumers.  Appx97564.  Based on this information, Commerce reasonably determined that the steel industry and two others comprised "the majority consumers of industrial class electricity in Korea" during the period of review, and thus "plainly received a disproportionately large amount of the subsidy conferred by the purchasing of industrial class electricity{.}"  Appx15444 (citation omitted).

Plaintiffs contend that the group of three industries did not receive "a disproportionately large amount of the subsidy," GOK Br. at 5-7, and that Commerce failed to identify a "logical basis of comparison" to support its finding of disproportionality, POSCO Br. at 14-16 (citation omitted).  But the reference to disproportionate is "general in nature, indicating that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce."  *See Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States* (*ASEMESA*), 102 F.4th 1252, 1259-61 (Fed. Cir. 2024) (discussing the term "substantially dependent").  Applying this general term to the facts of this case, Commerce reasonably found that a group of three industries—out of 19 industries in a well-diversified economy—received a disproportionately large amount of the subsidy.  Appx15443-15444; Appx97441; Appx1156-1157.

Further, when assessing dominant use or disproportionality, Commerce "should normally focus on the level of benefits provided{.}" *See Countervailing Duties*, 63 Fed. Reg. at 65,359. As Commerce explained, the electricity for LTAR program conferred a benefit because certain industrial tariff classifications "were insufficient to cover costs plus a reasonable rate of return." Appx15435. Thus, the nature of the electricity for LTAR program means that "consumption volumes are directly tied to the amount of subsidy conferred{.}" Appx15444. Plaintiffs concede that "certain industries consume more electricity than others," GOK Br. at 5-7, and that steel production is "inherently energy intensive," POSCO Br. at 14-15 (citations omitted). Given the link between the consumption of electricity and the amount of the subsidy, Appx15444, the electricity-intensive nature of the steel industry supports Commerce's finding of *de facto* specificity. Under these circumstances, Commerce reasonably determined that the majority consumption by only three industries—in the context of a well-diversified economy of more than 19 industry groupings—represented disproportionate receipt of the subsidy. Appx15443-15444.

Moreover, Commerce reasonably considered "the extent of diversification of economic activities" in Korea, 19 U.S.C. § 1677(5A)(D)(iii), and data regarding the consumption of electricity in Korea. *See* Appx15443. This approach accords with recent cases involving the provision of electricity for LTAR program, in which Commerce determined that the subsidy was *de facto* specific. *Large Diameter Welded Pipe from Korea*, 88 Fed. Reg. 85,236 (Dep't of Commerce, Dec. 7, 2023), and accompanying IDM at 33; *see also Brass Rod from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 89 Fed. Reg. 29,290 (Dep't of Commerce, Apr. 22, 2024) (*Brass Rod from Korea*) and accompanying IDM at 30.

Plaintiffs do not dispute that the Korean economy is diverse. *See generally* GOK Br.; POSCO Br.; Appx15443; Appx1155-1158. Instead, POSCO argues that Commerce failed "to

link its finding that the economy of Korea is diverse" with its disproportionality finding.

POSCO Br. at 18.  However, the economic diversification criterion is simply designed "to *inform*

the application of" the specificity factors, not supersede them.  *Id.* at 18 (quoting SAA at 931)

(emphasis added).  Commerce's consideration of Korea's diverse economy complies with this

guidance.  *See* Appx15444.  The "wide diversification of economic activities" among 19 industry

groupings informed Commerce's finding that the electricity consumption by only three

industries—the steel industry and two others—represented a "disproportionately large" amount

of the subsidy.  Appx15443-15444; *see also* Appx15443 (citing, *e.g.*, *AK Steel*, 192 F.3d at 1384)

(highlighting the "case-by-case" nature of the disproportionality analysis).

C.    Plaintiffs' Remaining Challenges Are Unpersuasive

Plaintiffs raise several additional challenges to Commerce's specificity finding, all of

which are unpersuasive.

1.    Commerce Reasonably Considered A Group Of Industries In Assessing
Specificity

Plaintiffs claim that Commerce randomly grouped unrelated industries to achieve a

desired result.  POSCO Br. at 13-18; GOK Br. at 6, 9.  But there is no requirement for industries

receiving subsidies to have shared characteristics to be considered as a "group" for purposes of

assessing specificity. 19 C.F.R. § 351.502(b).  Commerce "*is not required to determine whether*

*there are shared characteristics* among the enterprises or industries that are eligible for, or

actually receive, a subsidy."  19 C.F.R. § 351.502(b) (emphasis added).  Thus, plaintiffs'

challenge to Commerce's grouping of industries runs counter to applicable law.  *See, e.g.*, GOK

Br. at 9.

In *Changzhou Trina Solar Energy Co., Ltd. v. United States*, for example, the Court

sustained Commerce's specificity finding based on a group of subsidy recipients, rejecting the

plaintiff's argument that the "variety" of sectors in the group considered "undermine{d} any finding of specificity." 195 F. Supp. 3d 1334, 1352 (Ct. Intl. Trade 2016) (*Changzhou Trina Solar Panels*). Although *Changzhou Trina* Solar Panels involved a specificity finding based on another provision of section 1677(5A)(D)(iii)—whether the subsidy recipients are limited in number—the application to a "group" remains the same when applying "disproportionately large" subsidy use. *See* 19 U.S.C. § 1677(5A)(D). In assessing the *de facto* criteria (including disproportionality), "{a}ny reference to an enterprise or industry . . . includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D). Thus, as in *Changzhou Trina* Solar Panels, the variety of industries in the group does not undermine the specificity analysis.

2.    The Large Number Of Users Is A Predicate For Considering Disproportionality, Not A Disqualifying Factor

Plaintiffs next argue that the subsidy cannot be specific because it is widely used. POSCO Br. at 12-13; GOK Br. at 8. This argument misunderstands the predicate for applying the disproportionality test.

Commerce applies a "sequential approach" to specificity. 19 C.F.R. § 351.502(a). This means that Commerce "will examine the factors" in 19 U.S.C. § 1677(5A)(D)(iii) "sequentially in order of their appearance." *Id.* (citing Section 771(5A)(D)(iii) of the Act). "If a single factor warrants a finding of specificity, the Secretary will not undertake further analysis." *Id.* Thus, if a subsidy is specific because the subsidy recipients are "limited in number," Commerce will not continue to assess whether an enterprise or industry is a predominant user or receives a disproportionately large amount of the subsidy. *See* 19 U.S.C. § 1677(5A)(D)(iii). Instead, Commerce will evaluate disproportionality only if the earlier factors are *not* satisfied.

Accordingly, Commerce considers the disproportionality test for *de facto* specificity only when "the subsidy in question was provided to numerous and diverse industries."

