NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| POSCO,<br><br>                 Plaintiff,<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>                 Plaintiff-Intervenor,<br><br>      v.<br><br>UNITED STATES,<br><br>                 Defendant,<br><br>       and<br><br>NUCOR CORPORATION,<br><br>                 Defendant-Intervenors. |

Before:  Hon. Stephen A. Vaden,
        Judge

Court No. 24-00006

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed From Page: 2-3, 14-18

## <u>NUCOR CORPORATION'S RESPONSE TO POSCO'S AND THE GOK'S MOTIONS FOR JUDGEMENT ON THE AGENCY RECORD</u>

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Defendant-Intervenor Nucor Corporation*

Dated: October 8, 2024

Ct. No. 24-00006                                                    NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

                                                                              Page

I.      INTRODUCTION ............................................................................. 1

II.     RULE 56.2 STATEMENT .................................................................. 1

        A.      Administrative Decision Under Review ............................................. 1

        B.      Issues Presented and Summary of Arguments ..................................... 2

III.    STATEMENT OF FACTS ................................................................... 3

        A.      Introduction .................................................................................. 3

        B.      KETS ......................................................................................... 3

        C.      Electricity for LTAR ..................................................................... 4

        D.      Preliminary Results, Verification, and Final Results ............................ 5

IV.     STANDARD OF REVIEW .................................................................. 6

V.      ARGUMENT ..................................................................................... 7

        A.      Commerce's Decision to Countervail the Provision of Additional
                Free Allowances to POSCO Through the KETS Program Is
                Supported by Substantial Evidence and in Accordance with Law ......... 7

                1.      Commerce Correctly Determined that Additional Free
                        Allowances Provided Through the KETS Constitute a
                        Financial Contribution ...................................................9

                2.      Commerce Properly Found that the Additional Free
                        Allowances Provided Through the KETS Confer a Benefit ....................11

                3.      Commerce Properly Determined that the Additional Free
                        Allowances Provided Through the KETS Are Specific ..........................13

        B.      Commerce's Determination That the Provision of Electricity for
                LTAR was *De Facto* Specific Given That the Steel Industry
                Consumed a Disproportionate Amount of the Subsidy Is Supported
                by Substantial Evidence and in Accordance with Law ........................ 14

VI.     CONCLUSION.................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AK Steel Corp. v. United States,*
        192 F.3d 1367 (Fed. Cir. 1999)..............................................................15

*Bethlehem Steel Corp. v. United States,*
        25 CIT 307, 140 F.Supp.2d 1354 (2001) ........................................15, 16

*BGH Edelstahl Siegen GMBH v. United States,*
        600 F.Supp.3d 1241 (Ct. Int'l Trade 2022) .........................8, 12, 13, 14

*Ceramica Regiomontana, S.A. v. United States,*
        810 F.2d 1137 (Fed. Cir. 1987)................................................................6

*Changzhou Trina Solar Energy Co. v. United States,*
        466 F.Supp.3d 1287 (Ct. Int'l Trade 2020) ...........................................20

*Consol. Fibers, Inc. v. United States,*
        32 CIT 24, 535 F.Supp.2d 1345 (2008) ...................................................7

*Consolo v. Fed. Mar. Comm'n,*
        383 U.S. 607 (1966) ..................................................................................6

*Dongtai Peak Honey Indus. Co. v. United States,*
        38 CIT 334, 971 F.Supp.2d 1234 (2014), aff'd, 777 F.3d 1343 (Fed. Cir.
        2015) .....................................................................................................6, 7

*Fujitsu Gen. Ltd. v. United States,*
        88 F.3d 1034 (Fed. Cir. 1996)..................................................................6

*INS v. Elias-Zacarias,*
        502 U.S. 478 (1992)...............................................................................6, 8

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,*
        38 CIT 1632, 28 F.Supp.3d 1317 (2014) .................................................7

*Matsushita Elec. Indus. Co. v United States,*
        750 F.2d 927 (Fed. Cir. 1984)..................................................................6

*Mosaic Co. v. United States,*
        589 F.Supp.3d 1298 (Ct. Int'l Trade 2022) ...........................................20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
        463 U.S. 29 (1983).................................................................................6, 7

*Universal Camera Corp. v. NLRB*,
 340 U.S. 474 (1951) ................................................................................6

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................................6

19 U.S.C. § 1677(5)(D)(ii) ..........................................................................9, 10

19 U.S.C. § 1677(5)(E) ...................................................................................11

19 U.S.C. § 1677(5)(E)(iv) ..............................................................................12

19 U.S.C. § 1677(5A)(D) ....................................................................13, 14, 17

19 U.S.C. § 1677(5A)(D)(i) .............................................................................13

19 U.S.C. § 1677(5A)(D)(iii) ...........................................................................14

**Regulations**

19 C.F.R. § 351.502(a) .....................................................................................17

19 C.F.R. § 351.502(b) .....................................................................................17

19 C.F.R. § 351.503(a) .....................................................................................12

19 C.F.R. § 351.503(b) .....................................................................................12

19 C.F.R. § 351.503(c) .....................................................................................11

**Administrative Materials**

*Certain Aluminum Foil from the Sultanate of Oman*,
 86 Fed. Reg. 52,888 (Dep't Commerce Sept. 23, 2021) ...........................19

