**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| POSCO,<br><br>             Plaintiff,<br><br>   and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>             Plaintiff-Intervenor,<br><br>   v.<br><br>UNITED STATES,<br><br>             Defendant,<br><br>   and<br><br>NUCOR CORPORATION,<br><br>             Defendant-Intervenor. | **NON-CONFIDENTIAL**<br>Proprietary Information<br>Removed from Pages 3 through 6<br>and 9<br>Court No. 24-00006 |

**PLAINTIFF POSCO'S REPLY BRIEF IN SUPPORT OF
ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

November 5, 2024

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff POSCO*

## <u>TABLE OF CONTENTS</u>

I.    ARGUMENT ........................................................................................................ 2

    A.    Commerce's Determination That The Electricity for LTAR Program Is *De Facto* Specific Is Unsupported By Substantial Evidence And Is Otherwise Unlawful. ... 2

    B.    Commerce's Determination that the GOK's Provision of Carbon Emission Permits to POSCO Constitutes a Countervailable Subsidy is Unsupported by Substantial Evidence and is Otherwise Contrary to Law ..................................... 11

        i.    The KETS Does Not Provide A Financial Contribution Pursuant To 19 U.S.C. § 1677(5)(D)(ii) ......................................................................... 11

        ii.    The KETS Does Not Provide A Countervailable Benefit ....................... 15

        iii.    Commerce's Specificity Determination Continues to Be Unsupported by Evidence and Is Otherwise Not in Accordance with Law ....................... 18

            a.    The KETS Does Not Expressly Limit Access to an Enterprise or Industry ...................................................................................... 18

            b.    The K-ETS Meets the Safe Harbor of Section 1677(5A)(D)(ii). 20

II.    CONCLUSION................................................................................................... 23

CERTIFICATE OF COMPLIANCE ............................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
 192 F.3d 1367 (Fed. Cir. 1999)................................................................3

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
 102 F.3d 1252 (Fed. Cir. 2024)................................................................4

*Bethlehem Steel Corp. v. United States*,
 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ........................................4, 8

*Hyundai Steel Co. v. United States*,
 659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) ....................13, 17, 19, 20, 21

*Hyundai Steel Co. v. United States*,
 No. 22-00029, 2023 WL 8715732 (Ct. Int'l Trade Dec. 18, 2023) ................12, 13, 18, 19, 21

*Hyundai Steel v. United States,*
 2024 WL 1929018 (Ct. Int'l Trade May 2, 2024) ....................................19, 21, 22

*Mosaic Co. v. United States*,
 589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022) ........................................8, 9

*SEC v. Chenery Corp.*,
 332 U.S. 194 (1947).............................................................................7

**Statutes**

19 U.S.C. § 1677(5)(A)..........................................................................15

19 U.S.C. § 1677(5)(B)......................................................................16, 17

19 U.S.C. § 1677(5)(D)........................................................11, 12, 13, 15, 17

19 U.S.C. § 1677(5)(E)....................................................................15, 16, 17

19 U.S.C. § 1677(5A)(D)..............................................................2, 6, 8, 18, 20

**Other Authorities**

19 C.F.R. § 351.502(a)...........................................................................10

19 C.F.R. § 351.503(b) ......................................................................15, 17

19 C.F.R. § 351.511 ..............................................................................16

*Brass Rod From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 29,298 (Dep't of Commerce Apr. 22, 2024) .................................................................................8

*Certain Carbon and Alloy Cut-To-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) ........................................................ *passim*

*Oil Country Tubular Goods from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 84 Fed. Reg. 68,115 (Dep't of Commerce Dec. 13, 2019) .......................................................................16

*Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (March 8, 2018) ............................................22

Uruguay Round Agreements Act Statement of Administrative Action, H.R. Rep. No. 103-316 (1994) ..........................................................................21

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| POSCO, | |
|           Plaintiff, | **NON-CONFIDENTIAL** |
|   and | Proprietary Information |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | Removed from Pages 3 through 6 and 9 |
|           Plaintiff-Intervenor, | |
|   v. | Court No. 24-00006 |
| UNITED STATES, | |
|           Defendant, | |
|   and | |
| NUCOR CORPORATION, | |
|           Defendant-Intervenor. | |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

       Pursuant to U.S. Court of International Trade ("USCIT") Rule 56.2, and the scheduling order, Plaintiff POSCO ("POSCO" or "Plaintiff") hereby replies to the response briefs filed by Defendant, the United States, and the Defendant-Intervenor, Nucor Corporation ("Petitioner" or "Defendant-Intervenor").  Def.'s Response Brief, *POSCO v. United States*, No. 24-00006 (Ct. Int'l Trade Sept. 13, 2024), ECF No. 35 ("Def. Br."); Def.-Intervenor's Response Brief, *POSCO v. United States*, No. 24-00006 (Ct. Int'l Trade Oct. 8, 2024), ECF No. 38 ("Pet'r Br."); Order, *POSCO v. United States*, No. 24-00006 (Ct. Int'l Trade Apr. 17, 2024), ECF No. 26.  For the following reasons, Defendant's and Defendant-Intervenor's arguments are without merit and should be rejected.

