# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN**

|  |  |
|---|---|
| POSCO, | ) |
| Plaintiff, | ) ) ) |
| and | ) ) |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) ) ) |
| Plaintiff-Intervenor, | ) ) ) |
| v. | ) **Court No. 24-00006** |
| UNITED STATES, | ) **NONCONFIDENTIAL** ) |
| Defendant, | ) Business Proprietary Information ) Removed from Pages 3-6. |
| and | ) ) |
| NUCOR CORPORATION, | ) ) |
| Defendant-Intervenor. | ) ) |

## PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: November 26, 2024

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

ARGUMENT..................................................................................................................................1

I.      COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY IS NOT SUPPORTED
BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN
ACCORDANCE WITH LAW ...........................................................................................1

II.    COMMERCE'S DECISION TO COUNTERVAIL THE GOK'S K-ETS
PROGRAM IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE
RECORD OR OTHERWISE IN ACCORDANCE WITH LAW .......................................7

        A.      The Allocation of KAUs Did Not Amount to Revenue Foregone that Was
"Otherwise Due" to the GOK ...................................................................................7

        B.      The Additional KAUs Did Not Confer a Benefit to POSCO...................................8

        C.      The Allocation of Additional KAUs Was Not *De Jure* Specific.............................9

CONCLUSION..............................................................................................................................11

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*AK Steel Corp. v. United States*,
   192 F.3d 1367 (Fed. Cir. 1999) ................................................................................................ 3

*Bethlehem Steel Corp. v. United States*,
   140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ............................................................................ 3

*Canadian Solar Inc. v. United States*,
   No. 19-00178, 2022 WL 1583428 (Ct. Int'l Trade May 19, 2022) ........................................... 2

*Changzhou Trina Solar Energy Co. v. United States*,
   466 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ............................................................................ 2

*Government of Sri Lanka v. United States*,
   308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ............................................................................ 8

*Hyundai Steel Co. v. United States*,
   659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) ............................................................................ 9

*Hyundai Steel Co. v. United States*,
   No. 22-00032, 2023 WL 8715732 (Ct. Int'l Trade Dec. 18, 2023) .......................................... 9

*Mosaic Co. v. United States*,
   589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022) ........................................................................... 2

*Samsung Electronics Co., Ltd. v. United States*,
   973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) ........................................................................... 3

**STATUTES**

19 U.S.C. § 1677(5)(B) ................................................................................................................. 7

19 U.S.C. § 1677(5A)(D)(ii) ..................................................................................................... 9, 10

19 U.S.C. § 1677(5A)(D)(iii)(II) ................................................................................................... 2

19 U.S.C. § 1677(5A)(D)(iii)(III) ................................................................................................. 2

**OTHER AUTHORITIES**

*Statement of Administrative Action for the Uruguay Round Agreements Act*, H.R. Rep. No. 103-
   316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 ............................................................. 1

**INTRODUCTION**

Pursuant to Rule 56.2(d) of the Court's Rules, Plaintiff-Intervenor the Government of the Republic of Korea ("GOK") replies to the response briefs filed by Defendant United States and Defendant-Intervenor Nucor Corporation.  Def.'s Resp. Br., ECF No. 35 ("Def. Br."); Def.-Intervenor's Resp. Br., ECF No. 38 ("Pet'r Br.").  For the reasons explained by Plaintiff POSCO in its Reply Brief in Support of Its Motion for Judgment on the Agency Record, ECF No. 40 ("POSCO Reply"), and the additional reasons provided below, Defendant's and Defendant-Intervenor's arguments are without merit and should be rejected.

**ARGUMENT**

**I.     COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW**

Defendant and Defendant-Intervenor argue that Commerce's finding of *de facto* specificity was reasonable because a group of only three industries (i.e., the steel industry and two other industries) consumed a majority of the industrial class electricity in Korea.  Def. Br. at 16-18; Pet'r Br at 14-16.  These arguments are flawed.

