Slip Op. 25-100

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

POSCO,

          Plaintiff,

GOVERNMENT OF THE REPUBLIC OF KOREA,

          Plaintiff-Intervenor,

      v.

UNITED STATES,

          Defendant,

    and

NUCOR CORPORATION,

          Defendant-Intervenor.

</td><td>

Before: Jane A. Restani, Judge

Court No. 24-00006

</td></tr>
</table>

## OPINION

[Commerce's final determination in the countervailing duty order review of certain carbon and alloy steel cut-to-length plate from the Republic of Korea is partially sustained and partially remanded for reconsideration consistent with this opinion.]

Dated: August 8, 2025

Brady Warfield Mills, Morris, Manning & Martin, LLP, of Washington, DC, argued for the plaintiff, POSCO. With him on the brief were Donald B. Cameron, Jr., Edward John Thomas, III, Eugene Degnan, Jordan L. Fleischer, Julie Clark Mendoza, Mary Shannon Hodgins, Nicholas C. Duffey, Rudi Will Planert, Ryan R. Migeed, and Stephen A. Morrison.

Yujin Kim McNamara, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, DC, argued for the plaintiff-intervenor, Government of the Republic of Korea. With her on the brief were Daniel Martin Witkowski, Devin Scott Sikes, and Sung Un K. Kim.

Emma E. Bond, Lead Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the defendant. Of counsel on the brief were Fee Pauwels

and <u>William Mitchell Purdy</u>, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Alan Hayden Price</u>, Wiley Rein, LLP, of Washington, DC, argued for the defendant-intervenor, Nucor Corporation.  With him on the brief were <u>Adam Milan Teslik</u>, <u>Christopher Bright Weld</u>, <u>Derick G. Holt</u>, <u>Enbar Toledano</u>, <u>Maureen Elizabeth Thorson</u>, <u>Paul A. Devamithran</u>, and <u>Theodore Paul Brackemyre</u>.

Restani, Judge:  This action is a challenge to a determination by the United States Department of Commerce ("Commerce") that the Government of Korea's ("Korea") provision of electricity and its carbon emission credit system ("Cap and Trade Law") constitute countervailable subsidies to POSCO, a producer and exporter of carbon and alloy steel cut-to-length plate.

## BACKGROUND

In December 2023, Commerce issued the final results of its administrative review of countervailing duties on certain carbon and alloy steel plate from Korea, <u>see</u> <u>Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021</u>, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) ("<u>Final Results</u>"), along with the accompanying <u>Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review: Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea</u>, C-580-888, POR 1/1/2021–12/31/2021 (Dep't Commerce Dec. 1, 2023) ("<u>IDM</u>").  Commerce determined a countervailable subsidy rate of 0.87 percent for POSCO.  <u>Final Results</u>, 88 Fed. Reg. at 86,319.

Commerce found that two government programs in Korea provided countervailable subsidies to POSCO.  First, Commerce found that Korea's program providing subsidized electricity is <u>de facto</u> specific, and therefore a countervailable subsidy for the Korean steel industry.  <u>IDM</u> at 24.  Second, Commerce found that Korea's Cap and Trade Law gave POSCO a countervailable subsidy by providing the company more emissions permits than its "default"

allocation allowed.  <u>Id.</u> at 34–38.  Commerce reasoned that the extra permits were a financial contribution in the form of "revenue" foregone which conferred a benefit and were <u>de jure</u> specific to those industries.  <u>Id.</u>  POSCO and Korea contest these decisions.  <u>See</u> Compl., ECF No. 11 (Feb. 9, 2024); Consent Mot. to Intervene as Pl.-Int., ECF No. 14 (Feb. 23, 2024).

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2020) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2020).  The court will uphold Commerce's determinations in a countervailing duty review unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

### I.    Legal Framework

Commerce imposes countervailing duties to protect American producers from governments that "[unfairly] subsidize domestic industries to benefit the production or exportation of merchandise."  <u>Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States</u>, 633 F. Supp. 3d 1276, 1278 (CIT 2023).  A subsidy is only countervailable, however, if it (1) provides a financial contribution (2) that confers a benefit and (3) is specific to an enterprise or industry either as a matter of law (<u>de jure</u>) or as a matter of fact (<u>de facto</u>).  19 U.S.C. § 1677(5)–(5A) (2020).  Section 1677(5)(D) further specifies that something is only a financial contribution if it falls into one of four enumerated categories.[1]  Similarly, the statute lays out when a subsidy is "specific" to

---

[1] Under § 1677(5)(D), the four enumerated categories are:

   (i)     the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

   (ii)    foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

   (iii)   providing goods or services, other than general infrastructure, or

   (iv)    purchasing goods.

an enterprise or industry.  Id. § 1677(5A).  Relevant here, a subsidy is de jure specific when it "expressly limits access . . . to an enterprise or industry" and is de facto specific when the facts demonstrate that the subsidy is specific to an enterprise or industry, or group of enterprises or industries, in its operation.  Id. § 1677(5A)(D).

