C-580-888
Remand
Slip Op. 25-100
POR: 01/01/2021 – 12/31/2021
**PUBLIC DOCUMENT**
E&C/OVIII: TEAM

### *POSCO v. United States,*
### Court No. 24-00006, Slip Op. 25-100 (August 8, 2025)
### *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO SECOND COURT REMAND

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (the Court or CIT) in *POSCO v. United States*, 794 F. Supp. 3d 1402 (CIT 2025) (*Remand*

*Order*).  These results of redetermination concern the final results of the 2021 countervailing

duty (CVD) administrative review of certain carbon and alloy steel cut-to-length plate from the

Republic of Korea (Korea).[1]

On August 8, 2025, the Court remanded Commerce's *Final Results* to:  (1) reconsider

Commerce's finding that the provision of electricity for less than adequate remuneration (LTAR)

in Korea was *de facto* specific under section 771(5A)(D)(iii)(III) of the Tariff Act of 1930, as

amended (the Act), due to the steel industry and two other industries combined consuming a

disproportionately large amount of industrial class electricity in Korea during the period of

review (POR); (2) reconsider Commerce's finding that the provision of Korean Emission Trading

System (K-ETS) permits provided a financial contribution of revenue foregone within the

---

[1] *See Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2021*, 88 FR 86318 (December 13, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

meaning of 771(5)(D) of the Act; and (3) reconsider Commerce's *de jure* specificity finding under section 771(5A)(D)(i) of the Act for the provision of K-ETS permits program.[2]  The Court sustained Commerce's finding that the provision of K-ETS permits provided a benefit to POSCO within the meaning of section 771(5)(E) of the Act.[3]

On September 24, 2025, Commerce released the Draft Results of Redetermination on the three issues identified above.[4]  On September 29, 2025, Nucor Corporation (Nucor) submitted timely filed comments on the Draft Results of Redetermination; on October 3, 2025, POSCO Co., Ltd. (POSCO) and the Government of Korea (GOK) submitted timely filed comments.[5]

As discussed below, Commerce has addressed the parties' comments regarding our reconsideration of the *de facto* specificity finding for the provision of electricity for LTAR program, our reconsideration of the financial contribution finding with respect to the provision of K-ETS permits program, and our reconsideration that the provision of K-ETS permits program is *de jure* specific, pursuant to section 771(5A)(D)(i) of the Act.  As explained below, in these final results of redetermination, consistent with the Court's *Remand Order*, we find that there is not sufficient evidence on the record to find the provision of electricity for LTAR is *de facto* specific under section 771(5A)(D)(iii)(III) of the Act; that the provision of K-ETS permits by the GOK provided a financial contribution in the form of a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act; and that the provision of K-ETS permits is contingent upon export performance in accordance with sections 771(5A)(A) and (B) of the Act.  Based on this

---

[2] *See Remand Order*.
[3] *Id.*
[4] *See* Draft Results of Redetermination Pursuant to Court Remand, *POSCO v. United States* Court No. 24-00006, Slip. Op. 25-100 (CIT August 8, 2025), dated June 18, 2025 (Draft Results of Redetermination).
[5] *See* Nucor's Letter, "Comments on Draft Remand Results," dated September 29, 2025 (Nucor's Draft Remand Comments); *see also* POSCO's Letter, "POSCO Comments on Draft Results of Remand Redetermination," dated October 3, 2025 (POSCO's Draft Remand Comments); and the GOK's Letter, "Comments on Draft Results of Redetermination," dated October 3, 2025 (GOK's Draft Remand Comments).

analysis, we have found the provision of electricity for LTAR not countervailable, calculated a revised 1.53 percent subsidy rate to POSCO for the provision of K-ETS permits program, and recalculated a total *ad valorem* subsidy rate for POSCO of 1.72 percent.[6]

## II.    ANALYSIS

### A.  Specificity Determination for the Provision of Electricity for LTAR

<u>Background</u>

In the *Final Results*, Commerce found that the GOK's provision of electricity for LTAR was *de facto* specific under section 771(5A)(D)(iii)(III) of the Act.[7]  Specifically, we found that the steel industry and two other industries in Korea accounted for the majority of industrial electricity consumption during the POR, while the next three largest industries accounted for a significantly smaller percentage of the total consumption of industrial electricity during the POR.[8]  On this basis, we found that the three industries combining for the majority of industrial electricity consumption during the POR received a disproportionately large amount of the subsidy, pursuant to section 771(5A)(D)(iii)(III) of the Act.[9]  In the *Remand Order,* the Court remanded Commerce to reconsider its specificity determination, concluding that Commerce acted unreasonably by failing to consider the "shared characteristics" and "actual make-up of the eligible firms" between the three manufacturing industries before finding that the three industries

---

[6] *See* Memorandum, "Draft Remand Redetermination Calculations for POSCO," dated concurrently with this memorandum (POSCO's Draft Remand Calculation Memorandum).

[7] *See Final Results* IDM at Comment 1B.

[8] *See* Memorandum, "Final Results Calculations for POSCO," dated December 1, 2023 (POSCO Final Calculation Memorandum), at 4 and Attachment 3 (citing Memorandum, "Verification of the Questionnaire Responses of the Government of Korea for the Provision of Electricity for Less than Adequate Remuneration Program," dated September 28, 2023.  Specific record information relied on by Commerce in making this finding is business proprietary in nature.  For additional information regarding the underlying determination, *see Final Results* IDM and POSCO Final Calculation Memorandum.

[9] *See Final Results* IDM at Comment 1B.

together were specific on a disproportionate basis.[10]  The Court held that Commerce has to provide a logical basis for the grouping of the industries, and "cannot use its discretion to choose the largest consumers of a subsidy, group them together with no further explanation, and call it a reasonable choice."[11]  The Court further held that Commerce's determination was unsupported by substantial evidence on the basis that Commerce failed "by the plain meaning of the statute to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage."[12]

<u>Analysis</u>

Consistent with the *Remand Order*, we have reconsidered our determination that the provision of electricity for LTAR program is *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act.  The Court held that Commerce must (1) provide a logical basis for the grouping of industries or enterprises, and (2) use a "baseline" in its comparison that reflects how the Korean steel industry's subsidy is "out of line with the industry's own usage."[13]  Based on the Court's remand instructions and the specific record of the instant proceeding, we find that we do not have sufficient alternative information on the record of the underlying review to further consider a basis for the grouping of industries or enterprises, to establish a different baseline, or to otherwise further substantiate a *de facto* specificity determination under section 771(5A)(D)(iii) of the Act, in accordance with the Court's *Remand Order*.  Accordingly, on remand, we find that there is insufficient evidence to demonstrate that the provision of electricity

---

[10] *See Remand Order*, 794 F.Supp.3d at 1408 (citing *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1240-41 (Fed. Cir. 1992) (*PPG*)).
[11] *Id.* (citing *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1376, 1386 (Fed. Cir. 2022); *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1086-87 (Fed. Cir. 2025) (*Oman Fasteners*)).
[12] *Id.*, 794 F.Supp.3d  at 1410.
[13] *Id.*, 794 F.Supp.3d at 1407-17.

for LTAR program is specific, and, therefore, for purposes of the review period covered by this remand, we are finding this program to be not countervailable.

