**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI**

POSCO,

      Plaintiff,

  and

GOVERNMENT OF THE REPUBLIC OF KOREA,

      Plaintiff-Intervenor,

  v.

UNITED STATES,

      Defendant,

  and

NUCOR CORPORATION,

      Defendant-Intervenor.

**PUBLIC DOCUMENT**

Court No. 24-cv-00006-JAR

**PLAINTIFF POSCO'S**
**COMMENTS IN OPPOSITION TO REMAND RESULTS**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**TAFT STETTINIUS & HOLLISTER LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

January 15, 2026

*Counsel to Plaintiff POSCO*

## <u>TABLE OF CONTENTS</u>

I.    ARGUMENT .................................................................................................... 2

    A.    Commerce's Financial Contribution Determination for the KETS Program
        Continues To Be Unsupported By Substantial Evidence And Otherwise Not In
        Accordance With Law. ........................................................................................ 2

        1.    The Permits are Not Funds or Similar to the Financial Contributions in the
               Statute. ............................................................................................... 3

        2.    The Allocation of Additional Permits Does Not Constitute the Direct
               Transfer or Potential Transfer of Funds. ........................................... 6

    B.    Commerce's Specificity Determination for the K-ETS Program Is Unsupported
        By Substantial Evidence And Is Otherwise Not In Accordance With Law. ........... 8

        1.    Eligibility for Additional Permits is not "Contingent Upon" Export
               Performance. ...................................................................................... 9

        2.    Commerce Has Previously Recognized that KETS and Similar Programs
               Do Not Constitute an Export Subsidy. .............................................. 12

II.   CONCLUSION ............................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gov't of Sri Lanka v. United States*,
    308 F. Supp. 3d 1373 (Ct. Intl. Trade 2018)............................................................6

*Hyundai Steel Co. v. United States,*
    745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) .........................................................8

*Jarecki v. G.D. Searle & Co.*,
    367 U.S. 303 (1961)..............................................................................................4

*POSCO v. United States*,
    794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) .......................................................3, 4

*Schlumberger Tech. Corp. v. United States*,
    845 F.3d 1158 (Fed. Cir. 2017)...........................................................................4

*United States v. Williams*,
    553 U.S. 285, 128 S. Ct. 1830 (2008).................................................................4

*Yates v. United States*,
    574 U.S. 528, 135 S. Ct. 1074 (2015).................................................................4

**Statutes**

19 U.S.C. § 1677(5) ...................................................................................... *passim*

19 U.S.C. § 1677(5A) ....................................................................................8, 9, 11

**Other Authorities**

*Certain Carbon and Alloy Cut-To-Length Plate from the Republic of Korea: Final*
    *Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg.
    86,318 (Dep't Commerce Dec. 13, 2023).................................................................1

*Certain Iron-Metal Castings from India: Final Results of Countervailing Duty*
    *Administrative Review*, 65 Fed. Reg. 31,515 (Dep't Commerce May 18, 2000) .............13, 14

*Oil Country Tubular Goods From the Republic of Korea: Final Affirmative*
    *Countervailing Duty Determination*, 87 Fed. Reg. 59,056 (Dep't Commerce
    Sept. 29, 2022) ..................................................................................8, 12, 13

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI**

| | |
|---|---|
| POSCO,<br><br>  Plaintiff,<br><br> and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>  Plaintiff-Intervenor,<br><br>  v.<br><br>UNITED STATES,<br><br>  Defendant,<br><br> and<br><br>NUCOR CORPORATION,<br><br>  Defendant-Intervenor. | **PUBLIC DOCUMENT**<br><br>Court No. 24-cv-00006-JAR |

**PLAINTIFF POSCO'S**
**COMMENTS IN OPPOSITION TO REMAND RESULTS**

Pursuant to U.S. Court of International Trade Rule 56.2, and the scheduling order,

Plaintiff POSCO ("POSCO" or "Plaintiff") hereby comments in opposition to the U.S.

Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Second

Court Remand.  *See* Final Results of Redetermination Pursuant To Second Court Remand,

*POSCO v. United States*, 24-cv-00006-JAR (Dec. 9, 2025), ECF No. 60 ("*Remand Results*").

