UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI

| | |
|---|---|
| POSCO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | )  **Court No. 24-00006** |
| | ) |
| UNITED STATES, | )  **PUBLIC DOCUMENT** |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| NUCOR CORPORATION, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

## PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S COMMENTS ON THE FINAL RESULTS OF REDETERMINATION

Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: January 15, 2026

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES..........................................................................................ii

INTRODUCTION.........................................................................................................1

ARGUMENT.................................................................................................................2

I.     COMMERCE'S FINANCIAL CONTRIBUTION DETERMINATION FOR
THE K-ETS PROGRAM IS NOT SUPPORTED BY SUBSTANTIAL
EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE
WITH LAW .........................................................................................................3

     A.     KAUs Are Not Funds ..............................................................................3

     B.     The GOK's Provision of the Additional KAUs Is Not a Direct Transfer
of Funds....................................................................................................6

II.    COMMERCE'S SPECIFICITY DETERMINATION FOR THE K-ETS
PROGRAM IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON
THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW .......................9

     A.     The K-ETS Program Is Not Contingent Upon Export Performance..............10

     B.     Commerce's Own Prior Holding in *OCTG from Korea* Affirms that the
K-ETS Program Is Not an Export Subsidy ......................................................14

CONCLUSION .............................................................................................................18

# TABLE OF AUTHORITIES

## CASES

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) .................................................................. 4

*Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961) ....................................................... 4

*United States v. Williams*, 553 U.S. 285 (2008) ............................................................ 4

*Yates v. United States*, 574 U.S. 528 (2015) ................................................................. 4

## STATUTES

19 U.S.C. § 1677(5)(B) ......................................................................................................... 7

19 U.S.C. § 1677(5)(D)(i) ........................................................................................... 3, 6, 7, 8

19 U.S.C. § 1677(5A)(A) ................................................................................................... 10

19 U.S.C. § 1677(5A)(B) .................................................................................. 10, 15, 17, 18

19 U.S.C. §1677(5A) .......................................................................................................... 17

## REGULATIONS

19 C.F.R. § 351.502 ............................................................................................................ 17

19 C.F.R. § 351.514 ............................................................................................................ 17

## ADMINISTRATIVE DECISIONS

*Certain Iron-Metal Castings from India: Final Results of Countervailing Duty Administrative Review*, 65 Fed. Reg. 31,515 (May 18, 2000), and accompanying Issues and Decision Memorandum ........................................................................................................... 10

*Oil Country Tubular Goods From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 59,056 (Sept. 29, 2022), and accompanying Issues and Decision Memorandum .................................................................................................... 14, 16

## INTRODUCTION

In its opinion remanding the *Final Results* to Commerce, the Court directed the U.S. Department of Commerce ("Commerce") to reconsider its finding that the alleged provision of electricity for less than adequate remuneration ("LTAR") is *de facto* specific.  Court Op. and Order, ECF No. 51 ("Court Op.") at 20.  In its Final Results of Redetermination Pursuant to Court Remand, ECF No. 60-1 ("Final Remand Results"), Commerce found that the record does not support a finding that the alleged provision of electricity for LTAR is specific.  Final Remand Results at 4-5.  The GOK maintains its prior factual and legal arguments concerning specificity of the electricity for LTAR program, but we do not further address them in these comments because Commerce has determined on remand that the program is not specific and therefore not countervailable, and the GOK agrees with those conclusions.

The Court also found that Commerce's financial contribution and specificity findings related to the Korean Emission Trading System ("K-ETS") program are contrary to law and unsupported by substantial evidence.  Court Op. at 11-14; 16-19.  In particular, the Court found that Commerce's finding of a financial contribution in the form or revenue foregone was contrary to law as the GOK did not forego revenue that was "otherwise due."  *Id.* at 11-14.  Similarly, the Court rejected Commerce's *de jure* specificity finding as it was solely based on the existence of eligibility requirements without more.  *Id.* at 18-19.  In its Final Remand Results, Commerce abandoned its original rationales but continues to insist that the additional Korean Allocation Units ("KAUs") are a financial contribution and specific.  Final Remand Results at 6-12.  In doing so, Commerce now argues that KAUs are a financial contribution in the form of "direct transfer of funds" and specific because they meet the criteria for an export subsidy.  *Id.*  Because Commerce's Final Remand Results as it pertains to the K-ETS program are not supported by substantial evidence or otherwise in accordance with the law, the GOK objects.

