## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |  |
|---|---|---|
| POSCO, | ) | |
| Plaintiff, | ) ) ) | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) ) ) | |
| Plaintiff-Intervenor, | ) ) ) | |
| v. | ) ) | Court No. 24-00006 |
| UNITED STATES, | ) ) | PUBLIC DOCUMENT |
| Defendant, | ) ) ) | |
| and | ) ) | |
| NUCOR CORPORATION, | ) ) ) | |
| Defendant-Intervenor. | ) ) ) | |

## DEFENDANT'S RESPONSE TO COMMENTS ON THE REMAND REDETERMINATION

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:
FEE PAUWELS
Attorney
Office of the Chief Counsel
    for Trade Enforcement and Compliance
U.S. Department of Commerce

TARA K. HOGAN
Assistant Director
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-2228
E-mail: Tara.Hogan@usdoj.gov

Dated: February 20, 2026

*Attorneys for Defendant United States*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

BACKGROUND ............................................................................................................... 2

I.    The Underlying Administrative Review ..................................................................... 2

II.   Remand Order ........................................................................................................... 5

III.  Remand Redetermination ......................................................................................... 7

ARGUMENT ................................................................................................................... 10

I.    Standard Of Review ................................................................................................ 10

II.   Commerce Reasonably Determined On Remand That There is Insufficient
      Record Evidence to Demonstrate That the Provision of Electricity for LTAR
      Program Is Specific ................................................................................................. 11

III.  Commerce's Financial Contribution Determination for the Provision of
      K-ETS Permits Program on Remand Is Lawful and Supported by Substantial
      Evidence ................................................................................................................... 15

      A.  Record Evidence Supports Commerce's Finding That KAUs Constitute
          "Funds" Within The Meaning of 19 U.S.C. § 1677(5)(D)(i) ............................... 15

      B.  Commerce Reasonably Determined That The Additional Ten Percent
          Allocation of KAUs To Select Groups of Industries Constitutes a "Direct
          Transfer" of Funds Within the Meaning of 19 U.S.C. § 1677(5)(D)(i) ................ 19

      C.  Commerce's Determination That the Provision of K-ETS Permits Program
          Is Specific as an Export Subsidy Is Lawful and Supported by Substantial
          Evidence ......................................................................................................... 22

      CONCLUSION ........................................................................................................ 28

      ADDENDUM: Commerce Memorandum, "Countervailing Duty Investigation of Forged
      Steel Fluid End Blocks from India: Post-Preliminary Analysis," dated August 10, 2020

# TABLE OF AUTHORITIES

<u>Cases</u>

*Al Ghurair Iron & Steel LLC v. United States*,
  65 F.4th 1351 (Fed. Cir. 2023) ................................................................................. 10

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ................................................................................................. 10

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ................................................................................................. 11

*Essar Steel Ltd. v. United States*,
  678 F.3d 1268 (Fed. Cir. 2012) ............................................................................... 14

*Florida Power & Light Co. v. Lorion*,
  470 U.S. 729 ............................................................................................................. 14

*Hyundai Steel v. United States*,
  659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) ............................................................. 6

*Hyundai Steel v. United States*,
  701 F. Supp. 3d 1398 (Ct. Int'l Trade 2024) ..................................................... 18, 21

*Hyundai Steel v. United States*,
  745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ............................................................. 6

*MacLean-Fogg Co. v. United States*,
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................................... 10

*POSCO v. United States*,
  794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) ................................................... passim

*PPG Indus., Inc. v. United States*,
  978 F.2d 1232 (Fed. Cir. 1992) ................................................................................. 5

<u>Statutes</u>

19 U.S.C. § 1516a ........................................................................................................ 10

19 U.S.C. § 1677(5)(D) ........................................................................................ passim

19 U.S.C. § 1677(5A) ........................................................................................... passim

<u>Regulations</u>

19 C.F.R. § 351.502 ................................................................................................ 11, 12

19 C.F.R. § 351.503 .................................................................................................... 4, 5

19 C.F.R. § 351.506 ...................................................................................................... 16

19 C.F.R. § 351.511 ........................................................................................................ 3

19 C.F.R. § 351.514 ...................................................................................................... 27

<u>Other Authorities</u>

*Countervailing Duties: Final Rule*,
    63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998).......................................... 24, 25, 27

*Certain Iron-Metal Castings from India:  Final Results of Countervailing Duty
    Administrative Review*, 65 Fed. Reg. 31,515 (May 18, 2000) .................................... 25

*Forged Steel Fluid End Blocks from India: Final Affirmative Countervailing Duty
    Determination*, 85 Fed. Reg. 79,999 (Dep't of Commerce Dec. 11, 2020) ............................ 20

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    87 Fed. Reg. 42,144 (Dep't of Commerce July 14, 2022) ........................................ 2

*Oil Country Tubular Goods from the Republic of Korea: Final Affirmative Countervailing
    Duty Determination*, 87 Fed. Reg. 59,056 (Dep't of Commerce Sept. 23, 2022).................... 24

*Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Preliminary Results
    and Partial Rescission of Countervailing Duty Administrative Review; 2021*,
    88 Fed. Reg. 37,019 (Dep't of Commerce June 6, 2023) ........................................ 3

*Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of
    Countervailing Duty Administrative Review; 2021*,
    88 Fed. Reg. 86,318 (Dep't of Commerce Dec. 13, 2023) ........................................ 2

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
    H.R. Doc. No. 103-316, vol. 1 (1994) (SAA) ................................................. 4, 7, 16

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE JANE A. RESTANI, JUDGE

_____
                                              )
POSCO,                                        )
                                              )
            Plaintiff,                        )
                                              )
GOVERNMENT OF THE REPUBLIC OF                 )
KOREA,                                        )
                                              )
            Plaintiff-Intervenor,             )
                                              )
      v.                                      )    Court No. 24-00006
                                              )
UNITED STATES,                                )
                                              )
            Defendant,                        )
                                              )
and                                           )
                                              )
NUCOR CORPORATION,                            )
                                              )
            Defendant-Intervenor.             )
                                              )
_____)

## DEFENDANT'S RESPONSE TO COMMENTS ON THE REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments filed by plaintiff POSCO, ECF No. 63 (POSCO's Comments), plaintiff-intervenor the Government of the Republic of Korea (GOK), ECF No. 64 (GOK's Comments), and defendant-intervenor Nucor Corporation (Nucor), ECF No. 66 (Nucor's Comments) concerning the Department of Commerce's final remand redetermination filed in accordance with this Court's decision and remand order in *POSCO v. United States*, 794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) (*Remand*

*Order*).[1]  *See* Final Results of Remand Redetermination Pursuant to Court Remand, ECF No. 60-1, Dec. 9, 2025 (Remand Redetermination).  The Court should sustain Commerce's remand redetermination because it complies with the remand order, is supported by substantial evidence, and is otherwise in accordance with law.

## BACKGROUND

The administrative determination under review is the final results of the 2021 countervailing duty (CVD) administrative review of certain carbon and alloy steel cut-to-length plate (CTL plate) from the Republic of Korea (Korea).  *See Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 86,318 (Dep't of Commerce Dec. 13, 2023) (*Final Results*) (P.R. 178), and accompanying Issues and Decision Memorandum (IDM) (P.R. 174).

## I.    The Underlying Administrative Review

This case concerns two subsidy programs:  the provision of Korea Emissions Trading System (K-ETS) permits program and the provision of electricity for less than adequate remuneration (LTAR) program.  In the administrative review, Commerce found both the K-ETS permits program and the provision of electricity for LTAR program countervailable, calculating subsidy rates of 0.61 percent *ad valorem* and 0.07 percent *ad valorem*, respectively.  *See* IDM at 10, 14-50.[2]

---

[1]  "P.R." and "C.R." refer to public and confidential documents, respectively, in the investigation record, while "P.R.R." and "C.R.R." refer to documents in the public first remand record and confidential first remand record, respectively.

[2]  POSCO was the sole mandatory respondent in this administrative review.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 42,144 (Dep't of Commerce July 14, 2022) (P.R. 3) and Respondent Selection Memorandum (Aug. 1, 2022) (P.R. 15).

