**Slip Op. 26-36**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| POSCO,<br><br>          Plaintiff,<br><br>    and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>          Plaintiff-Intervenor,<br><br>    v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>    and<br><br>NUCOR CORPORATION,<br><br>          Defendant-Intervenor. | Before: Jane A. Restani, Judge<br><br>Court No. 24-00006 |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the Department of Commerce's final remand redetermination in countervailing duty order review of certain carbon and alloy steel cut-to-length plate from the Republic of Korea.]

Dated: April 17, 2026

<u>Brady Warfield Mills</u>, Taft Stettinius & Hollister LLP, of Washington, DC, for the plaintiff, POSCO. With him on the brief were <u>Donald B. Cameron, Jr.</u>, <u>Edward J. Thomas, III</u>, <u>Eugene Degnan</u>, <u>Jordan L. Fleischer, Jr.</u>, <u>Julie Clark Mendoza</u>, <u>Mary Shannon Hodgins</u>, <u>Nicholas C. Duffey, Jr.</u>, and <u>Rudi Will Planert</u>.

<u>Yujin Kim McNamara</u>, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, DC, for the plaintiff-intervenor, Government of the Republic of Korea. With her on the brief were <u>Daniel Martin Witkowski</u>, <u>Devin Scott Sikes</u>, and <u>Sung Un K. Kim</u>.

Tara Kathleen Hogan, Lead Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for the defendant.  Of counsel on the brief were Fee Pauwels and William Mitchell Purdy, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, of Washington, DC.

Alan Hayden Price, Wiley Rein, LLP, of Washington, DC, for the defendant-intervenor, Nucor Corporation.  With him on the brief were Adam Milan Teslik, Christopher Bright Weld, Derick G. Holt, Enbar Toledano, Maureen Elizabeth Thorson, Paul A. Devamithran, and Theodore Paul Brackemyre.

Restani, Judge:    Before the court is the United States Department of Commerce's ("Commerce") final remand redetermination pursuant to the court's remand order in POSCO v. United States, 794 F. Supp. 3d 1402 (CIT 2025) ("POSCO I").    See Final Results of Redetermination Pursuant to Court Remand, ECF No. 60-1 (Dec. 9, 2025) ("Remand Results"). In POSCO I, the court considered Commerce's final results of its countervailing duty ("CVD") administrative review of carbon and alloy steel cut-to-length plate ("CTL plate") from the Republic of Korea ("Korea") for period of review ("POR") January 1, 2021, to December 31, 2021.  See Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) ("Final Results").  In its Final Results, Commerce determined that Korea's provision of electricity for less than adequate remuneration ("LTAR") and its allocation of extra emissions permits ("Korea Allowance Units" or "KAUs") pursuant to the Korea Emission Trade System ("K-ETS") constituted countervailable subsidies to POSCO, a producer and exporter of CTL plate. See id.; Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review: Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea at 24, 34–38, P.R. 174 (Dep't Commerce Dec. 1, 2023) ("IDM").

The court sustained in part and remanded in part Commerce's final determination.  See POSCO I at 1417.  The court directed Commerce to reconsider: (1) the specificity of Korea's

electricity subsidy; (2) whether POSCO's receipt of extra emissions permits constitutes a financial

contribution; and (3) whether the allocation of those extra KAUs is de jure specific. Id. For the

following reasons, the court sustains all but the specificity finding as to KAUs and thus sustains in

part and remands in part Commerce's Remand Results.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its previous opinion

ordering remand to Commerce, see POSCO I, and recounts only those facts relevant to the court's

review of the Remand Results. In 2017, Commerce issued a CVD order on CTL plate from Korea,

and on July 14, 2022, Commerce initiated an administrative review of the CVD order for POR

January 1, 2021, to December 31, 2021. See Certain Carbon and Alloy Steel Cut-to-Length Plate

from the Republic of Korea: Countervailing Duty Order, 82 Fed. Reg. 24,103 (May 25, 2017)

("Order"); Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed.

Reg. 42,144 (July 14, 2022). In December 2023, Commerce issued its Final Results, along with

the accompanying Issues and Decision Memorandum, in which it found that two government

programs in Korea provided countervailable subsidies to POSCO. See Final Results; IDM.

On August 8, 2025, the court remanded in part Commerce's Final Results, concluding that

portions of Commerce's findings were unsupported by substantial evidence and contrary to law.

POSCO I at 1417. First, the court held that Commerce unreasonably determined that the Korean

government's provision of electricity was de facto specific. Id. at 1407–08. The court reasoned

that Commerce arbitrarily grouped the steel industry with two other unrelated manufacturing

industries without demonstrating that the three-industry group received a disproportionate share

of the electricity as required by Section 1677(5A)(D)(iii)(III). Id. at 1408, 1410–11; see 19 U.S.C.

§ 1677(5A)(D)(iii)(III). The court ordered Commerce to provide a logical basis for grouping the

three industries and to provide evidence supporting its finding that the Korean steel industry's subsidy is out of line with the industry's own usage.  POSCO I at 1408, 1410–11.

Second, the court held that Commerce's determination that the allocation of additional KAUs to POSCO constituted revenue foregone did not align with the language of Section 1677(5)(D)(ii).  Id. at 1412–13.  The court directed Commerce to reconsider whether POSCO's receipt of extra KAUs constituted a financial contribution under the other prongs of Section 1677(5)(D).[1]  See id. at 1411–13, 1413 n.8.  The court also held Commerce's determination that the allocation of extra KAUs was de jure specific to be unreasonable because K-ETS does not expressly designate the industries or group of industries that may obtain the KAUs.  Id. at 1416. Finally, the court determined that Commerce had failed to provide substantial evidence to support its conclusion that the Korean law's[2] intensity criteria fell outside the safe harbor provision of Section 1677(5A)(D)(ii).  Id. at 1416–17.

