C-580-888
Remand
Slip Op. 26-36
POR: 01/01/2021 – 12/31/2021
**Public Document**
E&C/OVIII: TEAM

***POSCO v. United States,***
**Consol. Court No. 24-00006, Slip Op. 26-36 (April 17, 2026)**
***Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea***

# FINAL RESULTS OF REDETERMINATION PURSUANT TO SECOND COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the second remand opinion and order of the U.S. Court of International Trade (the Court or CIT) in *POSCO v. United States*, Court No. 24-00006, Slip Op. 26-36 (April 17, 2026) (*Second Remand Order*). These final results of redetermination concern the final results of the 2021 administrative review of the countervailing duty (CVD) on certain carbon and alloy steel cut-to-length plate from the Republic of Korea (Korea) covering the period of review (POR) January 1, 2021, through December 31, 2021,[1] as amended by Commerce's *First Final Remand Redetermination*.[2]

In the *Second Remand Order*, the Court sustained the *First Final Remand Redetermination* with regard to: (1) Commerce's determination that the provision of electricity for less than adequate remuneration (LTAR) program is not countervailable on the basis that there was insufficient record evidence to find the provision of electricity for LTAR to be *de facto*

[1] *See Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 FR 86318 (December 13, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Final Results of Redetermination Pursuant to Second Court Remand: POSCO v. United States,* Court No. 24 00006, Slip Op. 25-100 (August 8, 2025) (*First Final Remand Redetermination*) available at https://access.trade.gov/FinalRemandRedetermination.

specific; and (2) Commerce's finding that the Government of Korea's (GOK's) provision of Korean Emissions Trading System (K-ETS) permits program provided a financial contribution in the form of a direct transfer of funds.[3] However, the Court again remanded Commerce's *First Final Remand Redetermination* to reconsider Commerce's specificity determination with respect to the provision of K-ETS permits program, which Commerce determined specific pursuant to sections 771(5A)(A) and (B) of the Tariff Act of 1930, as amended (the Act).[4] On June 17, 2026, Commerce released the Draft Remand Redetermination reconsidering the specificity of the provision of K-ETS permits program.[5] On June 24, 2026, POSCO Co., Ltd. (POSCO) and the Government of Korea (GOK) submitted timely filed comments on the Draft Remand Redetermination.[6]

As discussed below, in these final results of redetermination, Commerce has addressed the parties' comments regarding our reconsideration of the specificity determination with respect to the provision of K-ETS permits program and, pursuant to the Court's *Second Remand Order*, we find that the provision of K-ETS permits is *de facto* specific, pursuant to section 771(5A)(D)(iii)(I) of the Act. Based on this analysis, we are applying the *ad valorem* subsidy rate calculated in the *Final Results* using POSCO's total free on board (FOB) sales in the sales

---

[3] *See Second Remand Order* at 1-5 and 9-11.
[4] *Id.* at 15-17.
[5] *See* Draft Results of Redetermination Pursuant to Court Remand, *POSCO v. United States* Court No. 24-00006, Slip. Op. 26-36 (CIT April 17, 2026), dated June 17, 2026 (Draft Remand Redetermination).
[6] *See* POSCO's Letter, "POSCO Comments on Draft Results of Second Remand Redetermination," dated June 24, 2026 (POSCO's Second Draft Remand Comments); *see also* GOK's Letter, "Comments on Second Draft Results of Redetermination," dated June 24, 2026 (GOK's Second Draft Remand Comments).

denominator, *i.e.*, 0.61 percent for the provision of K-ETS permits program.[7] Accordingly, we calculated a revised total *ad valorem* subsidy rate for POSCO of 0.80 percent.[8]

## II. ANALYSIS

Background

In the *Final Results*, Commerce found that the additional ten percent allocations of Korean Allowance Units (KAUs) to certain subsectors participating in the K-ETS program was *de jure* specific under section 771(5A)(D)(i) of the Act.[9] Specifically, we found that Article 19 of the Act on Allocation and Trading of Greenhouse Gas Emissions Permits (AAGEP) Enforcement Decree establishes that the GOK provides 100 percent of the KAU allocation to the businesses in sectors subject to the K-ETS for which the results of multiplying the "production cost incurrence rate and the international trade intensity" is at least 0.2 percent.[10] Commerce found that these criteria were neither horizontal in application nor objective in nature (*i.e.*, did not meet the "safe harbor" provision pursuant to section 771(5A)(D)(ii) of the Act), because the criteria favored certain industries over others, namely industries that both incur higher costs of production due to compliance with the program and rely on international trade and export sales.[11] In the *First*

