**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| POSCO,<br><br>Plaintiff,<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | Court No. 24-00006<br><br>PUBLIC DOCUMENT |

**DEFENDANT'S RESPONSE TO**
**COMMENTS ON THE REMAND REDETERMINATION**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Sta.
Washington, D.C. 20044
Telephone: (202) 616-2228
E-mail: Tara.Hogan@usdoj.gov
*Attorneys for Defendant United States*

OF COUNSEL:
FEE PAUWELS
Attorney
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce

Dated: October 5, 2026

# TABLE OF CONTENTS


BACKGROUND .....1

I. The Underlying Administrative Review .....2

II. The Court's First Remand Order (*POSCO I*) .....4

III. Commerce's First Remand Redetermination and the Court's Second Remand Order (*POSCO II*) .....5

IV. Commerce's Second Remand Redetermination Finds the Additional KAU Allocation *De Facto* Specific .....6

ARGUMENT .....7

I. Standard of Review .....7

II. Commerce's Second Remand Redetermination Complies With the Court's Remand Order .....8

III. Commerce's Determination That the Additional KAU Allocation Is *De Facto* Specific Is Supported by Substantial Evidence and in Accordance With Law .....9

A. Commerce Reasonably Found That the Actual Recipients of the Subsidy Are Limited in Number .....9

B. Restricting the Denominator to K-ETS Participants Would Create the Very Loophole the SAA Guards Against .....12

C. *Government of Québec* Supports Commerce's Decision Not to Limit the Comparator to Eligible Entities .....16

D. *Mosaic* Does Not Support the GOK's Proposed Denominator .....18

E. The "Regulatory Burden" Imposed by the K-ETS Program Is Irrelevant to Commerce's Specificity Analysis .....20

CONCLUSION .....21

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Amanda Foods (Vietnam) Ltd. v. United States*,
774 F. Supp. 2d 1286 (Ct. Int'l Trade 2011) ........ 7

*Bethlehem Steel Corp. v. United States*,
223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) ........ 7

*Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States*,
61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ........ 7, 11

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ........ 7

*Crawfish Processors Alliance v. United States*,
483 F.3d 1358 (Fed. Cir. 2007) ........ 7

*Gov't of Québec v. United States*,
105 F.4th 1359 (Fed. Cir. 2024) ........ 6, 9, 10, 11, 17, 18, 19

*Gov't of Sri Lanka v. United States*,
308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ........ 15

*Hyundai Steel Co. v. United States*,
No. 23-00211, 2026 WL 1558544 (Ct. Int'l Trade May 18, 2026) ........ 15

*Hyundai Steel Co. v. United States*,
803 F. Supp. 3d 1252 (Ct. Int'l Trade 2025) ........ 11, 13, 15, 21

*Mosaic Co. v. United States*,
659 F. Supp. 3d 1285 (Ct Int'l Trade 2023) ........ 18, 19

*Nucor Corp. v. United States*,
494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021) ........ 7, 11

*POSCO v. United States*,
794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) ........ *passim*

*POSCO v. United States*,
829 F. Supp. 3d 1298 (Ct. Int'l Trade 2026) ........ *passim*

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ........ 8

*Wilmar Trading PTE Ltd. v. United States*,
466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) .......... 7, 11

**Statutes**

19 U.S.C. § 1516a(b) .......... 7

19 U.S.C. § 1677(5) .......... 3, 5

19 U.S.C. § 1677(5A) .......... *passim*

**Regulations**

19 C.F.R. § 351.502(a) .......... 8, 9

19 C.F.R. § 351.503(b) .......... 3

**Administrative Determinations**

*Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Rev*iew; 2021,
88 Fed. Reg. 86,318 (Dep't of Commerce Dec. 13, 2023) .......... 2, 3

*Countervailing Duties*,
63 Fed. Reg. 65 (Dep't of Commerce Nov. 25, 1998) .......... 13, 14, 20

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
H.R. Doc. No. 103-316, vol. 1 (1994) .......... 6, 10, 12, 14, 17, 19

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| POSCO,<br><br>Plaintiff,<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | Court No. 24-00006<br><br>PUBLIC DOCUMENT |

**DEFENDANT'S RESPONSE TO**
**COMMENTS ON THE REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to the comments filed by plaintiff POSCO, ECF. No. 82 (POSCO's Comments) and plaintiff-intervenor, the Government of the Republic of Korea (GOK), ECF No. 81 (GOK's Comments) concerning the Department of Commerce's second final results of redetermination filed in accordance with this Court's decision and remand order in *POSCO v. United States*, 829 F. Supp. 3d 1298 (Ct. Int'l Trade 2026) (*POSCO II*). *See* Final Results of Redetermination Pursuant to Second Court Remand, dated July 22, 2026 (Second Remand Redetermination).

We respectfully request that the Court sustain the second remand redetermination because it complies with the Court's opinion and order, is supported by substantial evidence, and is otherwise in accordance with law.