*Countervailing Duties*, 63 Fed. Reg. at 65,359.  Thus, far from being a disqualifying factor, such widespread use is a predicate to considering whether limited users are "in fact, dominant or disproportionate users."  *Id.*

Despite this sequential approach, the government of Korea relies on a case involving the first *de facto* criteria—that the subsidy recipients are "limited in number"—in attempting to undermine Commerce's reasoning.  *See, e.g.*, GOK Br. at 8 (citing *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1316 (Ct. Int'l Trade 2023) (*Mosaic* Morocco) (internal quotations omitted)).  However, the government of Korea fails to explain how the reasoning in this case implicates Commerce's analysis of disproportionality.[5]  In *Mosaic* Morocco, the Court remanded Commerce's determination that a tax fine reduction program was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I), when the record did not support Commerce's determination that the program was limited in number.  *Mosaic Co.*, 659 F. Supp. 3d at 1214-1217.  In this case, by contrast, Commerce's *de facto* finding is based on a later factor—disproportionality—which applies "where the number of users of a subsidy is very large."  *See* SAA at 931.  Plaintiffs are therefore wrong in claiming that the widespread use of electricity in Korea demonstrates any error in Commerce's disproportionality analysis.

> 3.    Commerce Reasonably Compared The Group's Electricity Consumption To Other Industrial Consumers Of Electricity

Plaintiffs also challenge Commerce's focus on industrial electricity use, arguing that Commerce should have compared the electricity consumption of the steel industry to *all*

---

[5]  Certain rules apply to all *de facto* criteria, such as the consideration of economic diversification and the provision that "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries."  19 U.S.C. § 1677(5A)(D).  However, the government of Korea has failed to link its arguments to any specific statutory provision.

consumer classes—including "residential, general, agricultural, and educational tariffs." POSCO Br. at 13; GOK Br. at 9. But Commerce generally links the analysis of dominant or disproportionate use to "the enterprises or industries that *received benefits* under the program." *Countervailing Duties*, 63 Fed. Reg. at 65,359 (emphasis added). "{T}he analysis of whether an enterprise or industry or group thereof is a dominant user of, or has received disproportionate benefits under, a subsidy program should normally focus on the level of benefits provided rather than on the number of subsidies given to different industries." *Id.*

In this case, Commerce explained that the program "conferred a benefit to the purchasers of certain *industrial* categories of electricity." Appx15437 (emphasis added). Commerce "determined that overall *industrial* electricity consumption {was} a reasonable measure of the amount of subsidy conferred" to the steel industry. Appx15444 (emphasis added). Thus, when assessing whether a group of industries received a "disproportionately large amount of the subsidy," Commerce reasonably focused on consumption among the industrial class. Appx15443-15444.

Citing this Court's decision in *Changzhou Trina Solar Energy Co. v. United States*, the government of Korea nonetheless argues that Commerce is "under an obligation to compare the industries receiving the subsidy to the industry makeup of the country at issue as a whole." GOK Br. at 6-7 (*citing Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1330 (Ct. Int'l Trade 2018) (*Changzhou Trina* Solar Cells)) (internal quotations omitted). The government of Korea takes this discussion out of context. In *Changzhou Trina* Solar Cells, the Court remanded Commerce's finding that the subsidization of aluminum extrusions was "limited in number" when provided to six "broad" industries—*i.e.*, building and construction; transportation; electrical; machinery and equipment; consumer durables; and other industries."

CONFIDENTIAL MATERIAL OMITTED

*Changzhou Trina* Solar Cells, 352 F. Supp. 3d at 1229, 1330-1331 (citing, *e.g.*, 19 U.S.C.

§ 1677(5A)(D)(iii)(I)).  Not only did *Changzhou Trina* Solar Cells involve a different *de facto*

criterion—applying when subsidy recipients are "limited in number," 19 U.S.C.

§ 1677(5A)(D)(iii)(I)—but the Court found that the six industries identified could be "further

broken down into numerous sub-industries."  *Id.* at 1331.  The same cannot be said for

Commerce's determination here, in which it identified three specific industries that alone

received a disproportionately large amount of the subsidy: the steel, [ ▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉ ] industries.  Appx15443-15444; Appx97564.  In its case-by-case analysis, Commerce

reasonably considered disproportionality in the context of the industrial class, consistent with the

nature of the benefit conferred.  Appx15443-15444; *see also Countervailing Duties*, 63 Fed. Reg.

at 65,359.

The government of Korea also relies on another Commerce decision, arguing that the

government of Korea acted consistently with the standard pricing mechanism.  GOK Br. at 10

(citing *Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty

Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying IDM at 12-13).  In

*Melamine From Trinidad and Tobago*, however, Commerce found "that the price-setting

method" for determining the pricing of electricity was "*consistent with* the meaning of 19 CFR

351.511(a)(2)(iii)"—governing a Tier 3 benchmark analysis for the adequacy of remuneration.

*Melamine From Trinidad and Tobago*, 80 Fed. Reg. 68,849, and IDM at 12-13 (emphasis added).

The case is therefore distinguishable from this proceeding, in which "a benefit is conferred

through the respondents' purchases of electricity{.}"  Appx15444.  Unlike in *Melamine from

Trinidad and Tobago*, the consumption of electricity in this proceeding was "directly tied to the

amount of subsidy conferred{.}"  Appx15444; *see also Countervailing Duties*, 63 Fed. Reg. at 65,359.

    4.    <u>*Bethlehem Steel* Is Distinguishable Based On The Nature Of The Program</u>

Finally, plaintiffs rely on *Bethlehem Steel*, in which the Court sustained Commerce's finding that an electricity discount—known as the Voluntary Curtailment Adjustment program—was not *de facto* specific despite record evidence that the steel industry received more than 51 percent of the subsidy program benefits.  POSCO Br. at 15-16; GOK Br. at 5, 10; *see also Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (2001), *amended*, 155 F. Supp. 2d 7071 (Ct. Int'l Trade 2001)).  *Bethlehem Steel* is distinguishable based on the differing nature of the program.

In *Bethlehem Steel*, this Court sustained Commerce's finding that an alleged subsidy program providing "discounted electricity to large users that curtailed their usage by at least 20 percent during designated times" was not specific.  *See Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1309 (Ct. Int'l Trade 2022) (*Mosaic* Russia), appeals filed, Fed. Cir. Nos. 24-1593, 24-1595 (citing *Bethlehem Steel*, 140 F. Supp. 3d at 1367-69).  The subsidy program at issue was designed to "encourage{} . . . off-hours electricity usage."  *Id.* at 1310 (citing *Bethlehem Steel*, 140 F. Supp. 3d at 1367).  The Court sustained Commerce's finding that the program was not specific, stating that although the Korean steel industry received over 51 percent of the discounts from the alleged subsidy program, "there {was} nothing in the record to indicate this percentage was disproportionately higher than would be expected."  *Bethlehem Steel*, 140 F. Supp. at 1369, *amended*, 155 F. Supp. 2d 7071.  In sustaining Commerce's finding, the Court also relied on a prior decision in which Commerce stated that it would "probably not find a countervailable" subsidy if the rate charged was consistent with a "standard pricing

mechanism" and the respondent was "in all other respects, essentially treated no differently than other industries which purchase comparable amounts of electricity." *Id.* at 1368 (quoting *Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg. 30,946, 30,950 (Dep't of Commerce, July 14, 1992)).