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
 89 Fed. Reg. 15,124 (Dep't Commerce Mar. 1, 2024) .............................19

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
 89 Fed. Reg. 6,500 (Dep't Commerce Feb. 1, 2024) ................................19

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,
 89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) .............................19

*Certain Steel Nails from Thailand*,
 87 Fed. Reg. 51,343 (Dep't Commerce Aug. 22, 2022) ............................19

*Large Diameter Welded Pipe from the Republic of Korea*,
    88 Fed. Reg. 85,236 (Dep't Commerce Dec. 7, 2023) ........................................................19

*Multilayered Wood Flooring from the People's Republic of China*,
    79 Fed. Reg. 45,178 (Dep't Commerce Aug. 4, 2014)..........................................................19

## I.    INTRODUCTION

On behalf of Defendant-Intervenor Nucor Corporation ("Nucor"), we hereby submit the following response to the June 17, 2024 brief in support of the motion for judgment on the agency record filed by Plaintiff POSCO and the July 15, 2024 brief in support of the motion for judgment on the agency record filed by Plaintiff-Intervenor the Government of Korea ("GOK") (collectively, "Plaintiffs"). *See* Pls.' Br. in Supp. of Pls.' Mot. for J. on the Agency R. (June 17, 2024), ECF Nos. 28, 29 ("Plaintiff Br.").  *See also* Pl. Intervenor's Br. in Supp. of Pls.' Mot. for J. on the Agency R. (July 15, 2024), ECF Nos. 32, 33 ("Plaintiff-Intervenor Br."). For the reasons discussed in this brief, in conjunction with the arguments presented by Defendant United States, Defendant-Intervenor respectfully requests that this court reject the arguments raised by the Plaintiffs and affirm aspects of the Final Results of the U.S. Department of Commerce ("Commerce") in the 2021 administrative review of the countervailing duty ("CVD") order on *Certain Carbon and Alloy Steel Plate from the Republic of Korea* ("*CTL Plate from Korea*").

## II.    RULE 56.2 STATEMENT

### A.    Administrative Decision Under Review

The administrative determination challenged in this appeal is Commerce's Final Results in the 2021 administrative review of the CVD order on *CTL Plate from Korea*.  Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Plate from the Republic of Korea*, 88 Fed. Reg. 86,318 (Dep't Commerce June 17, 2024) (final results of countervailing duty admin. rev.; 2021), Appx15419-15478.  *See also Certain Carbon and Alloy Steel Plate from the Republic of Korea*, 88 Fed. Reg. 86,318 (Dep't Commerce June 17, 2024) (final results of countervailing duty admin. rev.; 2021), Appx15500-15502.

B.    **Issues Presented and Summary of Arguments**

1.    **Whether Commerce's Decision to Countervail the Provision of Additional Free Allowances to POSCO through the KETS Program Is Supported by Substantial Evidence and in Accordance with Law?**

Yes.  Commerce appropriately found that the Government of Korea's ("GOK") provision of additional free carbon emissions allowances under the KETS program is countervailable. Plaintiff incorrectly argues that the provision of these allowances is not specific and does not constitute a financial contribution or confer a countervailable benefit.  Plaintiffs' arguments are in error.  Under the KETS program, the GOK provides an additional three percent allocation of free allowances to companies, such as POSCO, that satisfy certain high international trade intensity and/or high emissions production cost criteria.  In effect, the GOK relieves these companies from the obligation of having to purchase additional allowances from the government.  This extra allocation is a financial contribution because it constitutes revenue that the GOK would otherwise be able to collect.  These additional allowances confer a benefit to POSCO because they provide the company with something of value at no cost.  And these allowances are specific because they are provided to an expressly limited set of industries and companies, determined by the non-objective criteria established under Korean law.

2.    **Whether Commerce Correctly Found That the GOK's Provision of Electricity for LTAR was *De Facto* Specific Given That the Steel Industry Consumed a Disproportionate Amount of the Subsidy?**

Yes. Commerce correctly found that the GOK's provision of electricity for less than adequate remuneration ("LTAR") was *de facto* specific and conferred a countervailable benefit. In an economy with 19 diversified economic industry sectors, Commerce found that the steel industry consumed the [                ] amount of electricity of any industry during the 2021 period of review ("POR") and alone accounted for [          ] of total industrial classification electricity

consumed.  Commerce properly found that the steel industry was among the top three electricity consuming industries, which consumed more than [     ] (*i.e.*, a disproportionate amount) of the subsidized electricity under this tariff category.  Thus, the GOK's provision of electricity for LTAR is plainly *de facto* specific.