I.    ARGUMENT

   A.    *Commerce's Determination That The Electricity for LTAR Program Is De Facto Specific Is Unsupported By Substantial Evidence And Is Otherwise Unlawful*

In the *Final Results*, the U.S. Department of Commerce ("Commerce") found that the Government of Korea's ("GOK") provision of electricity for less than adequate remuneration ("LTAR") was *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act, 19 U.S.C. § 1677(5A)(D)(iii)(III).  *Certain Carbon and Alloy Cut-To-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023), Appx15500-15502 ("*Final Results*"), and accompanying decision mem. ("IDM") at comment 1, Appx15419-15478, ECF No. 24.  Under that provision a domestic subsidy is *de facto* specific if "{a}n enterprise or industry receives a disproportionately large amount of the subsidy."  19 U.S.C. § 1677(5A)(D)(iii)(III).  Commerce found that GOK data showed "the steel industry and two other industries combined, consume a majority of the industrial class electricity in Korea," and therefore "the steel industry, among a small group of industries, received a disproportionately large amount of the subsidy."  Appx15444 (emphasis added).  Commerce's determination is unsupported by substantial evidence and is otherwise not in accordance with law.

First, Commerce's *de facto* specificity determination relies on a random grouping of the steel industry with two other unrelated industries to support the conclusion that "the steel industry receives a disproportionate amount of the subsidy."  Appx15442.  The fact that a group of three unrelated industries consumes a majority of electricity does not show that the *steel industry* received a disproportionate amount of the alleged electricity for LTAR subsidy.  To support that conclusion with respect to the steel industry, Commerce needed to analyze the steel industry's consumption of electricity to determine if it was disproportionate.  Commerce failed to

explain how the [        ] percent of industrial electricity consumed by the steel industry, which is an electricity intensive industry and thus would be expected to consume a large amount of electricity, was disproportionate by comparing it to something.  *See* POSCO's Rule 56.2 Brief at 14, *POSCO v. United States*, No. 24-00006 (Ct. Int'l Trade June 17, 2024), ECF No. 28 ("POSCO Br.").  Even using the random grouping of three industries, Commerce's disproportionality determination is unlawful.  As Defendant admits, "'{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all facts and circumstances of a particular case.'"  Def. Br. at 16 (quoting *AK Steel Corp. v. United States*, 192 F.3d 1367, 1384 (Fed. Cir. 1999) (citation omitted)).  Lumping together three unrelated industries does not comport with such a fact intensive analysis and fails to show how this percentage of consumption by the industries is disproportionate in comparison to anything.

Second, Commerce's *de facto* determination is arbitrary as Commerce has failed to explain this "group" of three unrelated industries or why they are being grouped together in the first place.  Although Commerce did not need to show that the industries had shared characteristics, it did need to explain the basis for grouping them together.  Instead of doing so it seems that Commerce's method was to go down the list of industrial users from largest to smallest and to lump together the number of industries needed to reach a majority.  This is the essence of arbitrary and results-oriented decision making and does not support the conclusion that the steel industry received a disproportionate amount of the alleged subsidy from the electricity for LTAR program.

In response, Defendant argues that the steel industry and two other industries received a disproportionate amount of the alleged subsidy because the three industries consumed a majority

of industrial class electricity during the POR.  Def. Br. at 16-17; *see also* Def. Br. at 18 ("The nature of the electricity for LTAR program means that 'consumption volumes are directly tied to the amount of subsidy conferred.'").  Defendant's argument does not explain how the consumption percentage of the steel industry and two other unrelated industries combined supports the conclusion that the *steel industry* received a disproportionate amount of the alleged electricity for LTAR subsidy.  All this data shows is that a random group of three unrelated industries consumed a majority of industrial electricity.  Appx97564; Appx15444.[1]  The fact that there is some disparity between this group of three industries compared to the other industrial electricity consuming industries does not demonstrate disproportionate receipt of the alleged electricity subsidy by the steel industry.  *See* POSCO Br. at 15-16; *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001) ("To impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws.").

Defendant next claims that the statutory "reference to disproportionate is 'general in nature, indicating that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce.'"  Def. Br. at 17 (quoting *Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.3d 1252, 1259-61 (Fed. Cir. 2024)).  This is non-responsive to POSCO's arguments.  POSCO argued that Commerce cannot rely on consumption data for three unrelated industries to support the conclusion that the steel industry received a disproportionate amount of the alleged electricity for

---

[1] Commerce tallied up the largest industrial users until it reached a majority of **[          ]** percent.  *See* Appx97564 ([
          ] percent).

LTAR subsidy. Merely asserting that the term disproportionate is general in nature does not shield Commerce's illogical disproportionality decision from scrutiny under the standard of review.