"The specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy."  *Statement of Administrative Action for the Uruguay Round Agreements Act*, H.R. Rep. No. 103-316 at 930 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 (emphasis omitted).  The provision of electricity is a clear example of a broadly available and widely used program that is not intended to be countervailed.  Therefore, any determination of *de facto* specificity must be carefully scrutinized to demonstrate that the provision of a public good like electricity is specific, despite its widespread availability and use.

Defendant-Intervenor contends that the courts have upheld Commerce's findings that broadly available and widely used programs, such as the provision of electricity and other energy inputs, can be found to be specific. Pet'r Br. at 18-20. However, Defendant-Intervenor's reliance on *Canadian Solar*, *Changzhou Trina Solar Energy* and *Mosaic* is misplaced. In both *Canadian Solar* and *Changzhou Trina Solar Energy*, the courts upheld Commerce's finding of specificity based on regional specificity, as Commerce determined in those cases – using adverse facts available – that the Government of China provided subsidized electricity prices to certain geographic regions. *See Canadian Solar Inc. v. United States*, No. 19-00178, 2022 WL 1583428, at *2-4 (Ct. Int'l Trade May 19, 2022); *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1299 (Ct. Int'l Trade 2020). Therefore, the programs at issue in *Canadian Solar* and *Changzhou Trina Solar Energy* were not broadly available and widely used programs, but instead were geographically specific programs. In *Mosaic*, the court's decision pertained to Commerce's finding of specificity based on predominant use of natural gas by a particular industry under 19 U.S.C. § 1677(5A)(D)(iii)(II), not disproportionality under 19 U.S.C. § 1677(5A)(D)(iii)(III). *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1310 (Ct. Int'l Trade 2022). *Mosaic* is thus distinguishable from this case based on the fact that electricity in Korea was widely used by virtually everyone in the country, not predominantly by any particular industry as in *Mosaic*. Accordingly, these cases do not support Defendant-Intervenor's argument.

Moreover, as explained in the GOK's opening brief, disproportionality should not be confused with disparity. Pl.-Intervenor's Br., ECF No. 32 ("GOK Br.") at 5-6. The Federal Circuit has rejected the argument that Commerce should determine disproportionality simply "by looking at the percentage of the total benefit of a subsidy program accruing to a particular

company or industry." *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999).

The Federal Circuit explained that such a methodology could produce an "untenable result"

where a "benefit conferred on a large company might be disproportionate merely because of the

size of the company." *Id.* For that reason, "disproportionality" determinations must "tak{e} into

account all the facts and circumstances of a particular case." *Id.* Similarly, in *Samsung*

*Electronics Co., Ltd. v. United States*, the Court relied on *AK Steel* to hold that using just the

relative share of the total benefit to determine disproportionality could produce an untenable

result. 973 F. Supp. 2d 1321, 1326-27 (Ct. Int'l Trade 2014). The Court reasoned that

Commerce may not treat a subsidy as *de facto* specific by simply showing that the respondent

received a large benefit. *Id.* at 1328. Thus, the Federal Circuit and this Court have cautioned

against conflating disparity in benefit amounts with disproportionality in the benefit conferred, as

the disparity in the amount of the subsidy received could merely reflect differences in the size of

the industries or enterprises or other factors, which would indicate that the different subsidy

amounts received nevertheless were proportionate.

Commerce made the same error here in the Final Results. The steel industry consumed

[     ] percent of the total industrial electricity consumption in Korea. Appx97564. This is not

an especially large percentage, particularly when Commerce and this Court have found that the

receipt of more than 50 percent of the benefit by a single industry is not necessarily

disproportionate. *See Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (Ct.

Int'l Trade 2001). Commerce should have analyzed the steel industry's percentage of industrial

electricity consumption in light of relevant factors, such as the nature of the program (electricity,

which is widely available and used throughout the Korean economy), the nature of the steel

industry, and the steel industry's size. Commerce, however, randomly grouped the steel industry

with the **[                                        ]** industries to find that these industries together

comprised "the majority of consumers of industrial class electricity in Korea" and thus, "received

a disproportionately large amount of the subsidy." Appx15444. Commerce did so without

offering any explanation or analysis as to why those three industries constituted a specific group

of industries or why their aggregate consumption was considered disproportionate.