## II. Commerce Unreasonably Found That Korea's Provision of Electricity is De Facto Specific

### a. Commerce acted arbitrarily when it grouped steel with two other unrelated industries

POSCO and Korea argue that Commerce unreasonably grouped steel with two other unrelated industries when determining that those industries were disproportionate recipients of Korea's subsidized electricity.  Pl.'s Mot. for J. on the Agency R. at 17–18, ECF No. 28 (June 17, 2024) ("Pl.'s Br."); Government of Korea Br. in Supp. of Pl.'s Mot. for J. on the Agency R. at 5–6, ECF No. 32 (July 15, 2024) ("Pl.-Int.'s Br.").  POSCO and Korea argue that Commerce cannot group industries that have nothing in common for purposes of a de facto specificity analysis.  Pl.'s Br. at 17–18; Pl.-Int.'s Br. at 5–6.  The government responds that Commerce has wide latitude to decide how to group industries and does not need to consider "whether there are shared characteristics among the enterprises or industries."  Def.'s Resp. to Pl.'s and Pl.-Intervenor's Mots. for J. on the Agency R. at 19–20, ECF No. 35 (Sep. 13, 2024) ("Def.'s Br.") (citing 19 C.F.R. § 351.502(b) (amended Dec. 2024)).  Defendant-intervenor Nucor Corporation adds that because the agency "found that three industries in a highly diversified economy is a small enough group to constitute a relevant group of industries," the grouping is reasonable.  Def.-Intervenor's Resp. to Pl.'s and Pl.-Intervenor's Mot. for J. on the Agency R. at 17, ECF No. 38 (Oct. 9, 2024).

A subsidy is de facto specific if "[a]n enterprise or industry receives a disproportionately

large amount of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(III).  The statute further provides that "any reference to an enterprise or industry . . . includes a group of such enterprises or industries." Id. § 1677(5A)(D) (flush language).  The statute does not set out how Commerce should construct "a group of . . . enterprises or industries."  Id.  Commerce's regulations state that the agency does not need to consider "whether there are shared characteristics among the enterprises or industries" when grouping enterprises or industries.  19 C.F.R. § 351.502(b).  The Federal Circuit, however, has stated that "the actual make-up of the eligible firms . . . determines whether those firms comprise a specific industry or group of industries."  PPG Indus., Inc. v. United States, 978 F.2d 1232, 1240–41 (Fed. Cir. 1992).  Whatever the limits of that proposition are, any discretion the statute gives Commerce to group industries is abused when it is not exercised reasonably "within the constraints of the statute and record."  Oman Fasteners, LLC v. United States, 125 F.4th 1068, 1086–87 (Fed. Cir. 2025) (holding that while Commerce had discretion to apply an adverse inference, the agency must use that discretion reasonably).

Commerce grouped the Korean steel industry with two unrelated manufacturing industries to decide if Korea's provision of electricity was de facto specific.  In line with its regulations, Commerce did not consider "shared characteristics" when it grouped these industries.  Def.'s Br. at 19.  The agency reasoned that in addition to its regulation, the statute does not set out a rigid methodology for determining de facto specificity, giving Commerce "discretion to apply a reasonable methodology in making a . . . determination."[2]  IDM at 25.

Commerce acted unreasonably when it grouped the Korean steel industry with two other unrelated industries because Commerce failed to consider the actual make-up of the firms.  While Commerce relied on its regulation to avoid considering "shared characteristics among the

---

[2] Commerce does not provide further explanation as to its reasoning for this grouping.

enterprises or industries," Def.'s Br. at 17 (citing 19 C.F.R. § 351.502(b)), Commerce was nonetheless required by Federal Circuit precedent to consider the "the actual make-up of the eligible firms" when creating the group. PPG Indus., 978 F.2d at 1240–41. It did not do so. See IDM at 24–26. Even if Commerce is correct that it can choose any "reasonable methodology in making a de facto specificity determination," id. at 25, the agency must provide a logical basis for why these industries should be grouped together. See Hitachi Energy USA Inc. v. United States, 34 F.4th 1375, 1386 (Fed. Cir. 2022) (holding that Commerce's decision to refuse information from one of the parties and apply an adverse inference instead was not supported by substantial evidence because the agency offered "[n]o reasonable justification" for the action). Commerce cannot use its discretion to choose the largest consumers of a subsidy, group them together with no further explanation, and call it a reasonable choice. See Oman Fasteners, 125 F.4th at 1086–87.