**B. Financial Contribution Determination for the Provision of K-ETS Permits**

<u>Background</u>

In the *Final Results*, Commerce found that the GOK relieved POSCO of the financial burden of meeting its emissions compliance obligations, and thus provided a financial contribution to POSCO in the form of revenue foregone, pursuant to section 771(5)(D)(ii) of the Act.[14] Specifically, Commerce determined that the additional emissions permits allocation (Korea Allowance Units or KAUs) provided by the GOK operated in a manner similar to a tax program, wherein the government creates a financial obligation on an entity and a tax credit program relieves the entity of part of the value of the obligation, and that the Act on the Allocation and Trading of Greenhouse Gas Emissions Permits (AAGEP) and its Enforcement Decree created an obligation to the GOK due to the surrender of KAUs to the GOK.[15] Commerce noted that, regardless of whether the KAUs were purchased directly from the GOK or otherwise procured, the closed, controlled economy created by the AAGEP, wherein the GOK determines the amount of KAUs in the market, an entity would pay the cost of the additional allocation either through KAU purchase or reduction in emissions.[16] In the *Remand Order*, the Court concluded that Commerce's finding of a financial contribution in the form of revenue foregone was contrary to law, noting that the statute requires revenue foregone to be "otherwise due" under section 771(5)(D)(ii) of the Act, and that while the additional 10 percent KAU allocation decreased the chances of requiring use of the government-run auction of fines for

---

[14] *See Final Results* IDM at Comment 2A.
[15] *Id.*
[16] *Id.*

KAU surrender, the GOK did not have any right to collect an "enforceable obligation or debt."[17] The Court stated that the examples of revenue foregone in the statute provided examples of a specific entity's payment obligation, which was not present in the K-ETS program, and remanded Commerce to reconsider its determination with respect to whether the provision of the additional 10 percent allocations of KAUs provided to POSCO under the K-ETS program constituted a financial contribution.[18]

<u>Analysis</u>

Consistent with the Court's *Remand Order*, Commerce has reconsidered its determination that the provision of K-ETS permits provides a financial contribution of revenue foregone under section 771(5)(D)(ii) of the Act. We continue to find that the GOK's additional ten percent allocation of KAUs, provided to a select group of industries under the K-ETS program, provides a financial contribution to recipients; however, we have modified our analysis and find, on remand, that the GOK provides a financial contribution in the form of a direct transfer of funds, within the meaning of section 771(5)(D)(i) of the Act, to companies receiving the additional ten percent KAU allocation under this program.

In Phase 3 of the K-ETS program in Korea, the GOK gratuitously provides 90 percent of the KAUs allocated to companies subject to the program; for the industry subsectors that meet the criteria outlined in Article 19 of the Enforcement Decree of the AAGEP, the GOK provides an additional 10 percent, *i.e.*, 100 percent of the GOK's allocated value of KAUs is granted gratuitously, to companies within the industry subsector.[19] Companies receiving the allocation have a variety of options for use, all of which the record illustrates effectively convey a financial

---

[17] *See Remand Order*, 794 F.Supp.3d at 1412 (quoting *Hyundai Steel Co. v. United States*, 701 F.Supp.3d 1398, 1403-06 (CIT 2024) (*Hyundai Steel Company*)).
[18] *Id.*
[19] *See* GOK's Letter, "GOK's Initial Questionnaire Response," dated October 11, 2022 (GOK IQR), at Appendix 16.

value to the entity.  For example, companies may use KAUs to pay for the cost of compliance for carbon emissions that the entity would have otherwise had to pay for by purchasing KAUs or by paying a fine, carry over KAUs into a future compliance year to pay for a future cost of compliance, sell via private transactions, or sell the KAUs on a public trading Emissions Trading System (ETS) market which, according to the GOK, is operated in a manner similar to a stock exchange.[20]  The value of unused KAUs and shortfalls in KAUs are recognized on POSCO's financial statements as intangible assets (when it is likely that POSCO will receive future economic benefits from the carbon emissions permits) or liabilities (when there is a high possibility of resource outflows in meeting the obligations, or when the emissions amount used exceeds the amount allotted by the emissions permits).[21]  In other words, as we have previously noted, KAUs constitute an instrument of monetary value that are fungible due to the creation of a public trading market.[22]  Furthermore, as Commerce noted in the *Final Results*, "{i}n the design of the K-ETS program, the GOK created a closed and controlled economy where, for the purposes of a gradual reduction in the total level of greenhouse gas (GHG) emissions in Korea, the GOK manages the market price of a KAU through scarcity."[23]  The GOK creates a market value for the permits for the purposes of creating a cost for emission of GHG, and the additional gratuitous allocation provided by the GOK therefore provides a transfer of an instrument of

---

[20] *Id.* at 18-21 and Exhibit CEP-1.
[21] *See* POSCO's Letter, "POSCO's Initial Questionnaire Response," dated October 7, 2022, at Exhibit E-1; *see also* POSCO's Letter, "POSCO's Affiliated Companies Response," dated August 31, 2022, at Exhibit 1 {wherein Note 20 of the separate financial statements for 2021 for POSCO Holdings, Inc. (POSCO Holdings), the successor in interest company to POSCO, reports emissions liabilities for the POR at a value of 84,364 million Korean won.}.  We found POSCO Holdings to be POSCO's successor in interest in the subsequent administrative review.  *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2022*, 89 FR 47131 (May 31, 2024), and accompany Preliminary Decision Memorandum (PDM) at 9-11.
[22] *See*, *e.g.*, *Final Results* IDM at Comment 2a.
[23] *Id.*

monetary value through its allocation.  Accordingly, we find that the additional KAUs are a direct transfer of funds under section 771(5)(D)(i) of the Act.

As the Court noted in the *Remand Order*,[24] this Court has previously sustained Commerce's financial contribution in the form of a direct transfer of funds finding with respect to this program.[25]  Moreover, Commerce has previously found that similar government credits can constitute a direct transfer of funds, for example, in the context of the Government of India's (GOI) renewable energy program.[26]  In *PTFE Resin from India*, we stated that a renewable energy credit is "an instrument with monetary value and the GOI's bestowal of {such credits} to {respondents} constitutes a financial contribution in the form of a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act."[27]  We arrived at the same conclusion in *FEBs from India* with respect to the GOI's renewable energy program, concluding that such credits "have monetary value, even if the amount of that value may not be known at the time of bestowal" and finding "that the GOI bestowing {credits}, an instrument with monetary value, to {respondent} Bharat Forge constitutes a financial contribution in the form of a direct transfer of funds."[28]  While the facts of those cases are not perfectly identical to the program at issue here— *i.e.*, in the Indian context, the question focused on the treatment of earned credits, rather than the value of credits provided gratuitously—we find the facts and the underlying rationale applied in *PTFE Resin from India* and *FEBs from India* to be sufficiently similar to the facts here to permit Commerce to adopt an analogous approach for this case.  In both instances, the GOI provided

---

[24] *See Remand Order*, 794 F.Supp.3d at Slip Op. 25-100 at 1413, n. 8 (citing *Hyundai Steel Company*, 701 F.Supp.3d at 1403-06).
[25] *See Hyundai Steel Company*, 701 F.Supp.3d at 1403-06.
[26] *See Granular Polytetrafluoroethylene Resin from India:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 FR 3765 (January 25, 2022) (*PTFE Resin from India*), and accompanying IDM at Comment 7.
[27] *Id.*
[28] *See Forged Steel Fluid End Blocks from India:  Final Affirmative Countervailing Duty Determination*, 85 FR 79999 (December 11, 2020) (*FEBs from India*), and accompanying IDM at Comment 8.

instruments of monetary value to respondent companies, where the availability of such credits was otherwise limited to the "closed economy" created by the government's ability to control the supply of such credits. Thus, we find that the GOK's provision of additional ten percent KAU allocations to a select group of polluters under this program, including POSCO and its cross-owned affiliates, constituted a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act.