The underlying administrative determination at issue in the *Remand Results* is *Certain Carbon*

*and Alloy Cut-To-Length Plate from the Republic of Korea: Final Results of Countervailing Duty*

*Administrative Review; 2021*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023), ECF No.

24-4("*Final Results*"); Mem. from James Maeder, Deputy Assistant Secretary for Antidumping

and Countervailing Duty Operations, to Abedelali Elouradia, Deputy Assistant Secretary for

Enforcement and Compliance, "Issues and Decision Memorandum for the Final Results of

Countervailing Duty Administrative Review: Certain Carbon and Alloy Steel Cut-to-Length

Plate from the Republic of Korea; 2021" (Dec. 1, 2023), ECF No. 24-5 ("Final Decision Mem.").

 As discussed below, the *Remand Results* are unsupported by substantial evidence and are

otherwise not in accordance with law.[1]

## I.   <u>ARGUMENT</u>

 A.   Commerce's Financial Contribution Determination for the KETS Program
Continues To Be Unsupported By Substantial Evidence And Otherwise Not In
Accordance With Law.

 In the *Remand Results*, Commerce reexamined its financial contribution determination

for the Korea Emission Trade System ("KETS") program in response to the Court's rejection of

its determination that the allocation of additional carbon emission permits ("permits") resulted in

a financial contribution in the form of revenue foregone under section 771(5)(D)(ii) of the Tariff

Act of 1930, *as amended*. Commerce abandoned the revenue foregone analysis in favor of a

determination that the Government of Korea ("Government") provides a financial contribution in

the form of a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act.

*Remand Results* at 6. However, this attempt to salvage its financial contribution determination

fails because the allocation of additional permits to qualifying industry segments does not

constitute the direct transfer of funds pursuant to section 771(5)(D)(i). Commerce's financial

---

[1] Citations to the administrative record shall be to the public or confidential record document number ("PR" or "CR") followed by the page or exhibit number. Citations to the remand administrative record shall be to the public or confidential remand record document number ("PRR" or "CRR") followed by the page or exhibit number.

contribution determination thus remains unsupported by substantial evidence and otherwise not in accordance with law.

1.    *The Permits are Not Funds or Similar to the Financial Contributions in the Statute.*

In the *Remand Results*, Commerce treats the allocation of additional permits as the direct transfer of funds because it claims that the Government creates a market value for the permits for the purposes of creating a cost for the emission of greenhouse gas and therefore provides a transfer of an instrument of monetary value through the allocation of the permits.  *Remand Results* at 7.  As support, Commerce claims that the various options available to companies receiving the allocation of permits convey financial value to the entity, and that POSCO "recognizes" the permits as intangible assets or liabilities in its financial statements.  *Remand Results* at 6-7.  Commerce's analysis is flawed and inconsistent with the statute.

Section 771(5) of the Act provides:

(B) Subsidy described
A subsidy is described in this paragraph in the case in which an authority
(i) provides a financial contribution…
to a person and a benefit is thereby conferred.
…
(D)  FINANCIAL  CONTRIBUTION.—The  term  ''financial  contribution'' means— (i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees….

The list of financial contributions in the statute is not exhaustive, but Commerce may not disregard the examples in section 771(5)(D)(i) and create new types of financial contributions that are inconsistent with the examples in the statute.  As this Court explained: "the examples imbedded in a statutory provision give the words a 'more precise content'" and, because a statutory term is 'known by the company it keeps,' terms are 'appropriately read to refer… specifically to the subset' illustrated by any examples.'"  *POSCO v. United States*, 794 F. Supp.

3

3d 1402, 1413 (Ct. Int'l Trade 2025) ("*POSCO*") (quoting *United States v. Williams*, 553 U.S. 285, 294, 128 S. Ct. 1830, 1839 (2008); *Yates v. United States*, 574 U.S. 528, 543-44, 135 S. Ct. 1074, 1085 (2015)).  In treating the allocation of additional permits as a direct transfer of funds, Commerce has overly expanded the meaning of financial contribution because permits are not similar to, or consistent with, the types of financial contributions enumerated in the statute.  *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to Acts of Congress."); *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1165 (Fed. Cir. 2017) (explaining that the principle of *noscitur a sociis* "avoid{s} ascribing to one word a meaning so broad that it is inconsistent with its accompanying words.").