The K-ETS program is a regulatory compliance regime that imposes an obligation on companies to limit their greenhouse gas ("GHG") emissions. In other words, the K-ETS program places an overall burden on companies to internalize the costs of their emissions to comply with the gradually more stringent requirements of the K-ETS program. Certain industry subsectors face a greater burden from reducing their emissions. The provision of additional KAUs effectively allows those subsectors to emit a comparatively higher amount of GHG in order to equalize the burden. These regulatory permits do not constitute a financial contribution under the Tariff Act, nor are they intended to subsidize exports.

## ARGUMENT

First, Commerce's finding that the allotment of additional KAUs is a financial contribution is contrary to law and unsupported by substantial evidence. By treating the additional KAUs as funds (*i.e.*, money or monetary instrument), Commerce simply ignored record evidence clearly demonstrating that KAUs are the "right" to emit GHG, not money or monetary instruments. Further, Commerce's finding ignores the statutory prerequisite that the financial contribution must be a "direct transfer" or "potential direct transfer" of funds by the GOK to the recipients. Commerce attempts to circumvent this statutory requirement by erroneously focusing on the "variety of options" companies have to use the additional KAUs to determine that the additional KAUs "effectively convey a financial value." Final Remand Results at 6-7.

Second, Commerce's finding that the GOK's provision of additional KAUs is an export subsidy is flawed as the provision of additional KAUs is not contingent upon export performance. Moreover, Commerce's finding is in direct contrast to its prior determination in the *OCTG from Korea* case, wherein it refused to hold that the KAUs are an export subsidy.

I. **COMMERCE'S FINANCIAL CONTRIBUTION DETERMINATION FOR THE K-ETS PROGRAM IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW**

Following the Court's directive to reconsider whether the additional KAUs constitute a financial contribution, Commerce now argues that the additional KAUs are a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Tariff Act of 1930, as amended (the "Tariff Act"), 19 U.S.C. § 1677(5)(D)(i).  Final Remand Results at 6-9.  However, similar to the revenue foregone analysis, Commerce's finding that the additional KAUs are a direct transfer of funds is contrary to law and unsupported by substantial evidence.  Commerce's Final Remand Results hinge on the unfounded reasoning that the additional KAUs are "instrument of monetary value" as the company receiving them has "a variety of options for use, all of which effectively convey a financial value to the entity."  *Id.* at 6-7.  To support its claim, Commerce also adds that POSCO's financial statements recognize KAUs as either "intangible assets" if it does not use up its KAUs during the compliance year or "liabilities" if it emits more GHG than KAUs.  *Id.* at 7.  However, as explained below, the statute and record evidence demonstrate that KAUs are not funds, and there is no direct transfer of funds from the GOK to POSCO.

A. **KAUs Are Not Funds**

Section 771(5)(D)(i) of the Act provides that a financial contribution is a "direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees."  19 U.S.C. § 1677(5)(D)(i).  The term "funds" is normally defined as a "sum of money saved or made available for a particular purpose" or "money that is available to be spent."  *Fund Definition*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/fund; OXFORD LEARNER'S DICTIONARIES, https://www.oxfordlearnersdictionaries.com/definition/english/fund_1.  The statute confirms this meaning by providing examples of funds—*i.e.*, "grants, loans, and equity

3

infusions"—which all involve the transfer of money or the potential transfer of money.  *See, e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("{A} word is known by the company it keeps (the doctrine of *noscitur a sociis* ).  This rule we rely upon to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961))).  Consistent with this Court's approach, the word "funds" in section 771(5)(D)(i) of the Act must be construed in light of the illustrative examples embedded in the provision and therefore understood to refer only to the particular subset reflected by those examples.  Court Op. at 12 (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008); *Yates v. United States*, 574 U.S. 528, 543-44 (2015)).