In the final results, Commerce found the electricity for LTAR program countervailable on the basis that the Korea Electric Power Corporation (KEPCO) provided "a financial contribution in the form of the provision of a good or service," the good or service here being electricity. *See* IDM at 10; *see also* Post-Prelim. Analysis Memorandum (Aug. 9, 2023) at 12 (P.R. 147). Commerce calculated the benefit by analyzing whether the government price is consistent with market principles. *Id.* at 17-20 (citing 19 C.F.R. § 351.511(a)(2)). Commerce found that the GOK's provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) on the basis that the three industries comprising the majority of industrial electricity consumption during the POR received a disproportionately large amount of the subsidy. *Id.* at 24-26.

To determine the countervailability of the provision of K-ETS permits program, Commerce examined the Act on the Allocation and Trading of Greenhouse-Gas Emission Permits (AAGEP) and its implementing enforcement decree, and in particular the language implementing "Phase 3" of the program, in which the period of review fell. *See Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 37,019 (Dep't of Commerce June 6, 2023) (*Preliminary Results*) (P.R. 130), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 126) at 23-24.

Pursuant to the AAGEP and its implementing decree, the K-ETS requires subject entities to surrender emission permits to offset annual emissions of various greenhouse gases. *Id.* To operate the emissions trading system, the GOK establishes an allocation plan to reduce national greenhouse gas emissions and allocates emission permits to subject business entities. *Id.* In Phase 3, the GOK freely allocated a baseline of 90 percent of the total allocated permits for the

one-year compliance period.  *Id.* at 24.  In addition to the baseline 90 percent allocation, Article

19 of the AAGEP Enforcement decree establishes that the GOK provides additional permits

totaling 100 percent of the KAU allocation to the businesses in sectors subject to the K-ETS for

which the results of multiplying the "production cost incurrence rate and the international trade

intensity" is at least 0.2 percent.  *Id.*; *see also* Remand Redetermination at 9 (citing IDM at

Comment 2C).

In the final results, Commerce determined that the GOK, through the provision of K-ETS

permits program, provides a financial contribution in the form of revenue foregone pursuant to

19 U.S.C. § 1677(5)(D)(ii).  IDM at 34-37.  By providing "additional free emission allowances

to entities within certain sectors," Commerce found the GOK relieved those entities, in part,

from their "emissions compliance obligation."  *Id.* at 34.  Commerce found that the provision of

K-ETS permits program provides a benefit under 19 C.F.R. § 351.503(b)(2) "to the extent that

POSCO was relieved of the requirement to acquire additional allowances of KAUs in order to

comply with the K-ETS program."  *Id.* at 40.  Finally, Commerce found the program *de jure*

specific, because "the authority providing the subsidy, or the legislation pursuant to which the

authority operates, expressly limit{ed} access to the subsidy," 19 U.S.C. § 1677(5A)(D)(i), to

industries meeting two criteria:  trade intensity and production cost (level of emissions).  *Id.* at

45.

In considering the factors articulated in the statute's "safe harbor provision," 19 U.S.C.

§ 1677(5A)(D)(ii), Commerce found the relevant implementing laws, the Act on the Allocation

and Trading of Greenhouse Gas Emissions Permits (AAGEP) and its Enforcement Decree, to be

neither economic in nature nor horizontal in application.  IDM at 45-48; *see also* Statement of

Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No, 103-316, vol. 1 (1994) (SAA) at 930.

POSCO and the GOK appealed the final results, challenging Commerce's *de facto* specificity determination with respect to the electricity for LTAR program, and all three elements underlying Commerce's countervailability determination for the provision of K-ETS permits program: the determinations that (1) the GOK provides a financial contribution in the form of revenue foregone pursuant to 19 U.S.C. § 1677(5)(D)(ii), (2) the provision of K-ETS permits program provides a benefit under 19 C.F.R. § 351.503(b)(2), and (3) the program is *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i).

## II.    Remand Order

On August 8, 2025, the Court sustained in part and remanded in part Commerce's final results. *Remand Order*, 794 F. Supp. 3d at 1417.  The Court remanded Commerce's electricity for LTAR program *de facto* specificity finding, holding that Commerce "acted unreasonably when it grouped the Korean steel industry with two other unrelated industries because Commerce failed to consider the actual make-up of the firms." *Id.* at 1408.  Citing *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1240-41 (Fed. Cir. 1992), the Court found that Commerce must consider the actual make-up of the eligible firms when creating the group of industries.  *Id.* ("While Commerce relied on its regulation to avoid considering shared characteristics among the enterprises or industries, Commerce was nonetheless required by Federal Circuit precedent to consider 'the actual make-up of eligible firms' when creating the group" (internal citations omitted)).

The Court further found that "the statute precludes Commerce's finding that this group received a 'disproportionate' amount of the subsidy," where the definition of "disproportionate"

implies that a subsidy received would be compared to some type of baseline or expected value. *Id.* at 1408-09.  Accordingly, the Court found that the statute required Commerce "to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage," not just benefits received by other industries.  *Id.* at 1410 (citing *Hyundai Steel v. United States*, 745 F. Supp. 3d 1345, 1351 (Ct. Int'l Trade 2024)).

The Court sustained Commerce's determination that the provision of K-ETS permits program conferred a benefit upon POSCO, and remanded Commerce's determinations for financial contribution and specificity.  *Id.* at 1411-17.  Regarding financial contribution, the Court found contrary to law Commerce's finding that the GOK foregoes revenue by issuing additional emissions permits under the K-ETS program.  *Id.* at 1411.  Specifically, the Court held that to constitute revenue foregone under a plain reading of 19 U.S.C. § 1677(5)(D)(ii), the GOK must have failed to collect revenue from POSCO specifically.  *Id.* at 1412 ("As a factual matter, the extra permits may reduce Korea's aggregate revenue through supply-and-demand, but the statute's use of the word 'to' {in 'provides a financial contribution … to a person'} implies that Korea must have failed to collect revenue from POSCO specifically.").  Because the additional emissions permits did not replace an otherwise "enforceable obligation or debt," the Court held that the GOK did not forego revenue under 19 U.S.C. § 1677(5)(D)(ii).  *Id.* at 1412-13 (citing *Hyundai Steel v. United States*, 659 F. Supp. 3d 1327, 1334 (Ct. Int'l Trade 2023)).

With respect to Commerce's *de jure* specificity finding for the provision of K-ETS permits program, the Court found "Korea's provision of extra permits is not *de jure* specific." *Id.* at 1416.  A *de jure* specificity finding, the Court held, requires a more explicit limitation than the emissions and trade intensity criteria, given "nearly one third of regulated industries {received} extra permits" under the program.  *Id.* at 1416.  The Court likewise set aside

6

Commerce's determination that the trade intensity and production cost criteria do not qualify for the safe harbor provision under 19 U.S.C. § 1677(5A)(D)(ii), finding the determination unsupported by substantial evidence. *Id.* at 1416-17. Specifically, the Court held that the safe harbor provision requires more than a finding all industries are not equally likely to meet the criteria.[3] *Id.* at 1416.

## III.    Remand Redetermination

On December 9, 2025, consistent with the Court's directive, Commerce reconsidered its *de facto* specificity finding for the provision of electricity for LTAR program, its financial contribution finding with respect to the provision of K-ETS permits program, and its finding that the provision of K-ETS permits program is *de jure* specific, and revised its final results accordingly. *See* Remand Redetermination at 2-3.

First, Commerce found the provision of electricity for LTAR program to be not countervailable. Remand Redetermination at 3-4. Commerce considered the Court's instruction that Commerce is required to provide a logical basis for the grouping of industries or enterprises and separately statutorily required to use a "baseline" in its comparison that reflects how the Korean steel industry's subsidy is "out of line with the industry's own usage." Remand Redetermination at 4 (citing *Remand Order*, 794 F. Supp. 3d at 1407-11). Commerce considered

---

[3]    The United States respectfully disagrees with the Court's suggestion that the number of employees or the size of a company are not necessarily neutral in nature pursuant to 19 U.S.C. § 1677(5A)(D)(ii). *Remand Order*, 794 F. Supp. 3d at 1416 ("Commerce tries to contrast the intensity criteria with criteria such as the number of employees or the size of the company, which the agency says would be neutral. Commerce does not, however, explain how these criteria differ from the intensity criteria and would not also favor certain industries (*e.g.*, those prone to consolidation or natural monopolies."). The SAA itself confirms Congress' intention that these criteria are neutral in nature: "Finally, the objective criteria or conditions must be neutral, must not favor certain enterprises or industries over others, and must be economic in nature and horizontal in application, *such as the number of employees or the size of the enterprise*." SAA at 930.

the record before it and determined that it did not have sufficient alternative information on the record to further consider a basis for the grouping of industries or enterprises, to establish a different baseline, or to otherwise further substantiate a *de facto* specificity determination under 19 U.S.C. § 1677(5A)(D)(iii).  *See* Remand Redetermination at 3-5, 12-15.  Finding insufficient record evidence to demonstrate that the provision of electricity for LTAR program is specific, Commerce found the provision of electricity for LTAR program to be not countervailable during the period of review covered by this remand.  *Id.*

Second, Commerce found that the provision of K-ETS permits by the GOK provided a financial contribution in the form of a direct transfer of funds within the meaning of 19 U.S.C. § 1677(5)(D)(i).  Commerce continued to find that the GOK's additional ten percent allocation of KAUs, provided to a select group of industries under the K-ETS program, provides a financial contribution to recipients.  Commerce, however, modified its analysis and found that the GOK provides a financial contribution in the form of a direct transfer of funds, within the meaning of 19 U.S.C. § 1677(5)(D)(i), to companies receiving the additional ten percent KAU allocation under this program.  Remand Redetermination at 5-9.