On December 9, 2025, Commerce filed its Remand Results.  See Remand Results.  First, Commerce concluded that the record lacks sufficient evidence to support a finding that Korea's provision of electricity for LTAR program is de facto specific.  Id. at 4–5.  Second, Commerce modified its financial contribution analysis to find that Korea's allocation of KAUs constitutes a financial contribution in the form of a direct transfer of funds under Section 1677(5)(D)(i).  Id. at 6.  Third, Commerce found that the allocation of KAUs is specific because eligibility for KAUs is

---

[1] "Financial contribution" refers to
    (i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,
    (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,
    (iii) providing goods or services, other than general infrastructure, or
    (iv) purchasing goods.
19 U.S.C. § 1677(5)(D).
[2] See infra note 5.

contingent on export performance as one of multiple conditions, thereby satisfying the criteria for the export subsidy. Id. at 10.

On January 15, 2026, plaintiff POSCO and plaintiff-intervenor Korea separately filed comments on the Remand Results, requesting that the court remand Commerce's Remand Results with instructions to reconsider its financial contribution and specificity determinations with respect to K-ETS. Pl. POSCO's Comments in Opp'n to Remand Results at 2–3, 8, ECF No. 63 (Jan. 15, 2026) ("POSCO Cmts."); Pl.-Intervenor Gov't of the Republic of Korea's Comments on the Final Results of Redetermination at 18, ECF No. 64 (Jan. 15, 2026) ("Korea Cmts."). Defendant-intervenor Nucor submitted comments arguing that Commerce did not sufficiently explain its de facto specificity analysis of the electricity subsidy program. Def.-Intervenor Nucor's Comments in Opp'n to the Final Results of Redetermination Pursuant to Ct. Remand at 5–6, ECF No. 66 (Jan.15, 2026) ("Nucor Cmts.").

On February 20, 2026, the government filed its response, and POSCO, Korea, and Nucor filed their replies. Def.'s Resp. to Comments on the Remand Redetermination, ECF No. 69 (Feb. 20, 2026) ("Gov't Resp."); Pl.'s Comments in Supp. of Remand Results, ECF No. 70 (Feb. 20, 2026) ("POSCO Reply"); Pl.-Intervenor Gov't of the Republic of Korea's Confidential Comments in Supp. of the Final Results of Redetermination, ECF No. 71 (Feb. 20, 206) ("Korea Conf. Reply"); Def.-Intervenor's Comments in Supp. of the Final Results of Redetermination Pursuant to Ct. Remand, ECF No. 73 (Feb. 20, 2026) ("Nucor Reply").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(i). The court will uphold Commerce's determinations in a countervailing duty proceeding unless they are "unsupported by substantial evidence on the record, or otherwise not

in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order." U.S. Steel Corp. v. United States, 219 F. Supp. 3d 1300, 1307 (CIT 2017) (citation modified) (citation omitted).

## DISCUSSION

### I.    Commerce's Specificity Determinations Are Sustained in Part and Remanded in Part

#### a.    Commerce reasonably found that there is insufficient evidence to demonstrate that Korea's provision of electricity is specific.

POSCO and Korea argue that Commerce's determination is consistent with the court's order because Commerce, on remand, determined "there is insufficient evidence" to demonstrate that the provision of electricity for LTAR is specific and countervailable, and Commerce was not required to do more. POSCO Reply at 3 (citing Remand Results at 4–5); Korea Conf. Reply at 2. They argue that Commerce correctly concluded there was insufficient record evidence to establish the required baseline for comparison or to otherwise show that the steel industry received a disproportionate share of subsidies from the electricity for LTAR program. POSCO Reply at 3; see Korea Conf. Reply at 2–4. According to POSCO and Korea, Commerce correctly found it had insufficient alternative information to consider the actual make-up of firms in its group of enterprises or industries. POSCO Reply at 4; Korea Conf. Reply at 2. POSCO and Korea explain that electricity, unlike the subsidies in Hyundai Steel Co. v. United States, 701 F. Supp. 3d 1398, 1413 (CIT 2024), is widely available in Korea, so Commerce must provide a reasonable explanation for grouping enterprises or industries in its de facto specificity analysis. POSCO Reply at 5–7; Korea Conf. Reply at 6–7. Lastly, they argue that while Commerce could have reopened the record on remand, it is not obligated to do so. POSCO Reply at 8; Korea Conf. Reply at 8–9 (citing Fresh Garlic Producers Ass'n v. United States, 190 F. Supp. 3d 1302, 1306–07 (CIT

2016)).

Nucor argues that Commerce failed to adequately explain its determination in the light of the statute, Commerce's rules and practice, and the record before the agency. Nucor Cmts. at 5–6 (citing CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1380 (Fed. Cir. 2016)). Nucor explains that it is not enough for the Remand Results merely to state that "the record lacks the information necessary to perform the analysis suggested by the [c]ourt" without further explaining what that analysis involves or what specific information is missing from the record. Nucor Cmts. at 5–6 (citing Remand Results at 14). Nucor argues that if Commerce believed that the court's remand required an analysis beyond the scope of its original questionnaires, Commerce had the discretion to reopen the record on remand to obtain the information needed to carry out that analysis. Id. at 6 (citing Remand Results at 14).

The government responds that none of Nucor's arguments undermine Commerce's determination. Gov't Resp. at 11. Specifically, the government counters that Commerce's remand redetermination must comply with the remand order, id. at 12, and Nucor has not identified any record evidence on which Commerce should have relied to comply with the remand order. Id. (citing POSCO I at 1417).