---

[7] *See Final Results* IDM at 10, unchanged from *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 88 FR 37019 (June 6, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 25-26 (citing 19 CFR 351.503(b)(2)).
[8] *See* Memorandum, "Final Results Calculations for POSCO," dated December 1, 2023 (POSCO's Final Calculation Memorandum); *see also* Memorandum, "Draft Remand Redetermination Calculations for POSCO," dated September 24, 2025 (POSCO's Draft First Remand Calculation Memorandum). In the underlying administrative review for this litigation, POSCO's total *ad valorem* subsidy rate was 0.87 percent. However, as discussed in the *First Final Remand Redetermination*, Commerce removed the 0.07 percent *ad valorem* subsidy rate calculated for the electricity for LTAR program from the total *ad valorem* rate because Commerce found upon remand that the electricity for LTAR program was not countervailable. Accordingly, in this remand redetermination we made no changes to the calculations from POSCO's Final Calculation Memorandum, except for the removal 0.07 percent *ad valorem* subsidy rate calculated for the electricity for LTAR program from the total *ad valorem* rate. Therefore, POSCO's revised total subsidy rate is 0.80 percent *ad valorem*.
[9] *See Final Results* IDM at Comment 2C.
[10] *Id.*
[11] *Id.* As noted in the IDM, the six industries that did not meet the criteria but were nevertheless included in receiving the additional allocation because Article 19(2) of the AAGEP Enforcement Decree explicitly designates

*Remand Order*, the Court held that the provision of K-ETS permits program was not *de jure* specific because the existence of qualifying criteria *per se* does not establish specificity.[12] The Court further held that Commerce's determination that the additional ten percent allocation did not meet the safe harbor provision under section 771(5A)(D)(ii) of the Act was unsupported by substantial evidence.[13] The Court remanded this issue with instructions for Commerce to reconsider its determination.[14]

In the *First Final Remand Redetermination*, Commerce found that the additional 10 percent allocation of KAUs by the GOK to certain enterprises and industries rendered the provision of K-ETS program specific pursuant to sections 771(5A) and (B) of the Act as it met the criteria for the export subsidy, *i.e.* "a subsidy that is, in law or in fact, contingent upon export performance, alone or as one of two or more conditions."[15] Commerce found that in order to meet the "international trade intensity" criterion to receive the additional 10 percent allocation of KAUs, exports must account for a sufficient portion of the subsector's sales.[16] Because the "international trade intensity" criterion is dependent, in part, upon the amount of export sales of the subsector, and the GOK by law grants an additional 10 percent allocation of KAUs to companies within subsectors that meet the criterion, Commerce found the provision of K-ETS permits program to be specific based on export contingency.[17]

In the *Second Remand Order*, the Court again remanded Commerce's specificity finding that the provision of K-ETS program is specific under sections 771(5A)(A) and (B) of the Act.

---

the industries as recipients of the full allocation did not alter Commerce's analysis pursuant to section 771(5A)(D)(ii) of the Act.

[12] *See POSCO v. United States*, Court No. 24-00006, Slip Op. 25-100 (August 8, 2025) (*First Remand Order*) at 18-19.

[13] *Id.*

[14] *Id.* at 20.

[15] *See First Final Remand Redetermination* at 25-30.

[16] *Id.* at 27-30.

[17] *Id.* at 30.

Applying the Supreme Court's framework for judicial review of statutory interpretation laid out in *Loper Bright Enterprises. v. Raimondo*, *i.e.*, "exercis{ing} {its} independent judgment in deciding statutory meaning," the Court held that Commerce's export contingent specificity determination was an impermissible interpretation of section 771(5A)(B) of the Act.[18] Specifically, the Court held that Commerce's interpretation of the export performance provision in section 771(5A)(B) of the Act, "dilutes the statutory requirement beyond recognition."[19] The Court further held that the plain language of section 771(5A)(B) of the Act requires that export performance be a "necessary condition for receipt."[20] On this basis, the Court held that Commerce's finding of specificity as an export subsidy was therefore unreasonable, and on remand, directed Commerce to conduct a *de facto* specificity analysis of the provision of the additional allocation of KAUs under the K-ETS program.[21]