**BACKGROUND**

The administrative determination under review is the final results of the 2021 administrative review of the countervailing duty (CVD) order covering certain carbon and alloy steel cut-to-length plate (CTL plate) from the Republic of Korea (Korea), covering the period of review (POR) January 1, 2021, through December 31, 2021. *See Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 86,318 (Dep't of Commerce Dec. 13, 2023) (final results) (P.R. 178), and accompanying Issues and Decision Memorandum (IDM) (P.R. 174).[1]

**I. The Underlying Administrative Review**

This litigation originally concerned two subsidy programs: the provision of Korea Emissions Trading System or K-ETS permits program and the provision of electricity for less than adequate remuneration (LTAR) program. Relevant to Commerce's second remand redetermination, in the final results, Commerce found the provision of K-ETS permits program countervailable, calculating a program subsidy rate of 0.61 percent *ad valorem*. *See* IDM at 10, 14-50; *Final Results*, 88 Fed. Reg. at 86,319.

The K-ETS is governed by the Act on the Allocation and Trading of Greenhouse-Gas Emission Permits (AAGEP) and its implementing Enforcement Decree. *See Carbon and Alloy*

[1] "P.R." and "C.R." refer to public and confidential documents, respectively, in the administrative review record. "P.R.R." and "C.R.R." refer to documents in the public and confidential first remand record, respectively. "P.2R.R." and "C.2R.R." refer to documents in the public and confidential second remand record, respectively.

*Steel Cut-to-Length Plate from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 37,019 (Dep't of Commerce June 6, 2023) (preliminary results) (P.R. 130), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 126) at 23-24. The K-ETS requires subject entities to surrender emission permits, known as Korea Allowance Units (KAUs), to offset their annual emissions of greenhouse gases. *Id.* Only entities whose emissions exceed specified thresholds are subject to the K-ETS. *See* GOK Cmts. at 2 (citing Appx87202); GOK's Initial Questionnaire Response (Oct. 12, 2022) (GOK IQR) (P.R. 61-72, C.R. 157-79) at Appendix-16. To operate the system, the GOK establishes an allocation plan and allocates KAUs to subject business entities. PDM at 23-24. A participant whose emissions exceed its allocation must obtain additional KAUs or pay a penalty. *See POSCO II*, 829 F. Supp. 3d at 1305.

The period of review fell within "Phase 3" of the K-ETS, in which the GOK freely allocated to subject entities a baseline of 90 percent of their emissions allocation. PDM at 24. In addition to this baseline, the GOK allocates 100 percent of the KAU allocation to businesses in subsectors for which the result of multiplying the "production cost incurrence rate" and the "international trade intensity" is at least 0.002 (*i.e.*, 0.2 percent). IDM at Comment 2C (citing the Article 19 of the AAGEP Enforcement Decree). POSCO, which is classified in the "manufacturing of primary steel" subsector, received the full 100 percent allocation. *See* Second Remand Redetermination at 8.

In the final results, Commerce determined that the additional ten percent allocation of KAUs: (1) constituted a financial contribution in the form of revenue foregone pursuant to 19 U.S.C. § 1677(5)(D)(ii), IDM at 34-37; (2) conferred a benefit under 19 C.F.R. § 351.503(b)(2) "to the extent that POSCO was relieved of the requirement to acquire additional allowances of

KAUs in order to comply with the K-ETS program," *id.* at 40; and (3) was *de jure* specific under 19 U.S.C. § 1677(5A)(D)(i). *Id.* at 45-48.

## II. The Court's First Remand Order (*POSCO I*)

POSCO and the GOK challenged the final results, contesting Commerce's specificity determination for the electricity LTAR program and all three elements of Commerce's countervailable subsidy determination for the K-ETS permits program. The Court sustained in part, and remanded in part, Commerce's final results. *POSCO v. United States*, 794 F. Supp. 3d 1402, 1417 (Ct. Int'l Trade 2025) (*POSCO I*). With respect to the electricity for LTAR program, the Court held that Commerce unreasonably grouped the steel industry with two unrelated industries and that the record did not support a finding that the group received a disproportionately large amount of the subsidy. *Id.* at 1407-11.

The Court sustained Commerce's determination that the additional KAUs conferred a benefit on POSCO. *Id.* at 1413-14. In doing so, the Court rejected the GOK's argument that the additional KAUs confer no benefit because POSCO would be better off had the K-ETS never existed. The Court explained that "the 'benefits' of a subsidy are measured from the regulatory environment as it exists in the real world, not a hypothetical world with no government regulation." *Id.* at 1414. Finally, the Court held that the additional allocation is not *de jure* specific because the "existence of eligibility requirements" is not sufficient to establish *de jure* specificity, and that substantial evidence did not support Commerce's determination that the eligibility criteria fell outside the safe harbor of 19 U.S.C. § 1677(5A)(D)(ii). *Id.* at 1414-17. The Court directed Commerce to reconsider: (1) the specificity of the electricity program, (2) whether the additional KAUs constitute a financial contribution, and (3) whether the provision of the additional KAUs is specific. *Id.* at 1417.