Plaintiffs argue that the same reasoning should apply in this case because the challenged program is "based on usage and electricity prices are set based on a standard pricing mechanism." *See, e.g.*, POSCO Br. at 16; GOK Br. at 10. Despite plaintiffs' effort to assign the broadest possible interpretation to the reasoning in *Bethlehem Steel*, however, both Commerce and this Court have consistently distinguished *Bethlehem Steel* in later cases involving *de facto* specificity, based on the nature of the benefit involved. *See, e.g.*, *Mosaic* Russia, 589 F. Supp. 3d at 1309; *Brass Rod from Korea* IDM at 30.

In *Mosaic* Russia, for example, this Court sustained Commerce's finding that the Russian Federation's provision of natural gas for LTAR program was *de facto* specific. *Mosaic* Russia, 589 F. Supp. 3d at 1309-10. Commerce found that "the agrochemical industry was 'a predominant user of the subsidy,'" *id.* (citing 19 U.S.C. § 1677(5A)(D)(iii)(II)), and the Court sustained that determination when "the record reflect{ed} that the agrochemical industry purchased a far greater amount than any other industrial user," *id.* The Court distinguished *Bethlehem Steel* on the basis of the different "kind of program at issue there (encouragement of off-hours electricity usage) and how increased consumption was part of the inherent nature of th{at} program." *Id.* at 1310 (citing *Bethlehem Steel*, 140 F. Supp. 2d at 1367).

Commerce has similarly distinguished the reasoning in *Bethlehem Steel* based on the nature of the program—including in other cases involving Korea's provision of electricity for LTAR program. In *Brass Rod from Korea*, Commerce explained that the program considered in

25

*Bethlehem Steel* involved "identical price discounts offered to certain electricity users that agreed to voluntarily limit their electricity consumption." *Brass Rod from Korea*, 89 Fed. Reg. 29,290, IDM at 26 (citation omitted). Unlike the program in *Bethlehem Steel*, the consumption volumes for an LTAR subsidy program are directly tied to the amount of subsidy conferred through the pricing of the good in question. *Id.*; *see also* Appx15444. In this proceeding, as in *Brass Rod from Korea*, Commerce explained that the benefit of the electricity for LTAR program "is conferred through the respondents' purchases of electricity." Appx15444. Thus, "it is unnecessary to demonstrate the amount of subsidy conferred was disproportionate to the consumption of electricity." Appx15444; *see also Brass Rod from Korea* IDM at 30; *Large Diameter Welded Pipe from Korea* IDM at cmt. 2 (discussing *Bethlehem Steel*).

As in *Mosaic* Russia and *Brass Rod from Korea*, moreover, this case involves the provision of a good or service for LTAR. Under a domestic subsidy program such as electricity for LTAR, "a benefit exists to the extent that such goods or services are provided for less than adequate remuneration." 19 C.F.R. § 351.511(a)(1). Because the benefit of the electricity for LTAR program "is conferred through the respondents' purchases of electricity," Appx15444, and a group of three industries, including the steel industry, consumed a majority of industrial class electricity, Appx15443-15444, Commerce reasonably determined that the steel industry was part of a group of industries that received a disproportionately large amount of the electricity for LTAR subsidy, Appx15443-15444. Commerce's prior decision reviewed in *Bethlehem Steel* does not require a different outcome.

III.   Commerce's Determination To Countervail The Provision Of Additional Emission
       Permits In The Korea Emissions Trading System Is Lawful And Supported By
       Substantial Evidence

Commerce's determination to countervail the additional allocation of free emission

permits is lawful and supported by substantial evidence.  Commerce reasonably determined that

all three statutory requirements—financial contribution, benefit, and specificity—were satisfied

to countervail the provision of additional permits as part of the Korea Emissions Trading System.

A.     Commerce's Financial Contribution Determination Is Lawful And Supported By
       Substantial Evidence

First, Commerce reasonably determined that the ten percent additional allocation of free

emission permits provided a financial benefit in the form of foregone revenue.  Appx15452-

15455.  In challenging this determination, plaintiffs fail to give effect to Commerce's well-

supported factual findings regarding the operation of the Korea Emissions Trading System

program.  POSCO Br. at 19-32; GOK Br. at 11-14.

The statute sets forth "four broad generic categories of government practices that

constitute a 'financial contribution.'"  SAA at 927.  These four categories include: (1) "the direct

transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of

funds or liabilities, such as loan guarantees, (2) "*foregoing or not collecting revenue that is

otherwise due*, such as granting tax credits or deductions from taxable income," (3) "providing

goods or service, other than general infrastructure," or (4) "purchasing goods."  19 U.S.C.

§ 1677(5)(D) (emphasis added).  "The types of financial contributions listed in the statute"—

such as granting tax credits—"represent 'broad' and 'generic categories of government

practices.'"  *Hyundai Steel Co. v. United States*, 701 F. Supp. 3d 1398, 1404 (Ct. Int'l Trade

2024) (citing SAA at 927).  "{T}he examples that 'fall{} under each of the categories are not

intended to be exhaustive.'" *Id.* (citing SAA at 927). "{D}eterminations with respect to particular programs will have to be made on a case-by-case basis." SAA at 927.

By using broad statutory terms and authorizing Commerce to make "case-by-case" determinations in implementing the countervailing duty statute, SAA at 927, Congress granted an "implied delegation of adjudicative authority" to Commerce. *See ASEMESA*, 102 F.4th at 1261.[6] In this case, Commerce reasonably exercised its adjudicative authority in determining that the ten percent additional allocation of free emission permits to certain industries provided a financial contribution in the form of forgone revenue. Appx15452-15455. Commerce's finding comports with the statutory language and is supported by substantial evidence.

As an initial matter, Commerce's analysis complies with the statute, including the requirement for foregone revenue that is "otherwise due." *See* 19 U.S.C. § 1677(D)(ii). "The word 'otherwise' means 'in different circumstances.'" *BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1252–53 (Ct. Int'l Trade 2022) (quoting *Otherwise* at Entry 2 of 3, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/otherwise (last visited Sept. 13, 2024)). In this context, "otherwise" means "but for the subsidy program." *Hyundai Steel Co. v. United States* (*Hyundai Steel I*), 659 F. Supp. 3d 1327, 1334 (Ct. Int'l Trade 2023), *remand determination sustained in part, Hyundai Steel Co. v. United States* (*Hyundai Steel II*), 701 F. Supp. 3d 1398, 1404 (Ct. Int'l Trade 2024).