## III.    STATEMENT OF FACTS

### A.    Introduction

Commerce initiated an administrative review of the countervailing duty order on *CIL Plate from Korea* covering the 2021 POR on July 14, 2022, and selected PSOCO as the mandatory respondent.  Appx01011-01023;  Appx01035-01039.  Consistent with its practice, Commerce issued the initial questionnaire to POSCO and the GOK on August 3, 2022. Appx01040-01148. Among other inquiries, Commerce requested information about the Korea Emissions Trading System ("KETS") and the provision of additional emissions permits, *i.e.*, "KAUs," to certain Korean industry subsectors including steel producers. *Id.* Appx01069-01072. Commerce also requested information regarding the provision of electricity for LTAR. Appx01073-01079.

### B.    KETS

Under KETS, Korean companies are required to surrender emissions permits (*i.e.*, allowances) to offset their annual greenhouse gas emissions.  Appx15452.  Allowances are primarily allocated by the GOK at the start of each annual compliance period. *Id.*  During the POR, the KETS was in operational Phase 3 wherein the GOK calculated the number of allowances it would assign a company and then allocated 90% of that annual allotment to each company free of charge.  Appx15452; Appx15455; Appx15460; Appx15465.  The Korean Act on the Allocation and Trading of Greenhouse Gas Emissions Permits ("AAGEP") and accompanying enforcement decree ("AAGEP Enforcement Decree") provide that Korean companies meeting certain high

trade intensity and emissions production cost criteria qualify to receive the full 100% allotment of allowances (*i.e.*, an additional ten percent) at no cost from the GOK.  Appx15461; Appx15464. The steel industry was one of select group of industries targeted by these criteria and conditions; thus, as a steel producer, POSCO qualified for the full 100% allocation. Appx15465.

Regardless of whether a company receives the additional ten percent of allowances free of charge from the GOK, if that entity's emissions exceed its freely allocated allowances for the year, the company is responsible for acquiring additional allowances to account for the difference. Appx15454.  The AAGEP provides that Korean companies may do this in multiple ways including carrying forward from prior compliance periods, borrowing from future compliance periods, purchasing additional allowances directly from other private entities, and purchasing from a GOK-run auction.  Appx15452-15454.  Further, for companies unable to obtain sufficient allowances to cover their incurred emissions, the AAGEP establishes that the GOK may impose a "fine not exceeding three times the average market price of emissions permits for the pertinent compliance year up to KRW 100,000 per ton of carbon dioxide for the shortfall."  Appx06169-06170.

### C.    Electricity for LTAR

The exclusive supplier of electricity in Korea is the Korea Electric Power Corporation ("KEPCO"). KEPCO owns six government-operated generators of electricity and has a majority ownership stake in the Korea Power Exchange where electricity is traded and the price for electricity is set.  Appx15101.  The GOK reported that an updated electricity tariff system was instituted on January 1, 2021, and information on this new system became available just before the preliminary results. Appx14999-15000. As a result, Commerce requested additional information on this new system after the preliminary results. *Id.*

### D.    Preliminary Results, Verification, and Final Results

Commerce published its Preliminary Results on June 6, 2023, and preliminarily determined that the provision of additional free allowances constituted a countervailable subsidy. Appx14990-14993. Commerce found that "in providing additional free emission allocations to entities within certain sectors, the GOK is providing a financial contribution in the form of revenue forgone." Appx14992. And the agency determined a benefit to exist "to the extent that the recipient is relieved of the obligation to purchase additional allowances." *Id.* Commerce also found "the provision of additional free KAU to certain sectors to be *de jure* specific . . . because the additional allocations are expressly limited to certain industries as a matter of law." *Id.* Additionally, Commerce preliminarily determined that (i) KEPCO was a government authority; (ii) that KEPCO provided a financial contribution in the form of a good or service; (iii) KEPCO conferred a benefit by providing electricity for LTAR; and (iv) that such provision of electricity for LTAR was *de facto* specific. Appx15104; Appx15109.

Commerce conducted verification of the GOK's questionnaires responses from August 28, 2023 through September 1, 2023. Appx 97276-97277. Based on the agency's observations of certain discrepancies between the information the GOK reported and actual sales records, Commerce noted that instead of the steel industry and *three* other industries accounting for the majority of industrial electricity consumption, the steel industry and just *two* other industries accounted for the majority for industrial electricity consumption in Korea. Appx15444.

POSCO and the GOK submitted affirmative case briefs disputing Commerce's specificity finding for the LTAR program and disputing Commerce's financial contribution, benefit, and specificity findings for the KETS program. Appx97338; Appx97350. Nucor submitted a rebuttal brief on these and other issues. Appx97390. Commerce published its Final Results on December

13, 2023, continuing to countervail both the electricity for LTAR and KETS programs. Appx15442; Appx15466.