Defendant also argues that, because there is a linkage between the consumption of electricity and the amount of the subsidy, "the electricity-intensive nature of the steel industry supports Commerce's finding of *de facto* specificity." Def. Br. at 18. Again, this does not explain why Commerce relied on the electricity consumption of three unrelated industries to support the conclusion that the steel industry received a disproportionate amount of the alleged electricity for LTAR subsidy. Instead, this argument is only logical if Commerce is relying on electricity consumption by the steel industry alone. When viewed on that basis the steel industry only consumed [     ] percent of the total industrial electricity consumption in Korea, and only [     ] percent of the total electricity consumption in Korea. *See* POSCO Br. at 15 (citing Appx97564). These low percentages do not provide substantial evidence of disproportionate receipt of the alleged electricity for LTAR subsidy by the steel industry. *See* POSCO Br. at 14-15. Furthermore, the electricity intensive nature of the steel industry supports the conclusion that its consumption percentages are not out of proportion to what would be expected for this industry as compared to industries that are not electricity intensive. *See Bethlehem Steel*, 140 F. Supp.2d at 1369 (citing to the fact that an inherent characteristic of the steel industry is large consumption of electricity as supporting Commerce's finding that subsidy was not disproportionate for *de facto* specificity purposes).

More fundamentally, the existence of a standard pricing mechanism supports the conclusion that any alleged subsidy from the electricity for LTAR program is not *de facto* specific. Although Commerce structured its analysis in terms of disproportionate consumption

of industrial electricity on the theory that the amount of subsidy received is tied to the amount of

industrial electricity consumed, this is not the statutory test. The statute asks whether an

enterprise or industry received a disproportionately large amount of the subsidy. *See* 19 U.S.C.

§ 1677(5A)(D)(iii)(III). This is an important distinction because Commerce's specificity

determination is based on industrial users of electricity, and it is undisputed that all industrial

users pay the same rates based on a standard pricing mechanism. *See* POSCO Br. at 16. This

means that all users, large and small, receive the same proportionate amount of the subsidy. To

the extent an enterprise or industry uses more electricity than others, it will receive a larger

absolute amount of the subsidy. But the amount of subsidy received is proportionate to usage

since all users pay the same price. There is thus no basis to conclude that the steel industry, or

the random group of three industries, received a disproportionate amount of the alleged

electricity for LTAR subsidy. *See* POSCO Br. at 14 and Exhibit A.

Defendant repeatedly cites to the fact that Korea has a well-diversified economy to

support the conclusion that the steel industry received a disproportionate amount of benefits.

Def. Br. at 16-19. This may be true but Commerce fails to link its finding that the economy of

Korea is diverse with its finding that the steel industry, or even the group of industries with

which Commerce lumped the steel industry together, received a disproportionately large amount

of the subsidy. The fact that there are 19 industry groupings may show that, overall, the Korean

economy is diverse, but most of the industry groups such as wholesale and retail trade,

accommodation and food service, education, and membership organizations do not consume

industrial electricity. Appx01155-01158.[2]

---

[2] Defendant-Intervenor also argues that "[                              ] accounted for
[        ] of total industrial electricity consumption in Korea during the POR" and the fact that
[                                                    ] amounted to [          ] of total

In response to POSCO's argument that Commerce's *de facto* specificity determination is arbitrary because Commerce just randomly grouped together three large and unrelated industries to support its conclusion that the steel industry received a disproportionate amount of the alleged electricity for LTAR subsidy, Defendant points to Commerce's regulations that provide that "there is no requirement for industries receiving subsidies to have shared characteristics to be considered as a 'group' for purposes of assessing specificity." Def. Br. at 19 (citing 19 C.F.R. § 351.502(b)). But POSCO did not argue that Commerce was required to determine if these three industries had shared characteristics, and in fact acknowledged this regulation. POSCO Br. at 17-18. Instead, POSCO argued that Commerce's creation of its "group" was results-oriented and arbitrary because Commerce did not identify or define what this group represented or explain how it showed that the steel industry received a disproportionate amount of the subsidy. POSCO. Br. at 17-18. Just tallying up the largest three industries and concluding that they consume a majority of industrial electricity does not support the conclusion that the steel industry received a disproportionate amount of the alleged subsidy.

Defendant and Defendant-Intervenor attempt to distinguish *Bethlehem Steel*, where the court affirmed Commerce's finding that even the steel industry's receipt of 51 percent of benefits under an electricity program was not disproportionate for *de facto* specificity purposes. *See* Def. Br. at 24-26; *see* Pet'r Br. at 15-16. The distinguishing factor, according to Defendant, is "the differing nature of the program." Def. Br. at 24. This is a distinction without a difference. In *Bethlehem Steel*, the program involved electricity discounts for companies that agreed to lower

---

industrial consumption in an economy of more than 400,000 manufacturing establishments is additional evidence of disproportionate benefit." Pet'r Br. at 16. This was not relied upon by Commerce as the basis for its *de facto* specificity determination and is thus just a *post-hoc* argument by Defendant-Intervenor that should not be considered. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

their electricity usage during certain designated times of high electricity demand. *Bethlehem Steel,* 140 F. Supp. 2d at 1367. In the instant case, the program involves the provision of electricity for LTAR. But this difference in the nature of the program does not render *Bethlehem Steel* inapposite. That case stands for the proposition that disparity in the amount of benefits received based on usage levels alone is not a sufficient basis to find that a subsidy is *de facto* specific based on disproportionate receipt of the subsidy. That aspect of the holding is not contingent upon the nature of the program; it applies for any program where benefits are based on usage levels.