      Defendant and Defendant-Intervenor now argue that Commerce reasonably grouped these

three industries together. Def. Br. at 17; Pet'r Br. at 14-15. Defendant alleges that "{w}hen

combined" the three industries used **[     ]** percent of the total industrial electricity consumption

while the remaining industries "each consumed" less than **[  ]** percent. Def. Br. at 17. Rather

than supporting Commerce's finding, Defendant's argument underscores the fundamental flaws

in Commerce's analysis. Commerce artificially inflated the disparity of electricity consumption

between the steel industry and other industries by comparing the steel industry's electricity

consumption plus two other industries (i.e., **[                                        ]**) "combined" with

the remaining industries "individually." The record shows that the steel industry by itself

consumed only **[     ]** percent of the electricity consumed by industrial customers in Korea.

Appx97564. Comparing this percentage to the consumption rates of other industrial customers,

the disparity in electricity consumption is not significant. Commerce arbitrarily grouped these

three industries in its results-oriented analysis that led to its preferred outcome. *See* GOK Br. at

9; POSCO Reply at 3. Besides the arbitrary aggregation of the steel industry's electricity

consumption with the electricity consumption of two other unrelated industries, Commerce's

analysis ultimately boils down to an observation that there is a discrepancy between the

electricity consumption of some industries compared to other industries. But disparity on its

own does not demonstrate disproportionality.   Commerce therefore has failed to support its

determination with substantial evidence.

Defendant's and Defendant-Intervenor's other arguments also highlight material

inconsistencies in Commerce's analysis.  These parties argue that the Korean economy is diverse

by relying on the 19 different industry groupings found by Commerce.  Def. Br. at 18-19; Pet'r

Br. at 16-17.  Yet, Commerce's specificity finding was based on the electricity consumed by the

steel industry and two other industries compared to the total electricity consumed by industrial

electricity users.  Appx15443-15444.  The 19 industry groupings included a broad range of

economic activities such as "agriculture, forestry and fishing," "wholesale and retail trade,"

"transportation," "accommodation and food service activities," and "education."  Appx01156-

01157.  Companies within those and many others of the 19 industry groupings identified by

Commerce would not fall within the industrial user classification when purchasing electricity.

Rather, they would fall within the general, educational, or agricultural classifications.  Given that

Commerce's finding of economic diversity was based on a broad range of economic activities

that included individuals and companies that do not consume industrial electricity, any

specificity analysis relying on that economic-diversity finding should have compared the

electricity consumption by the steel industry (or a group of industries including the steel

industry) to the economy-wide electricity consumption in Korea.  As explained in the GOK's

opening brief and in POSCO's briefs, the steel industry consumed only **[     ]** percent of

electricity in Korea, and even if the steel industry was grouped together with the other two

industries identified by Commerce as large consumers of electricity, those industries consumed

only **[     ]** percent of total electricity in Korea.  *See* Appx87021-87022.  Those percentages do

not a support a finding that the steel industry received a disproportionate amount of the subsidy.

NONCONFIDENTIAL

If Commerce wished to compare the electricity consumption by the steel industry (or a group of industries including the steel industry) to just other industrial electricity users, Commerce at minimum should have analyzed whether the users of industrial electricity were diverse.  The record, however, contains no such analysis by Commerce.  Not one of the top 10 "industries" consuming industrial electricity correspond with the list of 19 industry groupings identified by Commerce for purposes of analyzing whether the Korean economy is diverse. Appx87021-87022.  Instead, many if not all would appear to fall within one of those 19 industry groupings – manufacturing.

As there is no reasoned analysis of whether the Korean manufacturing sector or the universe of industrial electricity users is diverse, Commerce's findings regarding the diversity of the Korean economy are totally divorced from the manner in which Commerce actually analyzed specificity with respect to the alleged provision of electricity for LTAR.[1]  Thus, even if Commerce's unlawful conflation of disparity with disproportionality were overlooked, Commerce's specificity analysis would remain unreasoned and unsupported by substantial evidence.