### b. The statute precludes Commerce's finding that this group received a "disproportionate" amount of the subsidy

POSCO and Korea argue that the Korean steel industry cannot receive a "disproportionate" share of the subsidy because the industry's subsidy is based only on how much electricity it uses. Pl.'s Br. at 11–16; Pl.-Int.'s Br. at 10–11. The government counters that three industries using a majority of electricity in a complex economy is enough to show disproportionality on its own. Def.'s Br. at 16–18. The government also contends that because "Congress intended to delegate the question of whether particular facts [show disproportionality] to Commerce," the court must show deference to the agency's determination.[3] Id. at 17 (citing Asociación de Exportadores e

---

[3] While the government argues that the lack of definition in the statute for "disproportionate" means that Commerce has deference to decide how to define and apply the term, it cites no relevant precedent for this proposition. Def.'s Br. at 17. In any case, such a position runs counter to the

Industriales de Aceitunas de Mesa v. United States, 102 F.4th 1252, 1259–61 (Fed. Cir. 2021)).

Countervailing duties do not cover generally available subsidies because "all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results." Mosaic Co. v. United States, 744 F. Supp. 3d 1367, 1379 (CIT 2025) (quoting the Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No 103-316 at 929 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4153 ("SAA")).  Otherwise, every public highway would expose imported goods to countervailing duties. Carlisle Tire & Rubber Co. v. United States, 5 CIT 229, 234, 564 F. Supp. 834, 838 (1983).  The requirement that subsidies be "specific" before they can be countered with countervailing duties exists to "winnow out . . . those foreign subsidies which truly are broadly available and widely used throughout an economy . . . such as certain public infrastructure-related programs." Gov't of Quebec v. United States, 105 F.4th 1359, 1375 (Fed. Cir. 2024) (quoting SAA at 929).

A subsidy is de facto specific if "[a]n enterprise or industry receives a disproportionately large amount of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(III).  When something is "disproportionate" it "[has] too much or too little in relation to something else; not suitable in comparison with something else in size, amount, importance, etc." See Disproportionate, BLACK'S LAW DICTIONARY (12th ed. 2024).  This definition implies comparing the subsidy received to some type of baseline or expected value.  When a subsidy is usage-based, the baseline for this comparison will ordinarily be an industry's usage of the subsidized good or service, given that "benefits on usage levels will necessarily result in larger users receiving a proportionally larger

_____

Supreme Court's command that "courts must exercise independent judgment in determining the meaning of statutory provisions." See Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 394 (2024).

percentage of the subsidy." <u>Hyundai Steel Co. v. United States</u>, 745 F. Supp. 3d 1345, 1353 (CIT 2024).  The baseline of comparison is not "the benefits [received by] others." <u>Id.</u> at 1351.  That baseline would produce the "untenable result" that "a benefit conferred on a large company might be disproportionate merely because of the size of [that] company."  <u>AK Steel Corp. v. U.S.</u>, 192 F.3d 1367, 1385 (Fed. Cir. 1999).  Given that in "virtually every program that confers benefits based on usage levels[,] one or more groups will receive a greater share of the benefits than another group . . .  impos[ing] countervailing duties on an industry where disparity alone is demonstrated . . . is anathema to" the purpose of the specificity requirement.  <u>Bethlehem Steel Corp. v. U.S.</u>, 25 CIT 307, 322, 140 F. Supp. 2d 1354, 1369 (2001).

       Commerce found that Korea's electricity subsidies were <u>de facto</u> specific to the Korean steel industry.  Commerce recognized that almost everyone in Korea uses the generally available subsidized electricity.  <u>See</u> <u>IDM</u> at 25; Def.'s Br. at 9 (explaining that the subsidized electricity is used by everyone in Korea apart from certain community energy services).  It found, however, that the Korean steel industry, combined with two other industries, used over half the industrial electricity in Korea.  <u>IDM</u> at 26.  Commerce concluded that this usage level made the subsidy <u>de facto</u> specific under 19 U.S.C. § 1677(5A)(D)(iii)(III), reasoning that these "industries, including the steel industry, plainly received a disproportionately large amount of the subsidy."  <u>Id.</u> Commerce recognized that the subsidy received by the Korean steel industry is directly tied to how much electricity the industry as a whole uses, and that electricity and subsidy usage will always match each other.  <u>See</u> <u>id.</u>  Commerce concluded that in a situation such as this, disproportionate consumption of electricity compared to the average industry is enough to show disproportionate use of the subsidy, with no need to investigate if the subsidy received by the Korean steel industry

does not align with its usage of electricity.[4] See id. ("[I]t is unnecessary to demonstrate the amount of subsidy conferred was disproportionate to the consumption of electricity[.]").