### C. Specificity Determination for the Provision of K-ETS Permits

Background

In the *Final Results*, Commerce found that the additional ten percent allocations of KAUs to certain subsectors participating in the K-ETS was *de jure* specific under section 771(5A)(D)(i) of the Act because Article 19 of the AAGEP Enforcement decree establishes that the GOK provides 100 percent of the KAU allocation to the businesses in sectors subject to the K-ETS for which the results of multiplying the "production cost incurrence rate and the international trade intensity" is at least 0.2 percent.[29] Commerce found that these criteria were neither horizontal in application nor objective in nature (*i.e.*, did not meet the "safe harbor" provision in section 771(5A)(D)(ii) of the Act), because the criteria favored certain industries over others, namely industries that both incur higher costs of production due to compliance with the program and industries that rely on international trade and export sales, including, separately, six out of the 28 identified industries that did not meet the criteria but were nevertheless included in receiving the additional allocation because Article 19(2) of the AAGEP Enforcement Decree explicitly designates the industries as recipients of the full allocation.[30] In the *Remand Order*, the Court

---

[29] *See Final Results* IDM at Comment 2C (citing GOK IQR at Appendix 16 and Exhibits CEP-1, CEP-8, and CEP-9).
[30] *Id.*

held that the provision of K-ETS permits program was not *de jure* specific because the existence

of qualifying criteria *per se* does not establish specificity.[31]  The Court further held that

Commerce's determination that the additional ten percent allocation did not meet the safe harbor

provision under section 771(5A)(D)(ii) of the Act was unsupported by substantial evidence.[32]

The Court remanded this issue with instructions for Commerce to reconsider its determination.[33]

Analysis

      Consistent with the Court's *Remand Order*, Commerce has reconsidered its determination

that the provision of K-ETS permits program is *de jure* specific under section 771(5A)(D)(i) of

the Act.  On remand, we find that the provision of the additional 10 percent allocation by the

GOK is specific under sections 771(5A)(A) and (B) of the Act, because it meets the criteria for

the export subsidy, *i.e.*, "a subsidy that is, in law or in fact, contingent upon export performance,

alone or as 1 of 2 or more conditions."  As discussed above, Article 19(1) of the AAGEP

Enforcement Decree provides that under Phase 3 of the K-ETS program, the phase of the

compliance year applicable to the POR, the GOK multiplies two factors, the "international trade

intensity" and "production cost incurrence rate" to determine the subsectors that receive the 100

percent free allocation of KAUs.[34]  To qualify, the subsector[35] must have a calculated value of

0.002 or above based on the multiplication of the calculated value for "international trade

intensity" and "production cost incurrence rate," the calculation of which is provided on the

record for each subsector and demonstrates that each of the qualifying sectors under Article 19(1)

of the AAGEP Enforcement Decree incurred positive rates for both "international trade

---

[31] *See Remand Order*, 794 F.Supp.3d at 1416.
[32] *Id.*
[33] *Id.*
[34] *See* GOK IQR at 9 and Exhibit CEP-1.
[35] *Id.* at Exhibits CEP-1 and CEP-8.

intensity" and "production cost incurrence rate."[36]  Because these values are multiplied by one another to meet the 0.002 percent threshold, meeting the threshold under Article 19(1) of the AAGEP is dependent on the exports of the subsector.  The "production cost incurrence" criterion is calculated based on GHG emissions and the amount of production value added during a base comparison period; the "international trade intensity" criterion is calculated by the sum of the annual average of exports and imports divided by the annual average of sales and imports during a base comparison period.[37]  Because the criterion "international trade intensity" used in the formula for the qualifying criteria is dependent upon the portion of export sales of the subsector, and the GOK grants an additional 10 percent of KAUs to companies with subsectors that meet the threshold standard for the additional allocation based on this formula by law, we find that the provision of K-ETS permits is specific pursuant to sections 771(5A)(A) and (B) of the Act, because the receipt of the additional 10 percent of KAUs is contingent upon export performance as one of two or more conditions.

Consistent with 19 CFR 351.525(b)(ii), Commerce adjusted the sales denominator to an export sales denominator for the calculation of the benefit received by POSCO under this program.  For POSCO and its two cross-owned affiliates that received the additional 10 percent KAU allocation, we created an attributable export sales value for the POR, consistent with 19

---

[36] *See* GOK IQR at 9-10 and Exhibits CEP-1 and CEP-8.  We note that Article 19(2) of the Enforcement Decree of the AAGEP provides for 100 percent free KAU allocations to organizations, including:  (i) local governments; (ii) schools pursuant to Article 2 of the Elementary and Secondary Education Act and Article 2 of the Higher Education Act; (iii) medical institutions pursuant to Article 3(2) of the Medical Service Act; (iv) public transportation operators pursuant to Article 2, subparagraph 3 of the Act on the Support and Promotion of utilization of Mass Transit System; and (v) business operators under Article 2, subparagraph 3 of the Integrated Energy Supply Act.  However, POSCO and its two cross-owned companies that received the additional 10 percent allocation of KAUs, POSCO SPS Co., Ltd., and POSCO Chemical Co., Ltd., qualified under Article 19(1) of the Enforcement Decree of the AAGEP, as the companies are classified under the Manufacture of Basic Iron and Steel, Manufacture of Steel Products by Cold Rolling, Cold Extrusion, and Cold Drawing, and Manufacture of Shaped Refractory Ceramic Products subsectors respectively.  *See* GOK IQR at 8-10 and Exhibits CEP-1, CEP-5, and CEP-7.
[37] *See* GOK IQR at 9-10 and Exhibits CEP-1 and CEP-9.

CFR 351.525(b)(6)(ii) and (iv), as described in the "Attribution of Subsidies" section in the *Preliminary Results*.[38] We then used this value to recalculate the *ad valorem* subsidy rate provided to POSCO under this program.[39]

## III.     INTERESTED PARTY COMMENTS

### 1.     Whether the Provision of Electricity for LTAR is *De Facto* Specific

*The GOK's Comments*:

The following is a verbatim summary of argument submitted by the GOK.  For further details, *see* the GOK's Draft Remand Comments at 2.