The provision of permits is part of the overall cap and trade system adopted by the Government.  Under this system, Korean companies that emit over a certain volume of carbon dioxide over a three-year period are subject to carbon emission limits imposed through the allocation of carbon emission permits.  Letter from Morris, Manning & Martin to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Initial Questionnaire Response" (Oct. 7, 2022) at Exhibit E-1 pp.1-3, CR Doc. 33-56, 117-132, PR Doc. 49-53 ("POSCO's Initial Questionnaire Response"); Letter from Lee and Ko LLC and Morris, Manning, and Martin LLP to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plant from the Republic of Korea, Case No. C-580-888: GOK's Initial Questionnaire Response" (Oct. 11, 2022) at Exhibit CEP-1, CR Doc. 157-179, PR Doc. 61-72 ("Government of Korea's Initial Questionnaire Response").  These carbon emitting companies are required to participate because they would not otherwise subject

themselves to a program that requires them to incur costs to reduce their carbon emissions. Government of Korea's Initial Questionnaire Response at Appendix-16 pp.2-3. The Government's allocation of emission permits sets a cap on the amount of emissions subject companies can omit, and if they exceed the cap they must purchase additional permits or incur penalties. The permits thus act as a restriction on those forced to participate. *See* Mem. from James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to Lisa W. Wang, Assistant Secretary for Enforcement and Compliance, "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review, 2021: Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea " (May 31, 2023) at 23, PR Doc. 126 ("Preliminary Decision Mem.") ("Fewer {permits are} issued in later phases in order to place a greater burden on participants to limit their greenhouse gas emissions over time.").

Viewed within this overall context, the allocation of permits is not like the direct transfer of funds as described in the statute, which include grants, loans, equity infusions, or loan guarantees. As an initial matter, the permits are not "funds" as that term is defined: "an amount of money that has been saved or made available for a particular purpose." *Fund*, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/ definition/english/fund_1?q=fund (last visited Dec. 16, 2025).[2] Article 2(3) of the Act on the Allocation of Trade of Greenhouse Gas Emissions Permits (AAGEP) defines "emission permit" as "an amount of greenhouse gas emissions permitted and allocated to an individual business entity producing greenhouse gases within the scope of total allowances . . . ." Government of

_____

[2] Pursuant to the practice comment in Rule 81 of the Rules of the U.S. Court of International Trade, POSCO attaches hereto printouts of the cited internet-based definitions.

Korea's Initial Questionnaire Response at Exhibit CEP-1, Article 2(3). The permits set a cap on the amount of emissions a company can emit. The provision of additional permits merely increases the emissions cap applicable to the participant. As defined in Article 2(3) of the AAGEP, the permits are thus not money made available for a particular purpose, such as grants, loans, or equity infusions that all involve the transfer of money, or the potential transfer of money in the case of loan guarantees.

Nor are the permits similar to the enumerated direct transfers of funds listed in the statute, such as grants, loans, or equity infusions. A grant is a "gift-like transfer." *Gov't of Sri Lanka v. United States*, 308 F. Supp. 3d 1373, 1383 (Ct. Intl. Trade 2018) (citing dictionary definitions). The provision of additional permits is not a gift-like transfer, but instead just results in the emissions cap under a costly and burdensome program being slightly higher for companies in qualifying segments than for other companies that do not qualify for the additional permits. Nor are the permits similar to loans or equity infusions as they do not involve the transfer of money or equity for a particular purpose. They are also not like loan guarantees that involve the potential transfer of funds by the government in the event of a loan default.

> 2.    *The Allocation of Additional Permits Does Not Constitute the Direct Transfer or Potential Transfer of Funds.*

The allocation of additional permits also does not constitute the "direct transfer" or "potential direct transfer" of funds. As discussed, the permits are not "funds" but instead set limits on the amount of carbon emissions a company can emit. The Government is thus not directly transferring funds to POSCO. Additionally, even *assuming arguendo* that the permits are viewed as having a monetary value, that value is not being directly transferred from the Government. Any value or revenue that may be generated from, for example, selling permits in the market, would not come "directly" from the Government pursuant to 19 U.S.C. § 1677(5)(B)

6

and (D)(i).  Instead, the revenue would come from the private party who purchased the permits.