KAUs are not money or monetary instruments and thus, cannot be considered "funds."  Record evidence clearly shows that KAUs are "permits" to emit a particular amount of GHG.  In particular, Article 2(3) of the Act on the Allocation and Trading of Greenhouse-Gas Emission Permits ("AAGEP"), which established the K-ETS program, defines KAUs as "an amount of greenhouse gas emissions permitted and allocated to an individual business entity producing greenhouse gases within the scope of total allowances for greenhouse gas emissions."  Appx07807.  Thus, KAUs serve solely as a mechanism aimed at constraining and reducing GHG emissions in Korea, giving companies subject to the K-ETS program the "right" to emit GHG.  This "right" bestowed by KAUs is not guaranteed.  The GOK can repossess the KAUs allocated to companies at any time, revoke all or some KAUs allocated, or adjust them in certain situations including those not attributable to companies, such as when total emission allowances decrease following a revision to an allocation plan.  Appx06171-06172; Appx07818-07819.

Further, several other indicators demonstrate that KAUs are not funds. First, KAUs for a compliance year become invalid six months after the end of the compliance year, rendering any unused KAUs non-marketable within a short period of time. Appx07827. Second, there is no guarantee that additional KAUs will be purchased as demand for KAUs arises only when companies emit more than their allocated permits and need to purchase additional KAUs. Nor is there a fixed value for the KAUs. Finally, companies have various options to obtain KAUs beyond purchasing them from other companies, including (1) relying on banked KAUs carried over from a prior compliance year; (2) borrowing KAUs from a forthcoming year; or (3) applying earned credits for certain activities (*e.g.*, external carbon offset programs) intended to reduce GHG emissions. Appx14991.

Commerce's reliance on *PTFE Resin from India* and *FEBs from India* to find that KAUs are instruments of monetary value is misplaced. Final Remand Results at 8-9. Despite acknowledging that the facts of those two cases are different from the case at issue, Commerce nevertheless insists that they are "sufficiently similar" in that the KAUs are instruments of monetary value because they are limited to a "closed economy" created by the GOK's ability to control the supply of the KAUs. *Id.* However, Commerce's characterization of the K-ETS program as a "closed economy" demonstrates Commerce's clear misunderstanding of the record evidence. Article 29(1) of the AAGEP expressly allows companies that achieve GHG reductions through projects that comply with international standards to convert all or a portion of those reductions into KAUs. Appx88714; Appx92235. Given that emission permits can enter the K-ETS program through external means, KAUs are not limited to a "closed economy" and the two cases cited by Commerce in its Final Remand Results are inapplicable. In any event, Commerce's decisions in *PTFE Resin from India* and *FEBs from India* cannot change the

statutory meaning of the words "funds."  A KAU is not money provided (or potentially provided) by the government and does not meet the proper definition of "funds."

Based on the aforementioned reasons, Commerce's finding that KAUs are funds is contrary to law and unsupported by substantial evidence.

### B.    The GOK's Provision of the Additional KAUs Is Not a Direct Transfer of Funds

Aside from the requirement that a financial contribution has to be in the form of funds, section 771(5)(D)(i) of the Act also requires a financial contribution to be a "direct transfer" or "potential direct transfer" of funds.

In its Final Remand Results, Commerce fails to address this statutory requirement. Instead, Commerce attempts to circumvent it by primarily relying on the fact that companies have "a variety of options" to convert KAUs into something with financial value.  Final Remand Results at 6-7.  The "options" Commerce lists, however, cannot be considered an actual or potential "direct transfer of funds."  First, Commerce argues that because KAUs can be used to "pay" for present or future costs of compliance, they convey a financial value to companies.  *Id.* Commerce, however, erroneously equates avoiding the cost of compliance or the repercussions of potential non-compliance to a direct transfer of funds.  The GOK bestowing companies the "right" to emit a certain amount of GHG during a compliance year, and thereby reducing their overall burden of compliance with the K-ETS program, is not the same as the GOK providing money to companies to purchase additional emission permits.  While the latter could be considered a direct transfer of funds within the meaning of section 771(5)(D)(i) of Act, 19 U.S.C. § 1677(5)(D)(i), the former cannot.  Conflating the avoidance of compliance costs with the receipt of funds would open a Pandora's box that could result in any changes or differentiation in a regulatory regime being treated as a countervailable subsidy.  For example,