This determination was made based on Commerce's analysis of the record and continued finding that KAUs constitute an instrument of monetary value.  *Id.*  First, companies receiving the additional 10 percent allocation have a variety of options for use, all of which the record illustrates effectively convey a financial value to the entity.  *Id.* at 6-7.  Second, the value of unused KAUs and shortfalls in KAUs are recognized on POSCO's financial statements as intangible assets (when it is likely that POSCO will receive future economic benefits from the carbon emissions permits) or liabilities (when there is a high possibility of resource outflows in meeting the obligations, or when the emissions amount used exceeds the amount allotted by the

emissions permits).  *Id.* at 7 (internal citations omitted).  Third, "{i}n the design of the K-ETS program, the GOK created a closed and controlled economy where, for the purposes of a gradual reduction in the total level of greenhouse gas (GHG) emissions in Korea, the GOK manages the market price of a KAU through scarcity."  *Id.* (citing IDM at 34-37).  Accordingly, Commerce found that the GOK's provision of an additional ten percent allocation of KAUs to a select group of polluters under the provision of K-ETS permits program, including POSCO and its cross-owned affiliates, constituted a direct transfer of funds within the meaning of 19 U.S.C. § 1677(5)(D)(i).

Third, Commerce found that the provision of K-ETS permits is contingent upon export performance in accordance with 19 U.S.C. §§ 1677(5A)(A) and (B).  Commerce reconsidered its *de jure* specificity determination with respect to the provision of K-ETS permits program and determined that the provision of the additional 10 percent allocation by the GOK is specific under 19 U.S.C. §§ 1677(5A)(A) and (B) as an export subsidy, *i.e.*, "a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions."  Remand Redetermination at 9-12.  In the remand order, the Court held that the provision of K-ETS permits program was not *de jure* specific because the existence of qualifying criteria *per se* does not establish specificity.  *Remand Order*, 794 F. Supp. 3d at 1416.  The Court further held that Commerce's determination that the additional ten percent allocation did not meet the safe harbor provision under 19 U.S.C. § 1677(5A)(D)(ii) was unsupported by substantial evidence.  *Id.* Accordingly, on remand, Commerce determined that under the eligibility formula under Article 19(1) of the AAGEP Enforcement Decree, subsector exports are, by law, one of three conditions for qualifying for the additional allocation of KAUs.  *See* Remand Redetermination at 9-12. Specifically, meeting the threshold requires that a subsector have a calculated value of 0.002 or

above based on the multiplication of the calculated value for "international trade intensity" and

"production cost incurrence rate," thus rendering the threshold under Article 19(1) of the

AAGEP dependent on the exports of the subsector.  *Id.* at 10-11.  The "production cost

incurrence" criterion is calculated based on GHG emissions and the amount of production value

added during a base comparison period; the "international trade intensity" criterion is calculated

by the sum of the annual average of exports and imports divided by the annual average of sales

and imports during a base comparison period.  *Id.*  Accordingly, Commerce found that the

criterion "international trade intensity" used in the formula for the qualifying criteria is

dependent upon the portion of export sales of the subsector.  *Id.*  Because the GOK grants an

additional 10 percent of KAUs to companies with subsectors that meet the threshold standard for

the additional allocation based on this formula by law, Commerce found that the provision of K-

ETS permits specific pursuant to 19 U.S.C. §§ 1677(5A)(A) and (B).  *Id.* at 11.

Commerce calculated a revised 1.53 percent *ad valorem* subsidy rate for POSCO for the

provision of K-ETS permits program and recalculated a total *ad valorem* subsidy rate for

POSCO of 1.72 percent.  Remand Redetermination at 30-31; *see also* Remand Calculation (Sept.

24, 2025 (P.R.R. 2, C.R.R. 1)).

## ARGUMENT

## I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in

accordance with the remand order," are "supported by substantial evidence, and are otherwise in

accordance with law."  *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct.

Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" means "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  "{S}ubstantial evidence review does

not permit {the Court} to reweigh the evidence." *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1359 (Fed. Cir. 2023). Further, under this standard, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

## II.    Commerce Reasonably Determined On Remand That There is Insufficient Record Evidence to Demonstrate That the Provision of Electricity for LTAR Program Is Specific

The Court identified two shortcomings in Commerce's *de facto* specificity determination for the provision of electricity for LTAR program. First, the Court held that Commerce was required to, but did not, "provide a logical basis for why {the three grouped industries Commerce found to be disproportionate recipients of the subsidy} should be grouped together." *Remand Order*, 794 F. Supp. 3d at 1408. Second, the Court held that to find a subsidy program specific under the disproportionate use provision, 19 U.S.C. § 1677(5A)(D)(iii)(III), Commerce was required, but did not, "use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage, not just the benefits received by others." *Id*. at 1410 (internal citations and quotations omitted). Accordingly, on remand, Commerce sought to do both things.

As explained in the remand redetermination, the record lacked the necessary information that Commerce could use to further consider a basis for the grouping of industries or enterprises in its *de facto* specificity analysis and information necessary to establish a "baseline" alternative to that relied upon by Commerce in its final results. Remand Redetermination at 4-5, 13-15. Accordingly, Commerce found no countervailability of the program. Commerce has complied with the directives of the Court, *see* Remand Redetermination at 13-15, and as we explain below, none of Nucor's arguments undermine Commerce's conclusion.

Nucor contends that the remand redetermination is inconsistent with 19 C.F.R. § 351.502(b) and Commerce's practice, and provides insufficient explanation for its finding. Regardless of the merits of these arguments, because they are inconsistent with the Court's order, they are unavailing. Commerce's remand redetermination must comply with the remand order, and Nucor has failed to identify any record evidence that could satisfy either analysis as ordered by the Court. *See Remand Order*, 794 F. Supp. 3d at 1417.

Commerce agrees with Nucor that 19 U.S.C. § 1677(5A)(D)(iii) does not require a determination of shared characteristics when grouping enterprises or industries for the purpose of a *de facto* specificity analysis. *See* Remand Redetermination at 14; Nucor's Comments at 5; *see also* Def.'s Response to Plaintiff's and Plaintiff-Intervenor's Motions for Judgement on the Agency Record, ECF 36 (Def. 56.2 Brief) at 14-20. But a disagreement with the Court's holding does not abrogate Commerce of its responsibility to conduct its remand redetermination in accordance with the Court's order. The Court did not, as Nucor suggests, merely remand "for additional explanation without requiring Commerce to conduct any specific type of analysis." Nucor's Comments at 5. The Court's directive was clear: "the agency must provide a logical basis for why these industries should be grouped together." *Remand Order*, 794 F. Supp. 3d at 1408. Finding no viable record information to use in conducting a shared characteristics analysis, Commerce determined that it could not make an affirmative specificity determination that would be consistent with the Court's order. Remand Redetermination at 13-15.

Commerce's analysis is not rendered insufficient merely because Commerce did not engage with 19 C.F.R. § 351.502(b) and Commerce's practice. Nucor's Comments at 5-6. The Court did not direct Commerce to elucidate further on the shared characteristics analysis, nor did the Court require that Commerce articulate what record information would be necessary to

inform such a finding, as Nucor asserts.  *See id.* ("{I}t is insufficient for the Remand Redetermination to find simply that the record lacks the information necessary to perform the analysis suggested by the Court, with no further explanation as to what exactly the agency believes that analysis entails or what record information is necessary to support it." (citing Remand Redetermination at 14) (internal quotations omitted)).