Commerce imposes countervailing duties to protect American producers from governments that "[unfairly] subsidize domestic industries to benefit the production or exportation of merchandise and thereby confer an advantage in the trading system." Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, 633 F. Supp. 3d 1276, 1278 (CIT 2023). A subsidy is only countervailable if it (1) provides a financial contribution (2) that confers a benefit and (3) is specific to an enterprise or industry, or group of such enterprises or industries, either as a matter of law ("de jure") or as a matter of fact ("de facto"). 19 U.S.C. §§ 1677(5)–(5A). The statute does

not set out how Commerce should construct "a group of such enterprises or industries." Id. § 1677(5A). Commerce's regulations state that the agency need not consider "whether there are shared characteristics among the enterprises or industries" when determining whether a subsidy is being provided to a group of industries or enterprises. 19 C.F.R. § 351.502(b). The Federal Circuit, however, has stated that "the actual make-up of the eligible firms . . . determines whether those firms comprise a specific industry or group of industries." PPG Indus. v. United States, 978 F.2d 1232, 1240–41 (Fed. Cir. 1992). Whatever the range of criteria for grouping industries may be, Commerce must exercise its discretion to group industries reasonably "within the constraints of the statute and record." See Oman Fasteners, LLC v. United States, 125 F.4th 1068, 1086–87 (Fed. Cir. 2025). It cannot be arbitrary. Commerce has discretion to re-open the record in front of it. See Fresh Garlic Producers Ass'n, 190 F. Supp. 3d at 1306; see also NTN Bearing Corp. of Am. v. United States, 25 CIT 118, 124, 132 F. Supp. 2d 1102, 1107–08 (CIT 2001) (clarifying that this discretion exists "absent express language from the court barring such action") (citation omitted).

In the Final Results, Commerce found that Korea's provision of electricity is countervailable because it is de facto specific. See IDM at 10, 24 (explaining that the steel industry receives a disproportionate amount of the subsidy); Final Results. In POSCO I, the court asked Commerce (1) to provide a logical basis for the grouping of industries or enterprises and (2) to use a "baseline" in its comparison that reflects how "the Korean steel industry's subsidy is out of line with the industry's own usage" of electricity. POSCO I at 1408, 1410. In the Remand Results, however, Commerce found that it did "not have sufficient alternative information on the record of the underlying review to further consider a basis for the grouping of industries or enterprises, to establish a different baseline, or to otherwise further substantiate a de facto specificity

determination."   Remand Results at 4.   Commerce found that there was insufficient record evidence to demonstrate that the provision of electricity for LTAR program was specific, meaning the program was not countervailable.  Id. at 4–5.

In POSCO I, the court required Commerce to support its conclusion that Korea's provision of electricity is specific, POSCO I at 1408, 1410, and now that Commerce has withdrawn this conclusion, it has complied with the court's remand order.  Additionally, when Commerce could not point to sufficient alternative information on the record to support its conclusion as required by the court's remand order in POSCO I, it was not required to re-open the record.  Fresh Garlic Producers Ass'n, 190 F. Supp. 3d at 1306.  While Nucor argues that Commerce should have pointed to what evidence was lacking, Nucor provides no legal support for its argument that Commerce needed to do more than it did here.  Further, Nucor does not indicate what type of information might be available to support a finding of specificity.  Accordingly, Commerce did not abuse its discretion in not reopening the record, and its conclusion that there was insufficient evidence of specificity as to an electricity subsidy is sustained.

> **b.  Commerce unreasonably found that Korea's allocation of additional KAUs is specific and must undertake a de facto specificity analysis on remand.**

At issue is the Korean government's allocation of additional KAUs to certain companies as part of K-ETS.  K-ETS is the central part of Korea's greenhouse gas ("GHG") reduction policy and its international commitment to reduce GHG emissions.  Letter from Lee & Ko LLC and Morris, Manning & Martin LLP to Sec'y of Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: GOK's Initial Questionnaire Response ("Korea IQR"), App.-16 at 1, C.R. 157–79, P.R. 61–72 (Oct. 12, 2022) ("App. 16").

Court No. 24-00006                                                      Page 10

Under K-ETS, the Korean government allocates KAUs to businesses[3] in accordance with the Act on the Allocation and Trading of Greenhouse-Gas Emissions Permits ("AAGEP").  Id.  Through K-ETS, participants must pay for their carbon emissions with KAUs (or risk a regulatory penalty) and must obtain additional permits if they choose to emit more GHGs than their initial allocation covers.  Id. at 2; Korea IQR, Ex. CEP-1 at 92, AAGEP, art. 33.  The Korean government provides a group of companies with KAUs that correspond only to 90% of the carbon emission goal.  App. 16 at 1.  Some participants are eligible for 100% free KAU allocation:  The Korean government provides additional KAUs to certain public organizations or non-profit entities such as local governments, schools, medical institutions, public transportation operators, and business operators, as well as subsectors that meet a mathematical threshold calculation.[4]  Id.; Korea IQR, Ex. CEP-1 at 149, Enforcement Decree of the AAGEP, art. 19(2) ("Enforcement Decree of the AAGEP").[5]  When a subsector's "international trade intensity" multiplied by "production cost incurrence rate" is 0.002 or above, the Korean government provides 100% free KAU allocation.  App. 16 at 2, 9; Enforcement Decree of the AAGEP, art. 19; Korea IQR, Ex. CEP-1 at 92, AAGEP, art. 12(4).  The "cost incurrence rate" for each subsector is calculated based on the product[6] of the yearly average of greenhouse gas emissions and the market price of the KAUs divided by the amount of value added from 2016 to 2018, the base comparison period.  Korea IQR at 45.  The "trade intensity" for each subsector is calculated by the sum of the annual average of exports and

---

[3] The Minister of Environment designates which businesses are eligible for allocation.  App. 16 at 1.