<u>Analysis</u>

Consistent with the Court's *Second Remand Order*, Commerce has reconsidered its determination that the provision of K-ETS permits program is specific under sections 771(5A)(A) and (B) of the Act. On remand, we find that the provision of the additional 10 percent allocation by the GOK is specific under section 771(5A)(D)(iii)(I) of the Act on the basis that the recipients were limited in number. A subsidy is *de facto* specific when "one or more" statutory factors exist: (I) the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (II) an enterprise or industry is a predominant user of the subsidy; (III) an enterprise or industry receives a disproportionately large amount of the subsidy; or (IV) the manner in which the authority providing the subsidy has exercised

[18] *See Second Remand Order* at 14-16 (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024)).
[19] *Id.* at 16.
[20] *Id.* at 16-17.
[21] *Id.* at 8.

discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.[22] Furthermore, Commerce will examine these factors in the order in which they appear. If a single factor warrants a finding of specificity, Commerce is not required to undertake further analysis.[23]

On remand, Commerce reviewed the existing record information detailing the number of companies that received the additional 10 percent allocation of KAUs (*i.e.*, those that received a 100 percent KAU allocation) under the K-ETS program, rather than the standard 90 percent allocation.[24] The GOK-provided data indicated that 494 companies received the 100 percent allocation.[25] The GOK also reported that there are 906,325 companies operating in the GOK's jurisdiction during 2021.[26] As Commerce has previously noted, the SAA sets forth the purpose of the specificity test, which is to "function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy."[27] Consistent with this principle, we find that a program which has only 494 company recipients in an economy the size of Korea cannot be considered "widely used" throughout the economy within the spirit of the specificity test as outlined in the SAA. As a result, we find that the program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, because the actual number of recipients of the subsidy was limited in number, *i.e.*, to just 494 recipients out of 906,325 corporate entities during 2019.[28]

---

[22] *See* section 771(5A)(D)(iii) of the Act.
[23] *See* 19 CFR 351.502(a).
[24] *See* GOK's Letter, "GOK's Initial Questionnaire Response," dated October 12, 2022 (GOK's IQR), at 11.
[25] *Id.*
[26] *Id.* at Appendix-16 (page 20).
[27] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA) at 929.
[28] *See* GOK's IQR at Appendix-16 (page 20).

This is consistent with our long-standing *de facto* specificity analysis practice.[29] The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has affirmed Commerce's practice of finding *de facto* specificity where the recipients of a subsidy are limited in number, emphasizing that the *de facto* specificity analysis is "a fact-intensive and case-specific inquiry" in which "Commerce exercises the necessary latitude afforded it in choosing the appropriate approach."[30] In *Government of Québec*, the Federal Circuit affirmed a *de facto* finding in which an even greater percentage of companies than at issue here was found to reflect participation that was "limited in number." The Federal Circuit found that Commerce's use of total corporate tax filers as the comparator to determine that the actual percentage of tax credit recipients was limited in number in accordance with law.[31] In that case, Commerce found, and the Federal Circuit upheld, 4,930 tax credit recipients of 387,949 total corporate tax filers to be *de facto* specific given that the recipients are limited in number. Here, Commerce likewise finds this program to be limited in number in accordance with section 771(5A)(D)(iii)(I) of the Act.

Likewise, the CIT has upheld Commerce's analogous specificity determination with respect to the provision of K-ETS permits program in the administrative review for the 2019 POR of certain hot-rolled steel flat products from Korea.[32] There, on remand, Commerce found the provision of K-ETS permits program to be *de facto* specific on the basis that the number of