## III. Commerce's First Remand Redetermination and the Court's Second Remand Order (*POSCO II*)

On December 9, 2025, Commerce filed its first remand redetermination. *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 60-1 (First Remand Redetermination). First, Commerce determined that the record lacked sufficient evidence to find the provision of electricity for LTAR *de facto* specific and therefore found that program not countervailable. *Id.* at 3-5, 12-15. Second, Commerce found that the additional ten percent allocation of KAUs constitutes a financial contribution in the form of a direct transfer of funds under 19 U.S.C. § 1677(5)(D)(i). *Id.* at 5-9. Third, Commerce found the provision of K-ETS permits program specific as an export subsidy under 19 U.S.C. § 1677(5A)(A) and (B). *Id.* at 9-12. Because it found the program to be an export subsidy, Commerce used an export sales denominator, calculating a revised rate of 1.53 percent *ad valorem* for the program and a total rate for POSCO of 1.72 percent *ad valorem*. *Id.* at 2-3, 11-12, 30-31.

On April 17, 2026, the Court sustained in part and remanded in part the first remand redetermination. *POSCO II*, 829 F. Supp. 3d at 1313. The Court sustained Commerce's finding that there is insufficient evidence to find the provision of electricity specific. *Id.* at 1303-05. The Court also sustained Commerce's financial contribution determination that the GOK's allocation of the additional ten percent of KAUs "is a direct transfer of funds under Section 1677(5)(D)(i)," *id.* at 1310-13, observing that "KAUs may both function as part of a regulatory scheme while also possessing inherent monetary value." Id. at 1312.

The Court held, however, that Commerce's finding of *de jure* specificity as an export subsidy was not supported by substantial evidence or in accordance with law. The Court observed that the Article 19(1) formula can be satisfied by subsectors with little or no export activity and the statute requires that export performance be a "necessary condition for receipt" of

the subsidy. *Id*. at 1309. The Court directed that, "in order to impose a countervailing duty, Commerce must instead evaluate whether the subsidy is *de facto* specific under Section 1677(5A)(D)." *Id.* at 1310; *see also id.* at 1313 ("Commerce must undertake a *de facto* specificity analysis of Korea's allocation of additional KAUs.").

### IV. Commerce's Second Remand Redetermination Finds the Additional KAU Allocation *De Facto* Specific

On July 22, 2026, Commerce filed the second remand redetermination. ECF No. 79-1.

Consistent with the Second Remand Order, Commerce conducted a *de facto* specificity analysis. Commerce found the GOK's provision of the additional ten percent allocation specific under 19 U.S.C. § 1677(5A)(D)(iii)(I) "on the basis that the recipients were limited in number." *Second Remand Redetermination* at 5. Commerce reviewed the existing record and found that, according to data the GOK itself reported, 494 companies received the 100 percent allocation, while 906,325 companies operated in Korea during the POR. *Id.* at 6, 10 (citing GOK IQR at 11 and Appendix-16 at 20). The recipients thus "amounted to less than 0.1 percent of companies operating in the Korean economy." *Id.* at 10. Referring to the overall purpose of the specificity test outlined in the Statement of Administrative Action, Commerce found that "a program which has only 494 company recipients in an economy the size of Korea cannot be considered 'widely used' throughout the economy." *Id.* at 6 (citing Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1 (1994) (SAA) at 929).

Commerce grounded its approach in the reasoning set forth in *Government of Québec v. United States*, 105 F.4th 1359 (Fed. Cir. 2024), in which the Federal Circuit upheld a finding that 4,930 recipients out of 387,949 corporate tax filers were limited in number, and in *Hyundai Steel I*, in which the Court sustained Commerce's finding that 504 recipients of the full KAU

allocation out of 787,438 companies operating in Korea were limited in number. *Second Remand Redetermination* at 7-8; *see also id.* at 8 n.34 (citing *Nucor Corp. v. United States*, 494 F. Supp. 3d 1377, 1383 (Ct. Int'l Trade 2021); *Wilmar Trading PTE Ltd. v. United States*, 466 F. Supp. 3d 1334, 1358 (Ct. Int'l Trade 2020); and *Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States*, 61 F. Supp. 3d 1306, 1342-43 (Ct. Int'l Trade 2015)).

Because Commerce no longer found the program to be an export subsidy, it reverted to the calculation in the final results, which uses POSCO's total sales as the denominator. *Id.* at 2-3, 8. Commerce thus applied the 0.61 percent *ad valorem* rate for the provision of K-ETS permits program and, having removed the 0.07 percent rate for the electricity for LTAR program, calculated a total subsidy rate for POSCO of 0.80 percent *ad valorem*. *Id.* at 3 n.8, 17-18. No party challenges that calculation.