In this case, Commerce found that revenue would be "otherwise due" but for the subsidy program, *i.e.*, the ten percent additional allocation of free emission permits. Appx15454. Substantial evidence supports Commerce's finding. The governing law—the AAGEP—provides

---

[6] In *ASEMESA*, the Federal Circuit held that because the statutory term "'substantially dependent'" was "general but not ambiguous," the statute provided an "implied delegation of adjudicative authority" to Commerce. *See* 102 F.4th at 1261.

that after the government of Korea accepts an entity's carbon emissions, an entity must surrender "a set amount" of emission permits to the government.  Appx15454[7] (citations omitted).  This obligation is important because emission permits "are financial instruments that are fungible."  Appx15452.  Because the emission permits "have a value, by requiring the surrender of a specific amount, the GOK *is establishing an amount of revenue*" that must be paid to the government of Korea.  Appx15454 (emphasis added).

Further, there are no emission permits "in the market that the GOK has not either freely allocated or sold."  Appx15454.  Any emissions permit "that is not freely allocated and is released into the market by the GOK generates revenue" for the government of Korea.  Appx15454.  The purpose of the system is to "ensure that every ton of carbon emissions has a price (or cost) associated with it, and that cost is being taken into account by the parties emitting the carbon."  Appx15453.  "In other words, by putting a price on carbon, the GOK is ensuring that polluters are paying a cost to the government acting on behalf of society."  Appx15453.  "By providing additional free allowances to the select group of polluters at issue here, the government is choosing *not* to collect costs (*i.e.*, foregoing revenue) that are otherwise due under the overall framework and purpose of that system."  Appx15453.  "Under such a legal regime that ultimately aims to impose a price or cost on carbon emissions, the provision of additional free allowances is foregoing revenue that otherwise *would* be due."  Appx15453.

---

[7] "A business entity eligible for allocation shall surrender emission permits equivalent to the amount of greenhouse gas emissions certified" by the government of Korea at the end of each compliance year.  Appx88713 (Art. 27 of AAGEP).  As the government of Korea explained in its questionnaire response, "participants must submit emission permits equivalent to the amount of carbon gas that they have emitted . . . within six months from the end of each compliance year."  Appx87200.

Commerce's factual findings in this case satisfy the but-for standard established by the statute. In a recent case, for example, this Court sustained Commerce's finding of a financial contribution from the additional allocation of emission permits in the Korea Emissions Trading System. *Hyundai Steel Co. v. United States*, No. 22-00032, 2023 WL 8715732, at *4 (Ct. Int'l Trade Dec. 18, 2023) (remanding on other grounds). In that case, the Court rejected the respondent's argument that there was "no expected revenue otherwise due because there is no way to know, when the South Korean government issues units, whether the recipient will need all the units received, a smaller number (in which case the recipient might then sell the unused portion), or a larger number." *Id.* The Court agreed with Commerce that "the key consideration is that, in lieu of giving these entities the additional {units} for free, the {South Korean government} *would have received revenue from said entities*." *Id.* (citation omitted) (emphasis added). "Because most other entities were required to pay for additional units that were simply given away to Hyundai and a few other similarly situated companies, the South Korean government failed to collect revenue that it otherwise would have received." *Id.* Thus, the Court determined that Commerce's finding was supported by substantial evidence.

In this case, similarly, substantial evidence supports Commerce's finding that any emissions permit that is not freely allocated "and is released into the market by the government of Korea generates revenue for the government of Korea." Appx15453. By contrast, granting additional free permits to certain entities does not generate revenue for the government of Korea—reflecting a missed opportunity for revenue in the but-for world. Appx15453-15454. "By providing additional free allowances to the select group of polluters at issue here, the government is choosing not to collect costs (i.e., foregoing revenue) that are otherwise due under the overall framework and purpose" of the emissions trading system. Appx15453.

Commerce has greater expertise than courts in understanding the economics of emissions trading systems and in applying the "broad" statutory standard to the case-by-case facts of the program. *See* SAA at 927. "Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (quoting *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996)). Deference is owed to Commerce's factual findings and exercise of "technical" expertise in understanding the inner-workings of the Korea Emissions Trading System. *See id.* (citations omitted).

Plaintiffs nonetheless claim error in Commerce's determination, arguing that: (1) Commerce failed to comply with the statute, (2) Commerce wrongly compared the ten percent additional allocation of emission permits to a tax credit, and (3) Commerce's findings are not supported by substantial evidence. POSCO Br. at 20-32; GOK Br. at 11-14. All of these arguments lack merit.

1.  Commerce Determined That But For The Additional Allocation, Revenue Would Be Due To The Government Of Korea—And Nothing More Is Required By The Statute

Plaintiffs argues that "Commerce failed to demonstrate that any {forgone} revenue was 'otherwise due' to the GOK as required by the plain language of the statute." POSCO Br. at 9; *see also* GOK Br. at 11-14. However, Commerce found that but for the additional allocation of free emission permits, revenue would have been otherwise due to the government of Korea. Appx15453-15455. Nothing more is required by the statute.

Plaintiffs' statutory arguments rely primarily on this Court's decision in *Hyundai Steel I*, 659 F. Supp. 3d at 1332. In *Hyundai Steel I*, the Court acknowledged that "a lay observer may

consider it clear that the GOK makes a financial contribution to Hyundai Steel by providing the additional KAUs{.}" 659 F. Supp. 3d at 1332.  Nevertheless, the Court remanded the case to Commerce, holding (among other things) that Commerce's financial contribution analysis failed to comply with the statute and was not supported by substantial evidence.  *Id.*  After the remand, the Court sustained Commerce's financial contribution finding—albeit on a different ground that the program provided a "direct transfer of funds."  *Hyundai Steel II*, 701 F. Supp. 3d at 1403-04 (citing, *e.g.*, 19 U.S.C. § 1677(5)(D)(i)).

In *Hyundai Steel I*, the Court found "the plain meaning of the phrase {otherwise due} does not encompass revenue that could, but not necessarily would, have otherwise been collected by the relevant authority."  POSCO Br. at 21 (quoting *Hyundai Steel I*, 659 F. Supp. 3d at 1334). In reaching this interpretation, the Court relied on dictionary definitions of the term "due" as "something '{t}hat is owed or payable as an *enforceable obligation or debt.*'"  659 F. Supp. 3d at 1334 (citing Due, Oxford English Dictionary, https://www.oed.com/dictionary/due_adj); *see also id.* (quoting Due, Dictionary.com, https://www.dictionary.com/browse/due (defining "due" as "'owed at present; having reached the date for payment' or, 'owing or owed, irrespective of whether the time of payment has arrived'").

Under these definitions, the Court reasoned that "the value embodied by {the additional allocated} permits does not represent revenue that, but for the permits being given" for free to the respondent, "'is otherwise due' to the GOK."  *Id.*  Relying on this reasoning, plaintiffs now assert that "there is no expected revenue owed to the GOK by virtue of the emissions permit allocations."  POSCO Br. at 22; *see also* GOK Br. at 11-14.