## IV.    STANDARD OF REVIEW

This court reviews Commerce's decisions in CVD proceedings to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).  *See also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). *See also Dongtai Peak Honey Indus. Co. v. United States*, 38 CIT 334, 336, 971 F.Supp.2d 1234, 1239 (2014), *aff'd*, 777 F.3d 1343, 1349 (Fed. Cir. 2015).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation omitted).  It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A plaintiff cannot ask the court to re-weigh the evidence on the record and decide the case for Commerce.  *See Matsushita Elec. Indus. Co. v United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  Factual findings by Commerce are afforded considerable deference.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion).  In addition, the court "uphold{s} a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987).  As such, Commerce

need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation omitted).

Moreover, in determining whether Commerce's decisions in CVD proceedings are "unsupported by substantial evidence on the record, or otherwise not in accordance with law," this court reviews the agency's conduct under the abuse of discretion standard. *See Dongtai Peak*, 38 CIT at 336, 971 F.Supp.2d at 1239; *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 38 CIT 1632, 1634-35, 28 F.Supp.3d 1317, 1323 (2014). Accordingly, the court has recognized that it "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action." *Consol. Fibers, Inc. v. United States*, 32 CIT 24, 35-36, 535 F.Supp.2d 1345, 1354 (2008).

## V.   <u>ARGUMENT</u>

### A.   <u>Commerce's Decision to Countervail the Provision of Additional Free Allowances to POSCO Through the KETS Program Is Supported by Substantial Evidence and in Accordance with Law</u>

Commerce properly found that the GOK's provision of extra free emissions allowances to POSCO under the KETS constitutes a countervailable subsidy. In the Final Results, Commerce correctly focused its analysis on the additional ten percent allocation that were provided at no cost to POSCO and other companies that satisfied specific high trade intensity and emissions production cost criteria established in the AAGEP. Appx15452-15466. Commerce reasonably found that this additional allocation amounted to revenue foregone, reasoning that

> the government is choosing not to collect costs (*i.e.*, foregoing revenue) that are otherwise due under the overall framework and purpose of that system. Under such a legal regime that ultimately aims to impose a price or cost on carbon emissions,

the provision of additional free allowances is foregoing revenue that otherwise *would* be due.

Appx15453.  Commerce thoroughly considered and addressed arguments raised by POSCO and the GOK in the underlying administrative review, demonstrating that the KETS program gives additional free allowances to POSCO that are specific, constitute a financial contribution, and provide a countervailable benefit.  Appx15452-15466.

Still, Plaintiff argues in this action that the KETS program does not provide a financial contribution or a benefit and is not specific.  Plaintiff Br. at 11-45; Plaintiff-Intervenor Br. at 11-16.  Defendant has effectively rebutted these claims at length, demonstrating that Commerce lawfully countervailed the provision of these allowances. Def.'s Resp. to Pls.' & Pl. Intervenor's Mot. For J. on the Agency R. (Sept. 13, 2024) ECF Nos. 35, 36 ("Defendant Br.") at 27-48.  With respect to the countervailability of the KETS program, Nucor agrees with Defendant and supports the arguments made in its brief.  *See id.*  Especially in light of the considerable deference afforded to Commerce to conduct fact-intensive investigations and make program- and period-specific factual determinations, *see, e.g.*, *Elias-Zacarias*, 502 U.S. at 483-84, Commerce's findings were reasonable and supported by the record.  Further, Commerce made these determinations against the backdrop of established agency and court precedent in which Commerce has found additional free allowances provided under similar emissions trading programs to be countervailable.  *See, e.g.*, *BGH Edelstahl Siegen GMBH v. United States*, 600 F.Supp.3d 1241 (Ct. Int'l Trade 2022).  Accordingly, despite Plaintiff's claims to the contrary, Commerce's countervailability determination was in accordance with law, based on substantial evidence, and not an abuse of the agency's discretion.

To support Defendant's brief, we provide additional argument and context in support of each of the three elements of Commerce's CVD framework (*i.e.*, financial contribution, benefit, and specificity) challenged by Plaintiff in this appeal.

> **1.    Commerce Correctly Determined that Additional Free Allowances Provided Through the KETS Constitute a Financial Contribution**

A government makes a financial contribution when it forgoes collecting revenue that is otherwise due.   19 U.S.C. § 1677(5)(D)(ii).   On that basis, Commerce determined that the additional ten percent of free allowances afforded POSCO through the KETS program constituted a financial contribution.  Appx15452.  Nevertheless, Plaintiffs mistakenly argues that a financial contribution is not provided because the additional allowances do not constitute revenue that is otherwise due to the GOK.  Plaintiff Br. at 20-31; Plaintiff-Intervenor Br. at 11-13.  Commerce thoroughly addressed this line of argument, explaining that "the GOK created a closed and controlled economy where . . . the GOK manages the market price of a KAU through scarcity." Appx15453.  Within this "closed and controlled" economy, the "GOK is the only entity that can determine the amount of KAUs in the market" and "there are no KAUs in the market that the GOK has not either freely allocated or sold." *Id.* Commerce therefore reasonably concluded that "{a}ny KAU that is not freely allocated and is released into the market by the GOK generates revenue for the GOK." *Id.*  Choosing to freely allocate additional KAU is foregoing that revenue. Building on the agency's reasoning, Defendant rebuts Plaintiff's arguments in detail.  *See* Defendant Br. at 27-39.  We provide two additional points for the court's consideration.