Here, the amount of the benefit from the electricity for LTAR program is tied to usage, just as the benefit from the electricity discount program at issue in *Bethlehem Steel* was tied to usage. In the *Final Results*, Commerce calculated an adjustment ratio to increase the per-unit price of electricity to determine the amount of the benefit. Appx97453-97456. So, the more units of electricity a party consumes, the higher the benefit. The benefit is therefore tied to usage, just as in *Bethlehem Steel*, where a larger company with high usage would receive a larger benefit under a program that links the benefit to reduction in usage levels.

Defendant nevertheless disavows *Bethlehem Steel* by citing to *Mosaic*.[3] Def. Br. at 24-26. Defendant's reliance on *Mosaic* is misplaced because the *de facto* specificity determination in that case was limited to "predominant use" under 19 U.S.C. § 1677(5A)(D)(iii)(II), not disproportionality under 19 U.S.C. § 1677(5A)(D)(iii)(III). *Mosaic Co. v. United States*, 589 F.

---

[3] Defendant also attempts to distinguish *Bethlehem Steel* by citing *Brass Rod from Korea*. Def. Br. at 25-26. *Brass Rod from Korea* addresses the same electricity for LTAR program in Korea that is at issue here. *Brass Rod From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 29,298 (Dep't of Commerce Apr. 22, 2024) and accompanying mem. at 30-31 (ACCESS Barcode: 4543953)). Because it is the same program, the benefit in that case is tied to usage just as it is here.

Supp. 3d 1298, 1309-10 (Ct. Int'l Trade 2022).[4]  To the extent the court in *Mosaic* distinguished *Bethlehem Steel*, it was the predominant use determination and not the disproportionate specificity determination.  *Id.* at 1310.  While the court relied on differences in the nature of the programs, it did not expound on why this was a distinguishing factor for the predominate use specificity finding.  *Id.*

POSCO argued that the term "disproportionate" is defined as being "out of proportion" and that Commerce failed to explain how the percentage of electricity consumed by the steel industry is out of proportion to what would otherwise be expected.  POSCO Br. at 14.  In response, Defendant-Intervenor argues that "Commerce's findings that the steel industry is the [          ] consumer of electricity, and that three industries accounted for the [          ] in Korea, were relative to [          ] other Korean industries."  Pet'r Br. at 18.  But in the *Final Results* Commerce did not specifically compare the steel industry or the group of three industries consumption to [          ] industries.  Instead, Commerce simply "concluded that a wide diversification of economic activities exists in Korea, including 19 industry groupings with a broad range of distinctly different types of economic activities within these groupings."  Appx15443.

Defendant-Intervenor also argues that "Commerce further explained that the 'three industries that consumed the next largest amounts of industrial electricity during the POR, after the three majority consumers, made up a significantly smaller percentage of the total industrial class electricity consumed during the POR.'"  Pet'r Br. at 18 (citing Appx15444).  This does not support the conclusion that the largest three industries' consumption was disproportionate.

---

[4] *Mosaic* has been appealed.  *See* Opening Brief of Defendant-Appellant, *Mosaic Co. v. United States*, Ct. No. 2024-1593 (Fed. Cir. June 7, 2024), Docket No. 21.

Rather, it is just comparing the largest consumers' consumption with the smaller consumers and reaching the unremarkable conclusion that the largest consumers' consumption was larger than the smaller consumers. Saying that the largest three consumers are bigger than the next smallest three says nothing about whether the three largest industries' consumption is out of proportion to what would otherwise be expected.

Finally, Defendant-Intervenor characterizes POSCO's argument about electricity being broadly available and widely used as an argument that the provision of electricity cannot be specific as general infrastructure. Pet'r Br. at 18. That is not what POSCO argued. POSCO merely pointed out the broad availability of electricity meant that it should be carefully scrutinized to ensure it meets specificity requirements. This is particularly true given that the electricity rates for industrial users such as the steel industry are set based on a standard pricing mechanism and thus no enterprise or industry receives a more preferential rate than other companies or industrial users. Appx91721-91734 (showing that electricity prices were based on standard pricing); *see also* POSCO Br. at 12-13.

In response to POSCO's point about the broad availability of electricity, Defendant argues that the predicate for applying the disproportionate test supports treating widely available programs as specific. *See* Def. Br. at 20-21. Defendant cites to 19 C.F.R. § 351.502(a), which states that Commerce will examine the *de facto* specificity factors in sequential order and that the "limited number" specificity factor comes before the disproportionate specificity factor in the hierarchy. Defendant concludes that the disproportionality factor only applies when it is established that users are not limited in number and therefore allegedly applies when the subsidy in question is provided to numerous and diverse industries. Def. Br. at 20. Defendant's argument is misplaced. The fact that a subsidy program is not provided to a limited number of

industries does not, *ipso facto*, lead to the conclusion that widespread usage is a predicate for the disproportionate specificity factor to apply.

Accordingly, this Court should find that Commerce's determination that the GOK's provision of electricity for LTAR was *de facto* specific is not supported by substantial evidence and is otherwise not in accordance with law.