---

[1] Even if the manufacturing sector or the universe of industrial electricity users could be described as diverse, that fact alone would not demonstrate that the steel industry's consumption of [    ] percent of industrial electricity is disproportionate absent any analysis of other factors that provide important context, such as the size and nature of the industries comprising the manufacturing sector or industrial electricity users.

II.     **COMMERCE'S DECISION TO COUNTERVAIL THE GOK'S K-ETS PROGRAM IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW**

A.      **The Allocation of KAUs Did Not Amount to Revenue Foregone That Was "Otherwise Due" to the GOK**

Defendant's argument that the GOK establishes an amount of revenue because the KAUs, which have a value, must ultimately be surrendered to the GOK misconstrues the financial contribution analysis. Def. Br. at 29, 37-38. As explained in the GOK's opening brief, the fact that all KAUs are surrendered to the GOK is irrelevant to the analysis of whether the surrendered KAUs would have resulted in revenue to the GOK. GOK Br. at 13. Rather, the act of purchasing additional KAUs from the GOK is the focal point of the analysis. As POSCO noted, no company was required to purchase additional KAUs from the GOK. POSCO Reply at 14-15. Companies, including POSCO, had the option to purchase additional KAUs from private market transactions or borrow KAUs from the next compliance year. Appx86985-86987; Appx86989; Appx89185-89202. More importantly, companies may not resort to either option if they reduce their greenhouse gas ("GHG") emissions below their KAU levels during a compliance year, in which case they would not surrender any KAUs to the GOK. Appx86979-86980. In such a circumstance, there would be no revenue that is otherwise due to the GOK.

Further, Defendant-Intervenor's argument that "there is no statutory requirement" for "revenue {to} be due from the respondent in question," Pet'r Br. at 10, conflicts with the statute's text. The statute limits countervailing a subsidy to situations in which a government authority "provides a financial contribution . . . *to a person and a benefit is thereby conferred*." 19 U.S.C. § 1677(5)(B) (emphasis added). In its opening brief, the GOK explained that because the financial contribution must provide a benefit to the recipient, a countervailable financial contribution in the form of revenue foregone can be provided to and confer a benefit upon

POSCO only if the revenue was otherwise due *from POSCO*. This was not the case here. As a result, Commerce's finding that the additional KAUs constitute revenue foregone that was otherwise due to the GOK is unsupported by substantial evidence and is not in accordance with law.

### B.    The Additional KAUs Did Not Confer a Benefit to POSCO

Defendant argues that Commerce was not required to consider the effects of the subsidy in determining whether a subsidy exists. Def. Br. at 41-42. Defendant's argument is a red-herring: Commerce must consider a program in its entirety, including the overall purpose of the program. For example, in *Government of Sri Lanka v. United States*, the Court faulted Commerce's reasoning in finding that certain reimbursements to respondents under a government program were countervailable subsidies as Commerce "assessed the reimbursements in isolation from the overall {government} program." 308 F. Supp. 3d 1373, 1380 (Ct. Int'l Trade 2018). Further, the Court noted that although Commerce may not need to consider the effect of a subsidy "where the other elements of the countervailable subsidy are satisfied," this "does not authorize Commerce . . . to ignore clear, readily available, and already-verified record evidence." *Id.* at 1380-81.

Commerce failed to take the requisite holistic approach here. As part of its effort to comply with the 2009 Copenhagen Accord (and later the Paris Agreement), the GOK enacted the K-ETS program through the Act on the Allocation and Trading of Greenhouse-Gas Emission Permits. Appx87190-87211. The program requires companies to either pay for their emissions (through KAUs) or face financial penalties if they fail to comply. Appx87201-87202. KAUs were provided to prevent carbon leakage that may jeopardize the overall objective of reducing global emissions. Appx87190-87192. As a result, these KAUs are permits that allow companies

8

to emit certain amounts of GHG during a compliance year without sustaining additional costs,

and not (as Commerce found) a mechanism to obtain cheaper inputs.