Commerce's determination that the three-industry group received a disproportionate share of the subsidy is unsupported by substantial evidence. Subsidized electricity is the type of "widely used . . . public infrastructure" that countervailing duties will ordinarily not cover. Gov't of Quebec, 105 F. 4th at 1375. Korean electricity subsidies must be "disproportionate" (or otherwise de facto specific) before Commerce imposes countervailing duties to "ensure[] that countervailing duties are not improperly levied against subsidies that are generally available and widely used across the economy." Id. Commerce, however, recognizes that the subsidy received by the Korean steel industry is directly tied to how much electricity the Korean steel industry uses. See Def.'s Br. at 16–17. The agency's only reasoning for its disproportionality analysis is that the Korean steel industry uses a large amount of electricity. Id. Commerce, however, was required by the plain meaning of the statute to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage, not just the "benefits [received by] others." See Hyundai Steel, 745 F. Supp. 3d at 1351. It is an obvious fact of life that "virtually every" generally available and widely used subsidy—roads, bridges, schools, highways—will be used by, and therefore benefit, some industries more than others. Bethlehem Steel Corp., 25 CIT at 322, 140 F. Supp. 2d at 1369. Commerce's "untenable" logic would lead to almost every generally available subsidy

---

[4] During oral argument, Defendant-Intervenors raised, for the first time, an argument that Korea's electricity program is gerrymandered to benefit industries like steel because the program subsidizes electricity usage during off-peak hours more heavily than usage during peak hours. Oral Argument at 1:35:36–1:39:06. Because the steel industry runs its factories 24-hours per day, the industry receives more subsidies per kilowatt hour of electricity it uses compared to most other industries that focus electricity usage during peak hours only. Id. Because Commerce did not rely on this reasoning in the Final Results or the accompanying IDM, the court will not address this argument.

being <u>de facto</u> specific to every "large company . . . merely because of the size of the company."[5]
<u>AK Steel Corp.</u>, 192 F.3d at 1385.   Commerce must show more to support a finding of
disproportionate subsidy use.

### III.    Commerce's Determination That Korea's Cap and Trade Law Gives a Countervailable Subsidy to POSCO is Unsupported by Substantial Evidence

#### a.  The Korean Cap and Trade Law

Under the Korean Cap and Trade Law, certain companies need permits to emit carbon.
Pl.'s Br. at 19–20.  At the start of each year, Korea gives permits to each regulated company equal
to a certain volume of carbon emissions.  <u>Id.</u>  At the end of the year, companies are responsible for
giving Korea enough permits to cover their carbon emissions from the previous year.   <u>Id.</u>
Companies have multiple options if they emit more carbon than their permits allowed.  First, the
companies can purchase additional permits through government-run auctions.  <u>Id.</u> at 5.  Second,
the companies can purchase additional permits on the private market from other companies that
have "extra" permits because those companies emitted less than their allowed allotments of carbon.
<u>See id.</u>  Third, the companies can borrow permits from future years' expected allotments.  <u>See id.</u>
Fourth, the companies can cover the difference with prior years' permits that they did not use.  <u>See id.</u>
Lastly, the companies can pay Korea fines.  <u>Id.</u>  Certain businesses, however, receive extra permits
at the start of each year.  <u>Id.</u>  at 4–5.  Korea gives companies that meet certain emission and

---

[5] The government cites to the court's decision in <u>Mosaic Co. v. United States</u>, 589 F. Supp. 3d
1298 (CIT 2022) for the proposition that a subsidy can be specific if one user dwarfs all other users
in absolute benefit.  Def.'s Br. at 25.  In <u>Mosaic</u>, however, Commerce argued that a natural gas
subsidy was <u>de facto</u> specific to the fertilizer industry because it was the "predominant" user.
<u>Mosaic</u>, 589 F. Supp 3d at 1309.  Specificity based on predominance is lawful under 19 U.S.C.
§ 1677(5A)(D)(iii)(II).  Commerce, however, did not use that subsection to support its finding
here.  Further, the natural gas at issue in <u>Mosaic</u> was not merely used as gas for power but as a
chemical component of the product at issue (phosphate fertilizer).  <u>Id.</u> at 1310.  The court finds
<u>Mosaic</u> inapposite.

international trade criteria ("intensity criteria") 100 permits for every 90 received by entities that do not meet that criteria. See id. Entities with extra permits can emit more carbon but cannot use the government-run auction to cover any shortfall. Def.'s Br. at 38–39. POSCO was one of the entities that met the relevant criteria for extra permits. Id. at 6.

### b. Commerce's finding of a financial contribution is contrary to law

POSCO and Korea argue that Korea does not forego any revenue by issuing more emissions permits. Pl.'s Br. at 26; Pl.-Int.'s Br. at 13–14. They contend that the statute's use of "revenue that is otherwise due" requires that the extra permits relieve POSCO of a pre-existing duty to pay Korea. See Pl.'s Br. at 22; Pl.-Int.'s Br. at 11–13. POSCO and Korea further argue that even if Korea does forego revenue when Korea issues extra permits, that revenue must be something that POSCO itself would otherwise owe Korea. Pl.'s Br. at 27–28; Pl.-Int.'s Br. at 12–13. According to the parties, it is not enough that Korea is foregoing some uncertain amount of revenue collected from an uncertain person or entity. Pl.'s Br. at 26–27; Pl.-Int.'s Br. at 12–13. The government responds that when regulated companies surrender their permits to Korea at the end of the year, the companies give Korea revenue because the permits have market value. Def.'s Br. at 36–37. The government adds that Korea reduces its revenue from fines and government-run auctions any time it gives permits away for free. Id. at 32–34.