> {Commerce} concluded in the Draft Remand Redetermination that the record does not support a finding that the alleged provision of electricity for {LTAR} is specific. Because the alleged subsidy program is not specific, {Commerce} held that it is not countervailable.  {Commerce} should reach the same conclusion in the Final Remand Redetermination.  The GOK maintains its prior factual and legal arguments concerning specificity of the electricity for LTAR program, but {the GOK does} not further address them in these comments because {Commerce} has determined on remand that the program is not specific and therefore not countervailable.

*POSCO's Comments*:

The following is a verbatim summary of argument submitted by POSCO.  For further details, *see* POSCO's Draft Remand Comments at 16.

> The determination that there is insufficient evidence to demonstrate that the provision of electricity for {LTAR} is specific is supported by the record. {Commerce} should continue to find that the electricity for {LTAR} program is not countervailable for the Final Remand.

---

[38] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 88 FR 37019 (June 6, 2023) (*Preliminary Results*), and accompanying PDM at 9-11, unchanged in *Final Results* IDM.  For a description of the methodology for the calculation of the attributable export sales values for this program, *see also* POSCO's Draft Remand Calculation Memorandum.

[39] *See* Memorandum, "Preliminary Results Calculation Memorandum for POSCO," dated May 31, 2023, at 6-7.

*Nucor's Comments*:

Nucor provided comments regarding Commerce's draft remand determination that did not include an executive summary.  For further details, *see* Nucor's Draft Remand Comments at 2-8.

**Commerce's Position:**

Nucor argues that the Draft Remand Redetermination creates new legal requirements for *de facto* specificity analysis without articulating "a rational basis for their existence in statute, regulation, case law, or agency practice."[40]  Nucor contends Commerce's regulations explicitly provide that Commerce is not required to determine whether there are shared characteristics among the enterprise or industries that are eligible for or receive a subsidy, and that any condition that provides a basis for *de facto* specificity under section 771(5A)(D)(iii) of the Act can be applied to a "group of enterprises or industries."[41]  Nucor cites to Commerce's previous statements in the *1998 Final Preamble*, which explain that Commerce is not required to evaluate the makeup of the firms that are eligible for or receive a subsidy and that requiring that a limited number of users share similar characteristics would undermine the purpose of the specificity test as articulated in the SAA.[42]  Nucor notes that neither the Court nor any interested party has questioned the legality of this rule or the consistency of this practice with the statute and regulations, or that three industries is too large a number to constitute a relevant group.[43]

---

[40] *See* Nucor Draft Remand Comments at 3.

[41] *Id.* at 3-4

[42] *Id.* at 4 (citing *Countervailing Duties:  Final Rule*, 63 FR 65348, 65357 (November 25, 1998) (*1998 Final Preamble*); Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA)).

[43] *Id.* (citing *Forged Steel Fluid End Blocks from Italy:  Final Affirmative Countervailing Duty Determination*, 85 FR 80022 (December 11, 2020), and accompanying IDM at Comment 4; *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  Final Affirmative Countervailing Duty Determination*, 86 FR 28559 (May 27, 2021), and accompanying IDM at Comment 4; *Certain Epoxy Resins from Taiwan:  Final Affirmative Countervailing Duty Determination*, 90 FR 14618 (April 10, 2025), and accompanying IDM at Comment 1).

While we agree with Nucor that the statute does not require Commerce to consider whether there are shared characteristics in a group of enterprises or industries providing the subsidy when considering a specificity determination (as articulated in Commerce's regulations), Commerce must also be responsive to the Court's *Remand Order*.[44]  Because we find the record lacks the information necessary to perform the analysis suggested by the Court, for purposes of the review period covered by this remand, we are finding this program to be not countervailable.

Nucor alternatively argues that Commerce should find that the steel industry is a predominant user of the electricity for LTAR subsidy under section 771(5A)(D)(iii)(II) of the Act, using the same grouping of three industries.[45]  However, with respect to this proceeding the Court has found that these "shared characteristics" restrictions apply to all *de facto* specificity analyses, *i.e.*, analyses under section 771(5A)(D)(iii) of the Act, rather than specifically applicable to section 771(5A)(D)(iii)(III) of the Act, *i.e.*, the disproportionality *de facto* specificity analysis Commerce used in the *Final Results*.[46]  In particular, the Court held: "Commerce acted unreasonably when it grouped the Korean steel industry with two other unrelated industries because Commerce failed to consider the actual makeup of the firms," and that "Commerce's 'untenable' logic," for the grouping of the three industries "would lead to almost every generally available subsidy being *de facto* specific to every "large company… merely because of the size of the company.'"[47]  The Court's *Remand Order* thus similarly precludes Commerce from using the same grouping of industries under a different *de facto* provision of section 771(5A)(D)(iii) of the Act without undertaking the articulated analysis.

---

[44] Though we agree with Nucor's arguments with respect to the Court's reference to *PPG* and *Oman Fasteners*, we are bound by the Court's holding that Commerce "acted unreasonably … because it failed to consider the actual make-up of the firms."  *Remand Order* at 1408 (citing *PPG*, 978 F.2d at 1232; *Oman Fasteners,* 125 F.4th at 1068); *see also* Nucor Draft Remand Comments at 3-6.

[45] *See* Nucor's Draft Remand Comments at 6-7.

[46] *See Remand Order*, 794 F.Supp.3d at 1408.

[47] *Id.*, 794 F.Supp.3d at 1409-10 (citing *AK Steel Corp. v. United States*, 192 F.3d 1367,1385 (Fed. Cir. 1999)).

Nucor has pointed to no record information that Commerce can utilize to complete this analysis, and we continue to find that there is insufficient information on the record of this segment to conduct these two analyses as instructed by the Court for a *de facto* specificity determination. Therefore, upon remand, we find that the provision of electricity for LTAR is not specific, and therefore not countervailable.

### 2. Whether the Provision of K-ETS Permits Provides a Financial Contribution and is Specific

*The GOK's Comments*:

The following is a verbatim summary of argument submitted by the GOK. For further details, *see* the GOK's Draft Remand Comments at 4-10.

> The GOK, however, objects to {Commerce's} Draft Remand Redetermination as it pertains to the K-ETS program. In particular, {Commerce's} financial contribution and specificity findings related to the K-ETS program are contrary to law and unsupported by substantial evidence. The allotment of additional {KAUs} does not constitute a direct transfer of funds and is not specific as an export subsidy. First, in its Draft Remand Redetermination, {Commerce} erroneously equates the additional KAUs with funds (*i.e.*, money or monetary instruments) to find that there is a direct transfer of funds by the GOK. By doing so, {Commerce} has ignored record evidence that clearly demonstrates that KAUs are the "right" to emit greenhouse gas (GHG), not money or monetary instruments.

> Second, {Commerce's} finding ignores the statutory prerequisite that the financial contribution must be a "direct transfer" or "potential direct transfer" of funds by the GOK to the recipients. To circumvent this requirement, {Commerce} shifts its focus on what companies receiving KAUs can do with them (*e.g.*, selling them in private transactions), rather than the GOK's provision of the additional KAUs.

> Lastly, {Commerce's} reasoning to determine that the GOK's provision of additional KAUs is an export subsidy is flawed as the international trade intensity criterion for eligibility is not actually contingent upon export performance.