To the extent POSCO is spared some additional financial burden from not having to purchase

additional permits, that would not constitute the direct transfer of funds from the Government.

Commerce's attempt to support its treatment of the permit allocation as the direct transfer

of funds by citing to its practice with the Government of India's renewable energy program is

misplaced.  *See Remand Results* at 8-9 (citing Mem. from James Maeder, Deputy Assistant

Secretary for Antidumping and Countervailing Duty Operations to Lisa W. Wang, Assistant

Secretary for Enforcement and Compliance "Issues and Decision Memorandum for the Final

Affirmative Determination of the Countervailing Duty Investigation of Granular

Polytetrafluoroethylene Resin from India" (Jan. 18, 2022) (ACCESS Barcode 4203113-02) at

Comment 7; Mem. from James Maeder, Deputy Assistant Secretary for Antidumping and

Countervailing Duty Operations to Jeffrey I. Kessler, Assistant Secretary for Enforcement and

Compliance, "Issues and Decision Memorandum for the Final Determination in the

Countervailing Duty Investigation of Forged Steel Fluid End Blocks from India" (Dec. 7, 2020)

(ACCESS Barcode 4062820-02) at Comment 8.  In the case of the Indian program, the

renewable energy credits were earned by the participants whereas the permits in this case are

provided gratuitously at the start of each compliance phase in order to set caps on each

participant's emissions.  Additionally, the fact that Commerce may have treated a program it

considers "analogous" as providing a direct transfer of funds does not provide authority for its

treatment of the permits as the direct transfer of funds.  The program at issue in the Indian cases

was not subject to judicial review and thus Commerce's determination for this program just represents Commerce's findings in another case and is not primary authority.[3]

In conclusion, Commerce's determination that the Government's allocation of additional permits constituted a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act is unsupported by substantial evidence and otherwise not in accordance with law.

B.    Commerce's Specificity Determination for the K-ETS Program Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law.

In the *Remand Results*, Commerce abandoned its previous and consistently applied *de jure* specificity determination under section 771(5A)(D)(i) of the Act.[4]  As a replacement, Commerce has adopted a novel export subsidy theory never used in the history of this KETS program.  This new export subsidy specificity determination is unlawful because the receipt of the additional permits is not "contingent" upon export performance as required under the statute.  Commerce has previously reached the same conclusion with respect to this same KETS program in the *OCTG from Korea* investigation.  *See Oil Country Tubular Goods From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 59,056 (Dep't Commerce Sept. 29, 2022) and accompanying Issues and Decision Memo at 35-36 ("*OCTG from Korea*") (Comment 1).  The Court should thus find that Commerce's determination is unsupported by substantial evidence and contrary to law.

---

[3] POSCO acknowledges that the court has previously affirmed Commerce's treatment of the allocation of additional permits as a direct transfer of funds.  *See Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345, 1350-53 (Ct. Int'l Trade 2024).  POSCO respectfully disagrees with that decision and notes that it was not appealed and is not binding on this Court.

[4] *See Remand Results* at 10-11.

      1.     *Eligibility for Additional Permits is not "Contingent Upon" Export Performance.*

In the *Remand Results*, Commerce determined that the allocation of additional permits is specific because it contends that the additional permit allocation is contingent upon export performance pursuant to section 771(5A)(B) of the Act. *Remand Results* at 10-11. As support, Commerce relies on the fact that the formula used by the Government to qualify for the additional 10 percent permit allocation includes exports as one of the variables. *See id.* at 11. Commerce's logic is flawed and is inconsistent with the statute.