6

merely scaling back or delaying a regulation that would require an update in a company's facilities or an increase in the minimum wage would benefit a company's bottom line. But there is no evidence that Congress had changes in regulatory burdens in mind when it defined countervailable subsidies to be limited to situations involving a "financial contribution" by a foreign government. As discussed above, KAUs are permits, not funds. The GOK's provision of KAUs simply bestowed upon companies the "right" to emit a certain amount of GHG during the compliance year. This cannot be equated to a "direct transfer" of "funds" from the GOK to the recipient of the additional KAUs.

Second, Commerce claims that companies can sell the additional KAUs via "private transactions" or "on a public trading {ETS} market." *Id.* at 7. Commerce, however, fails to link how these examples can be the basis for Commerce's finding that the allotment of additional KAUs is a **direct** transfer of funds **from the government**. A countervailable "subsidy" is defined in relevant part as when "an authority . . . provides a financial contribution . . .to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(D)(i). Although funds may be exchanged during the sale and purchase of KAUs in the transactions provided by Commerce as examples, these transfers of funds are between parties other than the GOK. Any revenue a company earns from the sale of KAUs would be received from another private party that purchased the permits, not from the GOK. Commerce fails to explain how these private transactions involving KAUs, to which the GOK is not even an involved party, can lead to its conclusion that the GOK provides a "direct transfer" of funds to the recipient by providing the additional KAUs.

Moreover, as this Court explained, a "subsidy only exists when a government 'provides a financial contribution … **to a person**.'" Court Op. at 11 (citing 19 U.S.C. § 1677(5)(B))

(emphasis added). The word "to" implies that the GOK must have provided a "direct transfer" or a "potential direct transfer" of funds **to POSCO specifically**. *Id.* Yet, Commerce fails to establish that any "funds" are transferred from the GOK "to" POSCO (or from the GOK to any party for that matter) as a result of the allotment of additional KAUs. The mere option for some companies to trade KAUs and earn revenue from the sale of KAUs cannot satisfy the statutory requirement that the GOK make any transfer of funds to POSCO specifically. Unlike a "direct transfer" (or "potential direct transfer") of funds in which government funds are depleted (or potentially depleted) and conveyed to a recipient, any revenue that POSCO might realize from selling the additional KAUs originate entirely from a private third party, not from the GOK. Accordingly, even assuming arguendo that KAUs could be treated as having "market value" (which the GOK denies), the allocation of additional KAUs simply constitutes an issuance of a regulatory permit, rather than a transfer of funds "to" POSCO.

Third, Commerce points to section 771(5)(D)(i) of the Act, 19 U.S.C. § 1677(5)(D)(i), which identifies "loan guarantees" as an example of the "potential direct transfer of funds or liabilities," and contends that the allocation of KAUs therefore constitutes a financial contribution even absent an "immediate" transfer of funds. Final Remand Results at 18-19. However, the analogy to "loan guarantees" is misplaced and inapt to the GOK's provision of additional KAUs. Section 771(5)(D)(i) provides that financial contribution includes "potential transfer of funds **or liabilities**, such as loan guarantees." 19 U.S.C. § 1677(5)(D)(i) (emphasis added). As "loan guarantees" are promises by the government to fulfill the obligations of a loan, if necessary, they are an example of a potential transfer of **liabilities** from the recipient of the alleged subsidy, not a potential direct transfer of funds to the recipient. Unlike loan guarantees, however, the allocation of KAUs does not create any financial liability or risk for the GOK. It