Quite the opposite.  Commerce's sole obligation on remand with respect to grouping enterprises or industries together derived from the Court's holding that the agency "acted unreasonably" where "Commerce *failed* to consider the actual make-up of the firms."  *Remand Order*, 794 F. Supp. 3d at 1408.  *If* Commerce continued to group enterprises or industries together on remand, *then* Commerce would be required to demonstrate a "logical basis" for such grouping.  *Id.*  Because Commerce ultimately did not continue to group enterprises or industries together on remand, it was not required to provide analysis supporting that grouping, or any other analysis informing a disproportionate use analysis.  *See* Remand Redetermination at 13-15.

This conclusion is further illustrated by Nucor's failure to identify any record evidence that could serve as a "logical basis" for the grouping of three industries set forth in the final results.  *Remand Order*, 794 F. Supp. 3d at 1408; *see also* Remand Redetermination at 15 ("Nucor has pointed to no record information that Commerce can utilize to complete this analysis.").  The Court determined that Commerce acted arbitrarily when it grouped the steel industry with two other industries in its disproportionate use *de facto* specificity analysis *without* providing a logical basis for grouping the three industries together.  *Remand Order*, 794 F. Supp. 3d at 1407-08; *see also* Remand Redetermination at 4-5 and 14-15.  It does not follow that, to find that it lacked support for this *affirmative* requirement, Commerce was required to articulate what information it required to support a logical grouping that the agency found was

*not* on the record; such a requirement defies logic.  The remand redetermination is supported by substantial evidence because Commerce found no evidence on the record to support finding the three industries had shared characteristics.  *See* Remand Redetermination at 13-15.  Nucor's own failure to identify record evidence serviceable as a logical basis for the grouping makes this clear.

Finally, Commerce was not required to reopen the record on remand to seek additional information.  *See* Nucor's Comments at 6.  "The decision to reopen the record is best left to the agency, in this case Commerce."  *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012).  As is well within its discretion, Commerce did not reopen the record.[4]  The Court remanded the final results because it found that Commerce "failed to consider the actual make-up of the firms."  *Remand Order*, 794 F. Supp. 3d at 1408.  Holding that Commerce failed to undertake this analysis necessarily implies that there was no such analysis for judicial review. Thus, the Court could not have identified and did not identify information on the record pertinent to the analysis.  *See id.* at 1407-08; *cf. Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the agency has not considered all relevant factors, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.  The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.").  As directed, Commerce examined the record before it and determined that the record contained no information to support finding shared characteristics among the grouped industries.  *See* Remand Redetermination at 13-15.  Commerce's determination complied with the remand order, is in accordance with law,

---

[4]  Notably, Nucor never requested or suggested that Commerce reopen the record on remand to solicit additional information.  *See generally* Nucor's Comments on Draft Remand Results, dated September 29, 2025 (P.R.R. 6, C.R.R. 3).

and supported by substantial evidence.  The Court should sustain this aspect of the remand

redetermination.

### III.    Commerce's Financial Contribution Determination for the Provision of K-ETS Permits Program on Remand Is Lawful and Supported by Substantial Evidence

On remand, Commerce reconsidered its financial contribution determination for the

provision of K-ETS permits program and found the program to provide a financial contribution

in the form of a direct transfer of funds within the meaning of 19 U.S.C. § 1677(5)(D)(i).  *See*

Remand Redetermination at 6-9.  This determination was made based on Commerce's analysis

of the record, which illustrates that KAUs constitute an instrument of monetary value, of which

some entities receive a larger allocation than others.  *Id.*

#### A.    Record Evidence Supports Commerce's Finding That KAUs Constitute "Funds" Within The Meaning of 19 U.S.C. § 1677(5)(D)(i)

Section 1677(5)(D)(i) defines the first of four bases on which Commerce can find that a

subsidy program provides a financial contribution:

> (D) FINANCIAL CONTRIBUTION.—The term 'financial contribution' means—
> (i) the direct transfer of funds, such as grants, loans, and equity transfusions, or the potential direct transfer of funds or liabilities, such as loan guarantees…

POSCO and the GOK make two challenges to Commerce's finding that KAUs constitute

"funds" within the meaning of the statute.  They argue that because KAUs are neither money nor

currency in the traditional sense of the words, Commerce's finding that they are "funds" is

inconsistent with the plain language of the statute.  They also argue that KAUs do not fit within

the list of examples included in the statutory definition of direct transfer of funds.  *See* POSCO's

Comments at 2-8 and GOK's Comments at 3-9.  As we explain below, neither argument is

persuasive.

First, POSCO and the GOK argue that KAUs are not "funds" as the word is used in the statute. *See* POSCO's Comments at 5-6 and GOK's Comments at 3-4. Congress defined financial contribution via "four broad generic categories of government practices" leaving to Commerce's discretion to make a financial contribution determination on a "case-by-case basis." SAA at 927; *see* Remand Redetermination at 16-17. It does not follow that Congress therefore intended to limit the definition of "direct transfer of funds," 19 U.S.C. § 1677(5)(D)(i), to transfers of money or currency, as the terms are traditionally understood. Such an overly narrow interpretation of the statute would place all kinds of monetary instruments beyond the reach of Commerce's countervailing duty enforcement powers, despite the unequivocal role of such instruments as means for transferring funds.[5] *See* Remand Redetermination at 19. KAUs have calculable market value, as demonstrated in Commerce's benefit calculation in the final results, which this Court has sustained. *See Remand Order*, 794 F. Supp. 3d at 1413-14. To nevertheless find that KAUs do not constitute funds within the meaning of the statute "would place form over substance, and present clear avenues for escaping the countervailability of subsidy programs." Remand Redetermination at 19.

Even relying solely on a plain language reading of the statute, the inclusion of "loan guarantees" as an example of a "potential direct transfer of funds or liabilities," 19 U.S.C. § 1677(5)(D)(i), refutes reliance on the traditional dictionary definition as limiting "funds" to money or currency. *See* POSCO's Comments at 5 and GOK's Comments at 3-4. A loan

---

[5] This is further illustrated by the GOK's admission that a scenario in which "the GOK provid{ed} money to companies to purchase additional emission permits {} could be considered a direct transfer of funds." GOK's Comments at 6. KAUs have a calculable associated value. *See* Remand Redetermination at 22-23. It defies logic that a gratuitous allocation of additional KAUs, for which there is an associated value, would escape the purview of trade remedies, where gifting the same value, but as money, would not.

guarantee is not, in itself, a form of currency. *See* Remand Redetermination at 18. Such a guarantee, instead, dictates the total amount due as a result of the loan contract. *Id.*; *see, e.g.*, 19 C.F.R. § 351.506 ("In the case of a loan guarantee, a benefit exists to the extent that the total amount a firm pays for the loan with the government-provided guarantee is less than the total amount the firm would pay for a comparable commercial loan…").

Further, record evidence illustrates how KAUs function as a monetary instrument. *See* Remand Redetermination at 6-8. Commerce agrees that the K-ETS program is designed to "constrain{} and reduc{e} GHG emissions in Korea," and therefore an additional allocation of KAUs serves to lessen the associated cost.[6] GOK's Comments at 4; *see also* Remand Redetermination at 19-21. Even so, this function of KAUs does not undercut Commerce's finding that KAUs constitute monetary instruments, and accordingly funds within the meaning of 19 U.S.C. § 1677(5)(D)(i). *See* Remand Redetermination at 6-9 and 23-24.

Through its design of the K-ETS program, "the GOK created a closed and controlled economy where, for the purposes of a gradual reduction in the total level of greenhouse gas (GHG) emissions in Korea, the GOK manages the market price of a KAU through scarcity." IDM at 35. Because the program operates with a limited number of available KAUs, the ways in which companies can use their allocations of KAUs, whether by selling or saving for future use, demonstrate their financial value. *See* Remand Redetermination at 7. Through the closed economy mechanism, the GOK is able to assign a market value to the permits, thus creating a

---

[6] Commerce disagrees with POSCO and the GOK to the extent that both parties characterize the K-ETS program as a "restriction" on companies' ability to emit GHG or a limited "right" to do so. POSCO's Comments at 6 and GOK's Comments at 6. The number of KAUs provided to a K-ETS program participant "is not a legal limitation on the participants, who could theoretically emit any amount of GHG and pay for the emissions not allocated gratuitously." Remand Redetermination at 20.

cost for the emission of GHG.  *Id.*  The additional ten percent allocation of KAUs provided by

the GOK to certain companies therefore provides a transfer of funds, where each KAU is a

monetary instrument with an associated market value.  *See id.* at 6-8.