[4] California and the European Union have adopted the same calculation.  Id. at 9 n.5.

[5] The rules governing K-ETS are contained in the AAGEP and its accompanying Enforcement Decree.  See App. 16 at 1.  The Enforcement Decree makes effective the enactment of the AAGEP. Enforcement Decree of the AAGEP at 1 (describing the purpose of the enforcement decree); id. art. 19(1) ("[A] type of business in which the value calculated by multiplying the production cost incurrence rate and the international trade intensity . . . is at least 2/1000.").

[6] "Product" here refers to the result of multiplying two factors, i.e. numbers.

imports divided by the annual average of sales and imports from the base comparison period.[7]  Id.

at 44.  POSCO is in the "Industry" sector and in the "Manufacturing of primary steel" subsector.

Id. at 43; Korea IQR, Ex. CEP-8 at 202.  The calculation for this subsector yields 0.04959 (listed

as 4.959%), which is greater than 0.002.  Korea IQR, Ex. CEP-8 at 202.

POSCO and Korea argue that Commerce unreasonably determined that the allocation of

KAUs is specific because the receipt of KAUs is not "contingent" upon export performance[8] as

required by Section 1677(5A)(B).  Pl. Cmts. at 8; Korea Cmts. at 10 (arguing that the statute

requires a finding that the subsidy depends on export performance).[9]  Citing to a definition of

"contingent,"[10] POSCO explains that it is "not sufficient for export performance to simply be one

of the factors that could qualify a company for receipt of an export subsidy," Pl. Cmts. at 9, and

Korea points out that the allocation of additional KAUs depends on the product of the factors, not

---

[7] In Appendix-16, when asked if "the actual export performance or export potential of an applicant or recipient" is taken into account to determine eligibility under the K-ETS provision of additional permits, the Korean government answered, "No, the actual export performance or export potential of an applicant entity or recipient is not taken into account in any way in determining the eligibility for or receipt of any assistance under this program."  App. 16 at 12.

[8] "Export performance" refers to actual or anticipated exportation or export earnings.  See 19 C.F.R. § 351.514(a) (explaining that "a subsidy" is "contingent upon export performance if the provision of the subsidy is, in law or in fact, tied to actual or anticipated exportation or export earnings, alone or as one of two or more conditions").

[9] Korea presents the following definitions in support.  Korea Cmts. at 10.  "Contingent" is defined as "depending on something that may or may not happen" or "dependent for existence, occurrence, character, etc., on something not yet certain; conditional."  Contingent, Oxford Learner's Dictionaries,        https://www.oxfordlearnersdictionaries.com/definition/english/contingent_2; Collins    Dictionaries,    https://www.collinsdictionary.com/us/dictionary/english/contingent. "Condition" is defined as "a situation that must exist in order for something else to happen," Condition,                Oxford                Learner's                Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/condition_1,  and  "something which must happen or be done in order for something else to be possible, especially when this is written    into    a    contract    or    law."    Condition,    Collins    Dictionaries, https://www.collinsdictionary.com/us/dictionary/english/condition.

[10] "Contingent" is defined as "occurring or existing only if (certain circumstances) are the case; dependent        on."        Pl.        Cmts.        at        9        (citing        Contingent, https://www.google.com/search?q=contingent+definition).

on them separately.  Korea Cmts. at 11.  According to POSCO, Commerce had to show, but could not show, that "but for" a company's export performance, it could not qualify for the additional permit allocation.  Pl. Cmts. at 9.  Korea claims that a subsidy program may only be found specific as an export subsidy if the export requirement is applied on an individual entity level, not a subsector level.  See Korea Cmts. at 15–16.

POSCO and Korea also provide mathematical examples to demonstrate how an industry that either has no exports but faces competition from imports, has a large number of imports, or has a low number of domestic sales could meet the criterion for additional KAUs.  Pl. Cmts. at 10; Korea Cmts. at 12.  They use these hypotheticals to demonstrate that meeting the threshold under Article 19(1) can be achieved through means other than exports, so the receipt of additional KAUs is not "contingent" upon export performance.[11]  Pl. Cmts. at 11; Korea Cmts. at 12.

Nucor and the government both argue that Commerce's remand determination is supported

---

[11] Additionally, both POSCO and Korea posit that Commerce is being inconsistent with its prior analogous determinations in Oil Country Tubular Goods From the Republic of Korea: Final Affirmative Countervailing Duty Determination, 87 Fed. Reg. 59,056 (Dep't Commerce Sep. 29, 2022) ("OCTG from Korea") and in Certain Iron-Metal Castings from India: Final Results of Countervailing Duty Administrative Review, 65 Fed. Reg. 31,515 (Dep't Commerce May 18, 2000) ("Metal Castings from India").  Pl. Cmts. at 12–14; Korea Cmts. at 10, 14–18.  Each administrative review, however, is a "separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1387 (Fed. Cir. 2014).  Further, as Nucor argues, the analysis in OCTG from Korea addresses Phase Two of the program, while this review concerns Phase Three, which applies different eligibility criteria and therefore requires a distinct specificity analysis. Remand Results at 25; Nucor Reply at 6–7.  The exact differences in the programs are not determinative.