---

[29] *See*, *e.g.*, *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results and Rescission, in Part, of the Countervailing Duty Administrative Review; 2022*, 90 FR 21002 (May 16, 2026) (*CORE from Korea*); *see also Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 90 FR 21010 (May 16, 2025) (*Cold-Rolled from Korea*); and *Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 90 FR 39181 (August 14, 2025) (*Hot-Rolled from Korea*).
[30] *See Government of Québec v. United States,* 105 F.4th 1359, 1368, 1374 (Fed. Cir. 2024) (*Government of Québec*).
[31] *See Government of Québec,* 105 F.4th at 1368, 1373-75.
[32] *See Hyundai Steel Company v. United States*, 803 F. Supp. 3d 1252, 1256-58 (CIT 2025) (*Hyundai Steel I*); *see also Final Results of Redetermination Pursuant to Court Remand: Hyundai Steel Company v. United States,* Court No. 22-00170, Slip Op. 24-55 (May 2, 2024) (*Hyundai Steel I Final Remand Redetermination*) available at https://access.trade.gov/FinalRemandRedetermination.

companies receiving the 100 percent allocation, 504 companies, was limited in number in accordance with section 771(5A)(D)(iii)(I) of the Act when compared to the 787,438 companies operating in Korea during 2019 (the POR of the administrative review).[33] The CIT has also upheld similar findings of *de facto* specificity regarding earlier iterations of this program.[34]

Consistent with 19 CFR 351.525(b)(ii), Commerce has reverted to the calculations used in the *Final Results* for the K-ETS program. Therefore, we are using the previously calculated *ad valorem* subsidy rate for POSCO under this program in the calculation of POSCO's subsidy rate. In the calculation in the *Preliminary Results*, for the three companies (POSCO, POSCO Chemical Co., Ltd., and POSCO SPS Co., Ltd.) that received the additional 10 percent KAU allocation, we used the appropriate sales denominator reflective of each company's total FOB sales value for the POR, consistent with 19 CFR 351.525(b)(6)(ii) and (iv), as described in the "Attribution of Subsidies" section in the *Preliminary Results*.[35]

## III. INTERESTED PARTY COMMENTS

*The GOK's Comments*:

The following is a verbatim summary of argument submitted by the GOK. For further details, *see* the GOK's Second Draft Remand Comments at 3-7.

---

[33] *See Hyundai Steel I Final Remand Redetermination* at 7-8. Though the *Hyundai Steel I* case concerned an earlier phase of the K-ETS program and thus provided all companies subject to the program a baseline 97 percent allocation of KAUs, this difference is relevant to the benefit received and is immaterial to Commerce's *de facto* specificity determination here. The only distinction between the different phases of the program relate to the amount of extra KAUs being freely allocated (*i.e.* benefit) and the eligibility criteria for that additional allocation. The facts of each case are otherwise largely the same.

[34] *See Nucor Corp. v. United States,* 494 F.Supp.3d 1377, 1383 (CIT 2021) (finding that, where only twenty-five companies using the loan restricting program compared to all companies operating in the Korean economy, the program participants were limited in number); *see also Wilmar* Trading *PTE Ltd. v. United States,* 466 F.Supp.3d 1334, 1358 (CIT 2020) (finding that the {14} industries benefitting from an input provided for less than adequate remuneration were limited in number when compared to all industries in the economy of Indonesia); and *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,* 61 F.Supp.3d 1306, 1342-43 (CIT 2015) (finding that the eight industries that received an input for less than adequate remuneration were limited in number when compared to all industries in the Turkish economy).

[35] *See Preliminary Results* PDM at 9-11, unchanged in *Final Results* IDM. *See also* Memorandum, "Preliminary Results Calculation Memorandum for POSCO," dated May 31, 2023, at 6-7.

> The GOK objects to {Commerce's} *de facto* specificity finding with respect to the K-ETS program because it is contrary to law and unsupported by substantial evidence. The record does not support a conclusion that the allotment of an additional 10 percent of {KAUs} is *de facto* specific.
>
> {Commerce's} determination rests on flawed reasoning. In concluding that the provision of additional KAU is *de facto* specific based on an allegedly "limited" number of recipients, {Commerce} relied on an improper comparator that distorts the analysis. By measuring the number of recipients against an irrelevant universe, the {Commerce} artificially creates the appearance of limitation where none exists.
>
> In its Second Final Remand Redetermination, {Commerce} must apply the correct legal standard and a reasoned, fact-based analysis. Properly applying the law to the record evidence will demonstrate that the GOK's provision of additional KAUs under the K-ETS program is not *de facto* specific.

*POSCO's Comments*:

The following is a verbatim summary of argument submitted by POSCO. For further details, *see* POSCO's Second Draft Remand Comments at 2-3.