## ARGUMENT

### I. Standard of Review

This Court's review of remand determinations is the same as its review of original determinations. *See* 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2002). Therefore, the "court will sustain {Commerce's} determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." *Amanda Foods (Vietnam) Ltd. v. United States*, 774 F. Supp. 2d 1286, 1290 (Ct. Int'l Trade 2011). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938));

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (stating "{s}ubstantial evidence is more than a mere scintilla") (internal quotation marks omitted).

## II. Commerce's Second Remand Redetermination Complies With the Court's Remand Order

The Court's remand order gave Commerce a specific instruction: "in order to impose a countervailing duty, Commerce must instead evaluate whether the subsidy is *de facto* specific under Section 1677(5A)(D)." *POSCO II*, 829 F. Supp. 3d at 1310. Commerce did exactly that. It reconsidered its export subsidy finding, examined the existing record under the first of the four *de facto* specificity factors, and found the provision of the additional ten percent allocation specific under 19 U.S.C. § 1677(5A)(D)(iii)(I) because the actual recipients are limited in number. *Second Remand Redetermination* at 5-8. Having found the first basis for a finding of *de facto* specificity satisfied, Commerce was "not required to undertake further analysis." *Id.* at 6 (citing 19 C.F.R. § 351.502(a)). Commerce then applied the subsidy rate calculated in the final results for the program and recalculated POSCO's total subsidy rate. *Second Remand Redetermination* at 8, 18.

Neither the GOK nor POSCO contend that Commerce failed to comply with the Court's order, nor does either party challenge Commerce's return to the 0.61 percent *ad valorem* rate calculated in the final results or the resulting total rate of 0.80 percent *ad valorem*. Their sole objection is to the comparator that Commerce used in its "limited in number" analysis. *See* GOK Cmts. at 1-2; POSCO Cmts. at 2-3. The second remand redetermination therefore complies with the remand order, and, as demonstrated below, is supported by substantial evidence and in accordance with law.

### III. Commerce's Determination That the Additional KAU Allocation Is *De Facto* Specific Is Supported by Substantial Evidence and in Accordance With Law

Commerce's determination that the recipients of the additional KAU allocation were limited in number rests on undisputed record data and on a comparison consistent with court precedent and Commerce's longstanding practice. POSCO's and the GOK's challenges provide no basis for further remand and this Court should sustain Commerce's second remand redetermination.[2]

#### A. Commerce Reasonably Found That the Actual Recipients of the Subsidy Are Limited in Number

A domestic subsidy is *de facto* specific if "one or more" of four statutory bases exist. 19 U.S.C. § 1677(5A)(D)(iii). The first basis asks whether "the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number." *Id.* § 1677(5A)(D)(iii)(I). Commerce examines the bases sequentially, and if a single basis warrants a finding of specificity, Commerce undertakes no further analysis. 19 C.F.R. § 351.502(a); *Second Remand Redetermination* at 5-6.

Neither the statute nor Commerce's regulations "prescribe any mandatory method that Commerce must employ in assessing *de facto* specificity," including how Commerce determines whether recipients are limited in number. *Government of Québec*, 105 F.4th at 1374. "Rather, it is a fact-intensive and case-specific inquiry, where the factors involved and the weight accorded to them vary from case to case. In conducting this inquiry, Commerce exercises the necessary latitude afforded it in choosing the appropriate approach." *Id.*

---

[2] Because POSCO "endorses and adopts by reference" the GOK's comments and raises no independent argument beyond those the GOK advances, *see* POSCO's Comments at 2–3, we respond to POSCO's and the GOK's arguments together.

Here, Commerce exercised that latitude reasonably. The GOK reported that 494 companies received the 100 percent KAU allocation rather than the standard 90 percent allocation. *Second Remand Redetermination* at 6 (citing GOK IQR at 11). The GOK also reported that 906,325 companies operated within its jurisdiction during the POR. *Id.* (citing GOK IQR at Appendix-16 at 20). In its comments, the GOK confirms the first figure, GOK Cmts. at 7, and does not contest the second, *id.* at 3. Comparing the two, Commerce found that the recipients "amounted to less than 0.1 percent of companies operating in the Korean economy," which "indicates that the recipients of the subsidy were limited in number on an enterprise basis and that the program was not widely used throughout the Korean economy." *Second Remand Redetermination* at 10.

That comparison is grounded firmly in the overall purpose of the specificity test. The test is meant to "function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy." SAA at 929; *Second Remand Redetermination* at 6. This Court has previously described the test in the same economy-wide terms. *See POSCO I*, 794 F. Supp. 3d at 1409 (quoting *Government of Québec*, 105 F.4th at 1375); *POSCO II*, 829 F. Supp. 3d at 1309 & n.13 (explaining that the specificity test was added "with the intent to exclude foreign subsidies that 'are broadly available and widely used throughout an economy'") (citing the SAA at 4242). Using this same standard, Commerce reasonably concluded that "a program which has only 494 company recipients in an economy the size of Korea cannot be considered 'widely used' throughout the economy within the spirit of the specificity test as outlined in the SAA." *Second Remand Redetermination* at 6.