However, plaintiffs fail to defer to Commerce's well-supported factual findings in this proceeding—which comport with the requirement in *Hyundai Steel I* that foregone revenue is

otherwise due when it "would" have otherwise been collected by the relevant authority.  *Hyundai Steel I*, 659 F.3d at 1334.  Commerce determined that but for the ten percent additional allocation, the government of Korea *would* have received revenue otherwise due.  *See, e.g.*, Appx15453.  Considering the full scope of the Korea Emissions Trading System program, Commerce found that "provision of additional free allowances" foregoes "revenue that otherwise *would* be due."  Appx15453.  But for the provision of additional free emission permits, Commerce found that "the GOK would at some point collect revenue through the program to account for the 'costs'" of carbon emissions, measured by emission permits.  Appx15454.  Nothing more is required by the statute.

Plaintiffs nonetheless argue that "at the time the emissions permits are issued, it is unknown whether the recipient will need all of the permits to cover their emission reduction obligations, or whether they will need to purchase additional permits from private parties or through the GOK auction."  POSCO Br. at 22-23; *see also* GOK Br. at 11-13.  This argument demands a degree of certainty that is not required by the statute.  Instead, the *Hyundai Steel I* Court recognized that the statute covers foregone revenue would otherwise be "due presently or *would be due at some time in the future*."  *See Hyundai Steel I*, 659 F. Supp. 3d at 1334 (citations omitted) (emphasis added).  This is because the statute references revenue that "is" otherwise due—in the present tense—and thereby "include{s} the future as well as the present."  *Id.* (citing 1 U.S.C. § 1); *see also* 19 U.S.C. § 1677(5)(D)(ii).  Thus, the statute is sufficiently broad to cover revenue that would be due in the future—whether directly from POSCO or indirectly from another entity subject to the emissions trading system.[8]  Commerce found that the requirement

---

[8]  *Hyundai Steel II* raised the question whether "the statute permits the agency to consider revenue that might ultimately be sent from a third party to the authority to fulfill the revenue

was satisfied because the operation of the emissions trading system—a closed marketplace in which only the government of Korea can issue emission permits—means that freely allocating additional permits to one entity or group of entities results in foregone revenue to the government.  Appx15453-15455.  Commerce's analysis thus comports with the statute.

Commerce recognized that "{r}educing emissions . . .  reduces the obligation to the GOK and is distinct from the other methods, which are options available to obligated entities to obtain KAUs for a compliance year."  Appx15454 n.142.  Commerce also acknowledged that "POSCO may not be personally required to purchase additional allowances from the government to meet its obligation."  Appx15454.  Nevertheless, the government of Korea designed a system in which every emissions permit that is not freely allocated "and is released into the market by the government of Korea *generates revenue* for the government of Korea."  Appx15453.  Therefore, by providing "additional free allowances to the select group of polluters at issue here," the government of Korea chose not to collect revenue "otherwise due under the overall framework and purpose" of the emissions trading system.  Appx15453.  The financial contribution statute is sufficiently "broad" to cover this scenario, *see* SAA at 927—particularly when Commerce determined that the additional allocation of free permits was analogous to the "tax credit" example listed as foregone revenue in the statute.  Appx15452; 19 U.S.C. § 1677(5)(D)(ii).

---

forgone provision."  701 F. Supp. 3d at 1404 n.6.  However,  a countervailable subsidy may be provided "*directly or indirectly*."  *Delverde, SrL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir. 2000), *as amended on denial of reh'g and reh'g en banc* (June 20, 2000) (citing 19 U.S.C. § 1671(a)(1)) (emphasis added).  Further, a financial contribution may be provided even without "actual evidence of the amount of the financial contribution," so long as the benefit may be calculated.  *See Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1362-65 (Ct. Int'l Trade 2015).  Thus, the "broad" statutory provisions allows Commerce to make case-by-case adjudications on this issue.  *See* SAA at 927.

Finally, POSCO contends that Commerce's interpretation is unreasonable under the *Chevron* standard. POSCO Br. at 28-29 (citing *Chevron, U.S.A., Inv. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), *overruled by Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024)). But Commerce did not purport to resolve any statutory ambiguity. Appx15453-15455. Instead, Commerce *applied* the law to the facts of the case—exercising its adjudicatory authority to assess whether the additional allocation of free emission permits provided a financial contribution. Appx15453-15455; *ASEMESA*, 102 F.4th at 1259-61. Commerce's exercise of adjudicatory authority is consistent with the "case-by-case" analysis sanctioned by Congress. SAA at 927; *see also Micron Tech.*, 243 F.3d at 1309 (quoting 19 U.S.C. § 3512(d)).

### 2. Commerce Reasonably Explained That The Provision Of Free Permits In The Korea Emissions Trading System Is Analogous To The Example Of Tax Credits In The Statute

Commerce reasonably explained that the additional allocation of free emission permits operated in a manner similar to a tax credit, supporting the determination that the program provided a financial contribution. Appx15452 (citing 19 U.S.C. § 1677(5)(D)(ii)). POSCO's argument that this program is unlike the examples listed in the statute is unavailing. *See* POSCO Br. at 22.

An authority provides a financial contribution by "foregoing or not collecting revenue that is otherwise due, *such as granting tax credits or deductions from taxable income*." 19 U.S.C. § 1677(5)(D)(ii) (emphasis added). Commerce found that the ten percent additional allocation of free permits "operates in a similar manner to a tax credit program," which is exemplary of foregone revenue. Appx15452. As Commerce explained, when "applying a tax, a government creates a financial obligation on an entity." Appx15452. "{A} tax credit program

relieves the entity of part of the value of the obligation." Appx15452. Similarly, the Korea

Emissions Trading System "creates an emissions compliance obligation" by requiring subject

entities "to surrender" emission permits reflecting the cost associated with each entity's

greenhouse gas emissions during the relevant period. Appx15452. The additional ten percent

allocation of free permits to certain industries "relieves entities within those industries, in part,

from this obligation" to the authority. Appx15452.

POSCO argues that Commerce's analogy to tax credits is "inapt." POSCO Br. at 26.

POSCO claims that unlike tax credits that reduce taxes "otherwise *legally owed* to the

government," the Korea Emissions Trading System program imposes "no expected revenue

otherwise due to the GOK." POSCO Br. at 26. Again, this argument fails to acknowledge

Commerce's finding that emission permits "have a recognized market value," and that "by

requiring the surrender of a specific amount" of permits, the government of Korea "is

establishing an amount of revenue that is required to be paid" to the government. Appx15454.

Thus, Commerce reasonably explained that the provision of free emission permits provides a

financial contribution in the form of foregone revenue, in a manner similar to tax credits.

Appx15454.