First, Plaintiff's argument is unduly focused on the mechanisms through which the value of the freely allocated allowances would be transmitted between the GOK and POSCO.  *See* Plaintiff Br. at 22-23.  In attempting to parse the language of the statute, Plaintiff wrongly fixates on the timing of when POSCO would have owed any revenue to the GOK. *Id.* There is no question

that these additional allowances have value or that POSCO is put in a better position by receiving them. Indeed, as Defendant noted, Commerce found that the ten percent additional allocation operates like a tax credit program where the recipient of the credit is relieved of the value of the obligation. Defendant Br. at 35. Thus, given the basic framework of the program, Commerce's interpretation of the revenue forgone provision in the statute is not unreasonable. Nor is it unsupported by substantial evidence. Rather, Commerce reasonably found the GOK provides a financial contribution to POSCO.

Second, Plaintiff mistakenly argues that the existence of a secondary market for KETS emissions allowances means that there could not be revenue forgone through the allocation of additional allowances. *See* Plaintiff Br. at 26. To start, as Defendant addresses, "Commerce found the requirement was satisfied because the operation of the emission trading system—a closed marketplace in which only the government of Korea can issue emission permits—means that freely allocating additional permits to one entity or group of entities results in foregone revenue to the government." Defendant Br. at 33-34. Moreover, there is no statutory requirement that the revenue be due from the respondent in question. *See* 19 U.S.C. § 1677(5)(D)(ii). That is, for the sake of argument, if POSCO were not to receive its free ten percent allocation and it purchased those additional allowances entirely from the private markets – instead of the GOK-run auction – POSCO would still be reducing the number of allowances available to be sold privately and thus requiring another company to purchase additional allowances from the GOK. The point being that, whether it is revenue received from POSCO or another company, by giving POSCO ten percent of its allowances for free, the GOK forgoes collecting revenue on those allowances. Additionally, as Defendant points out, there is a penalty price that GOK charges for companies that fail to cover their annual emissions with sufficient allowances. Defendant Br. at 7. Allowance

trading aside, this penalty prices establishes a clear link between the revenue the GOK could potentially collect and the revenue it forgoes by allocating additional free allowances.

### 2. Commerce Properly Found that the Additional Free Allowances Provided Through the KETS Confer a Benefit

A government confers a countervailable benefit "where there is a benefit to the recipient." 19 U.S.C. § 1677(5)(E). Therefore, in finding that the allocation of additional emission allowances provided something of value to POSCO, Commerce reasonably determined that the provision of those allowances conferred a countervailable benefit. Appx15458. Yet, Plaintiff argues that the total burden imposed by the KETS somehow negates the benefit provided POSCO and other companies that are allocated additional free allowances. *See* Plaintiff-Intervenor Br. at 16. Commerce comprehensively addressed this line of argument. Appx15458-15459. And Defendant rebutted these claims throughout its response brief, *see* Defendant Br. at 41-43. Indeed, as Defendant addressed, the question of whether a benefit is conferred is separate from the effect of that subsidy. *Id.* at 41-42. *See also* 19 C.F.R. § 351.503(c). In other words, any burden imposed on POSCO by the entirety of the KETS regulatory framework is distinct from an analysis of whether the additional free allowances provided under the KETS program confer a benefit to the respondent.

We highlight for the court the broad statutory authority that Commerce possesses to identify and countervail subsidies when a benefit is conferred to a respondent company. As noted above, the statute provides plainly that a "benefit shall normally be treated as conferred where there is a benefit to the recipient." 19 U.S.C. § 1677(5)(E). The statute then lists four illustrative examples (*i.e.*, equity infusions, loans, loan guarantees, and goods or services provided for LTAR). *Id.* § 1677(5)(E)(i)-(iv). Plaintiff erroneously argues that Commerce's benefit determination was unlawful because it failed to consider the extent to which the free allowances provided through the

KETS program were similar to the illustrative examples listed in the statute.  Plaintiff Br. at 33-34.  Plaintiff fails to acknowledge, however, that Commerce's regulations allow it to find countervailable benefits for "other subsidies" that are not specifically enumerated in the statute or the agency's regulations.  19 C.F.R. § 351.503(b).  Furthermore, Plaintiff's argument is based on the requirement in the agency's regulation that, when paragraph (b)(1) of 19 C.F.R. § 351.503 does not apply, under paragraph (b)(2), Commerce "will determine whether a benefit is conferred by examining whether the alleged program or practice has common or similar elements to the four illustrative examples in sections 771(5)(E)(i) through (iv) of the Act."  *Id.* § 351.503(b)(2).  This argument is in error.