> B. *Commerce's Determination that the GOK's Provision of Carbon Emission Permits to POSCO Constitutes a Countervailable Subsidy is Unsupported by Substantial Evidence and is Otherwise Contrary to Law*

>> i. *The KETS Does Not Provide A Financial Contribution Pursuant To 19 U.S.C. § 1677(5)(D)(ii)*

In the *Final Results*, Commerce determined that the 10 percent of permits that the GOK did not deduct from POSCO's permit allocation[5] was a financial contribution under 19 U.S.C. § 1677(5)(D)(ii) because it constituted revenue foregone by the GOK that was otherwise due. Appx15455. POSCO argued that this determination is contrary to the plain language of the statute and unsupported by substantial evidence because the GOK was not foregoing any revenue that was otherwise due to it or otherwise owed by POSCO.

Defendant argues that Commerce found revenue would be otherwise due but for the relative 10 percent differential in the permit allocations because the permits are fungible instruments with value that must be surrendered to the GOK, and therefore the GOK establishes an amount of revenue that must be paid to the GOK. Def. Br. at 28-29. Defendant argues that "by providing additional free allowances to the select group of polluters at issue here, the government is choosing not to collect costs (*i.e.*, foregoing revenue)," noting that "every ton of

---

[5] The GOK first limits companies subject to the KETS to 100 percent of their applicable carbon emissions caps *and then* applies a ratio to each company's allocation, reducing it by 10 percent for subject companies that do not meet trade intensity and production cost criteria. Appx87191; Appx88704; Appx88766.

carbon emissions has a price (or cost) associated with it and that cost is being taken into account by the parties emitting the carbon." Def. Br. at 29. Defendant and Defendant-Intervenor further claim that "any emission permit 'that is not freely allocated and is released into the market by the GOK generates revenue' for the government of Korea." Def. Br. at 29; Pet'r Br. at 9.

Whether the permits have a cost associated with carbon emissions or a value in the market is irrelevant to whether there is "revenue that is otherwise due" to the government as expressed in 19 U.S.C. § 1677(5)(D)(ii). An "emission permit" is defined as "an amount of greenhouse gas emissions permitted and allocated to an individual business entity producing greenhouse gases within the scope of total allowances for greenhouse gas emissions." Appx88695. They set a cap of an entity's carbon emissions and are not designed to generate revenue for the GOK. Unallocated "reserve" permits are used "to provide permits to new entrants and to participants that {have} constructed or expanded {their} facilities," and includes a pool of permits in reserve for liquidity management and to stabilize the market. Appx86979. Additionally, an entity that exceeds its allocated cap can borrow unused permits carried forward from prior years, borrow permits from future years, or purchase additional permits from private parties in the market. Appx86985-Appx86987. Defendant's assertion that any permit not freely allocated generates revenue for the GOK thus contradicts the record regarding the KETS. Even if the permits have a value or cost and even if they are surrendered to the GOK, neither the permits—nor the costs associated with them—are "revenue otherwise due." *See* POSCO Br. at 26-28; Plaintiff-Intervenor's Rule 56.2 Brief at 13-14, *POSCO v. United* States, No. 24-00006 (Ct. Int'l Trade Jul. 15, 2024), ECF No. 32 ("Pl.-Int. Br.").

Defendant argues that the court sustained Commerce's foregone revenue financial contribution determination in *Hyundai II* where the court noted that "because most other entities

were required to pay for additional units that were simply given away to Hyundai and a few other similarly situated companies, the South Korean government failed to collect revenue that it otherwise would have received."  Def. Br. 30 (citing *Hyundai Steel Co. v. United States*, No. 22-00029, 2023 WL 8715732, at *4 (Ct. Int'l Trade Dec. 18, 2023) ("*Hyundai II*")).  Defendant and Defendant-Intervenor also argue that, in this case, Commerce found that "the GOK would at some point collect revenue through the program to account for the 'costs' of carbon emissions, measured by emission permits" and that the court in *Hyundai I* recognized that the statute covers revenue otherwise due presently or at some time in the future.  Def. Br. at 32-34 (citing *Hyundai Steel Co. v. United States*, 659 F. Supp. 3d 1327, 1334 (Ct. Int'l Trade 2023) ("*Hyundai I*"));  Pet'r Br. at 9-10.

However, the court in *Hyundai II* did not grapple with the fact that the revenue is not certain, and thus not "due."  *See* POSCO Br. at 25 n.7.  It is not certain whether permits would ever be purchased from the government auction as permits may be purchased from private third parties rather than the GOK, borrowed from future or prior compliance periods, or not needed if the company reduces its carbon emissions below the required level.  Appx86980; Appx15454; *see also Hyundai I*, 659 F. Supp. at 1334.  Given these options, all that can be said is that, by providing additional permits, the GOK *could* be foregoing potential revenue *if* POSCO were to purchase permits from the GOK auction.  This would not be revenue that is certain and thus not revenue "otherwise due."  *See* POSCO Br. at 22 and Exhibit B (definitions of the word "due"); *Hyundai I*, 659 F. Supp. 3d at 1334.

Defendant argues that the relative allocation of permits operates in a manner similar to a tax credit program, which is an exemplar of revenue foregone in 19 U.S.C. § 1677(5)(D)(ii), because the KETS creates an emission compliance obligation that requires subject entities to

surrender permits and relieves entities of this obligation.  Def. Br. at 35-36.  According to

Defendant, emission permits have a recognized market value and that, by requiring the surrender

of permits, the GOK establishes an amount of revenue that is required to be paid to the

government.  Def. Br. at 36.  However, unlike the permits at issue, tax credits and tax deductions

represent a reduction in the amount of tax *revenue* that the government authority is legally

entitled to receive.  The taxpayer legally owes the government the taxes and, by reducing that tax

burden, the government is foregoing revenue that is otherwise payable or owed.  By contrast, the

relative allocation of permits does not create a legal obligation for POSCO to pay revenue to the

GOK.  POSCO can reduce its emissions below the permit allocation, buy permits from the

private market, or borrow from prior or future years to meet its emission permit obligation.