### C.    The Allocation of Additional KAUs Was Not *De Jure* Specific

The statute provides that where legislation "establishes objective criteria or conditions"

for eligibility, a subsidy is not *de jure* specific if (1) "eligibility is automatic," (2) "the criteria or

conditions for eligibility are strictly followed," and (3) "the criteria or conditions are clearly set

forth in the relevant statute, regulation, or other official document so as to be capable of

verification." 19 U.S.C. § 1677(5A)(D)(ii).  Yet, Defendant and Defendant-Intervenor argue that

the GOK's provision of additional KAUs was *de jure* specific because the applicable rules favor

certain industries over others.  Def. Br. at 43-47; Pet'r Br. at 13-14.  Defendant adds that the K-

ETS program "is limited to certain sectors that have high international trade intensity and/or high

production costs."  Def. Br. at 47.

As explained in its opening brief, courts have rejected this reasoning in other appeals

concerning the K-ETS program.  GOK Br. at 16-17.  For example, in *Hyundai Steel Co. v.*

*United States*, the Court found that the relevant laws in South Korea related to the same K-ETS

program do not "expressly restrict access to a particular (specific, as it were) and limited number

of enterprises or industries.  There is also nothing to demonstrate why any particular enterprise or

industry would not qualify as long as it met the statutory numbers."  No. 22-00032, 2023 WL

8715732, at *7 (Ct. Int'l Trade Dec. 18, 2023).  Moreover, in *Hyundai Steel Co. v. United States*,

the Court held that Commerce's *de jure* specificity determination with respect to the K-ETS

program "relied on the existence of the criteria *per se* to establish specificity" and did not "offer

a convincing explanation for why the 'international trade intensity' or 'production cost'

criteria . . . *inherently* favor a given enterprise or industry."  659 F. Supp. 3d 1327, 1342 (Ct. Int'l

Trade 2023).  Commerce's *de jure* specificity finding as to the K-ETS program in the Final

Results suffers from the same analytic flaws because Commerce relied on the existence of the criteria *per se* to establish specificity. Appx15464. In particular, Commerce reasoned that "the AAGEP and its implementing rules do establish criteria, and those criteria result in an express statutory limitation on which industries or enterprises qualify for the additional allocation by setting thresholds that industries must meet in order to qualify." Appx15464.

Setting aside Commerce's flawed logic, the record confirms that the K-ETS program is not *de jure* specific because it satisfies each of the relevant statutory factors. 19 U.S.C. § 1677(5A)(D)(ii). First, eligibility is automatic: Article 19(1) of the AAGEP Enforcement Decree specifies that the GOK will provide all KAUs to businesses for which the "production cost incurrence rate and the international trade intensity . . . is at least 2/1000." Appx86976-86977; Appx87191-87192; Appx88676-88799. Once an enterprise or industry meets the threshold, it automatically receives the KAUs. Second, the criteria or conditions for eligibility are strictly followed: nothing in the provision authorizes the GOK to exercise its discretion to modify or reverse eligibility. Appx88676-88799. Third, the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification: the criteria for eligibility are expressly stated in Article 12(4) of the AAGEP and Article 19(1) of the Enforcement Decree, making them easily verifiable. Appx88676-88799. Thus, Commerce's finding that the allocation of additional KAUs is *de jure* specific is unsupported by substantial evidence.

## CONCLUSION

For the reasons discussed above, the GOK requests that the Court grant POSCO's and the

GOK's Rule 56.2 Motions for Judgment on the Agency Record and remand to Commerce for

further proceedings.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: November 26, 2024    *Counsel for the Government of the Republic of Korea*

11

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that the forgoing brief complies with the word-count limitation set forth in the Court's April 17, 2024 Scheduling Order.  The brief contains 2,972 words according to the word-count function of the word-processing software used to prepare this submission.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: November 26, 2024              *Counsel for the Government of the Republic of Korea*