A subsidy only exists when a government "provides a financial contribution . . . to a person." 19 U.S.C. § 1677(5)(B). A financial contribution exists when a government authority "provides a . . . foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income." Id. § 1677(5)(B)–(D)(ii). In the statute, the term "otherwise due" means "but for the subsidy program," the subsidy recipient would owe the government an "enforceable obligation or debt." Hyundai Steel Co. v. United States, 659 F. Supp.

3d 1327, 1334 (CIT 2023).[6]  Further, the examples imbedded in a statutory provision give the words a "more precise content."  United States v. Williams, 553 U.S. 285, 294 (2008). Additionally, because a statutory term is "known by the company it keeps," terms are "appropriately read to refer . . . specifically to the subset" illustrated by any examples.  Yates v. United States, 574 U.S. 528, 543–44 (2015).

Commerce determined that POSCO's extra permits constituted a financial contribution within the meaning of 19 U.S.C. § 1677(5)(D).  Commerce relied on subsection (ii), reasoning that Korea's grant of extra permits to POSCO constituted a foregoing or not collecting of revenue that is otherwise due.  IDM at 34–35.  The agency viewed the extra permits as "akin to a tax program." Id. at 41.  Commerce reasoned that "the [permits] have a value, [and] by requiring the surrender of a specific amount, [Korea] is establishing an amount of revenue that is required to be paid."  Id. at 36.  Thus, by giving more permits to POSCO, Korea eased POSCO's burden of "payment."  Id. at 36–37.  Commerce also reasoned that Korea did not collect revenue that would have been due "by some company, at some point" because the extra permits reduced the number of participants in, and the demand for, government-run auctions.  Id.

Commerce's determination fails to align with the statutory language.  Commerce determined that Korea "provides a [foregoing or not collecting of revenue that is otherwise due] to [POSCO]."  Id. at 34.  The use of the word "to" plainly implies that the revenue foregone or not collected has to be money that POSCO would have paid.  If the government "provided a relief of debt to POSCO," one would logically understand that to mean that Korea relieved POSCO's debt.

---

[6] The court has on one occasion appeared to take a broader view of what constitutes forgone revenue, holding that this exact program forwent revenue because it gave away something for free that the government ordinarily would have only released via sale.  Hyundai Steel Co. v. United States, Slip Op. 23-182, 2023 WL 8715732, at *10–11 (CIT Dec. 18, 2023).

As a factual matter, the extra permits may reduce Korea's aggregate revenue through supply-and-demand, but the statute's use of the word "to" implies that Korea must have failed to collect revenue from POSCO specifically. It is not enough that Korea could have made more revenue from the entire group of regulated entities.

The statute also demands that Korea forego revenue "that is otherwise due." 19 U.S.C. § 1677(5)(D)(ii). It is true that if POSCO had fewer permits it would have a higher chance of covering emissions through the government-run auction or fines. This increased probability of payment, however, does not translate into money that is "due" because it does not give Korea the right to collect any "enforceable obligation or debt." Hyundai Steel, 659 F. Supp. 3d at 1334. Nor does Korea collect any revenue "'by requiring the surrender of a specific amount' of permits" from regulated companies. Def.'s Br. at 36 (quoting IDM at 36). If anything, by issuing POSCO more permits that "have a recognized market value," Korea increases the amount of revenue it expects POSCO to hand over at the end of the year.[7] IDM at 36. Further, Korea does not generate revenue by collecting emissions permits in any normal sense of the word. The permits only have market value because they allow private parties to engage in certain behavior.[8]

The remainder of § 1677(5)(D) confirms this reading of "foregoing or not collecting revenue that is otherwise due." The statute's examples of "foregoing or not collecting revenue"

---

[7] Because POSCO receives 11% more permits than it would with a "baseline" allotment, the "revenue" Korea collects from the company's permits at the end of the year only decreases if POSCO's extra permits reduce the average permit value by 10% due to increased supply. Commerce does not claim that the extra permits have this large of an effect on the average value of POSCO's remaining permits.