> In its Final Remand Redetermination, {Commerce} must apply the proper interpretation and application of the law. Doing so will lead to the conclusion that the GOK's provision of additional KAUs under the K-ETS program is neither a financial contribution nor specific.

*POSCO's Comments*:

The following is a verbatim summary of argument submitted by POSCO.  For further details, *see* POSCO's Draft Remand Comments at 3-16.

> The determination that the allocation of emission permits ({KAUs}) is a direct transfer of funds pursuant to section 771(5)(D)(i) is inconsistent with the statute. KAUs limit emissions and accordingly are not a direct transfer of money or equity pursuant to section 771(5)(D)(i).

> The determination that the allocations pursuant to the {K-ETS} program are contingent upon export performance pursuant to section 771(5A)(B) is illogical and inconsistent with the statute, and other determinations from {Commerce}, including a prior determination that the K-ETS program is not export-contingent.[48]

*Nucor's Comments*:

Nucor provided comments regarding Commerce's draft remand determination that did not include an executive summary.  For further details, *see* Nucor's Draft Remand Comments at 1.

**Commerce's Position:**

For the reasons discussed below, after considering the comments of interested parties, we continue to find upon remand that the provision of K-ETS permits by the GOK provides a financial contribution in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act and is specific under sections 771(5A)(A) and (B) of the Act, because the program meets the criteria for an export-contingent subsidy.

*Financial Contribution*

POSCO and the GOK argue that the provision of the additional KAUs does not constitute a direct transfer of funds, noting that the examples cited under section 771(5)(D)(i) of the Act

---

[48] *See* POSCO's Draft Remand Comments at 2 (citing *Oil Country Tubular Goods from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 FR 59056 (September 23, 2022) (*OCTG from Korea*), and accompanying IDM at Comment 1; *Certain Iron-Metal Castings from India:  Final Results of Countervailing Duty Administrative Review*, 65 FR 31515 (May 18, 2000) (*Metal Castings from India*), and accompanying IDM.)

include "grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees," and the provision of KAUs does not fall within these enumerated examples and bears no similarity to any of the examples.[49]  At the outset, we note that while section 771(5)(D)(i) of the Act provides a number of examples of the types of subsidies that may be considered to provide a direct transfer of funds, these are clearly listed as examples; the Act states that, "the direct transfer of funds, *such as* grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees," indicating that the list is not exhaustive.[50]  The SAA confirms as much:  "Section 771(5)(D) {of the Act} lists the four broad generic categories of government practices that constitute a 'financial contribution'… {and t}he examples of particular types of practice falling under each of the categories are not intended to be exhaustive."[51]  A subsidy need not be a "gift-like transfer," as POSCO argues, to be considered a financial contribution in the form of a direct transfer of funds, since the list of enumerated examples in the Act is merely illustrative, and non-exhaustive.[52]

POSCO argues that the allocated KAUs are "representative of the emissions limits the GOK imposes on each company," and as such serves as a cap and acts as a restriction, rather than a "gift-like transfer," a "fund" (which is defined as "an amount of money that has been saved or made available for a particular purpose)," or loans, loan guarantees, or equity infusions (because KAUs do not transfer money or equity).[53]  The GOK likewise argues that KAUs are not "funds," because they are authorizations to emit a particular amount of emissions, can be revoked after allocation and become invalid six months after the end of the compliance year, and have no

---

[49] *See* POSCO's Draft Remand Comments at 3-4.
[50] Section 771(5)(D)(i) of the Act (emphasis added).
[51] *See* SAA at 927.
[52] *Id.*
[53] *See* POSCO's Draft Remand Comments at 4-6.

guaranteed market value.[54]  We disagree that the use of "fund" in section 771(5)(D)(i) of the Act is intended to be restricted specifically to a transfer of money or equity.  Above, we explained that the gratuitous provision of additional KAUs to select enterprises in certain subsectors constituted a transfer of funds because of the marketable and fungible nature of such allocations. The fact that the K-ETS program provides an instrument of monetary value, rather than a cash infusion, is accounted for in the benefit analysis, consistent with Commerce's regulations under 19 CFR 351.503(b), which states that even if a benefit "does not take the form of a reduction input costs or an enhancement in revenues," Commerce may impose countervailing duties "when the facts of a particular case establish that a financial contribution (or income or price support) has conferred a benefit."  Commerce's benefit analysis with respect to this program in itself rebuts the GOK's argument that the KAUs have no articulable market value.  Commerce has previously explained in this same proceeding how such a benefit is conferred, describing its similarities to the four illustrative examples in sections 771(5)(E)(i) through (iv) of the Act, as required by 19 CFR 351.503(b)(2), and has been upheld by the Court on this analysis.[55]

POSCO and the GOK assert that KAUs do not satisfy the definition of "funds," but the purported distinctions are unconvincing.[56]  We disagree that the transfer of "funds," within the meaning of the Act, must necessarily relate to the transfer of money itself.  Importantly, the direct transfer of funds provision under section 771(5)(D)(i) of the Act also identifies the "potential direct transfer of funds or liabilities, such as loan guarantees."  Guarantees, as an example, do not themselves constitute money; rather, they impact the total amount a firm pays for the loan in the period(s) following the receipt of the guarantee.[57]  The same is true of KAUs

---

[54] *See* GOK's Draft Remand Comments at 5-6.
[55] *See Remand Order*, 794 F.Supp.3d  at 1413-14.
[56] *See* GOK's Draft Remand Comments at 5-7; *see also* POSCO's Draft Remand Comments at 5-6.
[57] *See*, *e.g.*, 19 CFR 351.506.

in this case.  Thus, even under POSCO and the GOK's theory that KAUs do not involve the *immediate* transfer of funds, they would still constitute a financial contribution under 771(5)(D)(i).

To read section 771(5)(D)(i) of the Act as intending to encompass only direct transfer of money or currency is antithetical to Congress' intention of creating "broad," "generic categories" in defining financial contribution.[58]  For example, where a government were to provide stocks to a recipient free of charge, such an interpretation of the statute could insulate a government from the application of the CVD laws simply because the instrument by which the benefit is conferred is not cash.  Similarly, to find that the provision of a KAU, which unambiguously has a market value (and can readily be transferred for that value), does not constitute a transfer of funds, as argued, would place form over substance, and present clear avenues for escaping the countervailability of subsidy programs.  Under the interpretation of the Act made by POSCO and the GOK, only the most straightforward types of cash hand-outs would constitute a financial contribution, whereas a government would be permitted to provide a monetary instrument, whether a stock, KAU, or some other type of credit, to recipient companies, and Commerce would be unable to treat the transfers as what they are:  transfers of funds.  Such a restrictive interpretation has no support in the CVD law.