Section 771(5A)(B) of the Act provides that "an export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions." The plain language of the statute thus requires that an export subsidy must be "contingent upon" export performance. It is not sufficient for export performance to simply be one of the factors that *could* qualify a company for receipt of an export subsidy. This is confirmed by dictionary definitions that define "contingent" as "occurring or existing only if (certain circumstances) are the case; dependent on." *Contingent*, Oxford Languages, https://www.google.com/search?q =contingent+definition. Therefore, to treat the additional allocation of permits as an export subsidy, Commerce must demonstrate that "but for" a company's export performance it could not qualify for the additional permit allocation. Commerce cannot make this showing.

Under the KETS, subsectors qualify for the additional allocation of permits if the result of the subsector's "trade intensity" multiplied by the "cost incurrence rate" is more than 0.002. Government of Korea's Initial Questionnaire Response at 9-10; Appendix-16 at p.2; Exhibit CEP-9. The formula for trade intensity is as follows, and includes exports as one factor:

> Annual average of (exports + imports) ÷ (sales + imports) during the Base Period
> (*i.e.*, from year 2016 to year 2018).

Government of Korea's Initial Questionnaire Response at 9-10.  The "cost incurrence rate" does

not mention or relate in any way to exports or export performance.  *See id.* at 10.  Instead, the

calculation of the cost incurrence rate is:

> Annual average of (GHG emitted amount x market price of the permits) + amount
> of value-added during the base period, which is from year 2016 through 2018.

Applying this formula, it is clear that the allocation of additional permits is not *contingent*

*upon* export performance.  Specifically, while a subsector that has large amounts of exports may

meet the criteria for the additional allocation of permits, so would a sector that has a large

amount of imports or a low amount of domestic sales.  For example, if a sector had $10 million

in exports, $5 million in imports, and $100 million in total sales, that subsector's "trade

intensity" based on the formula would be: ($10 + $5) / ($100 + $5) = 14 percent.  However, if

that same subsector had *no* exports and $17 million in imports, it would still have the same trade

intensity: ($0 + $17) / ($100 + $17) = 14.5 percent.  The same is true if the subsector had no

exports, $5 million in imports and $30 million in sales: ($0 + $5) / ($30 + $5) = 14 percent.

Similarly, even if a subsector exports, that does not mean that the subsector qualifies for

the additional permit allocation.  If a subsector does not have a sufficient product cost incurrence

rate, then the subsector cannot receive the additional allocation, regardless of whether the trade

intensity factor includes any level of exports.  For example, if a company has a 14 percent trade

intensity but only a 1 percent cost incurrence rate than the sum of the trade intensity multiplied

by the cost incurrence rate is only 0.0014, less than the 0.002 threshold for the additional

allocation of permits.  The additional allocation of permits is accordingly not "contingent upon"

export performance as the additional allocation is not *dependent upon* a certain level of exports.

10

Commerce disagrees that "the formula" precludes the program from being considered export contingent because one of the three variables in the formula is a subsector's average exports during the base period. *Remand Results* at 26-27. Commerce misses the point. Whether or not exportation is a variable in the equation does not mean that the relative allocation of permits is "contingent upon export performance, alone or as one of two conditions" pursuant to section 771(5A)(B). As explained, the allocation of permits pursuant to the trade intensity and production cost formula is not contingent upon export performance because, based on application of the formula, there are subsectors who export and will not qualify and there are subsectors who do not export and will qualify. It is thus not accurate for Commerce to claim that qualification is "contingent upon" export performance merely because the amount of exports is one variable in the formula.

Furthermore, Article 19(2) of the Enforcement Decree provides that additional permits are allocated to certain organizations including local governments, schools, medical institutions, public transportation operators, and certain business operators regardless of whether those organizations export. *Remand Results* at 11 n.36. In the *Remand Results*, Commerce claimed that it did not matter whether there were subsectors that qualify for additional permit allocations without exporting pursuant to Article 19(2) of the Enforcement Decree of the Act on Allocation and Trading of Greenhouse Gas Emissions Permits because POSCO qualified for its allocation based on application of the formula from Article 19(1). *Remand Results* at 27. However, that does not alter the fact that these other sectors receive additional permit allocations under the same KETS program without regard to whether they had any exports. This is further evidence that receipt of additional permits is not "contingent upon export performance." Furthermore, because the formula is applied to the entire industry subsector and not on a company specific

11

basis the fact that POSCO qualified under Article 19(1) and not Article 19(2) does not alter the fact that certain organizations qualify for additional permits without regard to exportation.