8

never obligates the GOK to pay out funds or otherwise confer monetary value regardless of how the permits are used. Accordingly, Commerce's reliance on the "loan guarantee" example cannot support treating the allocation of the additional KAUs as a "potential direct transfer of . . . liabilities" under section 771(5)(D)(i) of the Act, and Commerce's inapt analogy to "loan guarantees," which is a potential transfer of a liability, certainly cannot support treating the allocation of additional KAUs as a "potential direct transfer of funds."[1]

Because the GOK did not provide a "direct transfer of funds" to POSCO through the allocation of additional KAUs, Commerce's financial contribution determination is unsupported by substantial evidence and unlawful.

## II. COMMERCE'S SPECIFICITY DETERMINATION FOR THE K-ETS PROGRAM IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW

This Court directed Commerce, on remand, to reconsider its *de jure* specificity finding, reasoning that the existence of eligibility requirements by itself does not support a *de jure* specificity finding. Court Op. at 18-19. It also held Commerce's finding that the safe harbor provision is inapplicable to be unsupported by substantial evidence. *Id.*

Commerce now asserts that the GOK's provision of the additional KAUs is specific under section 771(5A)(A) and (B) of the Act, 19 U.S.C. § 1677(5A)(A) and (B), because "it meets the criteria for the export subsidy." Final Remand Results at 10-12. For reasons described below, Commerce's revised specificity determination remains unsupported by substantial evidence and unlawful.

---

[1] To the extent a loan guarantee could be construed as a "potential direct transfer of funds," a loan guarantee still involves the potential transfer of money, which provides further evidence that the term "funds" was not intended to cover permits like the KAUs.

### A.    The K-ETS Program Is Not Contingent Upon Export Performance

Section 771(5A)(B) of the Act provides that an "export subsidy is a subsidy that is . . . contingent upon export performance, alone or as 1 of 2 or more conditions."  19 U.S.C. § 1677(5A)(B).  The term "contingent" is typically defined as "depending on something that may or may not happen" or "dependent for existence, occurrence, character, etc., on something not yet certain; conditional."  *Contingent Definition*, OXFORD LEARNER'S DICTIONARIES, https://www.oxfordlearnersdictionaries.com/definition/english/contingent_2; COLLINS DICTIONARIES, https://www.collinsdictionary.com/us/dictionary/english/contingent.  This is confirmed by the statutory language that refers to export performance as a "condition."  A "condition" is typically defined as "a situation that **must exist** in order for something else to happen."  *Condition Definition*, OXFORD LEARNER'S DICTIONARIES, https://www.oxfordlearnersdictionaries.com/us/definition/english/condition_1 (emphasis added); *see also Condition Definition*, COLLINS DICTIONARIES, https://www.collinsdictionary.com/us/dictionary/english/condition ("A condition is something **which must happen or be done** in order for something else to be possible, especially when this is written into a contract or law."  (emphasis added)).  Commerce has likewise recognized in *Metal Castings from India* that the mere consideration of export data in determining eligibility for a program does not render the program an export subsidy.  *Certain Iron-Metal Castings from India: Final Results of Countervailing Duty Administrative Review*, 65 Fed. Reg. 31,515 (May 18, 2000), and accompanying Issues and Decision Memo at Comment 3.  In other words, the statute requires a finding that the subsidy is **dependent** on "export performance" in order for the subsidy to be considered an export subsidy within the meaning of section 771(5A)(B), 19 U.S.C. § 1677(5A)(B), and thus specific under section 771(5A)(A), 19 U.S.C. § 1677(5A)(A).  Accordingly, the mere inclusion of export data as one of multiple variables in an eligibility

formula should not be conflated with export performance as a legal condition for receiving a subsidy.

In its Final Remand Results, Commerce found that the additional KAUs are specific because eligibility under the "international trade intensity criterion" of the AAGEP is supposedly dependent on a subsector's export sales. Final Remand Results at 10-11. Commerce's reasoning is flawed for multiple reasons.