This Court recently sustained Commerce's identical determination that the K-ETS

program provides a financial contribution in the form of a direct transfer of funds.[7]  *Hyundai*

*Steel v. United States*, 701 F. Supp. 3d 1398, 1409 (Ct. Int'l Trade 2024).  The Court

acknowledged the relevance of KAUs as "something of monetary value" independent of the role

of KAUs as "part of a system of allocating emissions permits."  *Id.* at 1405 ("{T}he additional

allocation {of KAUs} may reasonably be characterized as part of a system of allocating

emissions permits *and* something of monetary value that {respondent} was granted for the

purpose of meeting their annual compliance requirements.").

Commerce disagrees, however, that KAUs serve exclusively as representative of an

entity's emissions cap.  *See* POSCO's Comments at 6 and GOK's Comments at 4.  As

Commerce articulated in detail in its remand redetermination, the record illustrates the role

KAUs play as a currency within the K-ETS system.  At the end of each compliance year, a

company is obligated to "pay" for the GHG emissions the company incurred within that window.

*See* Remand Redetermination at 19-21.  Though each company is allocated a certain number of

KAUs based on the given emissions target, as defined in Article 12 of the AAGEP and Article 17

of its Enforcement Decree, the amount a company owes at the end of the compliance year is

demonstrably separate and distinct from the initial allocation.  *Id.* at 20-21.  Whereas a

---

[7] For the purpose of Commerce's financial contribution analysis, the sole distinction is
that the administrative review at issue in *Hyundai Steel* examined Phase II of the provision of K-
ETS permits program, wherein certain industries received an additional three percent allocation
of KAUs, *i.e.*, a 100 percent allocation versus the standard 97 percent allocation.  *See Hyundai*
*Steel*, 701 F. Supp. 3d at 1402.

company's initial allocation is calculated and provided at the start of the compliance year, what

the company ultimately owes in KAUs is calculated based on its actual GHG emissions, as

codified under Article 27 of the AAGEP. *See id.* at 20. The role that KAUs play as the

monetary instrument within the K-ETS program is likewise unchanged by the fact that KAUs are

not necessarily "guaranteed." GOK's Comments at 4. Whether a company was allocated fewer

or more KAUs at the end of the compliance year than originally allocated has no bearing on the

company's ability to use its remaining allocated KAUs at the end of the compliance year to

"pay" for its emissions. *See* Remand Redetermination at 21. Similarly, any change in either the

allocation amount or the value of a KAU is reflected within Commerce's benefit calculation for

the provision of K-ETS permits program, as sustained by this Court. *See id.; Remand Order*,

794 F. Supp. 3d at 1414.

> B. Commerce Reasonably Determined That The Additional Ten Percent Allocation
> of KAUs To Select Groups of Industries Constitutes a "Direct Transfer" of Funds
> Within the Meaning of 19 U.S.C. § 1677(5)(D)(i)

POSCO and the GOK next argue that Commerce's financial contribution determination is

contrary to law because the value or revenue associated with KAUs does not come directly from

the GOK, but from a company's sale of KAUs. *See* POSCO's Comments at 6-7; GOK's

Comments at 6-9. This argument misconstrues both the statute and the record. As detailed in

the remand redetermination, and *supra,* section III(A), the precise value associated with a KAU

is separate and distinct from the determination that the KAU itself *is* a monetary instrument *of*

value. *See* Remand Redetermination at 22-23 ("A benefit exists, and is identified and measured,

*after* Commerce determines a financial contribution has been provided by a government under

{19 U.S.C. § 1677(5)(D)}." (emphasis added)). Although the value of a KAU may change,

KAUs have an inherent value as the representative currency for GHG emissions within the K-

ETS program. *See id.* at 6-8. This determination represents the end of Commerce's financial contribution analysis pursuant to 19 U.S.C. § 1677(5)(D). *See id.* at 20-21. That a company may sell a KAU on the public market or by other available means—therein exchanging the KAU for money—does not alter the conclusion that the KAU, standing alone, constitutes a monetary instrument. *Id.* The relevant inquiry is therefore not at what point "value or revenue {} may be generated from selling {a KAU}," but whether, when gratuitously allocated to a company from the GOK, the additional ten percent allocation of KAUs have an associated value. POSCO's Comments at 6-7. As Commerce has amply demonstrated, Remand Redetermination at 6-8, they do.

This determination is analogous to Commerce's prior determination in *FEBs from India* that Renewable Energy Certificates (RECs) received by entities in exchange for generating (and injecting into the grid) renewable energy constitute a financial contribution in the form of a direct transfer of funds. *See* Remand Redetermination at 8 (citing *Forged Steel Fluid End Blocks from India: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 79,999 (Dep't of Commerce Dec. 11, 2020) (*FEBs from India*), and accompanying Issues and Decision Memorandum (IDM) at Comment 8). Under a renewable purchase obligation (RPO), certain entities were required to purchase minimum thresholds of solar and non-solar renewable energy. *See* Commerce Memorandum, "Countervailing Duty Investigation of Forged Steel Fluid End Blocks from India: Post-Preliminary Analysis," dated August 10, 2020 (ACCESS Barcode: 4014295-01) (*FEBs from India* Post-Prelim.) at 5 (included in addendum). Where an entity does not meet the RPO, it may use RECs to satisfy its requirement. *Id.* This mechanism is informative in Commerce's analysis of the K-ETS program, in which an entity uses KAUs to "pay" for its emissions at the end of the compliance period. *See* Remand Redetermination at 8-9.

That RECs were earned by RPO participants in *FEBs from India*, whereas subject entities receive an additional allocation of KAUs gratuitously under K-ETS is not a distinction that renders the programs not analogous. *See* POSCO's Comments at 7-8; *see also* Remand Redetermination at 8-9. In both programs, the relevant government provided instruments of monetary value to respondent companies within a closed system in which the government limited the supply of such credits. *See* Remand Redetermination at 8-9; *see also Hyundai Steel*, 701 F. Supp. 3d at 1406 (affirming Commerce's reliance on the RECs program in *FEBs from India* as analogous to K-ETS for the purpose of financial contribution in the form of a direct transfer of funds within the meaning of 19 U.S.C. § 1677(5)(D)(i)).

With respect to Commerce's reference to the example of loan guarantees cited in 19 U.S.C. § 1677(5)(D)(i), Commerce does not, as the GOK asserts, cite the example as an analogy for KAUs. *See* GOK's Comments at 8-9; *see also* Remand Redetermination at 18-19. Rather, in finding that the statute does not "necessarily relate to the transfer of money itself," Commerce identified loan guarantees as "an example" of financial contributions provided within 19 U.S.C. § 1677(5)(D)(i) that "*do not themselves constitute money*." Remand Redetermination at 18 (emphasis added). Separately, Commerce also points to loan guarantees as an example within the statute illustrating that a direct transfer of funds need not be "immediate" to constitute a financial contribution. *Id.* at 18-19. This additional reference to loan guarantees is not an attempt to characterize the allocation of additional KAUs as "a potential transfer of liability," but rather to note that, even if KAUs did not constitute an immediate transfer of funds,[8] the statute's inclusion of loan guarantees as an example illustrates that a direct or potential direct transfer of

---

[8] As we explained, *supra* section III(B), Commerce's determination that the additional allocation of KAUs constitutes a direct transfer of funds is supported by substantial evidence.

funds needs not be *immediate* in order to satisfy 19 U.S.C. § 1677(5)(D)(i)'s definition of financial contribution. *Id.*

Commerce's financial contribution determination on remand is supported by substantial evidence and in accordance with law. This determination accurately reflects both the role—and value—of KAUs within the broader mechanism of K-ETS, consistent with 19 U.S.C. § 1677(5)(D).