The export performance criterion here, however, does play a similar role to the export levels in the bank's loan approval criteria at issue in Metal Castings from India.  See Remand Results at 28; Pl. Cmts. at 13.  There, export data was not required for loan approval but was part of a broader set of indicators.  Pl. Cmts. at 13 (citing to Metal Castings from India and accompanying Issues and Decision Memorandum at Comment 3).  Commerce accordingly determined that financing was not based on export-specific criteria because exportation or anticipated exportation was not a factor with regard to the provision of loans by the banks.  Id.  Here, the allocation of additional KAUs

by substantial evidence and not contrary to law because the allocation of KAUs to certain entities meeting the intensity criteria is specific.  Nucor Reply at 6; Gov't Resp. at 22 (citing Remand Results at 10–11).  According to Nucor, Commerce correctly noted that the Korean government multiplies two factors, international trade intensity and production cost incurrence rate, to determine which subsectors receive the KAUs.  Nucor Reply at 6.  The factor, international trade intensity, which includes export performance, is "1 of 2 or more conditions."  Id. (citing Remand Results at 11).  The government further underscores that Commerce reasonably found the "international trade intensity" criterion to be dependent upon the portion of export sales of the subsector to qualify for the additional allocation of KAUs.  Gov't Resp. at 22–23 (exports as a necessary criterion according to the explicit language of Article 19(1)).  The government dismisses POSCO's and Korea's theoretical mathematical scenarios and their attempts to read a "but for" test into the prepositional phrase "contingent upon."  Id. at 23.  The government explains that Commerce appropriately determined that "a subsector would not qualify for the additional allocation of KAUs unless a combination of the three factors of export performance, imports, and the costs incurred met the defined threshold for qualification."  Id. (citing Remand Results at 27).

A subsidy is specific if it is an export subsidy per Section 1677(5A)(B), an import

---

likewise does not require exports.  Korea IQR at 44–45; Pl. Cmts. at 14.  The reasoning underlying Metal Castings from India is thus informative.

substitution subsidy per Section 1677(5A)(C), or a domestic subsidy[12] per Section 1677(5A)(D).[13]

19 U.S.C. § 1677 (5A)(A).  "An export subsidy is a subsidy that is, in law [de jure] or in fact [de

facto], contingent upon export performance, alone or as 1 of 2 or more conditions."  19 U.S.C.

§ 1677(5A)(B).  According to Commerce's implementing regulation, a subsidy is an "export

subsidy if the Secretary determines that eligibility for, approval of, or the amount of, a subsidy is

contingent upon export performance," and a subsidy is "contingent upon export performance if the

provision of the subsidy is, in law or in fact, tied to actual or anticipated exportation or export

earnings, alone or as one of two or more conditions."  19 C.F.R. § 351.514(a).

Courts exercise their independent judgment in deciding statutory meaning.  Loper Bright

Enters. v. Raimondo, 603 U.S. 369, 394 (2024).  In doing so, courts use traditional tools of

---

[12] As stated in the previous section, a domestic subsidy is de jure specific if the subsidy "expressly limits access to . . . an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i).  This express limitation must confine the subsidy to "specifically named enterprises or industries or group of enterprises or industries."  BGH Edelstahl Siegen GmbH v. United States, 639 F. Supp. 3d 1237, 1244 (CIT 2023).  Subsidies have a safe harbor provision, however.  A domestic subsidy cannot be de jure specific if it "establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy[,] . . . eligibility is automatic[,] . . . the criteria or conditions for eligibility are strictly followed, and . . . clearly set . . . so as to be capable of verification."  19 U.S.C. § 1677(5A)(D)(ii).  "'[O]bjective criteria or conditions' means criteria or conditions that are neutral and that do not favor one enterprise or industry over another."  19 U.S.C. § 1677(5A)(D)(ii)(III).  "Neutral criteria" are those which are "based upon factors relating to the consumption of goods or services and . . . [are] uniformly available across industries."  BGH Edelstahl, 639 F. Supp. 3d at 1243.

[13] The provisions on specificity were added to the Tariff Act of 1930 when it was revised to "approve and implement the trade agreements concluded in the Uruguay Round of multilateral trade negotiations" in 1994.  Mr. Gibbons, From the Committee on Ways and Means, H.R. Rep. No. 103-826, pt. 1 at 1 (1994); see Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994).  Because "all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results," the specificity test is meant to exclude foreign subsidies that "are broadly available and widely used throughout an economy."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994), reprinted in 1994 U.S.C.A.A.N. 4040, 4242 ("SAA") (citing Carlisle Tire & Rubber Co. v. United States, 5 C.I.T. 229, 564 F. Supp. 834 (1983)).

statutory interpretation, id. at 401, specifically examining the "statute's text, structure, and legislative history, and [applying] the relevant canons of interpretation." Delverde, SrL v. United States, 202 F.3d 1360, 1363 (Fed. Cir. 2000); see also, e.g., Ventura Coastal LLC v. United States, 736 F. Supp. 3d 1342, 1357 (CIT 2024).  Starting with the text, the plain meaning of the word is ascertained in context.  Yates v. United States, 574 U.S. 528, 537 (2015) (citing Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)).  Dictionary definitions, although helpful, are not solely dispositive, and must be weighed considering the statute as a whole.  Id. (citation omitted).

In its original determination, Commerce found the additional ten percent KAU allocation to a select group of industries under K-ETS to be de jure specific as a domestic subsidy per Section 1677(5A)(D)(i), rather than as an export subsidy.  IDM at 45.  In POSCO I, the court held that Korea's allocation of KAUs is not de jure specific because, although the subsidy has eligibility criteria, the "existence of eligibility requirements" per se does not establish de jure specificity.  POSCO I at 1416.  Additionally, the court held that Commerce's determination that the criteria did not meet the safe harbor provision under Section 1677(5A)(D)(ii) was not supported by substantial evidence.  Id.  The court remanded this issue for Commerce to reconsider.  Id. at 1417.