> POSCO disagrees with {Commerce's} *Second Remand Results* and the determination that the provision of additional permits under the K-ETS program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act. However, POSCO wants to bring this litigation to a close and thus is not submitting substantive comments that address all aspects of POSCO's disagreement with the K-ETS determination in the *Second Remand Results*. Instead, POSCO briefly addresses the basis for its objections to the *Second Remand Results* and supports the comments filed by the {GOK}.

**Commerce's Position:**

We find upon remand that the GOK's provision of a 100 percent KAU allocation under the K-ETS permits program to select companies is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.

As discussed above, a subsidy is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act when the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number. As the Federal Circuit noted,

> {t}he governing statute and the implementing regulations do not prescribe any mandatory method that Commerce must employ in assessing *de facto* specificity or analyzing the listed factors {under section 771(5A)(D)(iii) of the Act}. Rather, it is a fact intensive and case-specific inquiry, where the factors involved and the weight accorded to them vary from case to case. In conducting this inquiry, Commerce exercises the necessary latitude afforded it in choosing the appropriate approach.[36]

Here, Commerce has compared the number of recipients of the 100 percent KAU allocation (*i.e.*, 494 companies) to the total number of companies operating in the GOK's jurisdiction during the POR (*i.e.*, 906,325 companies). We find that the number of recipient companies – which amounted to less than 0.1 percent of companies operating in the Korean economy – indicates that the recipients of the subsidy were limited in number on an enterprise basis and that the program was not widely used throughout the Korean economy. Accordingly, we find the program to be *de facto* specific.

As we noted, the Federal Circuit has recently determined that comparing the number of subsidy recipients to the number of corporate entities within an economy reflects an appropriate *de facto* specificity analysis and "does not conflict with the SAA's directive regarding the purpose of the specificity determination" which is to "winnow out only those foreign subsidies which are truly broad and widely used throughout an economy."[37] Such a comparison is consistent with extensive Commerce practice, and this court-affirmed approach is entirely appropriate for the intended purposes of our specificity analysis as set forth by the SAA, wherein Commerce is tasked with examining a program's usage *throughout an economy*.[38] Therefore, our analysis here is consistent with the SAA and Federal Circuit precedent.

---

[36] *See Government of Québec,* 105 F.4th at 1374.
[37] *Id.* at 1375.
[38] *Id.* (citing SAA at 929) (emphasis added); *see also, e.g., CORE from Korea, Cold-Rolled from Korea,* and *Hot-Rolled from Korea*.

The GOK contends that the central flaw in Commerce's *de facto* specificity determination is our use of the total number of corporate entities in the Korean economy as a comparator to the number of companies who received the full 100 percent allocation of KAUs to find that the number of recipients is limited in number.[39] Per the GOK and POSCO,[40] the appropriate comparator must be the number of companies subject to the provision of K-ETS permits program to begin with.[41] This argument is the very sort with which the SAA is concerned—the kind of limitation that would frustrate the purpose of the specificity test.[42] It is well established that just as the SAA characterizes the specificity test as intended to "avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout the economy," it likewise warns against misuse of the test as a "loophole through which narrowly {focused} subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law."[43] The GOK's proposed comparator falls into the latter, as this Court recently articulated in *Hyundai Steel I*:

> {T}here is no requirement that recipients of the benefit of the full allocation share some other characteristic, such as participation in the K-ETS, with the group comprising the denominator: "the fact that users may be limited due to the inherent characteristics of what is being offered" is not "a basis for finding the subsidy non-specific."[44]

---

[39] *See* GOK's Second Draft Remand Comments at 3; *see also* section 771(5A)(D)(iii)(I) of the Act.
[40] *See* POSCO's Second Draft Remand Comments at 2 ("The comparison of the number of companies that received additional permit allocations with the total number of companies in Korea is irrelevant to the inquiry into whether the beneficiaries under the program are limited in number, because not all companies in Korea are subject to the emission limitation regime in the first place.").
[41] *See* GOK's Second Draft Remand Comments at 3-5.
[42] *See Hyundai Steel I*, 803 F. Supp. 3d at 1256 (finding the argument that the number of companies subject to the provision of K-ETS permits program is the appropriate comparator for the additional allocation of KAUs "unpersuasive and in conflict with the purpose of the specificity test.").
[43] *See* SAA at 930.
[44] *See Hyundai Steel I*, 803 F. Supp. 3d at 1257 (citing *Countervailing Duties; Final Rule*, 63 FR 65348, 65359 (November 25, 1998) (*1998 Final Preamble*)).