Commerce's approach is consistent with its longstanding practice and with judicial precedent. *Second Remand Redetermination* at 7-8, 29, 34. In *Government of Québec*, the

Federal Circuit held that Commerce's use of total corporate tax filers as the comparator was in accordance with law. The court affirmed Commerce's finding that 4,930 tax credit recipients out of 387,949 corporate tax filers were limited in number. *Government of Québec*, 105 F.4th at 1368, 1373-75). That is "an even greater percentage of companies than at issue here." *Second Remand Redetermination* at 7. The Federal Circuit further held that comparing subsidy recipients to the corporate entities within an economy "does not conflict with the SAA's directive regarding the purpose of the specificity determination." *Government of Québec*, 105 F.4th at 1375. And in *Hyundai Steel I*, this Court sustained the analogous determination for this same program: that 504 recipients of the full KAU allocation were limited in number when compared to the 787,438 companies operating in Korea during 2019. *Hyundai Steel Co. v. United States*, 803 F. Supp. 3d 1252, 1256-58 (Ct. Int'l Trade 2025).

Although *Hyundai Steel I* concerned an earlier phase of the K-ETS, where the baseline allocation was 97 percent, that difference goes to the amount of the benefit and the eligibility criteria and "is immaterial to Commerce's *de facto* specificity determination here." *Second Remand Redetermination* at 8 n.33. This Court has also sustained findings that recipients were limited in number when compared to all companies or industries in the relevant economy. *Id.* at 8 n.34 (citing *Nucor*, 494 F. Supp. 3d at 1383; *Wilmar*, 466 F. Supp. 3d at 1358; and *Borusan*, 61 F. Supp. 3d at 1342-43). Commerce's approach thus reflects its "long-standing *de facto* specificity analysis practice." *Id.* at 7 & n.29.

Commerce's determination thus rests on uncontested record data, applies the analytical framework consistent with the SAA, and accords with Federal Circuit precedent, this Court's decisions, and Commerce's established practice. Therefore, the Court should sustain

Commerce's remand redetermination as supported by substantial evidence and in accordance with law.

### B. Restricting the Denominator to K-ETS Participants Would Create the Very Loophole the SAA Guards Against

The GOK's principal argument is that Commerce made an "apples-to-oranges comparison" because "the denominator of the comparator bears no meaningful relationship to the program at issue." GOK Cmts. at 1; *see also* POSCO Cmts. at 2-3. According to the GOK, "{t}he proper comparison is the universe of covered entities eligible to receive KAUs under the K-ETS program, not all companies operating in Korea." GOK Cmts. at 2. By the GOK's count, 684 companies were subject to the K-ETS in 2021, so that "a substantial majority of K-ETS participants received the additional allocation." *Id.* at 4, 7. Commerce reasonably rejected this argument below, and this Court should do so here. *Second Remand Redetermination* at 11-13.

The argument fails, first, because it disregards a significant portion of what the SAA says about the specificity test. Just as the test is intended to "avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout the economy," the SAA also warns that the test is not to serve as a "loophole through which narrowly {focused} subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law." *Id.* at 11 (quoting SAA at 930) (internal quotation marks omitted). The GOK's proposed comparator "is the very sort with which the SAA is concerned—the kind of limitation that would frustrate the purpose of the specificity test." *Id.* A subsidy that reaches 494 companies in an economy of more than 900,000 is, by any measure, one "provided to or used by discrete segments of an economy." SAA at 930. Counting only the members of that discrete segment in the denominator does not

make the subsidy broadly available; it simply assumes away the main question the specificity test is focused on.

Second, this Court has rejected the identical argument with respect to the provision of K-ETS permits program in a different case. In *Hyundai Steel I*, the Court considered the same argument advanced here, that the number of companies subject to the K-ETS is the appropriate comparator for the additional allocation of KAUs. This Court found it "unpersuasive and in conflict with the purpose of the specificity test." *Hyundai Steel I*, 803 F. Supp. 3d at 1257. The Court explained:

> {T}here is no requirement that recipients of the benefit of the full allocation share some other characteristic, such as participation in the K-ETS, with the group comprising the denominator: "the fact that users may be limited due to the inherent characteristics of what is being offered" is not "a basis for finding the subsidy non-specific."

803 F. Supp. 3d at 1257 (citing *Countervailing Duties*, 63 Fed. Reg. 65, 348, 65,359 (Dep't of Commerce Nov. 25, 1998) (*Preamble*)). The mere assertion that most companies operating in Korea received no permits because they were not subject to the K-ETS to begin with "merely reflects an inherent characteristic of the emissions trading system and is not a basis for finding the subsidy non-specific." *Id.* at 1257-58. Most importantly, this Court found that using the number of K-ETS participants as the denominator "{would} not speak to whether that benefit is widely available throughout the economy." *Id*. at 1258.