> 3.   Substantial Evidence Supports Commerce's Finding That Freely Allocating
>       Additional Emission Permits To Certain Entities Results In Foregone Revenue
>       That Otherwise Would Be Due To The Government Of Korea

Having failed to demonstrate any violation of law, plaintiffs challenge the factual

underpinnings of Commerce's factual findings. *See, e.g.*, POSCO Br. at 29-32; GOK Br. at 11-

14. However, Commerce's findings are supported by substantial evidence.

First, substantial evidence supports Commerce's factual finding that the government of

Korea establishes an amount of *revenue* owed to the government by requiring the surrender of

emission permits after each compliance year.  Appx15454.  POSCO claims that POSCO "did not 'owe' revenue" to the government of Korea before or after "its emission allocation."  POSCO Br. at 23; *see also* GOK Br. at 13 (disputing that revenue would have been owed to the GOK).  However, the government of Korea "require{es} the surrender of a specific amount" of permits corresponding to the carbon emissions during the compliance year.  Appx15454 (citing AAGEP Articles 24(1), 27, Appx88710-88711, Appx88713).  Article 27 of the AAGEP provides that "{a} business entity eligible for allocation *shall surrender emission permits* equivalent to the amount of greenhouse gas emissions certified" for each compliance year.  Appx88713 (emphasis added).  Because KAUs have a "recognized market value," Commerce reasonably found that the obligation to surrender a specific number of KAUs "establish{ed} an amount of revenue that is required to be paid to the GOK for compliance" with the Korea Emissions Trading System program.  Appx15454.

Although plaintiffs dispute whether POSCO would have purchased permits from the government auction (POSCO Br. at 22-23, GOK Br. at 13-14), Commerce found that the use of the auction "is not the point at which revenue is 'otherwise due'" to the government of Korea, Appx15454 (emphasis added).  Instead, "the obligation to the GOK for the compliance year is complete upon the surrender" of the permits to the government—which "generates revenue" from any emission permit that is not freely allocated.  Appx15454.  Plaintiffs do not dispute that the emission permits have an established market value, or that subject entities are required to surrender a specific number of permits to the government.  *See* Appx15453-15454.  Based on these findings, a reasonable mind could conclude that the act of surrendering permits to the government of Korea implicates revenue otherwise due—as found by Commerce.  Appx15453;

CONFIDENTIAL MATERIAL OMITTED

*see also Consol. Edison Co. of N.Y.*, 305 U.S. at 229; *Ningbo Dafa Chem. Fiber Co.*, 580 F.3d at

1253.[9]

Finally, POSCO contends that "data on the record suggests that the GOK largely would

not have generated revenue" from the additional permits allocated to POSCO—claiming that

[ ███████████████████████████████████████████████████████ ] .

POSCO Br. at 31 (citing Appx86982-86989).  But these figures only show how much revenue

the government of Korea actually [ ████████████ ] during the period of review.  *See*

Appx86982-86989.  They do not undermine Commerce's finding on the dispositive question—

whether the government of Korea would have been owed additional revenue assuming that the

additional allocation of free permits were *not* provided.  *See* 19 U.S.C. § 1677(5)(D)(ii)

(applying to foregone revenue "otherwise" due).

Indeed, the government of Korea explained that it did [ ███████████████████

██████████ ] "in consideration of the market price and supply of KAU20s at the time."

Appx92233-92234.  This is no surprise when the government of Korea "manages the market

price" of the emission permits "through scarcity"—which was necessarily impacted by providing

"additional free allowances to the select group of polluters at issue here."  *See* Appx15453.

Further, the government of Korea explained that entities receiving the additional free allocation

---

[9]  POSCO also argues that "{e}ach permit allocated above 90 percent would have been
part of {a} larger pool of permits used for multiple purposes"—namely, the "reserve" permits—
"and thus would not have necessarily been auctioned" by the government of Korea.  POSCO Br.
at 30.  But POSCO's citations merely indicate that the "reserve" permits may be available to
"permits to new entrants and to participants that {have} constructed or expanded {their}
facilities."  *See* POSCO Br. at 30 (citing Appx86979).  POSCO does not argue that either factual
predicate applies in this case and thus fails to undermine Commerce's factual findings.
Moreover, POSCO's argument does not undermine Commerce's finding that revenue would
have been due to the government of Korea but for the additional allocation of free permits.  By
providing additional free emissions permits to a select group of polluters, the government of
Korea is opting to *not* collect the "cost" of carbon emitted by those entities.  Appx15453.

CONFIDENTIAL MATERIAL OMITTED

of permits can only purchase from "the market," whereas entities subject to the baseline 90

percent allocation may purchase additional permits from the market *or through the government-*

*run auction.*"  Appx87191 (emphasis added).  Thus, absent the additional free allocation to

POSCO and others, more entities would have received the baseline allocation and, thus, would

have been eligible to purchase additional permits "through the government-run auction."  *See*

Appx87191.  Accordingly, POSCO's argument about the frequency of [ ███████████ ]

does not undermine Commerce's finding that "{b}y providing additional free allowances to the

select group of polluters at issue here, the government is choosing not to collect costs (i.e.,

foregoing revenue) that are otherwise due under the overall framework."  Appx15453.

      B.      Substantial Evidence Supports Commerce's Finding That The Additional
               Allocation Of Free Emission Permits Conferred A Benefit

Commerce also lawfully determined that the Korea Emissions Trading System program

conferred a benefit, pursuant to 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.503(b)(2), because

the additional allocation of free emission permits relieves POSCO of the obligation to purchase

additional allowances.  Appx15458.  As Commerce explained, relieving POSCO of this

requirement was akin to a tax exemption program that improves the financial status of the entity.

Appx15458-15460.  Plaintiffs' arguments to the contrary are unpersuasive.

      1.      Commerce Reasonably Measured The Benefit From The Additional
               Allocation Of Free Permits

"A benefit shall normally be treated as conferred where there is a benefit to the

recipient{.}"  19 U.S.C. § 1677(5)(E).  Section 1677(5)(E) lists equity infusions, loans, loan

guarantees, and goods and services as examples of a benefit.  *Id.*  By regulation, moreover, a

program that "provides for a full or partial exemption or remission of a direct tax" confers a

benefit "to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program."  19 C.F.R. § 351.509(a)(1).

In this case, Commerce determined that the provision of additional free emission permits conferred a benefit.  Appx15458-15459.  Commerce reasoned that the benefit conferred was similar to a tax exemption program as outlined in 19 C.F.R. § 351.509.  Appx15458-15459.  Specifically, the program "has similarities with the obligation and partial release from a burden of compliance that governments impose on entities in tax exemption programs."  Appx15458.  On this basis, Commerce determined that a benefit existed because the additional allocations had the effect of "releasing an entity from its financial obligations{.}"  Appx15459.