Commerce made clear that it found a countervailable benefit to exist under 19 C.F.R. § 351.503(b)(2) on the grounds that "POSCO was relieved of the requirement to acquire additional allowances of KAUs in order to comply with the K-ETS program."  Appx15458.  Commerce fully explained its benefit determination and did so in specific reference to 19 C.F.R. § 351.503(b)(2).  Appx15459.  The agency also noted that it "calculated the benefit from the revenue foregone by using a method akin to measuring the benefit in a LTAR program."  *Id.*

Indeed, while the type of carbon emissions allowances program at issue in this case is not listed by name in the statute or the agency's regulations, the benefit provided to respondent companies closely resembles an LTAR program in practice, *i.e.*, by paying nothing for something of value, POSCO and other Korean companies receive additional emissions allowances for LTAR.  *See* 19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. § 351.503(a).  This court in *BGH* made a similar point, explaining that "{d}ue to receiving the additional free allowances, BGH received something for free—allowances BGH otherwise would have been required to pay to acquire at auction or on the private market."  *BGH*, 600 F.Supp.3d at 1264.  The same logic applies here.  And contrary to

Plaintiff's claims, no additional explanation was required from Commerce as to its benefit

determination.

### 3.    Commerce Properly Determined that the Additional Free Allowances Provided Through the KETS Are Specific

A government provides a subsidy that is *de jure* specific where it "expressly limits access

to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i).  The statute further

explains that a subsidy is not *de jure* specific in certain enumerated instances, where the

government "establishes objective criteria or conditions governing {} eligibility."  *Id.*

§ 1677(5A)(D)(ii).  "Objective criteria or conditions" are defined as "criteria or conditions that are

neutral and that do not favor one enterprise or industry over another."  *Id.* § 1677(5A)(D).

Commerce correctly found that the additional ten percent allocation is *de jure* specific,

because of "the language in the AAGEP and do not favor one enterprise to certain industries as a

matter of law."  Appx15463.  Plaintiffs argue that the high trade intensity and emissions production

criteria established by the AAGEP do not "explicitly limit" which industries or companies are

eligible for the additional allocation.  Plaintiff Br. at 38.  Defendant responds that "the criteria

outlined in the AAGEP and its implementing rules result in an express statutory limitation by

setting thresholds industries must meet to qualify.  Defendant Br. at 44.  Defendant is correct, and

Commerce's *de jure* specific determination is supported by the record and in accordance with law.

We stress that the KETS program is not objective because it is not neutral.  The AAGEP

Enforcement Decree establishes the criteria for eligibility, which permit trade intensive and/or high

emissions production cost sectors to receive ten percent more allowances than other participants

in the program.  Appx15464.  By design, the program criteria "clearly favor certain industries,

such as primary steel, over others."  *Id.*  As such, the criteria themselves ensure that the program

cannot be neutral.  That is, these criteria are neither objective nor neutral because, as this court

reasoned in *BGH*, "the criteria must not favor certain industries over others." *BGH*, 600 F.Supp.3d at 1264. Yet that is exactly how the KETS program is structured. Thus, Commerce correctly determined that it is *de jure* specific.

> **B.** **Commerce's Determination That the Provision of Electricity for LTAR was *De Facto* Specific Given That the Steel Industry Consumed a Disproportionate Amount of the Subsidy Is Supported by Substantial Evidence and in Accordance with Law**

Commerce properly found that the provision of electricity for LTAR is de facto specific in this administrative review. The statute provides that a subsidy is *de facto* specific when: (i) the actual recipients are limited in number; (ii) and enterprise or industry is a predominant user of the subsidy; (iii) an enterprise or industry receives a disproportionate amount of the subsidy; or (iv) the subsidizing authority favors an enterprise or industry over others in granting the subsidy. 19 U.S.C. § 1677(5A)(D)(iii). For the *de facto* specificity analysis, the term "enterprise or industry" includes a group of enterprises or industries. *Id.* § 1677(5A)(D). The statute also requires Commerce to consider "the extent of diversification of economic activities within the jurisdiction. . . ." *Id.* § 1677(5A)(D).

In its final results, Commerce found that the provision of electricity for LTAR is *de facto* specific because "the steel industry and two other industries combined consume a majority of the industrial class electricity in Korea" and thus received a disproportionately large amount of the subsidy. Appx15444. By the GOK's own admission, the steel industry in Korea [

]. Appx87021. In an economy with at least [          ] economic industry sectors, Commerce found that the steel industry was the [     ] largest consumer of electricity in Korea. Appx15443. Commerce properly found that the steel industry was among the top three electricity consuming industries (all of which were

manufacturing industries), which consumed more than [      ] (i.e., a disproportionate amount) of the subsidized electricity under this tariff category. Appx15443-15444.