Unlike tax credits, POSCO does not owe or have to pay the government any revenue.

Defendant and Defendant-Intervenor argue that the revenue otherwise due need not be

due from the respondent but could be due from another entity subject to KETS.  Def. Br. at 33;

Pet'r Br. at 10.  Defendant-Intervenor thus claims that "if POSCO were not to receive its free ten

percent allocation and it purchased those additional allowances entirely from the private markets

instead of the GOK-run auction, POSCO would still be reducing the number of allowances

available to be sold privately and thus requiring another company to purchase additional

allowances from the GOK."  Pet'r Br. at 10.  First of all, no company is required to purchase

additional allowances from the GOK.  Appx86988-86989.  As explained, subject entities may

always buy permits from private parties, borrow from future years, or carry forward unused

permits from prior years.  Appx86980.  The GOK does not restrict the sale, exchange, or trading

of permits.  Appx86988; Appx86986.  Scarcity of permits may affect price; but it does not

14

reduce the number of allowances available to be sold privately.  Nor does it mean that another company would be required to purchase permits from the GOK.

Second, and more fundamentally, pursuant to the Tariff Act the financial contribution must involve revenue otherwise due to the government *from the respondent*.  19 U.S.C. § 1677(5)(A)-(B) (defining a countervailable subsidy as the case where "an authority— (i) provides a financial contribution… *to a person* and a benefit is thereby conferred.") (emphasis added); 19 U.S.C. § 1677(5)(E) ("A benefit shall normally be treated as conferred where there is a benefit *to the recipient*….") (emphasis added).  The person or recipient of the alleged subsidy in this case is the respondent – POSCO.

Commerce's determination that the KETS provides a financial contribution by foregoing or not collecting revenue otherwise due pursuant to 19 U.S.C. § 1677(5)(D) is unsupported by substantial evidence and contrary to law.

> ii.    *The KETS Does Not Provide A Countervailable Benefit*

In the *Final Results*, Commerce determined that the KETS permit allocation provides a benefit pursuant to 19 C.F.R. § 351.503(b)(2) to the extent that POSCO is relieved of the obligation to purchase additional allowances."  Appx15458.  In its opening brief, POSCO argued that Commerce failed to determine whether a benefit is conferred pursuant to 19 C.F.R. § 351.503(b)(2) because the regulation requires Commerce to examine whether the alleged program has common or similar elements to the four illustrative examples from 19 U.S.C. § 1677(5)(E).  POSCO Br. at 32-36.  In response, Defendant and Defendant-Intervenor argue Commerce "applied an adequate remuneration standard to the revenue foregone" because "the GOK is charging certain entities no cost for something that has an established market value." Def. Br. at 42 (citing Appx15459); Pet'r Br. at 12 (citing 19 U.S.C. § 1677(5)(E)(iv)).

Commerce's explanation in the *Final Results* that "the GOK is charging no cost for something that has an established market value" is done in the context of Commerce explaining its benefit *calculation* and does not amount to an explanation that the relative difference in permit allocation has common or similar elements to 19 U.S.C. § 1677(5)(E).

Furthermore, unlike the allocation and surrender of permits, 19 U.S.C. § 1677(5)(E) applies to situations where an authority sells goods or services at a price lower than that at which parties can acquire the good or service on the market. 19 C.F.R. § 351.511. Put another way, 19 U.S.C. § 1677(5)(E)(iv) requires there be "remuneration" in exchange for the "goods or services" provided. For example, a government provides a good or service when it *sells* raw materials, like hot-rolled steel, to a respondent at a price that is less than adequate remuneration. *See Oil Country Tubular Goods from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 84 Fed. Reg. 68,115 (Dep't of Commerce Dec. 13, 2019) and accompanying mem. at 12-13. Unlike the sale of raw materials, the allocation of KETS permits represents the cap imposed on an entity's carbon emissions, without any bargained-for exchange. *See* Appx88695 (defining "emission permit" as "an amount of greenhouse gas emissions permitted and allocated to an individual business entity producing greenhouse gases within the scope of total allowances for greenhouse gas emissions"). The allocation and surrender of permits is thus not similar to the sale of *goods or services* for less than adequate *remuneration*. Contrary to Defendant's arguments, whether the permits "ha{ve} an established market value" does not equate the permits to goods or services or explain how the permit allocation has common or similar elements to 19 U.S.C. § 1677(5)(E).