[8] This is not to say that the extra permits are beyond the scope of countervailing duty law entirely. The permits "are fungible financial instruments" that "have a recognized market value." See Def.'s Br. at 12, 36 (citing IDM at 36). The court has upheld Commerce's characterization of the permits as a "direct transfer of funds" under 19 U.S.C. § 1677(5)(D)(i). Hyundai Steel Co. v. United States, 701 F. Supp. 3d 1398, 1403–06 (CIT 2024). Nor does the court rule out that the extra permits could be permissibly construed as "goods or services" within the meaning of 19 U.S.C. § 1677(5)(D)(iii).

are "granting tax credits or deductions from taxable income." 19 U.S.C. § 1677(5)(D)(ii).  These

examples involve foregoing collection of a specific entity's payment obligation.  "Foregoing or

not collecting revenue otherwise due" is therefore "appropriately read to refer . . . specifically to

the subset" illustrated by these examples.  Yates, 574 U.S. at 543–44.  As explained above,

POSCO's extra permits do not erase a pre-existing duty to pay the government and thus go beyond

the scope of the examples' "more precise content."  Williams, 553 U.S. at 294.

### c.  Commerce reasonably found that the extra permits confer a benefit

Korea argues that POSCO's extra permits do not confer a benefit because POSCO would

be better off if the Cap and Trade Law did not exist at all.[9]  Pl.-Int.'s Br. at 15–16.  The government

responds that it "determines benefit by the reduction or elimination of the obligation, without

regard to" an alternative universe where the obligation never existed.  Def.'s Br. at 41 (quoting

---

[9] POSCO raises a number of additional arguments on this issue, all unpersuasive.  First, that
Commerce failed to compare the Cap and Trade Law to the statutory examples of a benefit as
required by 19 CFR § 351.503(b)(2).  Pl.'s Br. at 33.  The IDM, while not a model of clarity, shows
that Commerce considered the statutory examples and views POSCO's extra permits, for purposes
of calculating the subsidy's value to POSCO, as akin to goods or services provided for less than
adequate remuneration.  See IDM at 41.  Second, POSCO argues that it is "plain from the language
of the statute that [it] requires that there be some 'remuneration' provided by the respondent for
the good or service" and thus the extra permits cannot qualify because they are provided for free.
Pl.'s Br. at 34.  This argument flies in the face of both the statute and common sense.  The statute
does not exempt free goods or services.  See 19 U.S.C. § 1677(5)(E)(iv) ("goods or services . . .
provided for less than adequate renumeration") (emphasis added).  Such a reading of the statute
would border on absurd.  Third, POSCO argues that the emissions permits are not goods or
services.  Pl.'s Br. at 34.  POSCO misunderstands the statute.  The statute's only requirement is
that a "benefit shall normally be treated as conferred where there is a benefit to the recipient."  19
U.S.C. § 1677(5)(E).  The examples in subsections (i)–(iv) are just that, examples.  There is no
requirement that the benefit fit neatly into any of them.  POSCO concedes this with its fourth
argument.  POSCO argues that "Commerce's benefit determination" must align with its
determination that the financial contribution at issue was "revenue foregone that is otherwise due."
Pl.'s Br. at 35.  POSCO, however, fails to mention that none of the examples in subsections (i)–
(iv) deal with foregone revenue.  See 19 U.S.C. § 1677(5)(E)(i)–(iv).  POSCO's argument would
make it impossible for the benefit in this case to "follow as a consequence from the alleged
financial contribution" because Commerce could never pick a statutory example of a benefit that
speaks to foregone revenue.  Pl.'s Br. at 35.

BGH Edelstahl Siegen GmbH v. United States, 600 F. Supp. 3d 1241, 1264 (CIT 2022)).  The
government also argues that POSCO benefited because Korea gifted POSCO permits the company
would have otherwise had to purchase.  Id. at 42.

The statute provides that a "benefit shall normally be treated as conferred where there is a
benefit to the recipient."  19 U.S.C. § 1677(5)(E).  Because government subsidies often relieve
entities from burdens the government itself has imposed (such as taxes), the "benefits" of a subsidy
are measured from the regulatory environment as it exists in the real world, not a hypothetical
world with no government regulation.  See Countervailing Duties, 63 Fed. Reg. 65,348, 65,361
(Dep't Commerce Nov. 25, 1998).  The statute provides examples of how various financial
contributions can confer a benefit.  19 U.S.C. § 1677(5)(E)(i)–(iv).  For example, a loan confers a
benefit if it is given on non-commercial terms.  Id. § 1677(5)(E)(ii).

Commerce determined that POSCO's extra permits conferred a benefit within the meaning
of 19 U.S.C. § 1677(5)(E).  Commerce reasoned that the extra permits "release[ed] an entity from
its financial obligations" because without the extra permits POSCO would need to choose between
emitting less carbon or purchasing extra permits.  IDM at 41.  The agency did not find it material
that the "overall effect of" the Cap and Trade Law "may leave [POSCO] with higher costs" even
after POSCO's extra permits.  Id. at 40 (citing 1998 Final Preamble, 63 Fed. Reg. 65347, 65361
(Nov. 25, 1998)).  Commerce then calculated the amount of benefit by using "a method similar to
that used . . . when goods or services are provided 'for less than adequate remuneration.'"  Def.'s
Br. at 40 (citing IDM at 41).