We further disagree with the GOK's assertion that KAUs are the "right" to emit GHGs, rather than funds.[59]  First, record evidence demonstrates that a shortage of KAUs does not prohibit a program participant from emitting GHG.[60]  If necessary, if an entity owes more KAUs than it possesses, it can buy more KAUs via several avenues.[61]  Though the K-ETS program may

---

[58] *See* SAA at 927.
[59] *See* GOK's Draft Remand Comments at 7.
[60] *See* GOK IQR at 11-13 and Appendix 16.
[61] *Id.* at 13-15.

be "aimed at constraining and reducing GHG emissions in Korea," this does not alter the fact that record evidence supports finding that the provision of additional KAUs up to 100 percent of an entity's allocated KAUs provides an entity with instruments of monetary value.[62]  The process by which the GOK calculates the number of KAUs provided to each program participant illustrates that the amount is intended to be reflective of the participant's prior emissions rate; it is not a legal limitation on the participants, who could theoretically emit any amount of GHG and pay for the emissions not allocated gratuitously.  Further, the record is clear that KAUs are an instrument used to pay for the emittance of GHGs, and while the GOK sets the amount of KAUs provided to each entity under the program in accordance with an emissions target pursuant to Article 12 of the AAGEP and Article 17 of its Enforcement Decree (with adjustments to the allocation under Article 16 of the AAGEP and Articles 27 and 29 of its Enforcement Decree), the amount owed by an entity within the K-ETS program each compliance year is determined by a process separate from the allocation of KAUs, codified under Article 24 of the AAGEP, wherein the GOK independently calculates and verifies the amount of GHG emitted by the entity during the compliance year.[63]  KAUs are then submitted by the entity to pay the cost incurred from the GHG emissions that the GOK determines is owed by the company, under Article 27 of the AAGEP.[64]  KAUs are the instrument with which program participants pay for their GHG emissions, and the allocation documentation on the record illustrates that the GOK directly

---

[62] *See, e.g.*, the GOK's Letter, "GOK's First Supplemental Questionnaire Response – Part I," dated April 21, 2023, at 12 and Exhibit CEP-7.1.
[63] *See* GOK IQR at Appendix 16 ("Reporting, Verification, and Certification of Amounts of Emissions:  Pursuant to Article 24(1) of the AAGEP, participants shall prepare a report on the amount of GHG they have actually emitted during the compliance year in a measurable, reportable, and verifiable manner, and submit it to the {Ministry of Environment} MOE within three months from the end of the compliance year.  The MOE verifies and certifies the data in the report.  When the MOE certifies the actual amount of carbon gas emitted, it notifies the result to the relevant participant and registers the result in the Emissions Trading Registration System within five months from the end of each compliance year.").
[64] *Id.*

provides an amount of KAUs, which the record demonstrates have a monetary value, to the entity at the beginning of the compliance period under this program.[65]  Though the amount of KAUs may be adjusted based on a revision to the GOK's national allocation plan, or the business situation of the participant (such as the operation and/or closure of GHG emitting business facilities), the amount of KAUs owed is the amount based on the entity's actual GHG emittance and is finalized prior to the reconciliation and payment of KAUs.[66]  While the market value of the KAUs and the amount of the KAUs provided to the entity may change between the beginning of the compliance period and the final surrender and disposal of the KAUs for the compliance period, Commerce accounts for these changes in the benefit calculation by using the final allocated amount of KAUs for the compliance period and calculating any benefit value based on the prices at which the entity in question actually bought or sold KAUs during the compliance period.[67]  The fact that the benefit value may change from initial allocation to surrender does not preclude the fact that the GOK provides a financial contribution directly to entities receiving the additional allocation through an instrument with monetary value under the program.

POSCO argues that Commerce's comparison of the provision of K-ETS permits to the renewable energy program Commerce previously countervailed in India is inapplicable because the renewable energy credits in India were earned by the participants, while KAUs are provided

---

[65] *Id.*

[66] *Id.*

[67] *See, e.g.*, Memorandum, "Preliminary Results Calculation Memorandum for POSCO," dated May 31, 2023, at 6-7 ("We first calculated the average transaction price at which POSCO and its affiliates actually bought or sold 2021 Korea Allowance Units (KAU21s) or equivalents (Korean Offset Credits (KOCs) and international Korean Offset Credits (iKOCs) for 2020-2022), by dividing the total value of KAU21s, KOCs, and iKOCs reported sold or purchased by POSCO and the other responding companies during the compliance period by the total quantity of the KAU21s, KOCs, and iKOCs reported sold or purchased.  To calculate the benefit, we multiplied the amount of KAU21s allocated to POSCO, POSCO Chemical, and POSCO SPS for the compliance year 2021 by ten percent to determine the additional amount of KAU21s allocated by the GOK due to their classification as high trade intensity/cost incurrence rates sectors.  We then multiplied the total value of the ten percent additional allocation for each company by the calculated average transaction price of the KAU21s and equivalents to determine a benefit value for each company.").

gratuitously at the beginning of the compliance period.[68]  We do not find this distinction

material; Commerce's requirements for finding a financial contribution under section 771(5)(D)

of the Act do not distinguish between how or when an entity qualifies to receive a subsidy.  In

both the program described in *PTFE Resin from India*, and the K-ETS program at question in

this remand, Commerce has found that the government in question has provided a credit akin to a

financial instrument that has monetary value, even if the precise value of the instrument is not

known at the time of bestowal.[69]

    Lastly, POSCO argues that Commerce's treatment of the additional KAUs ignores the

context in which the additional KAUs are provided, which is as a measure of relief from a

burden imposed by GOK law and cannot be considered a direct transfer of funds within this

context.[70]  However, as Commerce has previously stated with respect to this program, when

analyzing whether a potential countervailable subsidy exists, Commerce does not take into

account the effects of the subsidy, or any related "burdens" imposed on a firm that are related to

the granting of the subsidy, such as those pertaining to compliance with certain environmental

obligations.[71]  The *1998 Final Preamble*  explains that Commerce has "sufficient flexibility to

accommodate circumstances in which the facts of a particular case indicate that a financial

contribution has conferred a benefit."[72]  A benefit exists, and is identified and measured, after

Commerce determines a financial contribution has been provided by a government under section

771(5) of the Act.  Thus, the question of whether the K-ETS program created a burden of

---

[68] *See* POSCO's Draft Remand Comments at 6 (citing *PTFE Resin from India* IDM at Comment 7; and *Forged Steel Fluid End Blocks from India:  Final Affirmative Countervailing Duty Determination*, 85 FR 79999 (December 11, 2020), and accompanying IDM at Comment 8).
[69] *See PTFE Resin from India* IDM at Comment 7.
[70] *See* POSCO's Draft Remand Comments at 7.
[71] *See 1998 Final Preamble*, 63 FR at 65361; *see also* 19 CFR 351.503(c); and, *e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 6842 (February 7, 2022), and accompanying IDM at Comment 3.
[72] *See 1998 Final Preamble*, 63 FR at 65631.

compliance is a separate analysis from the existence of a financial contribution in the first place. Here, POSCO's argument pertains to the existence of a benefit, rather than that of a financial contribution. Nevertheless, the Act and Commerce's practice are both clear that Commerce does not offset a countervailable subsidy based on the cost of compliance.