      2.    *Commerce Has Previously Recognized that KETS and Similar Programs Do Not Constitute an Export Subsidy.*

The fact that the provision of additional permits under the KETS program is not export contingent has been previously recognized by Commerce. In *OCTG from Korea*, Commerce recognized that the international trade intensity formula applies to the industry subsector as a whole and not to the individual participants. *OCTG from Korea* at 36. It thus found that while exports were part of the formula for international trade intensity it was obvious that the subsector may contain some companies that export as well as others that do not, and both companies could still qualify for the additional permits. Commerce thus correctly determined in *OCTG from Korea* that the KETS program was not "contingent" upon export. The same is true here where Commerce concedes that the additional permit allocation is based on the results of the calculation formula for the subsector and not based on calculations for an individual company within the subsector. *See Remand Results* at 10 (citing Government of Korea's Initial Questionnaire Response at Exhibits CEP-1 and CEP-8).

Commerce's attempt to distinguish the *OCTG from Korea* decision is unconvincing. *See Remand Results* at 25. Specifically, Commerce focuses on the fact that in *OCTG from Korea* the KETS program was in Phase Two and not Phase Three as in this case, and that under Phase Two there were two independent criteria and that subsectors could qualify under either criterion, one of which was based only on production costs and did not include exports as part of that calculation. *See id.* However, Commerce ignores the fact that, as it recognizes elsewhere in the *Remand Results*, "Article 19(2) of the Enforcement Decree of the AAGEP provides for 100 percent free KAU allocations to {certain} organizations . . . ." *Remand Results* at 11, n.36. That

100 percent allocation is not linked to exports in any way.   Furthermore, Commerce completely fails to address the reasoning in *OCTG from Korea* that is the same as here; namely, that it is the subsector that qualifies for the additional permits and thus individual companies within the subsector could qualify regardless of whether they had any exports.  That factual consistency makes *OCTG from Korea* on point.

Commerce's decision in *Metal Castings from India* is also instructive.  In that case, Commerce examined a loan program from the All-India Development Bank.  *Certain Iron-Metal Castings from India: Final Results of Countervailing Duty Administrative Review*, 65 Fed. Reg. 31,515 (Dep't Commerce May 18, 2000) and accompanying Issues and Decision Memo at Comment 3 ("*Metal Castings from India*").  As part of its loan evaluation process, the All–India Development Bank examined a host of financial indicators including: debt-to-equity ratio, debt services coverage ratio, gross profit, operating profit, break-even ratio, internal rate of return, cash flow, and cost of capital.  *Metal Castings from India* at Comment 3.  The bank also requested data regarding a borrower's production and sales information, which included *export data*, market opportunities (i.e., supply/demand for the product(s) both at home and abroad) and competition (both domestic and international).  The petitioner argued that because the respondents' export activity was considered as one part of the loan evaluation process, the program was an export subsidy.  Commerce determined that the evidence did not indicate that the respondents received financing based on export-specific criteria because exportation or anticipated exportation was not a factor with regard to the provision of loans by the banks.  *Id.* Instead, Commerce determined that the banks collect sales/market information to make an informed lending decision and not to provide preferential treatment to companies which export or intend to export.  *Id.*  Commerce determined there was no evidence that a company had an

13

obligation to export a certain percentage of its production for the receipt of a loan, or that the banks gave financing preferences to exporters.  *Id.*  Commerce thus determined that this program was not an export subsidy, even though the banks considered a company's exports as part of the evaluation process for loans.  *Id.*

Here, as in *Metal Castings from India*, the fact that export is a factor in the formula for determining eligibility for additional permits does not mean the KETS is export contingent. There is no evidence that the subsector, or the companies within the subsector, had an obligation to export a certain percentage of their production or to export at all.  As discussed, the subsector could qualify even if there were no exports at all and could potentially not qualify even if it had exports.  Commerce's attempt to distinguish *Metal Castings from India* on the grounds that the KETS program, unlike the program in *Metal Casing from India*, includes exports as part of the formula for eligibility for additional permits is unpersuasive.  *Remand Results* at 28.  In both *Metal Castings from India* and under the KETS program, exports were one variable considered for eligibility for the alleged benefits.