First, Commerce treats "international trade intensity" and "production cost incurrence rate" as separate criteria, when in fact the provision of additional KAUs depends on a single combined metric—the product of the two. Final Remand Results at 10-11; Appx86976-86977; Appx88703; Appx89002. Because "international trade intensity" is not a standalone criterion, industries with minimal international trade intensity but a high production cost incurrence rate still qualified for additional emission permits (*e.g.*, "{m}anufacturing of cement, lime, plaster & its products" industry, with an international trade intensity of 2.01 percent and a production cost incurrence rate of 11.88 percent), while industries with high international trade intensity but low production cost incurrence rate did not qualify (*e.g.*, "{m}anufacturing of aircrafts, spaceships & components" industry, with international trade intensity of 76.67 percent and production cost incurrence rate of 0.04 percent). Appx88998.

Second, and more importantly, record evidence shows that the international trade intensity for the additional KAUs does not even require "export performance." Appx86976. Commerce itself acknowledges in its Final Remand Results that the calculation underlying the international trade intensity not only relies on export sales, but also import sales. Final Remand Results at 11. Specifically, the international trade intensity is calculated by dividing the sum of annual average export **and import** amounts by the sum of annual average sales and import

amount.  Appx89002.  This formula, the numerator in particular, clearly demonstrates that the international trade intensity can yield a high value even without *any* export sales as long as there are sufficient import amounts.  For example, the formula for "international trade intensity" yields the exact same 20 percent for both where an industry subsector has $12 in exports, $10 in imports, and $100 in total sales, and where an industry subsector has $0 in exports, $25 in imports, and $100 in total sales:

> Example 1: (**$12 exports** + $10 imports) / ($100 total sales + $10 imports) = **0.2**

> Example 2: (**$0 exports** + $25 imports) / ($100 total sales + $25 imports) = **0.2**

In other words, an industry that has **no** exports but faces competition from imports would have a positive "international trade intensity" rate and could meet the criterion for the additional KAUs.  Thus, contrary to Commerce's reasoning, although exports may result in a relatively higher international trade intensity, meeting the threshold under Article 19(1) of the AAGEP is **not dependent** on exports—that is, the subsidy is not "contingent" upon export performance.  As such, the subsidy cannot be considered an export subsidy under the statute.

Third, regardless of the formula for calculating international trade intensity, the actual recipients of the additional KAUs—which are individual companies—do not need to export to obtain the additional KAUs, again demonstrating that provision of the alleged subsidy is not contingent upon export performance.  Under Article 19(1) of the AAGEP Enforcement Decree, the GOK relies on the multiplied value of the "international trade intensity" and "production cost incurrence rate" to determine which "business types" (*i.e.*, industry subsectors) qualify for additional allocations.  Appx86977; Appx88766-88767.  Under Attached Table 1 of the AAGEP Enforcement Decree, the formulas for both "international trade intensity" and "production cost incurrence rate" confirm that each factor is calculated on the "relevant industry" level, not the

individual participant level.  Appx86978; Appx89002.  For instance, the "international trade intensity" is the sum of "{a}nnual average export amount during the benchmark period of the **relevant industry**" and "{a}nnual average import amount during the benchmark period of the **relevant industry**" divided by the sum of "{a}nnual average sales during the benchmark period of the **relevant industry**" and "{a}nnual average import amount during the benchmark period of the **relevant industry**."  Appx89002 (emphases added).  Additional allocation under the K-ETS program is therefore conferred to an industry subsector if the product of that subsector's international trade intensity and production cost incurrence rate meets the 0.002 or above threshold.  But the companies receiving the KAUs do not themselves need to meet the criteria, and thus they can receive additional KAUs without exporting at all.