### C. Commerce's Determination That the Provision of K-ETS Permits Program Is Specific as an Export Subsidy Is Lawful and Supported by Substantial Evidence

Commerce similarly reconsidered its determination that the provision of K-ETS permits program was *de jure* specific and, on remand, found the program to be specific as an export subsidy pursuant to 19 U.S.C. §§ 1677(5A)(A) and (B). *See* Remand Redetermination at 10-12. The statute defines export subsidy as "a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions." 19 U.S.C. § 1677(5A)(B). In making this determination, Commerce considered the formula outlined in Article 19(1) of the AAGEP Enforcement Decree used to determine the subsectors that receive the 100 percent free allocation of KAUs. *See* Remand Redetermination at 10-11 (citing GOK's Initial Questionnaire Response, dated October 11, 2022 (P.R. 61, C.R. 157) at 9 and GOK's Initial Questionnaire Response: Exhibit CEP-1, dated October 11, 2022 (P.R. 65-66, C.R. 167) (Article 19(1) of the AAGEP Enforcement Decree)).

In particular, Commerce found the "international trade intensity" criteria, which is calculated by the sum of the annual average of exports and imports divided by the annual average of sales and imports, is dependent upon the portion of export sales of the subsector to qualify for the additional allocation of KAUs. *Id.* The explicit language of the relevant law (*i.e.*, Article 19(1) of the AAGEP Enforcement Decree) thus illustrates the role of exports as a

necessary criterion for a subsector to qualify for the additional ten percent allocation of KAUs. *Id.* at 10-12. Commerce's specificity finding with respect to the provision of K-ETS permits program is consistent with the statute and supported by substantial evidence.

Relying on theoretical scenarios, POSCO and the GOK contend that because there exists a universe in which a subsector could qualify for the additional allocation of KAUs without exports, Commerce's finding the additional allocation to be export contingent is contrary to the statute's language. *See* POSCO's Comments at 9-11 and GOK's Comments at 10-13. POSCO and the GOK rely on 19 U.S.C. § 1677(5A)(B)'s use of the prepositional phrase "contingent upon" to posit that the statute contains a "but for" test. *See* POSCO's Comments at 9; GOK's Comments at 10. Under this reading, the statute would require that but for a subsector having exports, the subsector could not qualify for the additional ten percent allocation of KAUs. However, the phrase "contingent upon" relates to the later portion of 19 U.S.C. § 1677(5A)(B), *i.e.*, "contingent upon export performance, *alone or as 1 of 2 or more conditions*" (emphasis added). The qualification formula for the program is, by law, contingent upon three factors: the amount of exports, the amount of imports, and the costs incurred for a given subsector's compliance. *See* Remand Redetermination at 27 (citing Article 19(1) of the AAGEP Enforcement Decree (P.R. 65-66, C.R. 167)). Accordingly, Commerce determined that a subsector would not qualify for the additional allocation of KAUs unless a combination of the three factors of export performance, imports, *and* the costs incurred met the defined threshold for qualification. *Id.* This was the appropriate analysis pursuant to 19 U.S.C. §§ 1677(5A)(A) and (B).

The preamble to Commerce's countervailing duty regulations expands on the objective of export subsidy specificity, illustrating the importance of a subsidy program's context in

Commerce's analysis. *See* Remand Redetermination at 28-30 (citing *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,357 (Dep't of Commerce Nov. 25, 1998) (*1998 Final Preamble*)). The inquiry does not end upon examination of the implementing formula and its possible outcomes. *See* POSCO's Comments at 10-11 and GOK's Comments at 11-13. Rather, Commerce considers various other factors, including, but not limited to:

> (1) The stated purpose or purposes of the subsidy as put forth in the governing laws or regulations; (2) the selection criteria and reasons for approval/ disapproval; (3) application and approval documents, including market or economic viability studies; (4) the existence and nature of any monitoring or enforcement mechanism; (5) governmental collection of data regarding the program recipients' exports (other than the customary collection of export and import data); (6) the exporting history of recipient firms or industries; and (7) other evidence that the Department deems relevant to consider.

*1998 Final Preamble*, 63 Fed. Reg. at 65,380. As appropriate, Commerce considered these factors in its analysis of Article 19(1) of the AAGEP Enforcement Decree. Commerce found that the GOK has characterized the additional allocation of KAUs as a means to protect subsectors that export from the competitive disadvantages created by the required reduction in emissions, and collects and monitors subsectors' historical exports. *See* Remand Redetermination at 29-30. These additional factors support Commerce's findings that exporting constitutes one of three qualification requirements pursuant to the formula in Article 19(1) of the AAGEP Enforcement Decree.

Distinguishing a subsidy program wherein eligibility is determined on an individual participant level from one determined at the industry subsector level, the GOK suggests that a subsidy program may only be found specific as an export subsidy if the export requirement is applied on an individual entity level. *See* GOK's Comments at 15-16 (citing *Oil Country Tubular Goods from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 59,056 (Dep't of Commerce Sept. 23, 2022) (*OCTG from Korea*),

and accompanying Issues and Decision Memorandum (IDM)).  The statute contains no such restriction.  Section 1677(5A)(B) requires that "a *subsidy* {} is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions."  The statute does not require that a subsidy program limit eligibility to *individual entities* on an export-contingent basis.  Likewise, as Commerce articulated in the *1998 Final Preamble*, the export subsidy specificity determination invokes many considerations, the importance of each consideration dependent on the specifics of the subsidy program being analyzed.  *See 1998 Final Preamble*, 63 Fed. Reg. at 65,380.  In this case, Commerce appropriately analyzed the language in Article 19(1) of the AAGEP Enforcement Decree, which provides for additional allocations of KAUs to subsectors meeting the necessary criteria, including exports.  *See* Remand Redetermination at 10-12.

POSCO's and the GOK's additional attempts to analogize this program with Commerce's determinations in *OCTG from Korea* and *Metal Castings from India* similarly rely on mischaracterizations of the proceedings.  *See* POSCO's Comments at 12-14 and GOK'S Comments at 14-18; *see also OCTG from Korea* IDM and *Certain Iron-Metal Castings from India:  Final Results of Countervailing Duty Administrative Review*, 65 Fed. Reg. 31,515 (Dep't of Commerce May 18, 2000) (*Metal Castings from India*), and accompanying Issues and Decision Memorandum (IDM)).

*OCTG from Korea* concerned Phase Two of the K-ETS program, under which a subsector could qualify for an additional allocation of KAUs by meeting *either* a "trade intensity" criteria *or* a "production costs" criteria.  *See* Remand Redetermination at 25 (citing *OCTG from Korea* IDM at Comment 1).  In this administrative review, in which the K-ETS program was in Phase Three, the formula specified by law requires a 0.002 minimum threshold of the *combined* criteria, the trade intensity criteria requiring exports.  *Id.  Metal Castings from*

*India*, in contrast, involved no export requirement at all. *See Metal Castings from India* IDM at Comment 3; *see also* Remand Redetermination at 28. There, the relevant subsidy program involved banks requesting financial indicator information from loan program candidates, including production and sales information such as export data, among other information. *See Metal Castings from India* IDM at Comment 3; *see also* Remand Redetermination at 28. Although the bank collected export data, Commerce concluded (and verified) that borrowers qualified for the program based on creditworthiness and demonstration of financial and commerce viability. *See* Remand Redetermination at 28. Export performance was not a factor for approval. *Id.* (citing *Metal Castings from India* IDM at Comment 3).

POSCO argues that the export performance criteria in the K-ETS program formula plays a role identical to that of export levels in a bank's loan approval decision in *Metal Castings from India*. *See* POSCO's Comments at 13-14. Article 19(1) of the AAGEP Enforcement Decree expressly identifies exports as one element of the formula used to determine whether a subsector receives an additional allocation of KAUs. However, whereas export data was not a required criterion for loan approval in *Metal Castings from India*, a subsector's annual average export amount is an express criterion for determining eligibility for the additional allocation of KAUs. *See* Remand Redetermination at 28.

Article 19(2) of the AAGEP Enforcement Decree is not, as the GOK and POSCO allege, proof that the formula for allocating additional KAU to certain subsectors is not export contingent. *See* POSCO's Comments at 11-12 and the GOK's Comments at 13. Unlike Article 19(1) of the AAGEP Enforcement Decree, Article 19(2) contains no formula or criteria for determining eligibility for an additional allocation of KAUs and instead lists six specific subsectors—higher education institutions, hospitals, railway transport, ground passenger

26

transport, and maritime transport—as recipients of the 100 percent allocation of KAUs.  *See* Remand Redetermination at 27.  This distinct provision is a separate portion of the implementing law than that with which Commerce made its determination, *i.e.*, Article 19(1).  *Id.*  Critically, the record demonstrates that POSCO did not benefit from the additional allocation of KAUs as one of the six subsectors identified in Article 19(2) of the AAGEP Enforcement Decree.  *See id.* at 27 ("{I}t is clear from the record that the 'manufacturing of primary steel' subsector, and thus POSCO, qualified for the program under Article 19(1) and was not in the subsectors {} identified by GOK presidential decree per Article 19(2).").  Had POSCO received its additional allocation of KAUs pursuant to Article 19(2) of the AAGEP Enforcement Decree, Commerce's analysis would accordingly change.  But because POSCO has not demonstrated that it received the additional allocation of KAUs under Article 19(2), this separate and distinct mechanism is irrelevant to Commerce's analysis.  *See id.*  The *1998 Final Preamble* confirms this point:

> {U}nder the new standard contained in {19 C.F.R.} § 351.514, if exportation or anticipated exportation was either the sole condition or one of several conditions for {qualifying for a subsidy}, we would consider any benefits provided under the program to the firm to be export subsidies unless the firm in question can clearly demonstrate that it had been approved to receive the benefits solely under non-export-related criteria.