On remand, instead of undertaking an analysis of the criteria for a de facto specific domestic subsidy, Commerce found that the additional ten percent allocation by Korea is specific under Sections 1677(5A)(A) and (B) because it meets the criteria for an "export subsidy."  Remand Results at 10.  It determined that "international trade intensity" is dependent upon the subsector's portion of export sales.  Thus, meeting the threshold is "dependent on the exports of the subsector."  Id. at 11.  In other words, the allocation of KAUs is contingent upon export performance as one of two or more conditions, meaning it is an export subsidy under the terms of Section 1677(5A)(B).  Id.

Commerce's conclusion that the allocation of additional KAUs is "contingent upon export performance," Remand Results at 2, is not supported by substantial evidence or in accordance with law because it dilutes the statutory requirement beyond recognition. Although Section 1677(5A)(B) allows export performance to be "1 of 2 or more conditions," that language does not permit Commerce to ignore that it must be "contingent upon export performance" and to treat export performance as merely one mathematical input among several where eligibility can be satisfied even in the absence of exports.[14] Looking at the plain meaning of the terms themselves, contingent is defined as "dependent on something else; conditional," Contingent, Black's Law Dictionary (9th ed. 2009), and "condition" is defined as "something essential to the appearance or occurrence of something else." Condition, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/condition (emphasis added). Looking at the statutory scheme as a whole, this specificity test was added following the Uruguay Round of multilateral trade negotiations, with the intent to exclude foreign subsidies that "are broadly available and widely used throughout an economy." See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994), reprinted in 1994 U.S.C.A.A.N. 4040, 4242 ("SAA"). Commerce's determination here does not show that the subsidy departs from that baseline.

By the statute's design, an export subsidy, per Section 1677(5A)(B), requires that export performance be a necessary condition for receipt—i.e., that a firm's exports cannot be zero and

---

[14] Consider a statute defining export subsidy as "contingent upon exports to the United States." The Korean government's formula for determining eligibility under Article 19(1) could still meet the threshold required by the Korean law even if exports to the United States were zero, and exports to another country were very high instead. The calculation for international trade intensity would be the sum of the annual average of all exports and imports divided by the annual average of sales and imports from the base comparison period. Summing the annual average for exports in the numerator when the exports to the United States are zero, one could hardly say that the subsidy is contingent upon exports to the United States.

still qualify.  Here, however, the record demonstrates that the Article 19(1) formula, as illustrated

by POSCO and Korea, can be satisfied through various combinations of imports, sales, and cost

factors, such that subsectors with little or no export activity may still meet the threshold.  Pl. Cmts.

at 10–11; Korea Cmts. at 12.  In that circumstance, export performance is not a true condition of

eligibility but simply one variable in a broader calculation.  Commerce's reasoning is further

undermined by its own regulatory definition, which interprets export subsidies as those tied

specifically to exportation, not merely those in which exports play some attenuated role.  See 19

C.F.R. § 351.514(a) (stating that an export subsidy is "contingent upon export performance if the

provision of the subsidy is, in law or in fact, tied to actual or anticipated exportation or export

earnings, alone or as one of two or more conditions").  Accepting Commerce's determination here

would effectively collapse the distinction between export subsidies and generally available

programs that reference trade-related metrics, contrary to the language of the statute.  Because the

program's design does not require export performance as a meaningful prerequisite for receiving

additional KAUs, Commerce's finding of specificity as an export subsidy is unreasonable.  On

remand, in order to impose a countervailing duty, Commerce must instead evaluate whether the

subsidy is de facto specific under Section 1677(5A)(D).

## II.    Commerce's Financial Contribution Determination for the Allocation of KAUs on Remand Is Reasonable

POSCO and Korea argue that Commerce unreasonably determined that Korea's allocation

of additional KAUs to a select group of industries constitutes a "direct transfer of funds" under

Section 1677(5)(D)(i).  See POSCO Cmts. at 2–8; Korea Cmts. at 3–9.  They argue that by treating

the allocation of KAUs as a direct transfer of funds, Commerce impermissibly expanded the

meaning of financial contribution because permits are not consonant with the examples of direct

transfers of funds listed in the statute.  POSCO Cmts. at 4; Korea Cmts. at 3–4.  Both parties reject

Commerce's determination that KAUs are instruments of monetary value. POSCO Cmts at 5–6; Korea Cmts. at 4. Instead, they assert that KAUs merely act as permits to emit a certain level of GHGs. POSCO Cmts. at 5–6; Korea Cmts. at 4. POSCO and Korea add that the allocation of additional KAUs is not a direct transfer of funds because, even assuming KAUs hold monetary value, any value received for the permits would come from selling them to private market participants, as opposed to the Korean government.[15] POSCO Cmts. at 6–7; Korea Cmts. at 6–8.