Record evidence demonstrates that the number of companies receiving the full 100 percent allocation of KAUs—494 companies—comprise less than 0.1 percent of companies operating in Korea during the POR.[45] That most of the companies operating in Korea during the POR received no permits because they were not subject to the K-ETS program to begin with "merely reflects an inherent characteristic of the emissions trading system and is not a basis for finding the subsidy non-specific."[46] In contrast, to require that Commerce limit the comparator—as the GOK and POSCO suggest—to the number of companies subject to the K-ETS program would render subsidy programs in which the number of users is limited "due to the inherent characteristics of what is being offered" non-specific.[47] For example, a lessened burden of compliance for a compliance program that not all companies are subject to, such as the K-ETS program, would be beyond the reach of Commerce's statutory mandate to countervail countervailable subsidies. This sort of limitation on Commerce's *de facto* specificity analysis would be tantamount to creating the very "loophole" with which the SAA is concerned.[48]

The GOK's arguments are not in accordance with Commerce's longstanding views of the *de facto* specificity analysis. Specifically, the *1998 Final Preamble* reiterates a prior Commerce statement that "… {Commerce} is not required to explain why the users of a subsidy may be limited in number."[49] Rather, "the SAA clearly indicates that {Commerce} does not need to find 'targeting' or 'purposeful government action' to conclude that a domestic subsidy is specific."[50] The GOK's proposed alternative approach—a comparison of the number of recipients to some narrow subset of the economy— seems to suggest that Commerce should consider that the

---

[45] *See* GOK's IQR at Appendix-16 (page 20).
[46] *See Hyundai Steel I*, 803 F. Supp. 3d at 1257.
[47] *See 1998 Preamble*, 63 FR at 65349.
[48] *See* SAA at 930.
[49] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65359 (November 25, 1998) (*1998 Final Preamble*).
[50] *Id.*

eligibility criteria may naturally limit the number of potential recipients; in other words, explain *why* there are a small number of users. Such a methodology would plainly contravene the guidance set forth in the SAA and the stated purpose of Commerce's specificity analysis. Put simply, just 494 companies in all of Korea used this program. This is undoubtedly a limited number of users and therefore this program is specific within the meaning of section 771(5A)(D)(iii)(I). *Why* such users may be limited in number is irrelevant to our analysis. The Federal Circuit's *Government of Québec*, per the GOK, is not analogous to the situation at hand and therefore inapplicable.[51] The GOK contends that, in *Government of Québec*, Commerce's standard *de facto* comparison was acceptable, because it was "logically consistent universe of potential recipients."[52] With respect to the provision of K-ETS permits program, in contrast, the GOK then asserts, "most companies included in the {Commerce's} denominator are categorically ineligible for KAUs because they are not subject to the K-ETS program. We disagree that the comparison is analogous."[53] The K-ETS program, like most subsidy programs, has characteristics that limit the usage (or likelihood of usage) of the program to a subset of the economy. Recognition of this fact does not mean that Commerce must artificially narrow its definition of "the economy" in assessing whether the program "truly {is} broadly available and widely used throughout an economy."[54] In any event, our reliance on *Government of Québec* is not limited to the comparable facts underlying both subsidy programs. Rather, as detailed here and in our Draft Remand Redetermination, *Government of Québec* reaffirms the principle laid out in the SAA that "Commerce exercises the necessary latitude afforded it in choosing the appropriate approach," in particular given the "fact-intensive and case-specific nature" of the *de*

---

[51] *See* GOK's Second Draft Remand Comments at 5.
[52] *Id.*
[53] *Id.*
[54] *See Government of Québec*, 567 F.Supp.3d 1273 (internal citations omitted); and SAA at 929 (emphasis added).

*facto* specificity analysis.[55] The Federal Circuit reaffirmed Commerce's obligation to analyze *de facto* specificity within the context of the particular facts before it, and we have done so here. That the underlying subsidy program in *Government of Québec* is not perfectly analogous to the provision of K-ETS permits program here does not alter the Federal Circuit's established principles.