Third, the GOK's approach cannot be reconciled with Commerce's longstanding interpretation of the *de facto* specificity provision. In the preamble to the 1998 rulemaking, Commerce explained that it "is not required to explain why the users of a subsidy may be limited in number," and that "the SAA clearly indicates that {Commerce} does not need to find 'targeting' or 'purposeful government action' to conclude that a domestic subsidy is specific."

*Preamble*, 63 Fed. Reg. at 65,359. The GOK's proposed comparison "seems to suggest that Commerce should consider that the eligibility criteria may naturally limit the number of potential recipients; in other words, explain why there are a small number of users." *Second Remand Redetermination* at 12-13. But "{w}hy such users may be limited in number is irrelevant to {the} analysis." *Id.* at 13 (emphasis omitted). The statute asks whether the actual recipients are limited in number; it does not require Commerce to seek the explanation for the limitation.

Fourth, POSCO's and the GOK's approach would neutralize Commerce's statutory mandate. To require Commerce to limit the comparator to the companies subject to the K-ETS program "would render subsidy programs in which the number of users is limited 'due to the inherent characteristics of what is being offered' non-specific." *Second Remand Redetermination* at 12. As Commerce observed, "a lessened burden of compliance for a compliance program that not all companies are subject to, such as the K-ETS program, would be beyond the reach of Commerce's statutory mandate to countervail countervailable subsidies." *Id.* Any government could insulate a subsidy from the CVD law by delivering it through a program with a narrow threshold for participation, then pointing to the high rate of receipt among the few participants. The provision of K-ETS permits program, "like most subsidy programs, has characteristics that limit the usage (or likelihood of usage) of the program to a subset of the economy. Recognition of this fact does not mean that Commerce must artificially narrow its definition of 'the economy' in assessing whether the program 'truly {is} broadly available and widely used throughout an economy.'" *Id.* at 13 (quoting SAA at 929).

The GOK attempts to distinguish *Hyundai Steel I*, asserting that it does not "contend that the K-ETS program is non-specific merely because many Korean companies fall outside the program," but only that Commerce "employed an unreasonable comparator." GOK Cmts. at 4.

*That is a distinction without a difference.* The only reason the GOK gives for excluding over 900,000 Korean companies from the denominator is that they "are neither subject to nor eligible to participate in the K-ETS program." *Id.* This argument fails because it treats an "inherent characteristic of the emissions trading system" as "a basis for finding the subsidy non-specific." *Second Remand Redetermination* at 12 (quoting *Hyundai Steel I*, 803 F. Supp. 3d at 1257).

The GOK also maintains that *Hyundai Steel I* "misconstrues the nature of the K-ETS program," which it characterizes as "a regulatory regime that imposes compliance obligations" and "not a subsidy as defined by the statute." GOK Cmts. at 1, 4. The Court has already sustained Commerce's determinations that the additional allocation of KAUs confers a benefit, *POSCO I*, 794 F. Supp. 3d at 1413-14, and constitutes a financial contribution, *POSCO II*, 829 F. Supp. 3d at 1310, recognizing that "KAUs may both function as part of a regulatory scheme while also possessing inherent monetary value," *id.* at 1312. The subsidy whose specificity is at issue is the additional ten percent allocation, not the entire regulatory regime. *See* IDM at 40 ("{A}ny overarching burden imposed by the K-ETS program is a separate matter from whether the additional ten percent KAU allocation is a countervailable subsidy."). The only remaining question is whether the recipients of that subsidy are limited in number, and the GOK's renewed objection to treating the allocation as a subsidy provides no basis for narrowing the denominator.

There is also no merit to the GOK's assertion that Commerce "failed to explain why comparing K-ETS participants to the entire Korean economy . . . is a meaningful measure of limitation." GOK Cmts. at 4-5 (relying on *Hyundai Steel Co. v. United States*, No. 23-00211, 2026 WL 1558544, at *18 (Ct. Int'l Trade May 18, 2026), and *Gov't of Sri Lanka v. United States*, 308 F. Supp. 3d 1373, 1380 (Ct. Int'l Trade 2018)). Commerce has already explained that the SAA directs Commerce to examine whether a subsidy is widely used "throughout an

economy," *Second Remand Redetermination* at 6, 10, 13, 17; that the Federal Circuit has held that a comparison of recipients to the corporate entities within an economy "does not conflict with the SAA's directive," *id.* at 10 (internal quotation marks omitted); and that this Court has sustained the same comparator for the same program in *Hyundai Steel I*, *id.* at 7-8, 11-12. Commerce did not analyze the additional allocation "in isolation from the overall" program. GOK Cmts. at 4. Rather, Commerce acknowledged the structure of the K-ETS program that "is limited to companies that meet a certain emission threshold" and that "the GOK further limits its provision of the 100 percent KAU allocation to select sectors based on trade intensity and production cost criteria." *Second Remand Redetermination* at 16. Analyzing the K-ETS program using a narrower comparator is commensurate with considering *why* there are a small number of users, a consideration not required by the statute. *id* at 12-13, 16. The GOK's disagreement with Commerce's explanation does not mean that Commerce failed to give one.