When measuring a benefit, moreover, specific rules govern the calculation of a benefit for certain government programs, such as grants.  19 C.F.R. § 351.503(a).  When these specific rules do not apply—and when the benefit "does not take the form of a reduction in input costs or an enhancement of revenues"—Commerce "will determine whether a benefit is conferred by examining whether the alleged program or practice has *common or similar elements* to the four illustrative examples" in section 1677(5)(E)(i)-(iv).  *Id.* § 351.503(b)(2) (emphasis added).

When measuring the benefit in this case, Commerce used a method similar to that used to measure the benefit when goods or services are provided "for less than adequate remuneration" (LTAR) pursuant to section 1677(5)(E)(iv).  *See* Appx15459.  When goods or services are provided for "less than adequate remuneration," the adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country which is subject to the investigation or review.  19 U.S.C. § 1677(5)(E).  Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*

Commerce reasonably applied an adequate remuneration standard when measuring the benefit in this case.  Appx15459.  Commerce acknowledged that the government of Korea was "not directly taxing carbon emissions," but nonetheless was "charging certain entities no cost for something that has an established market value."  Appx15459.  Because there was "an established in-country market price" for emission permits, Commerce "applied an adequate remuneration standard to the revenue foregone{.}"  Appx15459.  Commerce thus "compared the price paid by POSCO for the additional ten percent" allocation to the "benchmarked value" of the additional allocation "at the average market price POSCO and its affiliates paid for or purchased" permits during the compliance year, or their equivalents."  Appx15459.

2.    Plaintiffs' Challenges To Commerce's Reasoning Are Unpersuasive

The government of Korea challenges Commerce's determination that a benefit was conferred—arguing that Commerce failed to consider the "full cost of compliance" with the Korea Emissions Trading System and that "most companies suffered a significant financial burden in complying" with the program.  GOK Br. at 15-16.  This argument is unpersuasive.

As Commerce explained, "{a} subsidy that reduces a firm's costs of compliance remains a subsidy … even though the overall effect of the two government actions . . . taken together, may leave the firm with higher costs."  Appx15458 (quoting *Countervailing Duties,* 63 Fed. Reg. at 65,361).  By statute, Commerce "is not required to consider the effect of the subsidy in determining whether a subsidy exists."  19 U.S.C. § 1677(5)(C).  Consistent with this provision, "Commerce determines benefit by the reduction or elimination of the obligation, without regard to the source of that obligation."  *BGH Edelstahl Siegen GmbH*, 600 F. Supp. 3d at 1264.  Thus, "{t}he determination of whether a benefit is conferred is completely separate and distinct from

an examination of the 'effect' of a subsidy." *Countervailing Duties,* 63 Fed. Reg. at 65,361; 19 U.S.C. § 1677(5)(C).

Thus, when Commerce analyzes whether a potential subsidy exists, it does not consider the effects of the subsidy, or any related "burdens" imposed on a firm that are related to the granting of the subsidy. Appx15458. This practice has been upheld by the Court. *See, e.g.*, *Hyundai Steel I*, 659 F. Supp. 3d at 1338-40 & n.28; *see also Hyundai Steel Company v. United States*, No. 22-00032, 2023 WL 8715732, at *4-6. Accordingly, the government of Korea is incorrect in claiming that Commerce should have considered the "burdens" imposed by the broader Korea Emissions Trading System in assessing whether a "benefit" was conferred by the additional allocation of free permits to certain entities. *See* GOK Br. at 15-16.

POSCO's challenge to Commerce's benefit analysis is no more persuasive. *See generally* POSCO Br. at 32-36. Specifically, POSCO argues that "Commerce never actually provided an explanation as to how" the Korea Emissions Trading Program "had common or similar elements to the statutory examples as required by 19 C.F.R. § 351.503(b)(2)." *Id.* at 33. According to POSCO, "emissions permits are not 'goods' or 'services'" provided for less than adequate remuneration "as required for an LTAR program." *Id.* at 34 (citing 19 U.S.C. § 1677(5)(E)(iv)). As Commerce explained, however, the provision of free permits is comparable to an LTAR program because the government of Korea "is charging certain entities no cost for something with an established market value." Appx15459. Again, emission permits "are financial instruments that are fungible," Appx15452, and "an established in-country market price exists" for emission permits, Appx15459.

Finally, POSCO contends that Commerce failed to link its determination of benefit to the financial contribution provided by the government of Korea. *See* POSCO Br. at 35. To the

contrary, Commerce's benefit determination logically follows from the finding of a financial

contribution.  Appx15455; *see also* Appx15458-15459.  The provision of "additional free

allowances . . . would otherwise represent a cost to a select group of high polluters," Appx15454-

15455, and providing the free permits improved the "financial status" of the receiving entity, *see*

Appx15459.

C.    Commerce's Specificity Determination Is Lawful And Supported By Substantial Evidence

Finally, Commerce reasonably determined that the additional allocation of free permits

was *de jure* specific because, by law, the government of Korea allocated additional free permits

to industries or entities with specified levels of international trade intensity and high production

costs.  Appx15464.

A subsidy is *de jure* specific "{w}here the authority providing the subsidy, or the

legislation pursuant to which the authority operates, expressly limits access to the subsidy to an

enterprises or industry."  19 U.S.C. § 1677(5A)(D)(i).  "The *de jure* prong of the specificity test

recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently

small number of enterprises, industries or groups thereof, further inquiry into the actual use of

the subsidy is unnecessary."  SAA at 930.  However, the statute "does not attempt to provide a

precise mathematical formula for determining when the number of enterprises or industries

eligible for a subsidy is sufficiently small so as to properly be considered {*de jure*} specific."  *Id.*

Rather, "Commerce can only make this determination on a case-by-case basis."  *Id.*

1.    Commerce Reasonably Determined That The Program Expressly Limits Qualifying Enterprises Or Industries Eligible For The Additional Allocation Of Free Permits

Commerce reasonably determined that the provision of Korea Emissions Trading System

permits is *de jure* specific because the AAGEP and its implementing rules establish specific

criteria for determining which sectors and sub-sectors qualify for the additional allotment of free

permits.  Appx14991-14992, Appx15463-15466; *see also* 19 U.S.C. § 1677(5A)(D)(i).  Plaintiffs

nevertheless contend that the program does not meet the specificity criteria under 19 U.S.C.

§ 1677(5A)(D)(i).  POSCO Br. at 36-44; GOK Br. at 16-18.  For example, POSCO argues that

the AAGEP and AAGEP enforcement decree do not explicitly limit treatment to a specific

enterprise or industry as required to be *de jure* specific.  POSCO Br. at 37-38 (citing *Asociacion*

*de Exportadores e Industriales de Aceitunas de Mesa v. United States* (*ASEMESA*), 523 F. Supp.