In arguing that Commerce's *de facto* specificity analysis was unlawful, the Plaintiff relies heavily on the Court of International Trade's decision in *Bethlehem Steel Corp. v. United States*, but that case is inapplicable here.  As Defendant noted, the Federal Circuit has explained, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999); Defendant Br. at 16.  The determination at issue in Bethlehem Steel did not involve an adequacy of remuneration subsidy.  Instead, it addressed a "voluntary curtailment" program in which the GOK automatically provided identical price discounts to general, educational, or industrial users that voluntarily agreed to curtail electricity consumption by at least 20%.  *Bethlehem Steel Corp. v. United States*, 25 CIT 307, 319-20, 140 F.Supp.2d 1354, 1367 (2001).  Here, in contrast, the issue is an LTAR subsidy in which the benefit amounts are necessarily tied to the individual pricing and consumption patterns of individual companies and the type of electricity consumed. Benefits will vary, for example, depending on which industrial tariff classification applies to a certain enterprise or industry or what times of day or times of year the enterprise or industry consumes electricity.  Appx91722-91734.  Indeed, that is why Commerce's benchmark analysis focuses on industrial tariff rates and compares the rates to when POSCO actually consumes the electricity. In this context, it is unreasonable to say that the consumption volumes of a beneficiary industry or enterprise are necessarily or inherently greater than that of other industries or enterprises. That is because consumption volumes are directly tied to prices paid – *i.e.*, an industry or enterprise benefitting from an LTAR subsidy is likely to consume more of the subsidized input than it

otherwise would in large part because it is being subsidized. Accepting the argument that a determination of *de facto* specificity based on disproportionate or predominant use may not be based on relative consumption volumes would effectively nullify those provisions for the purpose of adequate remuneration programs.

For the purpose of an adequate remuneration program in a highly diversified economy, the fact that [                                                    ] of industrial electricity consumption is compelling evidence of disproportionate benefit.  Appx15443.  There is also evidence on the record that certain individual steel producers alone benefitted disproportionately from the provision of electricity for LTAR. In its initial questionnaire response, the GOK provided a list of the top 100 industrial consumers of electricity by facility.  Appx91736-91744.  While the GOK did not identify any companies on the list other than the respondent, the list shows that [

                  ] accounted for [        ] of *total* industrial electricity consumption in Korea during the POR. *Id.* According to Commerce's economic diversification memo, there were more than 400,000 manufacturing establishments operating in Korea during the POR. Appx01156. That [                                                    ] amounted to [        ] of total industrial consumption in an economy of more than 400,000 manufacturing establishments is additional evidence of disproportionate benefit.

The Plaintiffs also suggest that it is unlawful for Commerce to base a disproportionality finding on the combined consumption of a small group of industries or enterprises.  Plaintiff Br. at 13-14; Plaintiff-Intervenor Br. at 9.  This argument is contrary to the plain language of the statute and should be rejected. The statute states explicitly that "any reference to an enterprise or industry . . . includes a *group* of such enterprises or industries."  19 U.S.C. § 1677(5A)(D)

(emphasis added). Respondents do not explain why they believe Commerce must base its *de facto* specific analysis on the steel industry alone in light of this clear statutory language.

Plaintiffs accuse Commerce of arbitrary and capricious "results-oriented aggregation of electricity" and argue that, even based on this purportedly "arbitrary grouping" of industries, the record does not support a finding of disproportionality. Plaintiff Br. at 16-18. Neither argument is persuasive. First, there is nothing arbitrary or capricious about Commerce's conclusion. Commerce found that three industries in a highly diversified economy is a small enough group to constitute a relevant group of industries or enterprises within the meaning of the statute, and that [                         ] by such a small number of industries constitutes disproportionate use. Appx15443-15444. These are both reasonable factual determinations that Commerce is required to make in conducting its sequential specificity analysis. 19 C.F.R. § 351.502(a). *See also id.* § 351.502(b) (explaining that Commerce's analysis of specificity based on a "group" of industries or enterprises does not depend on "whether there are shared characteristics among the enterprises or industries . . . ."). Under Plaintiff's reasoning, effectively any finding of disproportionate use by a group of industries or enterprises would be arbitrary and capricious "results-oriented aggregation."

Second, Plaintiff bases their arguments on total electricity consumption, rather than on industrial electricity consumption. They argue that, considering total consumption rather than industrial consumption, the percentage used by the three industries is [        ] of all consumption. Plaintiff Br. at 19. As Commerce has recently explained, "this program encompasses the provision of industrial electricity for LTAR and our specificity analysis was based on disproportionate consumption of industrial electricity by the steel industry and others." Appx15443. There is also no basis to conclude that a disproportionality finding requires use exceeding any specific threshold.