Also, unlike the four illustrative examples in 19 U.S.C. § 1677(5)(E), Commerce failed to determine whether a benefit is conferred by the financial contribution. 19 U.S.C. § 1677(5)(B)

16

defines a countervailable subsidy as "the case in which an authority—(i) provides a financial contribution… to a person and a benefit is *thereby* conferred;" and each of the four illustrative examples in 19 U.S.C. § 1677(5)(E) represent situations where the financial contribution thereby confers a benefit, unlike Commerce's explanation of benefit in the *Final Results*.  19 U.S.C. § 1677(5)(B) (emphasis added).  For example, 19 U.S.C. § 1677(5)(E) states that "a benefit shall normally be treated as conferred… in the case where *goods or services are provided*, if *such goods or services are provided* for less than adequate remuneration," and 19 U.S.C. § 1677(5)(D)(iii) lists "providing goods or services" within the meaning of "financial contribution."  The court's decision in *Hyundai I* supports this interpretation because it remanded Commerce's benefit determination in that case so it would be consistent with Commerce's financial contribution determination on remand.  *Hyundai I*, 659 F. Supp. 3d at 1338.

Defendant argues that Commerce's benefit determination "logically follows from the finding of financial contribution" because the relative allocation of permits represents a cost to polluters and allegedly "improved the 'financial status' of the receiving entity," but fails to explain how the financial contribution of revenue foregone thereby confers a benefit.  Def. Br. at 41-43.  Commerce determined that "the GOK provided POSCO a financial contribution in the form of revenue foregone in accordance with section 771(5)(D)(ii)," Appx15455, but whether additional permits would "otherwise represent a cost to a select group of polluters" or "improved the financial status of the recipient" says nothing about the amount of due revenue foregone or not collected by the GOK.  The *Final Results* thus fail to determine that the financial contribution of revenue foregone has "thereby conferred a benefit" to POSCO during the POR, unlike the four examples from 19 U.S.C. § 1677(5)(E) as required by 19 C.F.R. § 351.503(b)(2) and contrary to 19 U.S.C. § 1677(5)(B).

Commerce's determination that the KETS confers a countervailable benefit is unsupported by substantial evidence and contrary to law.

      i.    *Commerce's Specificity Determination Continues to Be Unsupported by Evidence and Is Otherwise Not in Accordance with Law*

          a.    *The KETS Does Not Expressly Limit Access to an Enterprise or Industry*

Defendant argues that the AAGEP and its implementing rules result in an express statutory limitation by setting thresholds industries must meet to qualify, noting that some industries or enterprises qualify while others do not. Def. Br. at 44-45. Contrary to Defendant's claims, whether all industries will meet the criteria does not mean that the KETS "expressly limit{s} access to the subsidy to an enterprise or industry" pursuant to 19 U.S.C. § 1677(5A)(D)(i). There is an "inherent disconnect" between the "types of businesses" in the AAGEP and "'a *specific* enterprise or industry' or 'a *given* enterprise or industry' as referred to in the Tariff Act," as the court pointed out in *Hyundai II*, 2023 WL 8715732 at *7 (emphasis in original). The court noted that whether a certain industry such as the "'Manufacturing of Basic Steel' qualifies for the additional allocation appears to have no significance for whether any other enterprise or industry does or does not qualify." *Hyundai II*, 2023 WL 8715732 at *7. Further, whether a subsector qualifies depends on whether it meets the trade intensity and production cost criteria. Appx89002-89003. Depending on the relevant factors, any large business could qualify for the 100 percent allocation in one KETS phase but may not necessarily qualify in a subsequent phase. Commerce's determination that some industries or enterprises may benefit "while others do not," Appx15464, reflects only "the truism that not all industries will 'qualify under the criteria,'" which the court found insufficient to justify a finding of *de jure*

specificity.  *Hyundai I*, 659 F. Supp. 3d at 1342; *Hyundai II*, 2023 WL 8715732 at *7-8; *Hyundai III*, 2024 WL 1929018 at *10-12.

The court has held that Commerce's finding of *de jure* specificity, relying on the same reasoning in Commerce's *Final Results* here, was not supported by substantial evidence.  In *Hyundai II*, the court noted that Commerce determined that the AAGEP "imposes a 'limitation on which industries qualify for the additional allocation by setting thresholds that industries must meet in order to qualify,'" and found that "{a}bsent from this discussion is any indication of how the criteria, or the limitation and the thresholds, operate to 'restrict the bounds of {the} particular subsidy to a given enterprise or industry.'"  *Hyundai II*, 2023 WL 8715732 at *7.  The court reasoned that "{t}here is also nothing to demonstrate why any particular enterprise or industry would not qualify as long as it met the statutory numbers."  *Hyundai II*, 2023 WL 8715732 at *7.

Similarly, in *Hyundai I*, the court held that the Commerce did "not offer a convincing explanation for why the 'international trade intensity' or 'production cost' criteria… establish *de jure* specificity pursuant to §1677(5A)(D)(i)."  *Hyundai I*, 659 F. Supp. 3d at 1342.  The court reasoned that "Commerce relied on the existence of the criteria *per se* to establish specificity" and that "the existence of criteria alone, and absent any analysis of those criteria, is not enough to demonstrate an explicit limitation *to an enterprise or industry*."  *Id.*  The court thus already rejected the logic of the *Final Results* here as to how the KETS allegedly expressly limits access to the subsidy to an enterprise or industry and should do so again here.