Commerce properly determined that POSCO's extra permits conferred a benefit.  Without
the extra permits, POSCO would have had to choose between emitting less carbon or buying
additional permits.  IDM at 41.  POSCO benefitted because it "received something for free—

allowances [it] otherwise would have been required to pay to acquire at auction or on the private

market." BGH Edelstahl, 600 F. Supp. 3d at 1264.  Even if POSCO would be better off if the Cap

and Trade Law never existed, such a narrow reading of "benefit" does not align with the statute's

examples of "tax credits or deductions from taxable income" as financial contributions. 19 U.S.C.

§ 1677(5)(D)(ii).  Every recipient of a tax credit or deduction would be better off if the tax in

question never existed in the first place.  POSCO and Korea's argument implies that tax credits

and deductions could never confer a benefit despite the explicit listing of tax credits as financial

contributions in the statute.

### d.  Commerce unreasonably found that the permits are <u>de jure</u> specific

POSCO and Korea argue that the extra permits are not <u>de jure</u> specific because the permits

are not "expressly limit[ed] . . . to . . . an enterprise or industry."  Pl.'s Br. at 38; Pl.-Int's Br. at

16–18.  POSCO also argues that the extra permits are non-specific as a matter of law under the

safe harbor provision of 19 U.S.C. § 1677(5A)(D)(ii) because the extra permits are allocated

pursuant to industry-neutral intensity criteria.[10]  Pl.'s Br. at 41.  The government responds in two

ways.  First, it argues that the intensity criteria are an "express limitation" on which industries can

obtain extra permits, and so are <u>de jure</u> specific under § 1677(5A)(D)(i).  See Def.'s Br. at 45.

Second, the government argues that the intensity criteria "favor [certain] enterprises or industries,"

and so cannot qualify for the safe harbor provision of § 1677(5A)(D)(ii).  See id. at 47.

Under 19 U.S.C. § 1677(5A)(D)(i), a subsidy is <u>de jure</u> specific if "the subsidy . . . expressly

limits access to . . . an enterprise or industry."  This express limitation must confine the subsidy to

"specifically named enterprises or industries or group of enterprises or industries."  BGH Edelstahl

---

[10] As defined above, the intensity criteria look at how emission-intensive an industry is as well as
the industry's exposure to international trade.  IDM at 46.

Siegen GmbH v. United States, 639 F. Supp. 3d 1237, 1244 (CIT 2023).  The "existence of eligibility requirements does not suffice to identify a discrete class which has been afforded benefits."[11]  PPG Indus., 978 F.2d at 1240 (quoting PPG Indus., Inc. v. United States (PPG I), 928 F.2d 1568, 1578 (Fed. Cir. 1991)); see also Hyundai Steel Co. v. United States, 701 F. Supp. 3d 1398, 1413 (CIT 2024) ("Any . . . eligibility criteria necessarily requires some identification of the recipients that meet those criteria.").

Under 19 U.S.C. § 1677(5A)(D)(ii), however, subsidies have a safe harbor.  A subsidy cannot be de jure specific if it "establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy . . . eligibility is automatic . . . the criteria or conditions for eligibility are strictly followed, and . . . clearly set . . . so as to be capable of verification."  19 U.S.C. § 1677(5A)(D)(ii).  The section further provides that "'objective criteria or conditions' means criteria or conditions that are neutral and that do not favor one enterprise or industry over another."  Id.  "Neutral" means "based upon factors relating to the consumption of goods or services and [] uniformly available across industries."  BGH Edelstahl, 639 F. Supp. 3d at 1243.

Commerce determined that Korea's provision of extra permits was de jure specific.  Under the Cap and Trade Law, only entities in industries meeting the intensity criteria are eligible for extra permits.  IDM at 47.  Nearly one-third of the regulated industries, from "waste treatment" to

---

[11] The Court has regularly rejected Commerce's reasoning as applied to both the Cap and Trade Law as well as similar programs.  See BGH Edelstahl, 600 F. Supp. 3d at 1269 (ruling on a similar program in the EU); BGH Edelstahl, 639 F. Supp. 3d at 1243 (ruling on that same EU program a second time); Hyundai Steel, 659 F. Supp. 3d at 1342 (remanding Commerce's determination on the Korean Cap and Trade Law); BGH Edelstahl Siegen GmbH v. United States, 663 F. Supp. 3d 1378, 1384 (CIT 2023) (ruling on the EU program for a third time); Hyundai Steel, 701 F. Supp. 3d at 1412 (remanding Commerce's determination on the Korean Cap and Trade Law a second time); Hyundai Steel, Slip Op. 23-182, 2023 WL 8715732, at *7 (remanding Commerce's determination on the Korean Cap and Trade Law); but see Hyundai Steel Co. v. United States, 753 F. Supp. 3d 1355, 1360 (CIT 2025) (upholding Commerce's decision that the Korean Cap and Trade Law is de jure specific).