As explained in detail in the *1998 Final Preamble*, which speaks to the conferral of a benefit amount, Commerce looks at each subsidy independent of other parts of a law, regulation, *etc*., to evaluate whether a countervailable benefit has been conferred, and does not take into account any effects related to the granting of the subsidy.[73] The *1998 Final Preamble* speaks directly to the circumstances in this case, stating: "{a} subsidy that reduces a firm's cost of compliance remains a subsidy … even though the overall effect of the two government actions, taken together, may leave the firm with higher costs."[74]

The fact that the subsidy program itself, or some related law or regulation, affects the recipient's behavior is not material to Commerce's determination as to whether either a benefit or a financial contribution is conferred by the government under the program. Section 771(5)(C) of the Act makes this explicit, stating that Commerce "is not required to consider the effect of the subsidy in determining whether a subsidy exists." The *1998 Final Preamble* also describes a relevant example, under which a government implements new environmental restrictions that require a firm to purchase new equipment. The government then provides that firm with subsidies to purchase the new equipment, but this assistance does not fully offset the cost of the equipment, thus imposing an overall burden on the firm.[75] In the *1998 Final Preamble*, Commerce proceeds to explain that in this instance, Commerce would treat the new

---

[73] *Id.*
[74] *Id.*
[75] *Id.*

environmental requirements and the subsidization of part of the equipment as two separate

programs, and Commerce would not consider the cost of the new restrictions as an offset to the

assistance that reduces that burden.[76]  This example notably states that "a subsidy exists" under

these circumstances and does not limit the type of subsidy or financial contribution that may be

provided by the government in question; the *1998 Final Preamble* notes that "if there is a

financial contribution, and a firm… receives revenues beyond the amount it would otherwise

earn, that is the end of the inquiry insofar as the benefit element is concerned."[77]  Similarly, we

would not consider the overarching burden imposed by the K-ETS program as a means of

offsetting the assistance provided via the additional KAU allocation, and any determination of a

financial contribution is considered within its own context, separate of the imposition of the

restriction.  This practice is in accordance with Commerce's regulations under 19 CFR

351.503(c)(2), which specifically states that Commerce will not consider the cost in complying

with a government-imposed regulation, requirement, or obligation when measuring a benefit

from assistance provided to a firm to comply with a government regulation.  The CIT has also

previously rejected this claim regarding the K-ETS program, noting that:

> {T}he court considers—and rejects—Hyundai Steel's primary claim that
> Commerce impermissibly ignored the burdens imposed by the K-ETS program. …
> {The Act} addresses the circumstances in which environmental compliance is non-
> countervailable, and those circumstances are not present here nor does Hyundai
> Steel claim that they are present. … {and} the {*1998 Final Preamble*} expressly
> contemplates the countervailability of subsidies that are intended to offset a firm's
> cost of complying with environmental restrictions.[78]

Under our clear practice, the question of a compliance burden is irrelevant to both Commerce's

financial contribution and benefit analysis; the record is clear that the GOK directly provides a

---

[76] *Id.*

[77] *Id.*

[78] *See Hyundai Steel Co. v. United States*, 659 F Supp.3d 1327, 1339-1340 (CIT 2023) (citing *1998 Final Preamble*, 63 FR at 65361).

financial instrument to POSCO that has a market value, and the statute and regulations require no further analysis regarding financial contribution.

For the foregoing reasons, we continue to find that the provision of the additional ten percent allocation of K-ETS permits provides a financial contribution in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act.

*Specificity*

With respect to Commerce's specificity finding on an export-contingent basis, POSCO argues that Commerce's finding directly contradicts Commerce's previous finding in *OCTG from Korea* that the K-ETS program is not an export subsidy.[79] In particular, POSCO argues that, in the investigation of *OCTG from Korea*, Commerce specifically recognized that the K-ETS program was not export contingent because "the international trade intensity formula applies to the industry subsector as a whole," and that Commerce found that companies that did not export would qualify for the additional K-ETS permits as part of a subsector.[80] At the outset, we note that the analysis in *OCTG from Korea* pertained to Phase Two of the K-ETS program, whereas the K-ETS program was in Phase Three during this POR.[81] Importantly, Phase Two had different qualifying criteria for the additional allocation, thus requiring a different specificity analysis.[82] In *OCTG from Korea*, Commerce found that there were two independent criteria, "trade intensity" and "production costs," and that subsectors could qualify under either criteria.[83] As explained above, however, record evidence demonstrates that under the Phase Three formula, the receipt of the additional 10 percent of KAUs is contingent upon export performance as one of

---

[79] *See* POSCO's Draft Remand Comments at 8 (citing *OCTG from Korea* IDM at Comment 1).
[80] *Id.*
[81] *See* GOK IQR at Appendix 16.
[82] *See* Memorandum, "Countervailing Duty Investigation of Oil Country Tubular Goods from the Republic of Korea: Post-Preliminary Analysis," dated June 29, 2022; *see also OCTG from Korea* IDM at Comment 1).
[83] *Id.*

two or more conditions.  Moreover, the statute explicitly states that specificity determinations

can be made on an enterprise or industry basis, including a group of enterprises or industries; in

our determination regarding the K-ETS program, we have analyzed the subsectors identified by

the GOK as an industry or group of industries permitted under the Act.[84]

POSCO argues that section 771(5A)(B) of the Act provides that an export subsidy is

"contingent upon export performance, alone or as one of two or more conditions," and that the

K-ETS program does not meet the criteria of "contingent," *i.e.*, "dependent upon," because the

trade intensity criteria is not dependent upon export performance.[85]  The GOK likewise argues

that "contingent" is defined as "dependent," and Commerce should interpret section 771(5A)(B)

of the Act as requiring a finding that a subsidy is dependent on export performance, either alone

or as one or two or more conditions.[86]  POSCO argues that, because the numerator of the trade

intensity criteria is based on an annual average of exports plus imports, and the trade intensity

criteria must exceed a 0.002 threshold when multiplied by the production cost incurrence rate,

the actual application of the formula results in qualification criteria not dependent upon

exports.[87]  POSCO and the GOK both argue that this formula creates a scenario under which,

with a sufficient amount of imports and cost incurrence, a subsector could qualify without

export, and notes that, conversely, a subsector could export and still not qualify for the

program.[88]  We disagree that the use of the formula, which all parties acknowledge is in part

dependent on a reported level of exports, precludes this program from being considered export

---

[84] *See* Section 771(5A) of the Act ("For purposes of this paragraph, and paragraph (5B), any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries.")

[85] *See* POSCO's Draft Remand Comments at 9-10.

[86] *See* GOK's Draft Remand Comments at 9.

[87] *See* POSCO's Draft Remand Comments at 9-11 (citing GOK IQR at 9-10, Appendix 16, and Exhibit CEP-9); *see also* GOK's Draft Remand Comments at 9-10 (citing GOK IQR at 9-10 and Exhibits CEP-1 and CEP-9).