## II.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court again remand Commerce's determination with instructions to reconsider the *Final Results,* and for such other relief that the Court deems just and proper.

14

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**Taft Stettinius & Hollister LLP**

1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff POSCO*

*Certificate of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 4,087 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated: January 15, 2026

**Attachment 1**

Definition of **fund noun** from the Oxford Advanced Learner's Dictionary

# fund *noun*

OPAL W

/fʌnd/

/fʌnd/

1 ★        [countable] an amount of money that has been saved or has been made available for a particular purpose
   - *a disaster relief fund*
   - *the company's **pension fund***
   - *the International Monetary Fund*
   - **in a fund**  *There is currently over $200 000 in the fund.*

SEE ALSO  **slush fund, social fund, trust fund**

|  Wordfinder

|  Extra Examples

TOPICS  **Social issues**  B2  ,  **Money**  B2

Oxford Collocations Dictionary

**Want to learn more?**

Find out which words work together and produce more natural sounding English with the ***Oxford Collocations Dictionary*** app.

 

2  ⭐    **funds** [plural] money that is available to be spent

- *government/federal funds*

- *The hospital is trying to **raise funds** for a new kidney machine.*

- *to provide/use funds for something*

- *More **funds** should be **allocated** to housing.*

- *The project has been cancelled because of lack of funds.*

- *I'm short of funds at the moment—can I pay you back next week?*

Collocations   **Finance**

Extra Examples

TOPICS **Business**  B2

Oxford Collocations Dictionary



3  ⭐ [countable] *(finance)* a company that manages money for people by investing it; the money managed by such a company

- *Any extra money that James saves should go into a money market fund.*

- *She is a **fund manager** for an Asian bank.*

SEE ALSO  hedge fund, mutual fund

| Extra Examples

4  ⭐ [singular] **fund of something** an amount or a supply of something

- *a fund of knowledge*

| Word Origin

See fund in the Oxford Advanced American Dictionary

See fund in the Oxford Learner's Dictionary of Academic English

Check pronunciation: fund

**Oxford Learner's Dictionaries**

Browse Dictionaries & Grammar

Search Box

System Requirements

Contact Us

**More from us**

Oxford Learner's Dictionaries API

English Language Teaching

Oxford Teacher's Club

Oxford Languages

OUP Worldwide

Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide

Privacy Policy    Children's Privacy Policy    Cookie Policy    Manage Your Privacy Choices    Terms & Conditions

Accessibility    Legal Notice    English (US)    © 2026 Oxford University Press



**Attachment 2**

contingent definition

AI Mode · All · Images · Videos · Shopping · Short videos · News · More

Sign in · Tools

## contingent ⋮

**Overview** · Usage examples

### Dictionary

Definitions from Oxford Languages · Learn more

 **con·tin·gent**
/kənˈtinj(ə)nt/

*adjective*

1. subject to chance.
   "the contingent nature of the job"

   Similar: chance · accidental · fortuitous · possible · unforeseen

2. occurring or existing only if (certain circumstances) are the case; dependent on.
   "resolution of the conflict was contingent on the signing of a ceasefire agreement"

   Similar: dependent · conditional · subject to · based on · determined by

*noun*

a group of people united by some common feature, forming part of a larger group.
"a contingent of Japanese businessmen attending a conference"

Similar: group · party · body · band · set · deputation · delegation

Feedback

Show more ⌄

## People also ask ⋮

What does contingent mean in simple terms?

What does contingent in real estate mean?

What is the meaning of the word contingent on?

What is a contingent example?

Feedback

Merriam-Webster
https://www.merriam-webster.com › dictionary › contin...

### CONTINGENT Definition & Meaning

The meaning of CONTINGENT is **dependent on or conditioned by something else**. How to use contingent in a sentence. Synonym Discussion of Contingent.

Cambridge Dictionary
https://dictionary.cambridge.org › dictionary › contingent

### CONTINGENT | definition in the Cambridge English Dictionary