Furthermore, Commerce itself acknowledges that "Article 19(2) of the Enforcement Decree provides for an additional allocation of KAUs to certain sectors, regardless of whether the sectors meet the criteria under Article 19(1)."  Final Remand Results at 27.  Article 19(2) of the AAGEP Enforcement Decree provides additional allocation to certain public organizations or non-profit entities (*e.g.*, local governments, schools, medical institutions, and public transportation operators).  Appx86977; Appx88767.  Unlike Article 19(1) of the AAGEP Enforcement Decree, under which industry subsectors qualify for additional allocation based on "the value calculated by multiplying the production cost incurrence rate and the international trade intensity," Article 19(2) has nothing to do with international trade, much less export performance in particular.  Appx86976; Appx88766.  Again, this shows that export performance is not required before the GOK will provide additional KAUs.

Commerce has either misunderstood the law, the facts, or both.  But neither the law nor the facts support Commerce's finding that the provision of additional KAUs is specific as an export subsidy.

**B.  Commerce's Own Prior Holding in *OCTG from Korea* Affirms that the K-ETS Program Is Not an Export Subsidy**

Based on the reasoning above, Commerce previously found that the K-ETS program was **not** an export subsidy, in direct contradiction to the current Final Remand Results.  In *OCTG from Korea*, Commerce squarely rejected that the K-ETS program is an "export subsidy."  *Oil Country Tubular Goods From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 59,056 (Sept. 29, 2022), and accompanying Issues and Decision Memorandum at 35-36 ("*OCTG from Korea IDM*").  Commerce rejected that theory on two separate grounds.  First, Commerce noted that although "exports are included in a formula that provides one of two methods by which a company may qualify," "exports play no part" in the "other method by which a company may qualify" for additional allocation.  *OCTG from Korea IDM* at 36.  In other words, Commerce acknowledged that a subsidy program cannot be "contingent upon export performance" where a program provides independent eligibility criteria under which exports are irrelevant.  Second, Commerce found "no indication that the program is contingent upon export performance," emphasizing that the eligibility determination "applies to the industry subsector as a whole, not to the individual participants," such that a qualifying industry subsector may contain both companies that export and those that only sell domestically—yet "both companies would still qualify."  *Id.*  Commerce thus recognized that where eligibility is determined at the industry subsector level, the necessary link between the subsidy and export performance is severed.  On that basis, Commerce concluded that the

14

additional allocation of emission permits under the K-ETS program was not export contingent within the meaning of section 771(5A)(B) of the Act, 19 U.S.C. § 1677(5A)(B).

Yet, Commerce now asserts that its prior determination in *OCTG from Korea* is "inapplicable" because it pertained to Phase Two of the K-ETS program, which allegedly had "different qualifying criteria for the additional allocation" from Phase Three, the phase applicable to the POR. Final Remand Results at 25-26. That distinction is unavailing. The Phase Two features on which Commerce relied in *OCTG from Korea*—and that compelled rejection of the identical "export subsidy" theory advanced here—remain materially the same in Phase Three. Same as Phase Two, K-ETS Phase Three provides alternative qualification methods for additional allocation of emission permits under which exports play no part—namely Article 19(2) of the AAGEP Enforcement Decree. Appx86977; Appx88767; *see also* Final Remand Results at 27 (recognizing Article 19(2) as an alternative basis for the GOK to grant additional KAUs that does not involve international trade intensity as part of a formula). Thus, even under K-ETS Phase Three, export sales appear only in a formula that provides one route (*i.e.*, Article 19(1) criteria) by which a company may qualify for additional allocation, and the other route (*i.e.*, Article 19(2) criteria) remains unrelated to export performance. Under Commerce's own reasoning in *OCTG from Korea*, that structure defeats any finding that the K-ETS program is contingent upon export performance.

Further, as in Phase Two, Phase Three continues to determine eligibility for additional allocation of emission permits at the industry subsector level, not the individual participant level. Appx86976. As explained above, under Article 19(1) of the AAGEP Enforcement Decree, the GOK relies on the multiplied value of the "international trade intensity" and "production cost incurrence rate" to determine which "business types" (*i.e.*, industry subsectors) qualify for

additional allocations, and the formulas for both "international trade intensity" and "production cost incurrence rate" are calculated on the "relevant industry" level, not the individual participant level.  Appx86977-86978; Appx88766-88767; Appx89002.  Thus, similar to the finding in *OCTG from Korea*, the eligibility formula applies to the "**industry subsector as a whole, and not to the individual participants**."  *OCTG from Korea IDM* at 36 (emphasis added).