*1998 Final Preamble*, 63 Fed. Reg. at 65,381.

Commerce analyzes subsidy programs based on the information on the record and the mechanics of the programs on a case-by-case basis.  On remand, Commerce analyzed the language of Article 19(1) of the AAGEP Enforcement Decree, including its formula for determining which subsectors qualify for the additional allocation, as is the agency's obligation.  *See* Remand Redetermination at 10-12.  Accordingly, consistent with 19 U.S.C. §§ 1677(5A)(A) and (B), Commerce determined that the provision of K-ETS permits program is specific as an export subsidy, as illustrated by the evidence on the record.

27

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter final judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:                                      /s/ Tara K. Hogan
FEE PAUWELS                                      TARA K. HOGAN
Attorney                                         Assistant Director
Office of the Chief Counsel                      U.S. Department of Justice
   for Trade Enforcement and Compliance    Civil Division
U.S. Department of Commerce                       Commercial Litigation Branch
                                                 P.O. Box 480, Ben Franklin Sta.
                                                 Washington, D.C. 20044
                                                 Telephone: (202) 616-2228
                                                 E-mail: Tara.Hogan@usdoj.gov

Dated: February 20, 2026                          *Attorneys for Defendant United States*

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document complies with ¶ 2(B)(i) of the Standard

Chambers Procedures of the United States Court of International Trade because it contains **8,360**

words, including text, footnotes, and headings.

/s/Tara K. Hogan

# ADDENDUM

Commerce Memorandum, "Countervailing Duty Investigation of Forged Steel Fluid End Blocks from India: Post-Preliminary Analysis," dated August 10, 2020

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-533-894
Investigation
POI: 4/1/2018 – 3/31/2019
**Public Document**
AD/CVD Office I: WPL

August 10, 2020

**MEMORANDUM TO:**    Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

**FROM:**    James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**SUBJECT:**    Countervailing Duty Investigation of Forged Steel Fluid End
Blocks from India: Post-Preliminary Analysis

## I.   SUMMARY

The Department of Commerce (Commerce) preliminarily determines that additional
countervailable subsidies are being provided to Bharat Forge Limited (Bharat Forge), a producer
and exporter of forged steel fluid end blocks (fluid end blocks) from India.

## II.   BACKGROUND

On May 26, 2020, Commerce published its preliminary determination in the countervailing duty
(CVD) investigation of fluid end blocks from India.[1] In its *Preliminary Determination*,
Commerce identified three programs for which additional information was needed to reach a
preliminary determination.[2] After issuing supplemental questionnaires and receiving timely
responses from Bharat Forge and the Government of India (GOI),[3] this memorandum analyzes

---

[1] *See Forged Steel Fluid End Blocks from India: Preliminary Affirmative Countervailing Duty Determination, and
Alignment of Final Determination with Final Antidumping Duty Determination*, 85 FR 31452 (May 26, 2020)
(*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] *See* Preliminary Decision Memorandum at 22.

[3] *See* GOI's Letter, "Countervailing Duty Investigation of Forged Steel Fluid End Blocks from India: Response to
Supplemental Questionnaire Issued on March 31, 2020," dated May 4, 2020; *see also* Bharat Forge's Letter,
"Forged Steel Fluid End Blocks from India: Bharat Forge Limited's Supplemental Section III Response, 3rd Part,"
dated May 20, 2020 (Bharat Forge SQR3); Commerce's Letter, "Forged Steel Fluid End Blocks (fluid end blocks)
from India: Supplemental Questionnaire for Bharat Forge Limited," dated June 4, 2020; Commerce's Letter,
"Forged Steel Fluid End Blocks (Fluid End Blocks) from India: Supplemental Questionnaire for the Government of
India (GOI)," dated June 4, 2020; Bharat Forge's Letter, "Forged Steel Fluid End Blocks from India: Submission of
Bharat Forge Limited's Second Supplemental Section III Response," dated June 19, 2020 (Bharat Forge SQR4); and
GOI's Letter, "Countervailing Duty Investigation of Forged Steel Fluid End Blocks from India: Response to
Supplemental Questionnaire Issued on June 04, 2020," dated June 29, 2020 (GOI SQR2).

INTERNATIONAL
T R A D E
ADMINISTRATION

the three programs identified in the *Preliminary Determination*:  (1) the 1998 Power Generation and Promotion Policy; (2) Renewable Energy Certificates; and (3) the Status Certificate Program.

## III.    USE OF FACTS AVAILABLE

### A.  Legal Standard

Sections 776(a)(1) and (2) of the Tariff Act of 1930, as amended, (the Act) provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person:  (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

### B.  Application of Facts Available:  Financial Contribution and Specificity

Commerce requested information about the 1998 Power Generation and Promotion Policy from the GOI.  The GOI responded that it was unable to provide the requested information and referred Commerce to Bharat Forge's response.[4]  Bharat Forge provided detailed descriptions and information regarding the program that indicate that the program provides a financial contribution and is specific, as further discussed below.  Bharat Forge and the GOI do not contest that the program provides a financial contribution and is specific.  Therefore, although we typically rely on the government for information regarding the financial contribution and specificity aspects of a program, in this instance, Bharat Forge has provided sufficient information for Commerce to reach a finding on countervailability, and no party argues to the contrary.  Thus, we are preliminarily relying on the information provided by Bharat Forge for this program as facts available (FA), pursuant to section 776(a)(2)(A) of the Act.

## IV.    SUBSIDIES VALUATION

### A.  Allocation Period

The allocation period or average useful life (AUL) of renewable physical assets used in the production of subject merchandise is 15 years.[5]

### B.  Attribution of Subsidies

The attribution of subsidies received by Bharat Forge and Saarloha Advanced Industries Private Limited is described in the *Preliminary Determination*.

In the Preliminary Decision Memorandum, Commerce identified Bharat Forge's affiliate BF Utilities as a provider of power, fuel, and water to Bharat Forge during the POI and a provider of

---

[4] *See* GOI SQR2 at 8.
[5] *See* Preliminary Decision Memorandum at 6.

capital goods to Bharat Forge during the AUL period.[6]  Bharat Forge indicates in its supplemental response that BF Utilities is a company under common control.[7]  This characterization is supported by the accompanying financial statements of BF Utilities, which state that, during the POI, board members of BF Utilities held senior management positions in Bharat Forge.[8]  Accordingly, we preliminarily find that Bharat Forge and BF Utilities meet the cross-ownership definition detailed in 19 CFR 351.525(b)(6)(vi).  We further find that BF Utilities is a supplier of inputs primarily dedicated to the production of the downstream product.  Therefore, for this post-preliminary decision, we are attributing subsidies received by BF Utilities to the combined sales of BF Utilities and Bharat Forge (excluding intercompany sales), in accordance with 19 CFR 351.525(b)(6)(iv).