The government and Nucor argue that Commerce reasonably determined that Korea's allocation of KAUs is a direct transfer of funds under Section 1677(5)(D)(i). See Gov't Resp. at 15–22; Nucor Reply at 4–5. They argue that KAUs constitute "funds" under Section 1677 because they are fungible instruments of monetary value. See Gov't Resp. at 16–18; Nucor Reply at 4. They maintain that the examples in Section 1677(5)(D)(i) are illustrative and that "funds" should be read broadly given that Congress indicated in the legislative history[16] that Commerce had discretion to make financial contribution determinations on a case-by-case basis. Gov't Resp. at 16; Nucor Reply at 4–5. The government adds that the inclusion of "loan guarantees" in Section 1677(5)(D)(i) shows that Congress understood direct transfers of funds to include more than currency or funds in the traditional sense because a loan guarantee is not, in and of itself, a form of currency. Gov't Resp. at 16–17. The government also argues that Korea's allocation of KAUs

---

[15] POSCO and Korea also argue that Commerce's reliance on Granular Polytetrafluoroethylene Resin from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, 87 Fed. Reg. 3,765 (Dep't Commerce Jan. 25, 2022) ("PTFE Resin from India") and Forged Steel Fluid End Blocks from India: Final Affirmative Countervailing Duty Determination, 85 Fed. Reg. 79,999 ( Dep't Commerce Dec. 11, 2020) ("FEBs from India") is misplaced. POSCO Cmts. at 6–8; Korea Cmts. at 5–6. The government and Nucor maintain that the reasoning behind Commerce's determinations in PTFE Resin from India and FEBs from India applies because the renewable energy credits at issue were instruments of monetary value. Gov't Resp. at 20–22; Nucor Reply at 5.
[16] See SAA at 4240.

is a direct transfer because KAUs hold "inherent value" as the representative currency within K-ETS—even if their precise value is not realized until the moment of sale on the private market. Id. at 19–20.

To find a countervailable subsidy here, Commerce must establish that an authority provided a financial contribution and thereby conferred a benefit. See 19 U.S.C. § 1677(5). Under Section 1677(5)(D)(i), "the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees" may constitute a financial contribution. Id. § 1677(5)(D)(i). Examples imbedded in a statutory provision give the words a "more precise content." United States v. Williams, 553 U.S. 285, 294 (2008). Additionally, because a statutory term is "known by the company it keeps," terms are "appropriately read to refer . . . specifically to the subset" illustrated by any examples. Yates, 574 U.S. at 543–44.

On remand, Commerce determined that Korea's additional ten percent allocation of KAUs, provided under K-ETS, provides a financial contribution to recipients. Remand Results at 6. Commerce found that KAUs are fungible instruments of monetary value due to the design of K-ETS, wherein the Korean government controls a limited supply of KAUs and where companies must use KAUs to pay for their emissions and may buy or sell KAUs in a public market. Id. at 6–7. Commerce analogized to its practices regarding the government of India's renewable energy program. See id. at 8 (citing Granular Polytetrafluoroethylene Resin from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, 87 Fed. Reg. 3,765 (Dep't Commerce Jan. 25, 2022) ("PTFE Resin from India") (bestowal of renewable energy credits determined to be direct transfer of funds where credits had monetary value) and Forged Steel Fluid End Blocks from India: Final Affirmative Countervailing Duty

<u>Determination</u>, 85 Fed. Reg. 79,999 (Dep't Commerce Dec. 11, 2020) ("<u>FEBs from India</u>") (same, even where value of credits not ascertainable at time of transfer)).[17]  Commerce also relied upon this court's decision in <u>Hyundai Steel</u>, 701 F. Supp. at 1402–06 (sustaining Commerce's determination that allocation of additional KAUs under K-ETS was a direct transfer of funds).  <u>Id.</u> at 8–9.

Commerce's determination that Korea's allocation of additional KAUs is a "direct transfer of funds" under Section 1677(5)(D)(i) was reasonable.  <u>See</u> Remand Results at 6–9.  The court addresses each of Commerce's considerations in turn.  First, Commerce reasonably concluded that KAUs are fungible instruments of monetary value rather than mere permits to emit GHGs.  The record shows that the Korean government, through K-ETS, has created a limited market for KAUs in an effort to reduce GHG emissions.  <u>See</u> <u>App. 16</u> at 1–2, <u>Korea IQR</u>, Ex. CEP-1 at 1, AAGEP,

---

[17] Commerce's reliance on <u>FEBs From India</u> and <u>PTFE From India</u> was reasonable.  Korea suggests that the Indian cases are not applicable because the Indian program created a closed economy for credits.  <u>See</u> Korea Cmts. at 5.  By contrast, Korea posits that the KAU economy is not closed because Article 29(1) of the AAGEP allows companies that achieve GHG reductions through projects that comply with international standards to convert those reductions into KAUs. <u>Id.</u>  Article 29(1), however, is just another mechanism through which the <u>Korean government</u> controls the supply of KAUs.  <u>See</u> <u>Korea IQR</u>, Ex. CEP-1 at 20, AAGEP, art. 29(1).  Moreover, under Article 29(3), the Korean government has authority to "set the maximum number of offset emission permits" that may be surrendered and to "place a restriction on the effective period of offset emission permits." <u>Id.</u>, art. 29(3).
POSCO suggests that the Indian cases are inapplicable because the participants in the Indian program earned their renewable energy credits, whereas here the Korean government gratuitously provides credits to cap emissions.  <u>See</u> POSCO Cmts. at 7.  If anything, the fact that the Korean government gratuitously allocates KAUs is even more indicative of a direct transfer.  Moreover, POSCO is mistaken that the Korean government provides credits to cap a participant's emissions. A company's emissions level may exceed that allowed for by its initial allocation of KAUs.  <u>See</u> <u>App. 16</u> at 2.  Irrespective, Commerce noted that the Indian program was not "perfectly identical" and instead looked at the "underlying rationale" informing its determinations.  Remand Results at 8–9.  As the court has already observed, it was reasonable for Commerce to find "these determinations analogous insofar as the respective governments were providing instruments of monetary value to respondent companies." <u>Hyundai Steel</u>, 701 F. Supp. 3d at 1406 (citation modified) (citation omitted).