In support of its position that *Government of Québec* is not analogous here, the GOK points instead to this Court's decision in *Mosaic*.[56] In that underlying proceeding, Commerce compared the number of corporate recipients of tax penalty relief (8,761) to the total number of corporate taxpayers in Morrocco (262,165) and found the program to be *de facto* specific pursuant to section 771(5A)(D)(iii)(I) of the Act. In *Mosaic*, the CIT found that Commerce's specificity analysis should have considered the fact that the program was available to corporate and individual taxpayers, and that Commerce's analysis did not support "a conclusion that the program was not broadly available and broadly used throughout the Moroccan economy."[57] However, in Commerce's final results of redetermination pursuant to remand in that proceeding, Commerce noted that it "respectfully disagree{d} with the CIT's holdings in the {Court's remand order} regarding Commerce's determination that the reduction in tax fines and penalties program is *de facto* specific pursuant to section 771(5A)(D)(iii)(I) of the Act, and believes there is sufficient evidence to continue to find the program is used by a limited number of actual recipients based on the record evidence."[58] Additionally, litigation in *Mosaic* is ongoing; thus, the Court's decision is not final and conclusive.[59]

---

[55] *Id.*
[56] *Id.* at 5 (citing *Mosaic Co. v. United States*, 659 F. Supp. 3d at 1285, 1314-15 (CIT 2023) (*Mosaic*)).
[57] *See Mosaic*, 659 F. Supp.3d at 1315.
[58] *See Final Results of Redetermination Pursuant to Court Remand, The Mosaic Company v. United States*, Consol. Court No. 21-00116, Slip Op. 23-134 (CIT September 14, 2023), dated January 22, 2024, available at https://access.trade.gov/FinalRemandRedetermination.
[59] *See The Mosaic Company v. United States*, Slip Op. 25-3 (CIT January 8, 2025).

Further, that case is readily distinguishable from the instant one. First, the number of recipients of the 100 percent KAU allocation (494) here represents a fraction of the number of recipients in the administrative proceeding addressed in Mosaic (8,761).[60] Regardless of the GOK's arguments regarding *Mosaic* and its view of the proper comparison figure, the key fact here is that only 494 companies used this program. To find a program used by *only 494 companies* in the entirety of Korea to be not specific, as the GOK contends, would strain credulity, be antithetical to the specificity test and prior precedent, and upend the purpose of the CVD statute to capture subsidization provided by foreign governments to discrete segments of an economy.[61] Second, in *Mosaic*, the Court faulted Commerce for, in its view, not analyzing the full universe of recipients within the Moroccan economy, rather than limiting the universe of the program to less than the full economy, as the GOK argues is appropriate. As the Court noted, the fact "{t}hat 3.34% of corporate taxpayers benefited from penalty relief, under a program that was not limited to corporate taxpayers, does not support a conclusion that the program was not broadly available and broadly used throughout the Moroccan economy."[62] There, the Court indicated that the 8,761 recipient figure was an incomplete representation of users of the program in that case;[63] here we have the complete number of recipients of the 100 percent allocation (which is far fewer than even that relied upon in *Mosaic*). Third, the Court found that the program in that case was "a common, ordinary tax administration program" and that the "penalty relief program at issue {was} available not only to all industries and sectors but to all types of taxpayers;" in *Mosaic*, there were more participants in the program than Commerce had

---

[60] *See Mosaic*, 659 F. Supp. 3d at 1314.
[61] *See* SAA at 930.
[62] *Id.* at 1315.
[63] *Id*. at 1315 ("The term 'taxpayers' encompasses individuals as well as all types of juridical persons in addition to corporations; it is reasonable to conclude that it also might include such entities as partnerships and unincorporated associations. In deciding that the program was *de facto* specific, Commerce based its determination on 8,761 corporate *taxpayers rather than ascertain the actual number of users of the program*.") (emphasis added).

considered, and the Court found that the widespread nature of tax penalty reductions was broadly available throughout the Moroccan economy.[64] This is distinguishable from the circumstances here, where the K-ETS program is limited to companies that meet a certain emission threshold and the GOK further limits its provision of the 100 percent KAU allocation to select sectors based on trade intensity and production cost criteria.[65]