**C. *Government of Québec* Supports Commerce's Decision Not to Limit the Comparator to Eligible Entities**

The GOK argues that Commerce's reliance on *Government of Québec* is "misplaced" because, in that case, all corporate tax filers "were eligible to claim the credit if they satisfied the statutory criteria," so the denominator "reflected the full universe of potential recipients." GOK Cmts. at 2-3. Here, conversely, the GOK contends that Commerce's numerator and denominator "do not represent a common universe of potential recipients" because most Korean companies are not subject to the K-ETS. *Id.* at 3.

The GOK's distinction does not survive scrutiny. The tax credit at issue in *Government of Québec* was not available to every tax filer. "{T}o be eligible for this credit, an employer must satisfy several criteria, including, among others, engaging in a qualified business and having received the required certification." *Second Remand Redetermination* at 16 (quoting

*Government of Québec*, 105 F.4th at 1374). Yet "{n}either Commerce nor the Federal Circuit suggested that the number of recipients must be compared to a set of only 'qualified businesses' and those with 'the required certification' in conducting the *de facto* specificity analysis. Rather, the specificity analysis was based on a comparison of recipients to the full universe of taxpayers." *Id.* at 16-17. The same is true here. The provision of K-ETS permits program, "like most subsidy programs, has characteristics that limit the usage (or likelihood of usage) of the program to a subset of the economy." *Id.* at 13. A Korean company receives the full allocation if it meets the emissions thresholds and operates in a qualifying subsector, just as a Québecois employer received the credit if it engaged in a qualified business and obtained the required certification. In both cases, eligibility criteria narrowed the field of recipients. In both cases, Commerce measured the recipients against the economy rather than against the narrowed field. *See Second Remand Redetermination* at 5-8; *Government of Québec*, 105 F.4th at 1374.

The GOK's "universe of potential recipients" is simply eligibility by another name. As Commerce explained, "{t}o equate eligibility for a subsidy to the universe that can be considered for limited in number specificity would undermine the SAA's clear instructions to consider subsidization 'throughout an economy.'" *Id.* at 17 (quoting SAA at 930). Indeed, "none of the cited cases actually support the GOK's proposed interpretation, whereby the comparison group is restricted (*i.e.*, to compare the number of recipients to the number of 'potential qualifying' entities)." *Id.* at 16.

Furthermore, Commerce's "reliance on *Government of Québec* is not limited to the comparable facts underlying both subsidy programs." *Id.* at 13. Commerce relied on the principles *Government of Québec* establishes: that the *de facto* specificity analysis is "a fact-intensive and case-specific inquiry" in which "Commerce exercises the necessary latitude

afforded it in choosing the appropriate approach," *id.* at 7 (quoting *Government of Québec*, 105 F.4th at 1374), and that comparing the number of subsidy recipients to the number of corporate entities within an economy "does not conflict with the SAA's directive regarding the purpose of the specificity determination," *id.* at 10 (quoting *Government of Québec*, 105 F.4th at 1375). The Federal Circuit "reaffirmed Commerce's obligation to analyze *de facto* specificity within the context of the particular facts before it," and Commerce did so here. *Id.* at 14. "That the underlying subsidy program in *Government of Québec* is not perfectly analogous to the provision of K-ETS permits program here does not alter the Federal Circuit's established principles." *Id.*

**D. *Mosaic* Does Not Support the GOK's Proposed Denominator**

In place of *Government of Québec* and *Hyundai Steel I*, the GOK urges the Court to follow *Mosaic*, which it says "closely resembles" this case. GOK Cmts. at 5. In *Mosaic*, the Court rejected Commerce's *de facto* specificity determination for a Moroccan tax penalty relief program. *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1314-17 (Ct Int'l Trade 2023). According to the GOK, *Mosaic* stands for the proposition that companies exempt from a burden cannot be included in the denominator when measuring the specificity of relief from that burden. GOK Cmts. at 5-6. *Mosaic* is readily distinguishable.

First, *Mosaic* involved a program of an entirely different character. The program was "a common, ordinary tax administration program" and the "penalty relief program at issue {was} available not only to 'all industries and sectors' but to all types of taxpayers." *Mosaic*, 659 F. Supp. 3d at 1316. The additional KAU allocation bears no resemblance to a generally available tax administration measure. The K-ETS program "is limited to companies that meet a certain emission threshold and the GOK further limits its provision of the 100 percent KAU allocation to select sectors based on trade intensity and production cost criteria." *Second Remand*

*Redetermination* at 16. A program that is restricted twice, and that reached only 494 companies, is not "common" or "ordinary" as relevant to the specificity test. To find a program used by only 494 companies in the entirety of Korea to be non-specific "would strain credulity, be antithetical to the specificity test and prior precedent, and upend the purpose of the CVD statute to capture subsidization provided by foreign governments to discrete segments of an economy." *Id.* at 15 (citing SAA at 930).