3d 1393, 1403 (Ct. Int'l Trade 2021)).[10]

Plaintiffs are incorrect.  As Commerce explained, the criteria outlined in the AAGEP and

its implementing rules result in an express statutory limitation by setting thresholds industries

must meet to qualify.  Appx15464.  "The criteria included in the AAGEP and implementing

rules establish that some industries or enterprises may benefit from the additional assistance in

the form of the allocation of additional {emission permits}, while others do not."  Appx15464

(citing, *e.g.*, Appx87191-87192); *see also* Appx88704 (Article 12(3), 12(4)(1)).  Pursuant to the

AAGEP, "all emission permits may be allocated" for free to a business entity "whose level of

cost occurrence and international trade intensity upon reduction of greenhouse gases pursuant to

the enactment of this Act falls under the sector," as prescribed by the enforcement decree.

Appx88704.  The enforcement decree, in turn, provides that "{b}usiness types falling under"

these criteria "shall mean business types as set forth in the allocation plan as a type of business in

which the value calculated by multiplying the production cost incurrence rate and the

---

[10]  Plaintiffs also cites *Hyundai Steel I* and *Hyundai Steel Co. v. United States* in support
of its argument that the trade intensity and production cost criteria do not satisfy the "expressly
limits" criteria set forth in 19 U.S.C. § 1677(5A)(D)(i).  POSCO Br. at 38 (citing *Hyundai Steel*
*I*, 659 F. Supp. 3d at 1341; *Hyundai Steel Co. v. United States*, 2023 WL 8715732, at *16); *see*
*also* GOK Br. at 17.  However, neither case is final and litigation is ongoing.  Appx15465.

international trade intensity referred to in Attached Table 1 is at least 2/1000." Appx88766; *see also* Appx89002-89003 (including the attached table). The government of Korea provided Commerce with lists of sectors subject to the emissions trading system, *see* Appx88981, Appx88984-88986, as well as the specific sectors receiving the free additional allocation of permits, Appx88993, Appx88997-88999; *see also* Appx88997. Thus, the criteria outlined in the AAGEP and its implementing rules limit which industries or enterprises qualify for the additional allocation of free permits. Appx15464.

Moreover, the express limitation in this case distinguishes it from *ASEMESA*, cited by plaintiffs, in which there was a lack of "uniform treatment," but no express limitation of access to the program. *See* 523 F. Supp. 3d at 1402-1403. Commerce possesses adjudicative authority to make such factual assessments in each case. *See ASEMESA*, 102 F.4th at 1261 (discussing "implied delegation of adjudicative authority to the agency"). Indeed, Commerce "can only make" the determination of *de jure* specificity "on a case-by-case basis," SAA at 930, and reasonably determined that the criteria were satisfied in this case, Appx15458-15459.

POSCO also argues that the Korea Emissions Trading System program cannot be *de jure* specific because at the time of creating the criteria, the government of Korea "did not yet know which subsectors met" them. POSCO Br. at 38. Even if true, Commerce is not required to consider the intent behind the subsidy, but the result. *See* 19 U.S.C. § 1677(5A)(D)(i). "The de jure prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, further inquiry into the actual use of the subsidy is unnecessary." SAA at 930. Consistent with this standard, the AAGEP and the implementing rules identify and provide conditions that limit

eligibility to select industries that meet the criteria, with one of the criteria being volume of international trade.  Appx15464-15465.

> 2.  The Law Does Not Provide Objective Criteria Because The Conditions Favor Certain Industries

Finally, POSCO and the government of Korea assert that the AAGEP and the implementing rules meet the "objective criteria" requirements of 19 U.S.C. § 1677(5A)(D)(ii). POSCO Br. at 41-44; GOK Br. at 17-18.  That provision provides that a program is not *de jure* specific where the authority or legislation creating the program "establishes objective criteria or conditions governing the eligibility for" *and* "eligibility is automatic," "the criteria or conditions for eligibility are strictly followed," and "the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification."  19 U.S.C. § 1677(5A)(D)(ii).  The provision defines the term "objective criteria or conditions" as "criterial or conditions that are neutral and that *do not favor one enterprise or industry* over another."  *Id.* (emphasis added).  To qualify as objective criteria, the conditions "must be neutral, must not favor certain enterprises or industries over others, and must be economic in nature and horizontal in application, such as the number of employees or the size of the enterprise."  SAA at 930.

Plaintiffs argue that eligibility is automatic, the criteria are strictly followed, and the criteria are clear—and, thus, the program is not *de jure* specific.  *See* POSCO Br. at 41-42; *see also* GOK Br. at 17-18.  However, these arguments are beside the point because the criteria for receiving the subsidy are not "objective."  19 U.S.C. § 1677(5A)(D)(ii).  Instead, the AAGEP and the enforcement decree establish criteria that favor certain industries, such as primary steel. Appx15464-15465.

As Commerce has explained, "the criteria governing the eligibility on accessing the subsidy must be neutral and must not favor one enterprise or industry over another." *Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (March 8, 2018) (*Silicon Metal from Australia*), and accompanying IDM at 20. In *Silicon Metal from Australia*, Commerce determined that the criteria used by the government of Australia were not neutral because "the criteria favor enterprises or industries that conduct 'emission-intensive' activities and are 'trade-exposed' over industries or enterprises that do not conduct such activities and are not trade exposed which thus constitutes an explicit limitation on access to the subsidy." *Silicon Metals from Australia* IDM at 20-21.

The same is true here. As Commerce explained, the provision of additional free permits under Article 12(4)(1) of the Korea Emissions Trading Program is limited to certain sectors that have high international trade intensity and/or high production costs. Appx15464 (citing, *e.g.*, Appx87191-87192, Appx88997-88999; Appx89000, Appx89002-89003). These criteria cannot be said to have a horizontal application, such as criteria measuring total sales. Appx15464; SAA at 930. Because the provision of Korea Emissions Trading System permits is not objective, plaintiffs' arguments regarding the remaining factors under section 1677(5A)(D)(ii) are of no moment . *See* POSCO Br. at 41-42; *see also* GOK Br. at 17-18.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain Commerce's final results and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:

/s/ Emma E. Bond
EMMA E. BOND
Trial Attorney
FEE PAUWELS
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480
Washington, DC 20044
(202) 305-2034
Email: emma.e.bond@usdoj.gov

September 13, 2024

Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 13,559 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s/ Emma E. Bond</u>

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:    THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| POSCO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| GOVERNMENT OF THE REPUBLIC | )    Ct. No. 24-0006 |
| OF KOREA, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| NUCOR CORPORATION, | ) |
| | ) |
| Defendant-Intervenor. | ) |

## <u>ORDER</u>

Upon consideration of plaintiff's and plaintiff-intervenor's motions for judgment on the

agency record, all responses thereto, and all other pertinent papers, it is hereby

ORDERED that plaintiff's and plaintiff-intervenor's motions are DENIED; and it is

further

ORDERED that the Department of Commerce's determination is sustained; and it is

further

ORDERED that judgment shall enter in favor of the United States.

_____
JUDGE

Dated:_____, 2024
      New York, NY