The fact that three industries alone account for [          ] of all electricity demand in Korea

supports rather than undermines Commerce's finding.  Plaintiff Br. at 19.

Furthermore, Plaintiff argues based on dictionary definitions that Commerce's

disproportionality finding has to be relative to something else.  *Id.* at 14.  Whether or not correct

as a matter of statutory interpretation, Commerce's conclusion was made in relation to something

else.  On its face, Commerce's findings that the steel industry is the [          ] consumer of

electricity, and that three industries accounted for the [

          ] in Korea, were relative to [          ] other Korean industries. Appx15443.  This is

compelling evidence of disproportionality in relation to total industrial consumption.  Appx15443.

Citing to the GOK's initial questionnaire listing the top ten consumers of total electricity and

industrial electricity, Commerce further explained that the "three industries that consumed the next

largest amounts of industrial electricity during the POR, after the three majority consumers, made

up a significantly smaller percentage of the total industrial class electricity consumed during the

POR." Appx15444.  By itself, the steel industry consumes a disproportionate amount of subsidized

electricity relative to other Korean manufacturing industries.  By appropriately combining the top

three industries and explaining its reasons for doing so, Commerce demonstrated that no other

combination of industries comes close to the large manufacturing industries disproportionately

benefitting subsidized energy.  Appx87021-87022; Appx15444.

In its brief, Plaintiff also argues that electricity is broadly available and widely used such

that the subsidy cannot be specific.  Plaintiff Br. at 12-13.  But this line of argumentation seeks to

paint the provision of electricity as general infrastructure, which the courts have rejected.  As

Defendant rightly notes, "{t}he specificity requirement serves as an initial screening mechanism

to winnow out only those foreign subsidies which truly are broadly available . . . such as public

highways and bridges." Defendant Br. at 15 (internal citations omitted). Commerce has found that the provision of electricity for LTAR, as well as other energy inputs, to be countervailable, and thus specific, in numerous cases, including proceedings involving Korea. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) (final results of countervailing duty admin. rev.; 2021) at cmt. 4; Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 89 Fed. Reg. 15,124 (Dep't Commerce Mar. 1, 2024) (final results of countervailing duty admin. rev.; 2021) at cmt. 4; Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 89 Fed. Reg. 6,500 (Dep't Commerce Feb. 1, 2024) (final results of countervailing duty admin. rev.; 2021) at cmt. 1; Appx15432-15449; Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe from the Republic of Korea*, 88 Fed. Reg. 85,236 (Dep't Commerce Dec. 7, 2023) (final results of countervailing duty admin. rev.; 2021) at cmt. 2. Commerce has also found the provision of electricity for LTAR to be specific in proceedings involving other countries. *See, e.g.,* Issues and Decision Memorandum accompanying *Certain Steel Nails from Thailand*, 87 Fed. Reg. 51,343 (Dep't Commerce Aug. 22, 2022) (final deter. of countervailing duty inv.) at cmt. 2; Issues and Decision Memorandum accompanying *Certain Aluminum Foil from the Sultanate of Oman*, 86 Fed. Reg. 52,888 (Dep't Commerce Sept. 23, 2021) (final deter. of countervailing duty inv.) at cmt. 4; Issues and Decision Memorandum accompanying *Multilayered Wood Flooring from the People's Republic of China*, 79 Fed. Reg. 45,178 (Dep't Commerce Aug. 4, 2014) (final results and partial rescission of countervailing duty admin. rev.; 2011) at cmt. 3.

Furthermore, the courts have sustained Commerce's findings that electricity and other energy inputs have been found to be specific. *See, e.g.*, *Canadian Solar Inc. v. United States*, Consol. Ct. No. 19-00178, slip op. 22-49 at 2 (Ct. Int'l Trade May 19, 2022) (upholding Commerce's finding that the subsidization of electricity for LTAR from the Government of China was specific); *Changzhou Trina Solar Energy Co. v. United States*, 466 F.Supp.3d 1287, 1303 (Ct. Int'l Trade 2020) (sustaining Commerce's finding that the provision of electricity for LTAR is a specific subsidy); *Mosaic Co. v. United States*, 589 F.Supp.3d 1298, 1309 (Ct. Int'l Trade 2022) (finding that substantial evidence supports Commerce's determination that the provision of natural gas was *de facto* specific).

## VI.   <u>CONCLUSION</u>

For the reasons detailed above, Defendant-Intervenor Nucor respectfully requests that the court reject the arguments raised by POSCO and the GOK and affirm aspects of Commerce's Final Results in the 2021 administrative review of the CVD order on *CTL Plate from Korea*.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Adam M. Teslik, Esq.
Paul A. Devamithran, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Defendant-Intervenor Nucor Corporation*

Dated: October 8, 2024

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Nucor Corporation's Response to POSCO's and the GOK's Motions for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 5,899 words.

_/s/ Alan H. Price_
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Corporation
(Representative Of)

October 8, 2024
(Date)