Defendant adds that the statute does not require Commerce "to consider the intent behind the subsidy, but the result."  Def. Br. at 45.  This is a red herring.  POSCO's argument does not require consideration of the intent of the alleged subsidy.  Rather, POSCO's argument is simple–for this subsidy to be specific as a matter of law, the AAGEP must expressly limit the 100

19

percent allocations to specific enterprises or industries.  That is, by its terms.  The fact that the GOK did not know what enterprises or industries would be included in the trade intensive or high production cost sectors means it could not have expressly limited it to any particular enterprise or industry.  This has nothing to do with intent.

> b.  *The K-ETS Meets the Safe Harbor of Section 1677(5A)(D)(ii).*

Defendant and Defendant-Intervenor claim that the trade intensity and production cost criteria are not objective because "the AAGEP and the enforcement decree establish criteria that favor certain industries such as primary steel."  Def. Br. at 46; Pet'r Br. at 13-14.  Defendant notes that the KETS is allegedly "limited to certain sectors that have high international trade intensity and/or high production costs."  Def. Br. at 47.  The observation that certain subsectors qualify for the additional allocation merely demonstrates the result of the GOK applying the KETS criteria.  In other words, the *Final Results* determines that the trade intensity and production cost criteria are not "objective" because the criteria allegedly favor industries "with defined higher levels of international trade intensity and productions costs."  Appx15465. Commerce's explanation does not lead to the conclusion that the criteria favor one enterprise or industry over another for purposes of 19 U.S.C. § 1677(5A)(D)(ii).  Under Commerce's logic, any eligibility criteria could be said to favor an enterprise or industry.  As the court has noted, "Commerce's observation that 'some industries may benefit from the additional assistance in the form of the allocation of additional KAUs, while others do not,' merely reflects the truism that not all industries will 'qualify under the criteria.'" *Hyundai I*, 659 F. Supp. 3d at 1342.  Whether subsectors meet the trade intensive and production cost criteria does not mean that the criteria favor one enterprise or industry over another for purposes of 19 U.S.C. § 1677(5A)(D)(ii).

Defendant claims that the criteria "cannot be said to have a horizontal application such as criteria measuring total sales." Def. Br. at 47. Yet, the *Final Results* fail to explain how the criteria are not economic in nature or horizontal in application and thus would be unlike the number of employees or size of the enterprise examples from the SAA. Uruguay Round Agreements Act Statement of Administrative Action, H.R. Rep. No. 103-316 at 930 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4243 ("SAA"); *see also* POSCO Br. at 43. The GOK applied the trade intensity and production cost criteria evenly to all subsectors subject to the KETS to determine who qualified. Appx88997-88999; *see also* Appx88966-88980. The criteria thresholds do not vary by enterprise or industry. Any type of business can qualify under the KETS if they meet the trade intensity and production cost criteria. Indeed, Commerce admits that "these criteria are based on mathematical formulas and are therefore 'objective' in that sense." Appx15464.

The court rejected the logic underlying the *Final Results* in *Hyundai I*, *Hyundai II*, and *Hyundai III* and should do so again here. *Hyundai I*, 659 F. Supp. 3d at 1342; *Hyundai II*, 2023 WL 8715732 at *8; *Hyundai III*, 2024 WL 1929018 at *11. For example, in *Hyundai III*, Commerce determined that the trade intensity and production cost criteria "'are not horizontal in application' because the favored subsectors, by their nature, have more GHG-intensive (i.e., heavy polluting) production processes' and 'are more dependent on international markets for sales and/or sourcing.'" *Hyundai III*, 2024 WL 1929018 at *10. The court remanded Commerce's *Remand Results*, explaining that "Commerce's rationale merely repackages the language of the criteria into a statement that certain subsectors are favored." *Hyundai III*, 2024 WL 1929018 at *11. The court reasoned that "even criteria recognized as objective (such as the size or number of employees) 'could exclude entire categories of enterprises and industries, but

21

such criteria would not render the subsidy *de jure* specific because it is horizontal (operating throughout an economy)." *Hyundai III*, 2024 WL 1929018 at *11 (citing *BGH III*, 663 F. Supp. 3d 1382). The court acknowledged that "any subsidy bestowed pursuant to eligibility criteria necessarily requires some identification of the recipients that meet those criteria." *Hyundai III*, 2024 WL 1929018 at *12. The same reasoning applies equally here. The *Final Results* merely reflects the fact that not all enterprises or industries will qualify pursuant to the criteria and does not evidence that the criteria are not "horizontal in application."

Defendant relies on *Silicon Metal from Australia* as support for its argument that the AAGEP criteria are not objective. Def. Br. at 47 (citing *Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (March 8, 2018)), and accompanying IDM at 20-21. The discussion of this issue by Commerce in that case is abbreviated and while it may have some relevance to the *de jure* specificity finding here, POSCO notes that this decision was not appealed. Thus, even to the extent it involved similar facts POSCO disagrees with this decision and thinks it too is not in accordance with law because the program in that case did not limit eligibility to certain enterprises or industries.

Commerce's determination that the KETS is *de jure* specific and does not meet the safe harbor is unsupported by substantial evidence and contrary to law.

II.     *CONCLUSION*

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its motion for judgment on the agency record and reject the arguments of Defendant and Defendant-Intervenor.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff POSCO*

CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 6,775 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  November 5, 2024