"coal mining" qualify for extra permits because the industries meet the intensity criteria. <u>Id.</u> at 46–47. In addition, by naming them in a government decree, Korea grants extra permits to six industries that do not meet the intensity criteria.[12] <u>Id.</u> Commerce determined that because of the intensity criteria, "the subsidy . . . expressly limits access to . . . an enterprise or industry." <u>Id.</u> at 45 (quoting 19 U.S.C. § 1677(5A)(D)(i)). It explained that the "criteria result in an express statutory limitation on which industries or enterprises qualify . . . by setting thresholds that industries must meet." <u>IDM</u> at 46. Commerce also determined that the criteria did not fit into § 1677(5A)(D)(ii)'s safe harbor provision because "[the intensity criteria] clearly favor certain industries, such as primary steel." <u>Id.</u> Commerce concluded that the intensity criteria are slanted towards industries "with defined higher levels of international trade intensity and production costs." <u>Id.</u> at 47. The agency says this is because "by their nature, certain manufacturing industries have more [emission]-intensive production processes . . . and are more dependent on international [trade] for sales and sourcing." <u>Id.</u> at 46. Commerce contrasted the intensity criteria with other criteria like "the number of employees or size of the enterprise." <u>Id.</u>

Korea's provision of extra permits is not <u>de jure</u> specific. The subsidy has criteria, but the "existence of eligibility requirements" is not enough on its own to create <u>de jure</u> specificity. <u>PPG Indus.</u>, 978 F.2d at 1240 (quoting <u>PPG I</u>, 928 F.2d at 1578). It is true that the subsidy sets "thresholds that industries must meet," and not every industry will qualify. <u>IDM</u> at 46. That reality will exist, however, with every set of criteria, even the most neutral and objective. The Cap and Trade Law's criteria, far from singling out "specifically named enterprises or industries," give nearly one third of regulated industries extra permits. <u>BGH Edelstahl</u>, 639 F. Supp. 3d at 1244. The existence of a government decree that singles out six specific industries for special treatment

_____

[12] The specifically named industries are not part of this action. <u>See</u> <u>IDM</u> at 46–47.

underscores how far removed the intensity criteria are from an express eligibility limitation.[13] <u>IDM</u> at 47.  Commerce cannot use "the existence of the criteria <u>per se</u> to establish specificity." <u>Hyundai Steel</u>, 659 F. Supp. 3d at 1342.  The agency must show a more explicit limitation on the subsidy in order to find <u>de jure</u> specificity.

Commerce's determination that the criteria do not qualify for § 1677(5A)(D)(ii)'s safe harbor provision is also unsupported by substantial evidence.  Industries that "have more [emission]-intensive production processes . . . and are more dependent on international [trade] for sales and sourcing" are more likely to meet the intensity criteria.  <u>IDM</u> at 46.  That fact may be useful for a <u>de facto</u> specificity analysis, but it is not relevant for determining if a subsidy is "uniformly available across industries." <u>BGH Edelstahl</u>, 639 F. Supp. 3d at 1243.  Standing alone, the fact that not every industry is equally likely to meet a set of criteria does not mean that the criteria pick favorites.  <u>Id.</u>  Commerce tries to contrast the intensity criteria with criteria such as the number of employees or the size of the company, which the agency says would be neutral. <u>IDM</u> at 46.  Commerce does not, however, explain how these criteria differ from the intensity criteria and would not also favor certain industries (e.g. those prone to consolidation or natural monopolies).[14]  Commerce "merely repackages the language of the criteria into a statement that certain subsectors are favored." <u>Hyundai Steel</u>, 701 F. Supp. 3d at 1412.  That reasoning, however, is not enough to take the intensity criteria out of § 1677(5A)(D)(ii).

---

[13] Commerce mentions this government decree as support for its conclusion that the intensity criteria are <u>de jure</u> specific but does not explain how the intensity criteria and the decree are connected.  <u>IDM</u> at 47.

[14] Criteria that systemically favor certain industries over others may show that the subsidy is <u>de facto</u> specific. Whether a facially neutral subsidy could ever be so heavily gerrymandered towards an enterprise or industry that it becomes <u>de jure</u> specific is not before the court because this case does not come close to that scenario.

## CONCLUSION

For the foregoing reasons, the court sustains in part and remands in part Commerce's

Final Results for a determination consistent with this opinion.  Commerce must reconsider its

determination as to (1) the specificity of Korea's electricity subsidy, (2) whether POSCO's extra

emissions permits constitute a financial contribution, and (3) whether the provision of extra

permits is specific.  The remand determination shall be issued within 60 days hereof. Comments

may be filed 30 days thereafter and any response 15 days thereafter.


                                          /s/Jane A. Restani

                                     Jane A. Restani, Judge


Dated: August 8, 2025
       New York, New York