[88] *Id.*

contingent under sections 771(5A)(A) and (B) of the Act19 CFR 351.514(a) in particular notes that Commerce "will consider a subsidy to be contingent upon export performance if the provision of the subsidy is, in law or in fact, tied to *actual or anticipated exportation or export earnings*, alone or as one of two or more conditions."[89]

While there may be hypothetical scenarios wherein a subsector could qualify, or not qualify, for the additional allocation under the program based on the calculations of the formula, section 771(5A)(B) of the Act describes an export subsidy as a subsidy that is "in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions."  Here, it is clear that the qualification criteria for the program is, by law, contingent upon export performance as one of three conditions used in the calculation of the formula for each subsector:  (1) the amount of exports; (2) the amount of imports, and (3) the costs incurred for the subsector's compliance, as explicitly provided in the formula described in Article 19(1) of the AAGEP Enforcement Decree, by which the GOK determines if a subsector qualifies for the additional allocation.[90]  Finally, although Article 19(2) of the Enforcement Decree provides for an additional allocation of KAUs to certain sectors, regardless of whether the sectors meet the criteria under Article 19(1), it is clear from the record that the "manufacturing of primary steel" subsector, and thus POSCO, qualified for the program under Article 19(1) and was not in the subsectors (higher education institutions, hospitals, railway transport, ground passenger transport, and maritime transport) identified by GOK presidential decree per Article 19(2).[91]

---

[89] *See* SAA at 929 ("'Export subsidies' are defined as those subsidies which are contingent in law or in fact, whether solely or as one of several other conditions, upon export performance.  This definition is more expansive than the one used in existing U.S. law and practice.  Commerce intends to issue regulations … which will elaborate on the criteria for identifying export subsidies on the basis of this expanded definition.").

[90] *See* GOK IQR at 9-10 and Exhibits CEP-1 and CEP-9.

[91] *Id.* at 9-10 and Exhibits CEP-4 and CEP-8.

We likewise disagree that the decision in *Metal Castings from India*, wherein Commerce found that a bank requesting financial indicators for eligibility for a loan program, including production and sales information that included export data and market opportunities, did not make the program export contingent because export contingency was not a factor with regard to the provision of the loan, is comparable to the K-ETS additional allocation criteria.[92]  In *Metal Castings from India*, Commerce found that, "we verified that any company in any industrial sector can receive a term loan under the financing schemes, provided that the borrower is creditworthy and the proposed project is financially and commercially viable… {i}n our examination of the loan application and approval process, we noted that export performance was not a factor or criterion for approval and receipt of a loan from these banks and financial institutions."[93]  We disagree with POSCO's assertion that the K-ETS program is similar in that it does not actually determine eligibility based on exports; Article 19(1) of the AAGEP Enforcement Decree, and the attached table referenced therein, outlines specific criteria required for the gratuitous additional allocation, which clearly includes the annual average export amount.[94]  POSCO further argues that Commerce should consider the "trade intensity" criteria as being within the definition of the "traded goods sector" as defined by 19 CFR 351.502(c), rather than export contingent.[95]  However, the regulations governing the eligibility of this program clearly cite exportation, and thus this program meets the requirements for a finding of export contingency within the meaning of sections 771(5A)(A) and (B) and 19 CFR 351.514.

POSCO argues that a cap and trade program designed for reducing emissions within Korea cannot logically be contingent upon export, and that the *1998 Final Preamble*

---

[92] *See* POSCO's Draft Remand Comments at 13-14 (citing *Metal Castings from India* IDM at Comment 3).
[93] *See Metal Castings from India* IDM at Comment 3.
[94] *See* GOK IQR at Exhibits CEP-1 and CEP-8.
[95] *See* POSCO's Draft Remand Comments at 15-16.

distinguishes between broad development goals or economic policy, and specific program

objectives and criteria.[96]  However, we note that we are not making a specificity determination

on the cap and trade program, in and of itself, but an additional allocation provided as part of the

cap and trade program, which the GOK has previously explained to Commerce is intended as a

measure to increase competitiveness of Korea's domestic industries in markets where

competitors exist that are not subject to the same or similar carbon reduction programs,

reporting:

> This {cost of reducing greenhouse emissions} burden does not affect the
> competition in the domestic market since all competitors face the same burden.
> However, the situation changes in the market where there are other competitors
> who sell similar goods or services without having to take such burden.  In other
> words, companies that are subject to this or similar carbon emission programs are
> disadvantaged from market competition perspective, and equal opportunity to
> compete in the market becomes broken.  In order to rehabilitate and provide equal
> market opportunity to the participants in markets in which there are other
> competitors who are not subject to restrictions similar to those imposed under this
> program, the GOK does not deduct permits in case of sectors or  sub-sectors that
> meet the (i) trade intensity and (ii) production costs criteria.  {The K-ETS program}
> {t}herefore is in fact a method of maintaining international competitiveness for
> polluting industries.[97]

POSCO cites the *1998 Final Preamble*'s instruction of distinguishing between broad

development goals or economic policy, and specific program objectives and criteria, and argues

that the K-ETS additional allocation should not be considered the specific program objective and

criteria.[98]  However, in the *1998 Final Preamble*, Commerce identified a list of non-exhaustive

factors to consider for export subsidy analysis:

> (1) {t}he stated purpose or purposes of the subsidy as put forth in the governing
> laws or regulations; (2) the selection criteria and reasons for approval/ disapproval;
> (3) application and approval documents, including market or economic viability
> studies; (4) the existence and nature of any monitoring or enforcement mechanism;
> (5) governmental collection of data regarding the program recipients' exports (other

---

[96] *Id.* at 8.
[97] *See CTL Plate from Korea 2019 AR* IDM at Comment 3.
[98] *Id.* at 12-13 (citing *1998 Final Preamble*, 63 FR at 65348, 65380).

than the customary collection of export and import data); (6) the exporting history of recipient firms or industries; and (7) other evidence that {Commerce} deems relevant to consider.[99]

As discussed above, while participation in the K-ETS program itself may not be contingent upon export, the clear intent of the criteria under the AAGEP in its Enforcement Decree, as previously articulated by the GOK, is that the additional 10 percent allocation provides a benefit to subsectors that export, as a measure of protection against the competitive disadvantages created by the required reduction in GHG emissions.  The GOK collects and monitors subsectors' historical exports as part of the export criteria, and clearly utilizes it in determining the eligibility for the additional allocation; thus, the factors outlined in the *1998 Final Preamble* indicate this program is export specific.  Therefore, we find upon remand that the provision of the additional ten percent allocation of K-ETS permits is export contingent under sections 771(5A)(A) and (B) of the Act.

## IV.    FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, Commerce has, as discussed above, reconsidered its specificity finding for the provision of electricity for LTAR, and reconsidered its financial contribution and specificity findings with respect to the provision of K-ETS permits.  Based on the foregoing redeterminations, we have revised the subsidy rate calculation for POSCO with respect to the provision of electricity for LTAR and the provision of K-ETS permits.  The recalculated total *ad valorem* subsidy rates for the POR of January 1, 2021, through December 31, 2021, are listed in the chart below.[100]

---

[99] *See 1998 Final Preamble*, 63 FR at 65380.
[100] For details on the revised recalculations for these draft results of redetermination, *see* POSCO's Draft Remand Calculation Memorandum.

| Company | Subsidy Rate in the *Final Results*[101]<br>(percent *ad valorem*) | Subsidy Rate in the Final Remand Redetermination<br>(percent *ad valorem*) |
|---|---|---|
| POSCO | 0.87 | 1.72 |

12/9/2025

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia,
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[101] *See Final Results*, 88 FR at 86319.