This is the same structural feature on which Commerce relied in *OCTG from Korea* to find that the K-ETS program was not export contingent—because eligibility necessarily extends to companies with no export sales within a qualifying subsector, severing the required link between the subsidy and export performance.  As Commerce noted in *OCTG from Korea*, Phase Two eligibility for additional allocation likewise turned on the "types of business" (*i.e.*, industry subsectors) with "(1) … an international trade intensity of at least 30 percent; (2) … production costs of at least 30 percent; or (3) … an international trade intensity of at least 10 percent and production costs of at least five percent."  *OCTG from Korea IDM* at 34.  The formulas for both international trade intensity and production cost incurrence rate remained unchanged throughout Phase Two and Phase Three and, accordingly, are calculated at the industry subsector level, not the individual participant level. Commerce cannot reach the opposite conclusion here on the same structural facts without explaining—on the basis of record evidence—why the subsector-wide eligibility framework that previously defeated export contingency in *OCTG from Korea* would now support an export contingency finding.

Finally, Commerce's reliance on the "statute" to base its export subsidy determination on an "industry or group of industries" is contrary to law.  Commerce cites section 771(5A) of the Act, 19 U.S.C. § 1677(5A), which provides that "{f}or purposes of this paragraph, and paragraph (5B), any reference to an enterprise or industry is a reference to a foreign enterprise or

foreign industry and includes a group of such enterprises or industries." Final Remand Results at 26. But that provision is <u>not</u> a free ticket to apply "grouping" in every specificity analysis. By its own terms, it operates only where the relevant statutory provision contains a "reference to an enterprise or industry." 19 U.S.C. §1677(5A). Because the export subsidy provision—section 771(5A)(B) of the Act, 19 U.S.C. § 1677(5A)(B)—contains no such reference, the "grouping" clause on which Commerce relies does not apply in the context of export subsidy determinations. Given that Article 19(1) of the AAGEP Enforcement Decree is clear that eligibility for additional allocation under that criterion is determined at the industry subsector level, not at the individual participant level, Commerce thus cannot rely on that eligibility criterion—because it cannot invoke the "grouping" clause—when determining whether K-ETS is export contingent. Otherwise, Commerce's interpretation would improperly expand the statute by reading "grouping" into a provision where Congress did not include it, effectively rewriting the law on export subsidies.[2]

For all of these reasons, Commerce should have followed its prior holding in *OCTG from Korea* and found that the K-ETS program is not an export subsidy. Commerce's purported distinction between Phase Two and Phase Three does not identify any material change in the key structural features that defeated export contingency in *OCTG from Korea*. Nor does the statute provide any legal basis to apply "grouping" to an export subsidy determination under section

---

[2] Commerce's own regulations confirm the same point. Commerce's export subsidy regulation contains no reference to "grouping" in assessing export contingency. 19 C.F.R. § 351.514. The lack of reference can be seen as intentional when contrasted with Commerce's domestic subsidy regulation which expressly addresses grouping enterprises or industries in the context of specificity determinations. 19 C.F.R. § 351.502. Commerce thus lacks any legal basis to make an export subsidy determination based on a group of enterprises or industries.

771(5A)(B), 19 U.S.C. § 1677(5A)(B).  Accordingly, Commerce's export subsidy finding is not supported by substantial evidence on the record and is not otherwise in accordance with law.

## **CONCLUSION**

For the reasons discussed above, the GOK requests that the Court reject Commerce's Final Remand Results and remand again for Commerce to reconsider its financial contribution and specificity determinations with respect to the K-ETS program.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated:  January 15, 2026                    *Counsel for the Government of the Republic of Korea*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that the forgoing brief complies with paragraph 2(B)(1) of the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 5,249 words including text, headings, footnotes, and quotations and excluding the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing software used to prepare this submission.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated:  January 15, 2026    *Counsel for the Government of the Republic of Korea*