### C. Denominators

In accordance with 19 CFR 351.525, Commerce considers the basis for a respondent's receipt of benefits under each program when attributing subsidies, *e.g.*, to the respondent's export or total sales.[9]  We have identified the denominator we used to calculate the countervailable subsidy rate for each program, as discussed below and in the calculation memorandum prepared for this post-preliminary analysis.[10]

### D. Discount Rate

Under 19 CFR 351.524(d)(3)(i), Commerce uses as its discount rate the long-term interest rate for each year in which Bharat Forge received non-recurring subsidies.  Bharat Forge reported receiving Indian rupee-denominated long-term loans during the AUL period.  Where applicable, we relied on the interest rates reported on those loans as the discount rate.[11]  For years in which there is no company-specific interest rate available, we used the lending rate identified by the International Monetary Fund's International Financial Statistics for the corresponding or preceding year, pursuant to 19 CFR 351.505(a)(3)(ii).[12]

## V.    ANALYSIS OF PROGRAMS

### A. Programs Preliminarily Determined to Be Countervailable

#### 1.  1998 Power Generation and Promotion Policy

Bharat Forge reported in its initial questionnaire response an outstanding balance during the POI of deferred taxes under the Bombay Sales Tax Rules of 1959, as a result of its wind power

---

[6] *Id.* at 8.
[7] *See* Bharat Forge SQR3 at Exhibit CVDU-4.
[8] *Id* at Exhibit CVDU-1.
[9] *See* Preliminary Decision Memorandum at 8.
[10] *See* Memorandum, "Countervailing Duty Investigation of Forged Steel Fluid End Blocks from India: Calculations for the Post-Preliminary Analysis for Bharat Forge Limited," dated concurrently with this memorandum.
[11] *See* Preliminary Decision Memorandum at 9.
[12] *Id.*

operations.[13]  In a supplemental questionnaire response, Bharat Forge clarifies that the sales tax deferrals related to wind power were conferred under the 1998 Power Generation and Promotion Policy.[14]

Bharat Forge states that "one of the main purposes of this policy was to encourage companies to operate windmills and generate electricity from renewable/non-conventional sources."[15] Companies that make investments in a new plant, machinery, building, land, or technical investment are entitled to sales tax benefits proportionate to that investment, which they may claim as either a deferral or an exemption.[16]  For sales tax exemptions, the company can claim an exemption equal to one-sixth of its eligible investment for up to six years, provided that the plant operates at a load factor of at least 12 percent during each year.[17]  For sales tax deferrals, provided the company meets the 12 percent load factor threshold during that year, it can defer that year's sales taxes for up to ten years.[18]  Bharat Forge reports that it opted for sales tax deferral under this program.[19]

Bharat Forge explains that the sales tax deferral certificates under this program were originally issued to Bharat Forge in 1999 for its windmill operations.[20]  When BF Utilities was spun-off from Bharat Forge in 2001, it transferred its eligibility to continue deferring the sales tax liabilities to Bharat Forge.[21]

As noted above in the section titled "Use of Facts Available," in analyzing this program, we are relying on the information provided by Bharat Forge as facts otherwise available pursuant to section 776(a)(2)(A) of the Act.  We preliminarily determine that the 1998 Power Generation and Promotion Policy provides a countervailable subsidy.  The program is *de jure* specific, as FA, within the meaning of section 771(5A)(D)(i) of the Act because it is limited to producers of renewable energy.[22]  Further, we also find, as FA, that this program provides a financial contribution in the form of revenue forgone, consistent with section 771(5)(D)(ii) of the Act.

Because the deferred taxes must be repaid to the SGOM, we are treating the unpaid tax liability as an interest free loan,[23] and find the benefit to be the interest that Bharat Forge would have otherwise paid during the POI, had they borrowed the full amount of the tax deferrals from a commercial lender.[24]  On this basis, we preliminarily determine the countervailable subsidy rate of 0.05 percent *ad valorem* for Bharat Forge.

---

[13] *See* Bharat Forge IQR at 85.
[14] *See* Bharat Forge SQR3 at 12.
[15] *See* Bharat Forge SQR3 at 15.
[16] *Id.* at 14-15.
[17] *Id.* at 14.
[18] *Id.*
[19] *Id.* at 12.
[20] *See* Bharat Forge SQR3 at 13.
[21] *Id.*
[22] *Id.* at 15.
[23] *See* 19 CFR 351.509(a)(2).
[24] *Id.*

Barcode:4014295-01 C-533-894 INV - Investigation  -

2.   Renewable Energy Certificates

The GOI describes Renewable Energy Certificates (REC) as a market-based mechanism to bridge the gap between the availability and use of renewable energy.[25]  Distributors, producers, and consumers of conventional fossil fuel energy above a designated threshold are required by the Central Electricity Regulatory Commission (CERC) to meet a renewable purchase obligation (RPO).[26]  During the POI, the RPO consists of a minimum purchase of 2.75 percent solar energy and 11 percent non-solar renewable energy, as a share of the obligated entity's total energy purchases.[27]  If an obligated entity fails to meet the RPO, it may use RECs to satisfy this requirement, and if it does not have RECs for this purpose, CERC may determine a monetary penalty calculated on the basis of the shortfall.[28]

RECs are tradable credits that obligated entities can use to satisfy their RPO for the fiscal year.[29]  To receive RECs from the GOI, an energy producer must be accredited by CERC and apply within six months of the corresponding energy generation.[30]  CERC will review the application and issue one REC for each megawatt hour of electricity generated from renewable sources and injected into the grid.[31]  In addition to being able to meet an entity's RPO, RECs are also tradable, with the price floor set by CERC on the basis of renewable energy cost, capacity, and usage targets.[32]

Bharat Forge reports that BF Utilities received RECs based on its wind power generation activities during the POI.[33]  Neither Bharat Forge nor BF Utilities is subject to RPOs.[34]  However, as noted above, RECs are tradable between entities and, therefore, the RECs still have value to BF Utilities because it can sell them to companies seeking to avoid penalties for failure to meet their RPOs.  Commerce preliminarily determines that RECs are *de jure* specific, pursuant to section 771(5A)(D)(i) of the Act because they are available only to producers of renewable energy.

By virtue of imposing an RPO on certain entities and creating this mechanism by which entities can use or trade RECs, the GOI is providing a fiscal allowance or certificate that has value at the time of bestowal.  It is important to note that because BF Utilities is not required to fulfill an RPO, its only use for the RECs is to sell them to obligated entities.  Therefore, we preliminarily determine that the GOI is providing a financial contribution in the form of a direct transfer of funds, pursuant to section 771(5)(D)(i) of the Act.

As noted above, the REC has value at the time of bestowal, though the exact amount of value is not yet known.  The exact value of the REC in this instance, and therefore the benefit received by

---

[25] *See* GOI SQR2 at 9.
[26] *See* Bharat Forge SQR4 at 5-6.
[27] *Id.* at 6.
[28] *Id.*
[29] *See* GOI SQR2 at 9.
[30] *Id.* at Exhibit 2B.
[31] *Id.*
[32] *Id.*
[33] *See* Bharat Forge SQR3 at 21.
[34] *See* Bharat Forge SQR4 at 7.

BF Utilities, can be measured in the amount for which BF Utilities sells its RECs to other entities.  This program provides a recurring benefit, as RECs are not tied to capital assets and recipients can expect to receive additional subsidies under this same program from year to year, consistent with 19 CFR 351.524(c)(2)(i).  We calculated the benefit to BF Utilities as the value of RECs BF Utilities sold during the POI.[35]  On this basis, Commerce has preliminarily determined the countervailable subsidy rate of 0.05 percent *ad valorem* for Bharat Forge.

### B. Program Preliminarily Determined Not to be Not Used

Status Certificate Program

The Status Certificate Program recognizes exporters as they reach certain export performance thresholds.  Status holders under the program are eligible for privileges including self-declaration for imports and exports, priority reviews of the standard input-output norms, exemption from furnishing bank guarantees, exemption from compulsory negotiation of documents through banks, permits to establish export warehouses, and preferential treatment in handling of consignments.[36]  In their initial questionnaire response, Bharat Forge reported that they received no benefits under the program, and that it was "merely a recognition by the Government."[37]

Commerce asked Bharat Forge whether they received any of the specific privileges detailed in the program document.[38]  Bharat Forge reported that it received none of the benefits available under the status certificate program.[39]  Accordingly, we preliminarily find that this program was not used during the POI.

---

[35] *See* Bharat Forge SQR3 at Exhibit CVDU-8.
[36] *See* GOI IQR at 134-135; *see also* GOI IQR Exhibit 7a at 97.
[37] *See* Bharat Forge IQR at 61.
[38] *See* Commerce's Letter, "Forged Steel Fluid End Blocks (Fluid End Blocks) from India:  Supplemental Questionnaire for Bharat Forge Limited," dated June 4, 2020 at 3.
[39] *See* Bharat Forge SQR4 at 1-4 and Exhibit CVD-43.1.

## VI.    Recommendation

We recommend that you approve the positions described above.

☒
_____

Agree

☐
_____

Disagree

8/10/2020

X _____

Signed by: JEFFREY KESSLER