art. 1. This market works as follows. Companies must pay for their emissions using KAUs. App. 16 at 11. The Korean government, however, limits the supply of KAUs: Companies receive an initial allocation from the Korean government, id. at 1, they may bid on KAUs at government-run auctions,[18] id. at 2, or they may convert emissions reductions from external projects that comply with international standards into KAUs. Korea IQR, Ex. CEP-1 at 111–12, AAGEP, arts. 29–31. Companies may trade KAUs privately or through a public market. See id., Ex. CEP-1 at 104–07, AAGEP, arts. 19–23. A company's final GHG emissions level is determined separately from its initial allocation of KAUs. See App. 16 at 8–9, 11. If a company has emitted more than its allocated KAUs allow for, it must purchase KAUs from another party, through the government-run auction, or pay a fine. Id. at 1–2.

The record thus supports Commerce's determination: KAUs hold monetary value as a limited-supply currency needed to pay for GHG emissions within K-ETS—companies allocated KAUs receive monetary value because they may use them to pay for emissions or sell them to generate revenue. While POSCO and Korea stress that KAUs should be considered permits to emit, such that they convey no financial value and merely serve to reduce compliance costs, POSCO Cmts. at 5–6; Korea Cmts. at 6, this court has noted that KAUs may both function as part of a regulatory scheme while also possessing inherent monetary value.[19] Hyundai Steel, 701 F. Supp. 3d. at 1405.

---

[18] Companies receiving the additional 10 percent allocation may not bid on additional KAUs in the government-run auction. See App. 16 at 2.

[19] Neither POSCO nor Korea adequately explains why the reasoning of Hyundai Steel should not apply here. While Korea sets forth a parade of horribles should this court "conflat[e] the avoidance of compliance costs with the receipt of funds," see Korea Cmts. at 6, it ignores that the AAGEP's stated purpose is to reduce GHG emissions "by introducing a system for trading [KAUs] through market mechanisms." See Korea IQR, Ex. CEP-1 at 92, AAGEP, art. 1. This system cannot function unless KAUs have inherent value apart from their capacity to reduce compliance burdens.

Second, Commerce reasonably determined that the KAUs, as fungible instruments of monetary value, constitute "funds" under Section 1677(5)(D)(i). See Remand Results at 9. POSCO and Korea argue that the term "funds" in Section 1677(5)(D)(i) must be accorded its plain meaning, namely "an amount of money that has been saved or made available for a particular purpose." POSCO Cmts. at 5 (citing Fund, Oxford Advanced Learner's Dictionary (URL omitted)); see also Korea Cmts. at 3 (citing Fund Definition, Cambridge Dictionary (URL omitted)). It is not clear why KAUs would not satisfy this definition, especially because KAUs are designed to be a fungible means of paying for GHG emissions and have a market-determined value, and because Korea admits that a cash transfer to companies to buy KAUs could be considered a transfer of funds. See Korea Cmts. at 6.

POSCO and Korea also draw much attention to the examples embedded within Section 1677(5)(D)(i). See POSCO Cmts. at 3–6; Korea Cmts. at 3–6. While it is true that these examples may give the term "funds" a "more precise content," Williams, 553 U.S. at 294, it is also true that the "types of financial contributions listed in [Section 1677(5)(D)(i)] . . . represent 'broad' and 'generic categories of government practices'" and "'are not intended to be exhaustive.'" Hyundai Steel, 701 F. Supp. 3d at 1404 (quoting SAA at 4240).[20] Even assuming that the allocation of KAUs is not explicitly captured by the examples listed in Section 1677(5)(D)(i) (grants, loans, equity infusions, loan guarantees),[21] it was not unreasonable for Commerce to find the additional

---

[20] The SAA is the authoritative interpretation of the statute. 19 U.S.C. § 3512(d).

[21] As the court suggested in Hyundai Steel, the allocation of KAUs could conceivably be considered a "grant" given that POSCO "was actually provided the additional KAU allocation at no cost and without any exchange for consideration." 701 F. Supp. 3d at 1405. Given the court's conclusion here that there was a direct transfer of funds, however, the court need not reach this specific issue.

allocation of permits "sufficiently similar to the [statutory] examples based on [their] fungible and marketable nature." Id. at 1404.

Third, it was reasonable for Commerce to conclude that Korea's additional allocation of KAUs to certain companies was a "direct transfer" under Section 1677(5)(D)(i). POSCO and Korea maintain that Korea does not transfer anything of monetary value when it allocates the permits because any value the permits hold is determined by the private market. POSCO Cmts. at 6–8; Korea Cmts. at 6–9. This argument proves too much. Whether any asset holds any financial value is entirely dependent on external market forces, and POSCO and Korea do not adequately explain why KAUs should be treated differently from any other commodity. Irrespective, because Commerce reasonably concluded KAUs constitute "funds," it logically follows that the allocation of KAUs is a direct transfer of funds.

The court accordingly sustains Commerce's determination that Korea's allocation of additional ten percent KAUs to a select group of industries is a direct transfer of funds under Section 1677(5)(D)(i).

## CONCLUSION

For the foregoing reasons, Commerce's determination in the Remand Results, ECF No. 60-1, is sustained in part and remanded in part. In order to meet the requirements for imposition of countervailing duties here, Commerce must undertake a de facto specificity analysis of Korea's allocation of additional KAUs. The remand determination shall be issued within 75 days hereof. Comments may be filed 30 days thereafter and any response 15 days thereafter.

  /s/ Jane A. Restani
Jane A. Restani, Judge

Dated: April 17, 2026
New York, New York