Despite the differences between the cases, the GOK cites *Mosaic* in support of its argument that the numerator and denominator here are "not logically comparable."[66] The GOK attempts to argue that because only companies that emit a certain volume of carbon equivalents are subject to the K-ETS program,[67] companies that were not subject to the K-ETS program "therefore should be treated as part of the numerator of the companies whose compliance costs have been reduced or eliminated in relation to the K-ETS program, or because the program is irrelevant to them, they should be removed from the analysis altogether."[68] However, as noted above, Commerce's *de facto* analysis here reflects the particular facts of this subsidy program, as recently upheld by the Federal Circuit in *Government of Québec*.[69]

In any case, none of the cited cases actually support the GOK's proposed interpretation, whereby the comparison group is restricted (*i.e.*, to compare the number of recipients to the number of "potential qualifying" entities). For instance, regarding the tax credit program in question in *Government of Québec*, "{t}o be eligible for this credit, an employer must satisfy several criteria, including, among others, engaging in a qualified business and having received the required certification."[70] Neither Commerce nor the Federal Circuit suggested that the

---

[64] *Id.* at 1316 (internal quotations and citations omitted).
[65] *See* Draft Remand Redetermination at 4-5.
[66] *See* GOK's Second Draft Remand Comments at 5.
[67] *Id.* at 5-7.
[68] *Id.* at 7.
[69] *See Government of Québec,* 105 F.4th at 1374.
[70] *Id.*

number of recipients must be compared to a set of only "qualified businesses" and those with "the required certification"[71] in conducting the *de facto* specificity analysis. Rather, the specificity analysis was based on a comparison of recipients to the full universe of taxpayers. To equate eligibility for a subsidy to the universe that can be considered for limited in number specificity would undermine the SAA's clear instructions to consider subsidization "throughout an economy."[72]

Finally, the GOK references the burden imposed on companies participating in the provision of K-ETS permits program to meet the relevant emissions requirements as informative to Commerce's *de facto* specificity analysis[73] This argument, too, is misplaced, as it conflates Commerce's specificity analysis with the separate and distinct benefit analysis. As this Court explained in *Hyundai Steel I*, the fact that most companies in Korea do not face any burden to meet the emissions requirements and therefore receive no KAU allocations "merely reflects an inherent characteristic of the emissions trading system and is not a basis for finding the subsidy non-specific."[74] And most critically, use of the number of companies subject to the provision of K-ETS permits program as the denominator here "{would} not speak to whether that benefit is widely available throughout the economy."[75] As such, we again reject this argument.

Accordingly, we find that the provision of K-ETS program is *de facto* specific under section 771(5A)(D)(III)(i) of the Act, and that the total subsidy rate under this program is 0.61 percent *ad valorem*.

---

[71] *Id.*
[72] *See* SAA at 930.
[73] *See* GOK's Second Draft Remand Comments at 4 ("These covered entities are placed under an overall burden to internalize the costs of their emissions and must utilize KAUS to comply with the stringent requirements of the K-ETS program. Companies falling below these thresholds neither participate in the program nor receive any KAUs and, consequently, do not face any burden to meet the emissions requirements imposed by the K-ETS program.").
[74] *See Hyundai Steel I* at 1258.
[75] *Id.* at 1258.

## IV. FINAL RESULTS OF REDETERMINATION

Consistent with the *Second Remand Order*, Commerce has, as discussed above, conducted a *de facto* specificity analysis with respect to the provision of K-ETS permits program. Based on the foregoing analysis, we have revised the subsidy rate calculation for POSCO with respect to the provision of K-ETS permits program. The recalculated total *ad valorem* subsidy rates for the POR of January 1, 2021, through December 31, 2021, are listed in the chart below.[76]

| Company | Subsidy Rate in the *Final Results*[77] (percent *ad valorem*) | Subsidy Rate in the First Final Remand Redetermination (percent *ad valorem*) | Final Subsidy Rate (percent *ad valorem*) |
|---|---|---|---|
| POSCO | 0.87 | 1.72 | 0.80 |

7/22/2026

X [signature]

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
for Policy and Negotiations,
performing the non-exclusive functions and duties
of the Assistant Secretary for Enforcement and Compliance

[76] For details on the revised recalculation for the final results of redetermination, *see* POSCO's Final Calculation Memorandum and POSCO's Draft First Remand Calculation Memorandum.
[77] *See Final Results*, 88 FR at 86319.