Second, the issue that the Court identified in *Mosaic* was that Commerce had considered too narrow of a universe, not too broad a one. The Court faulted Commerce for basing its determination "on 8,761 corporate taxpayers rather than ascertain{ing} the actual number of users of the program," when the program was also available to individuals and other types of taxpayers. *Mosaic*, 659 F. Supp. 3d at 1315. As the Court put it, the fact "{t}hat 3.34% of corporate taxpayers benefited from penalty relief, under a program that was not limited to corporate taxpayers, does not support a conclusion that the program was not broadly available and broadly used throughout the Moroccan economy." *Id.* In other words, the Court in *Mosaic* faulted Commerce "for, in its view, not analyzing the full universe of recipients within the Moroccan economy, rather than limiting the universe of the program to less than the full economy, as the GOK argues is appropriate." *Second Remand Redetermination* at 15. The reasoning in *Mosaic* points toward, not away, from an economy-wide inquiry. The concern featured in *Mosaic* is absent here: whereas the recipient figure in *Mosaic* was "an incomplete representation of users of the program," Commerce here has "the complete number of recipients of the 100 percent allocation." *Id.* Finally, aside from the factual distinctions, *Mosaic* is an opinion issued in a trial-level case that is ongoing. *Government of Québec*, by contrast, is

precedent that this Court is bound to follow, and it approves the comparison Commerce has made in this case.

### E. The "Regulatory Burden" Imposed by the K-ETS Program Is Irrelevant to Commerce's Specificity Analysis

Finally, the GOK argues that the K-ETS program "creates a regulatory burden on the entities subject to the program," that the additional allocation merely reduces that burden, and that even if the additional allocation "completely eliminated a participant's compliance costs," the participant "would merely be placed on even footing with the hundreds of thousands of entities that are not subject to the K-ETS program at all." GOK Cmts. at 5. On remand, Commerce found that this argument "conflates Commerce's specificity analysis with the separate and distinct benefit analysis." *Second Remand Redetermination* at 17. The GOK responds that "Commerce missed the point" and that its argument "is unrelated to a benefit analysis." GOK Cmts. at 6. Commerce did not miss the point; it correctly identified GOK's argument.

The contention that recipients of the additional allocation are merely placed "on even footing" with companies that bear no K-ETS obligations is an argument about whether, and to what extent, the recipients are better off. That is a question of benefit, and it has been resolved. Commerce explained in the final results that "any overarching burden imposed by the K-ETS program is a separate matter from whether the additional ten percent KAU allocation is a countervailable subsidy," because "{a} subsidy that reduces a firm's cost of compliance remains a subsidy . . . even though the overall effect of the two government actions . . . , taken together, may leave the firm with higher costs." IDM at 40 (quoting *1998 Preamble*, 63 Fed. Reg. at 65,361). This Court sustained that determination, holding that "the 'benefits' of a subsidy are measured from the regulatory environment as it exists in the real world, not a hypothetical world

with no government regulation," and observing that "{e}very recipient of a tax credit or deduction would be better off if the tax in question never existed in the first place." *POSCO I*, 794 F. Supp. 3d at 1414.

Repackaging the argument as one about the suitability of the comparator does not make it any more persuasive. As this Court explained in *Hyundai Steel I*, the fact that most companies in Korea do not face any burden to meet the emissions requirements, and therefore receive no KAU allocations, "merely reflects an inherent characteristic of the emissions trading system and is not a basis for finding the subsidy non-specific." 803 F. Supp. 3d at 1257. Moreover, "use of the number of companies subject to the provision of K-ETS permits program as the denominator here '{would} not speak to whether that benefit is widely available throughout the economy.'" *Second Remand Redetermination* at 17 (quoting *Hyundai Steel I*, 803 F. Supp. 3d at 1258).

The specificity inquiry under 19 U.S.C. § 1677(5A)(D)(iii)(I) asks how many enterprises actually received the subsidy. It does not ask *why* those enterprises are few, *Second Remand Redetermination* at 12-13, or what obligations they bear in exchange. The regulatory burden that accompanies participation in the K-ETS program has no bearing on whether the 494 recipients of the additional allocation are limited in number across the Korean economy. Commerce reasonably rejected this argument, and this Court should do the same.

**CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's second remand redetermination and enter final judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:
FEE PAUWELS
Attorney
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Sta.
Washington, D.C. 20044
Telephone: (202) 616-2228
E-mail: Tara.Hogan@usdoj.gov

Dated: October 5, 2026

*Attorneys for Defendant United States*

CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with ¶ 2(B)(i) of the Standard Chambers Procedures of the United States Court of International Trade because it contains 6,261 words, including text, footnotes, and headings.

/s/Tara K. Hogan